**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HERITAGE FOUNDATION ) | |
| 214 Massachusetts Ave. N.E. ) | |
| Washington, D.C.  20002 ) | |
| ) | |
| MIKE HOWELL ) | |
| 214 Massachusetts Ave. N.E. ) | |
| Washington, D.C.  20002 ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| v. ) | Case No. 23-cv-1198 |
| ) | |
| U.S. DEPARTMENT OF HOMELAND ) | |
| SECURITY ) | |
| 2707 Martin Luther King Jr., Ave., S.E. ) | |
| Washington, D.C.  20528 ) | |
| ) | |
| ) | |
| *Defendant*. ) | |
| ) | |

## COMPLAINT AND PRAYER FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs THE HERITAGE FOUNDATION and MIKE HOWELL (collectively

"Plaintiffs") for their complaint against Defendant DEPARTMENT OF HOMELAND

SECURITY ("DHS"), allege on knowledge as to Plaintiffs, and on information and belief as to

all other matters, as follows:

1.      This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552,

to compel the production of information related to DHS's decisions to admit HRH Prince Henry

Charles Albert David George of Wales, the Duke of Sussex, Earl of Dumbarton, and Baron

Kikell K.C.V.O. ("HRH" or "Duke of Sussex") into the United States and to allow him to remain

to date.  The requested information is of immense public interest.  *See* Plaintiffs' FOIA Request

(Mar. 9, 2023) ("Request" or "Plaintiffs' FOIA Request") (Ex. 1). Widespread and continuous media coverage has surfaced the question of whether DHS properly admitted the Duke of Sussex in light of the fact that he has publicly admitted to the essential elements of a number of drug offenses in both the United States and abroad. United States law generally renders such a person inadmissible for entry to the United States. Intense media coverage has also surfaced the question of whether DHS may have improperly granted the Duke of Sussex a waiver to enter the Country on a non-immigrant visa given his history of admissions to the essential elements of drug offenses. Finally, the media coverage has surfaced the question of whether DHS' decision to admit the Duke of Sussex into the United States should be reconsidered in light of the Duke of Sussex's most recent admissions to the essential elements of numerous drug offenses both here and abroad in his 2023 memoir, *Spare*.

2.      While this case focuses on the widespread public and press interest on the specific issue of whether DHS acted, and is acting, appropriately as regards the Duke of Sussex, it cannot be separated from its broader context. The press and Congressional hearing rooms are replete with detailed accusations that DHS is deliberately refusing to enforce the Country's immigration laws and is responsible for the current crisis at the border. Indeed, the broader controversy is so grave that Articles of Impeachment have been filed against DHS Secretary Alejandro N. Mayorkas (H. Res. 8 & 89, 117th Cong. (2023)) and Secretary Mayorkas has taken the extraordinary step of retaining private counsel to represent him in impeachment proceedings. *See Retaining Private Counsel to Represent the DHS Secretary in Impeachment Processes*, 47 Op. O.L.C. __, 2023 WL 2468411 (OLC Jan. 4, 2023); PIID 70RDAD23C00000002.

## PARTIES

3.     Plaintiff, The Heritage Foundation ("Heritage"), is a Washington, D.C.-based nonpartisan public policy organization with a national and international reputation whose mission is to "formulate and promote public policies based on the principles of free enterprise, limited government, individual freedom, traditional American values, and a strong national defense."  The Heritage Foundation, About Heritage, *found at* https://www.heritage.org/about-heritage/mission (last visited Apr. 29, 2023).  Heritage is a not-for-profit section 501(c)(3) organization which engages in substantial dissemination of information to the public.  Heritage operates a national news outlet, *The Daily Signal*.

4.     Plaintiff Mike Howell leads The Heritage Foundation's Oversight Project and is an author for *The Daily Signal*.  The Oversight Project is an initiative aimed at obtaining information via Freedom of Information Act requests and other means in order to best inform the public and Congress for the purposes of Congressional oversight.  The requests and analysis of information are informed by Heritage's deep policy expertise.  For example, Dr. Nile Gardiner, the Director of the Margaret Thatcher Center for Freedom at Heritage, has provided extensive analysis and commentary on the matters at issue here.  Dr. Gardiner served as an aide to former Prime Minister Margaret Thatcher, Baroness Thatcher, L.G., O.M., D.StJ, P.C.  Dr. Gardiner is a prominent authority on U.S.-British relations and the transatlantic alliance.  He has given expert testimony before Congress on multiple occasions.  By function, the Oversight Project is primarily engaged in disseminating information to the public.  *See, e.g.*, Oversight Project, *found*

*at* https://www.heritage.org/oversight (last visited Apr. 29, 2023); Twitter, *found at*
@OversightPR (last visited Apr. 29, 2023).

5.     Defendant DHS is a federal agency of the United States within the meaning of 5
U.S.C. § 552(f)(1) whose mission statement is "[w]ith honor and integrity, we will safeguard the
American people, our homeland, and our values."  Department of Homeland Security, About
DHS, *found at* https://www.dhs.gov/mission (last visited Apr. 29, 2023).

6.     Customs and Border Patrol ("CBP"), a DHS component, defines its mission as to
"[p]rotect the American people, safeguard our borders, and enhance the nation's economic
prosperity."  CPB, About CPB, *found at* https://www.cbp.gov/about (last visited Apr. 29, 2023).
CBP's "[e]nduring [m]ission [p]riorities" as to the border are to "Secure the Border—Protect the
Homeland through the air, land and maritime environments against illegal entry, illicit activity or
other threats to uphold national sovereignty and promote national and economic security."  *Id.*

7.     USCIS, a DHS component, is "the government agency that oversees lawful
immigration to the United States."  USCIS, Mission and Core Values, *found at*
https://www.uscis.gov/about-us/mission-and-core-values (last visited Apr. 29, 2023).

## JURISDICTION AND VENUE

8.     This Court has jurisdiction pursuant to 5 U.S.C. § 552(a)(4)(B) because this
action is brought in the District of Columbia and 28 U.S.C. § 1331 because the resolution of
disputes under FOIA presents a federal question.

9.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendant
DHS's principal place of business is in the District of Columbia.

## BACKGROUND

### Illegal Drug Offenses and Admission to the United States

10.     Congress has long deemed individuals who commit Controlled Substance

("CDS") violations inadmissible to the United States.  When one is inadmissible, one cannot

lawfully enter the United States, even if one has applied for and received a visa.  Although the

exact prohibitions have changed over time, the bar applicable during all time periods relevant to

this Complaint reads as follows:

> Except as provided in clause (ii), any alien convicted of, or who admits having
> committed, or who admits committing acts which constitute the essential elements
> of— . . .
>> **(II)** a violation of (or a conspiracy or attempt to violate) any law or regulation of a
>> State, the United States, or a foreign country relating to a controlled substance (as
>> defined in section 802 of Title 21), is inadmissible.

8 U.S.C. § 1182(a)(2)(A)(i)(II) ("Section 1182(a)(2)(A)(i)(II)").  The statute looks to the legality

of conduct at the time it *occurred.  See, e.g.*, *Kahn v. Att'y Gen.*, 979 F.3d 193, 189–90 (3d Cir.

2020) (collecting cases); *Fernandez-Bernal v. Att'y Gen.*, 257 F.3d 1304, 1310 (11th Cir. 2001).

For the purposes of this bar to admissibility, the fact of conviction—*or* admission to the

"essential elements" of a CDS violation—are treated as interchangeable equivalents.  *See*

*Dillingham v. INS*, 267 F.3d 996, 1003 (9th Cir. 2001) ("We believe that under the terms of

§ 212(a)(2)(A)(i), however, the fact that Dillingham 'admitted' his prior offense is of no greater

consequence than the conviction itself."), *overruled on other grounds*, *Nunez-Reyes v. Holder*,

646 F.3d 684 (9th Cir. 2011) (en banc).

11.     The statutory text expressly covers foreign conduct:

> [A]ny alien . . . who admits having committed, or who admits committing acts which
> constitute the essential elements of— . . . a violation of (or a conspiracy or attempt to
> violate) any law or regulation of a *foreign* country relating to a controlled substance (as
> defined in section 802 of Title 21), is inadmissible."

Section 1182(a)(2)(A)(i)(II) (emphasis added).  When conduct occurs abroad, a court asks

whether the admitted conduct "constitutes the essential elements of a violation of [the applicable

foreign] law."  *Pazcoguin v. Radcliffe*, 292 F.3d 1209, 1213 (9th Cir. 2002).  Elements are

defined as the essential facts that must be proven to sustain a conviction; any applicable

affirmative defenses are not considered.  *Id.* at 1215.  To reiterate, the bar applies when the

*conduct* is admitted.  There need not be an admission that an *offense* was committed.  *Id.*

12.     *Any* CDS related offense—even comparatively "minor" crimes like simple

possession—is sufficient to trigger the bar.  *Galvez v. Ashcroft*, 98 Fed.Appx. 666, 667–68

(9th Cir. 2004) (Section 1182(a)(2)(A)(i)(II) applies even to "minor drug offense(s) relating to

simple possession or use of controlled substances" (internal quotation and citation omitted)).

Indeed, Section 1182(a)(2)(A)(i)(II) is frequently applied to bar admission of aliens who admit to

simple possession of CDS.  *See, e.g.*, *Pazcoguin*, 292 F.3d at 1212 (applying Section

1182(a)(2)(A)(i)(II) to historical marijuana use over 20 years ago); *Talioaga v. Gonzales*, 212

Fed.Appx. 612, 613 (9th Cir. 2006) (applying Section 1182(a)(2)(A)(i)(II) to use of "marijuana

and methamphetamine in the past"); *Matter of IRM*, 2017 WL 4685431 (AAO Sept. 25, 2017)

(applying Section 1182(a)(2)(A)(i)(II) to applicant who stated he had not smoked marijuana

since 2011 and had been attending AA meetings since 2013).

13.     There are two narrow exemptions applicable to Section 1182(a)(2)(A)(i)(II)'s bar

to admission.  The first is extraordinarily narrow, providing in pertinent part that:

> The Attorney General may, in his discretion, waive the application of subparagraphs
> (A)(i)(I), (B), (D), and (E) of subsection (a)(2) and subparagraph (A)(i)(II) of such
> subsection insofar as it relates to a single offense of simple possession of 30 grams or less
> of marijuana if—
> > **(1)(A)** in the case of any immigrant it is established to the satisfaction of the
> > Attorney General that—
> > > **(i)** the alien is inadmissible only under subparagraph (D)(i) or (D)(ii) of
> > > such subsection or the activities for which the alien is inadmissible

occurred more than 15 years before the date of the alien's application for a visa, admission, or adjustment of status,

**(ii)** the admission to the United States of such alien would not be contrary to the national welfare, safety, or security of the United States, and

**(iii)** the alien has been rehabilitated; or

**(B)** in the case of an immigrant who is the spouse, parent, son, or daughter of a citizen of the United States or an alien lawfully admitted for permanent residence if it is established to the satisfaction of the Attorney General that the alien's denial of admission would result in extreme hardship to the United States citizen or lawfully resident spouse, parent, son, or daughter of such alien.

8 U.S.C. § 1182(h).  Notably, this provision only applies to a *single* offense (or admission of the essential elements thereof).  *See, e.g.*, *Rodriguez v. Sessions*, 741 Fed. Appx. 381, 385 (9th Cir. 2018) ("Furthermore, although '[t]he Attorney General may, in his discretion, waive [inadmissibility] insofar as it relates to a *single* offense of simple possession of 30 grams or less of marijuana' under 8 U.S.C. § 1182(h) (emphasis added), Petitioner voluntarily admitted to possessing marijuana on many occasions.  Accordingly, he is precluded from this discretionary waiver of inadmissibility, thereby making him ineligible for adjustment of status.").

14.     The second exception, while still narrow, is a bit more broad.  An exemption exists for individuals seeking admission on a *nonimmigrant* visa[1]:

Except as provided in this subsection, an alien (i) who is applying for a nonimmigrant visa and is known or believed by the consular officer to be ineligible for such visa under subsection (a) (other than paragraphs (3)(A)(i)(I), (3)(A)(ii), (3)(A)(iii), (3)(C), and clauses (i) and (ii) of paragraph (3)(E) of such subsection), may, after approval by the Attorney General of a recommendation by the Secretary of State or by the consular officer that the alien be admitted temporarily despite his inadmissibility, be granted such a visa and may be admitted into the United States temporarily as a nonimmigrant in the discretion of the Attorney General, or (ii) who is inadmissible under subsection (a) (other than paragraphs (3)(A)(i)(I), (3)(A)(ii), (3)(A)(iii), (3)(C), and clauses (i) and (ii) of paragraph (3)(E) of such subsection), but who is in possession of appropriate documents

---

[1]  A nonimmigrant visa is "issued to foreign nationals seeking to enter the United States on a temporary basis for tourism, business, medical treatment and certain types of temporary work."  CBP, Requirements for Immigrant and Nonimmigrant Visas, *found at* https://www.cbp.gov/travel/international-visitors/visa-waiver-program/requirements-immigrant-and-nonimmigrant-visas (last visited Apr. 29, 2023).  Conversely, an immigrant visa is "issued to a foreign national who intends to live and work permanently in the United States."  *Id.*

or is granted a waiver thereof and is seeking admission, may be admitted into the United States temporarily as a nonimmigrant in the discretion of the Attorney General.  The Attorney General shall prescribe conditions, including exaction of such bonds as may be necessary, to control and regulate the admission and return of inadmissible aliens applying for temporary admission under this paragraph.

8 U.S.C. § 1182(d)(3)(A) ("Section 1182(d)(3)(A)").

15.     How do these provisions work in practice?  First, because a visa is separate from admissibility, regulations implementing the statutory scheme provide that "[e]very nonimmigrant alien who applies for admission to, or an extension of stay in, the United States, shall establish that he or she is admissible to the United States, or that any ground of inadmissibility has been waived under section 212(d)(3) of the Act."  8 C.F.R. § 1214.1.

16.     United Kingdom Nationals may enter the United States without a visa for "90 days or less" under the Visa Waiver Program, but they require either an immigrant or nonimmigrant visa to enter the United States for a longer period of time.  *Compare* 8 U.S.C. § 1187; 8 C.F.R. § 217.2(a) *with* 8 U.S.C. § 1182(a)(7).

17.     Typically, because a visa is required for entry to the United States for any substantial period of time, the application of Sections 1182(a)(2)(A)(i)(II) & 1182(d)(3)(A) begins to play out when an individual applies for a nonimmigrant visa.

18.     Most visas are processed via a form DS-160.  (Ex. 2).  That form contains a number of questions tracking the grounds of inadmissibility in 8 U.S.C. § 1182(a).  Pertinent here, the following questions are included:





19.     This information is given on oath.  *See* Ex. 2, at 80.  During the visa application process, the visa applicant is often interviewed by a consular official.  As part of that process, additional questions regarding drug use are often asked.  That is particularly so if either excerpted question is answered "Yes."  By regulation, a consular officer may *recommend* a waiver be granted under Section 1182(d)(3)(A):

> Consular officers may recommend directly to the designated DHS office that the alien be admitted temporarily despite his or her inadmissibility in any case where a waiver may be available, unless the consular officer has reason to believe that the applicant is inadmissible under INA 212(a)(3)(A)(i), (3)(A)(ii), (3)(A)(iii), (3)(B), (3)(C), (3)(D), (3)(E)(i), (3)(E)(ii), (3)(E)(iii), (3)(F), or (3)(G).  The Department may recommend that

the Secretary of Homeland Security waive ineligibility under any ground in section 212(a) of the INA, except for sections 212(a)(3)(A)(i)(I), (3)(A)(ii), (3)(A)(iii), (3)(C), (3)(E)(i), and (3)(E)(ii).

22 C.F.R. § 40.301.  The Foreign Affairs Manual ("FAM") provides further guidance.  It instructs juvenile convictions for "simple possession" to be disregarded.  9 FAM 302.4-2(B)(5).[2] The provisions of the Foreign Affairs Manual dealing with Section 1182(d)(3)(A) waivers provides:

> An INA 212(d)(3)(A) waiver is available for NIV applicants found ineligible under INA 212(a)(2)(C) if you or the Secretary of State chooses to recommend one.  You should consider the following factors, among others, when deciding whether to recommend a waiver:
> > (1) (U) The recency and seriousness of the activity or condition causing the applicant's inadmissibility;
> > (2) (U) The reasons for the proposed travel to the United States;
> > (3) (U) The positive or negative effect, if any, of the planned travel on U.S. public interests.

9 FAM 302.4-3(D)(2).  That *recommendation* then goes for *decision* by DHS components.

20.     If the State Department recommends granting a Section 1182(d)(3)(A) waiver, DHS regulations allow that recommendation to be acted upon by "[d]istrict directors" and "officers in charge outside the United States" in certain districts. 8 C.F.R. § 1212.4(a).  They may accept or reject the State Department recommendation.  *Id.*

21.     An alien may make an application for a Section 1182(d)(3)(A) waiver if they possess a valid visa via filing a Form I-192 (Ex. 3) "prior to the applicant's arrival in the United States" (unless the applicant was unaware of the grounds of inadmissibility).  *Id.* at § 1212.4(b).  That application is then acted upon.  *Id.*

---

[2]  The FAM is not entitled to force of law or "binding."  *Galvez*, 98 Fed. Appx. at 667–68 (refusing to defer to this provision of the FAM).  This provision is almost certainly void as it directly contradicts the statute.  8 U.S.C. § 1182(a)(2)(A)(ii)(I) (excepting from statutory bar only juvenile convictions for crimes "involving moral turpitude" and not extending that exception to juvenile convictions for CDS violations).

22.     If a Section 1182(d)(3)(A) waiver is granted, "[t]he Deputy Commissioner or the district director may at any time revoke a waiver previously authorized under section 212(d)(3) of the Act and shall notify the nonimmigrant in writing to that effect." *Id.* at § 1212.4(h).

### Media Questions Concerning Past Applications of 8 U.S.C. §§ 1182(a)(2)(A)(i)(II) & 1182(d)(3)(A) to those Seeking Admission on Nonimmigrant Visas.

23.     There has been extensive media interest in past applications of Sections 1182(a)(2)(A)(i)(II) and 1182(d)(3)(A) to aliens seeking nonimmigrant admission to the United States.  This coverage has directly surfaced questions regarding whether DHS is enforcing the law in a discretionary area consistently, impartially, or is showing favoritism.  Put differently, the coverage has focused on the fact that because DHS has discretion in this area, it is critical to *know* that such discretion is being properly exercised.  News media has extensively covered the issue and explained that even prior use of marijuana, regardless of whether that use was legal in a state within the U.S. or in a foreign country, can cause a foreigner to be banned from the United States.

24.     There are many prominent examples in which the media extensively covered whether DHS (or its predecessors) properly applied the law:

- **Mark Berry.**  In 2010, Berry, known as "Bez", was refused a visa and prevented from performing in the U.S. with *Happy Mondays* because of Berry's prior drug convictions. *Independent* (Apr. 4, 2014), App. B204; *Independent Online* (Apr. 3, 2014), App. B142.[3]

- **Isabella Brazier-Jones.**  In March 2019, Brazier-Jones arrived in Los Angeles, California for a two-month trip with her friend, but was stopped by Customs officials who thought the two did not intend to leave the U.S.  *Independent Online* (June 17, 2019), App. B126.  After a full body search, the officials looked through her phone and found a reference to taking cocaine.  *Id.*  After Brazier-Jones admitted to taking cocaine in 2017, she was deported back to the United Kingdom.  *Id.*  Brazier-Jones, a former private chef and hopeful actress, was barred from entering the U.S. for ten years.  *Id.*

---

[3]  Plaintiffs submitted four Appendices with their FOIA Request in support of their Application for Expedited Processing.  Appendix A (Ex. 4), Appendix B (Ex. 5), Appendix C (Ex. 6) and Appendix D (Ex. 7).  The form of Appendix citation used herein is App. [Letter][page].

International media reported that Brazier-Jones did not disclose taking cocaine on her ESTA application, which likely contributed to her being banned from the U.S.  *Express Online* (June 18, 2019), App. B160.

- **Pete Doherty.**  Doherty has a multitude of drug convictions.  *Independent Online* (Apr. 3, 2014), App. B141–42; *Independent* (Apr. 4, 2014), App. B204.  In 2010, Doherty was allowed to fly to the U.S. and arrived at the JFK airport in New York before he was sent back home on the next flight.  *Independent Online* (Apr. 3, 2014), App. B141–42.

- **Kyle Falconer.**  In 2007, Falconer was convicted for cocaine possession.  *Independent Online* (Apr. 3, 2014), App. B142; I*ndependent* (Apr. 4, 2014), App. B204.  Falconer's conviction prevented the Scottish band *The View* from touring in the U.S. until they were granted permission in 2011.  *Independent Onli*ne (Apr. 3, 2014), App. B142.

- **Andrew Feldman.**  In the 1970s, Feldman took LSD.  *The Telegraph* (Apr. 3, 2014), App. B24.  Feldman later became a Vancouver professor and wrote an academic paper on his experience of taking LSD in the '70s.  *Id.*  In 2007, Feldman was denied entry into Blaine, Washington after this paper was discovered by a border agent.  *Id.*  There was media interest in this matter as it is a "strange case[] of travellers" being prevented from entering the U.S.  *Id.* at App. B23.

- **Nigella Lawson.**  In 2013, Lawson, a celebrity chef in London, confessed in her divorce court proceedings that she had taken cocaine and marijuana.  *Contra Costa Times* (Apr. 6, 2014), App. B131; *Daily Mail* (Apr. 3, 2014), App. B207; *Press Association* (Apr. 3, 2014), App. B212; *Independent Online* (Apr. 3, 2014), App. B140; *Guardian* (Apr. 3, 2014), App. B16; *Sky News* (Apr. 3, 2014), App. B216.  In 2014, Lawson was prevented from boarding a flight to Los Angeles, California.  *Contra Costa Times* (Apr. 6, 2014), App. B131; *Daily Mail* (Apr. 3, 2014), App. B207; *Guardian* (Apr. 3, 2023), App. B15–16; *Press Association* (Apr. 3, 2014), App. B212; *Sky News* (Apr. 3, 2014), App. B216.  It was reported that "[t]he US Department of Homeland Security told the Mail that foreigners who had admitted drug taking could be deemed inadmissible.  However, Lawson has visited America since the court appearance."  *Guardian* (Apr. 3, 2014), App. B16; *Sky News* (Apr. 3, 2014), App. B216.  Days later, Lawson was formally invited to the U.S. Embassy to apply for a U.S. visa.  *Independent Online* (Apr. 3, 2014), App. B at 140; *Guardian* (Apr. 4, 2014), App. B17; *Daily News* (Apr. 4, 2014), App. B197.  "A spokeswoman for the US Embassy said:  'There are several ways of legally travelling into the United States and Ms. Lawson has been invited to come to the embassy and apply for a visa for travel to the US.  We understand she has professional requirements for US travel and these matters are generally handled routinely and expeditiously, so stand by."  *Daily Mail* (Apr. 4, 2014), App. B194–95.  There was reporting that Lawson likely was required to submit to a drug test and possible medical examination as part of that application.  The decision to not permanently ban Lawson from entering the U.S. and inviting her to apply for a visa shortly after being denied is unclear.  One report suggested that it may have had to do with a successful medical examination of Lawson by a doctor contracted with the embassy.  *Guardian* (Apr. 3, 2014), App. B17.  The media questioned why Lawson had been allowed to enter the U.S. weeks after her cocaine confession, but

was denied entry at a later time, especially when other celebrities who admitted to using drugs were allowed into the U.S. *Independent Online* (Apr. 3, 2013), App. B140–41. Media even accused DHS of applying a "double standard" and reported allegations that "U.S. officials . . . choose to turn a blind eye" in some cases. *Contra Costa Times* (Apr. 6, 2014), App. B131; *see also The Blog* (June 4, 2014), App. B37–40 (citing case to criticize policy as "ineffectual, and illogical"); *Express* (Apr. 4, 2014), App. B200–01 (reporting Anthony Bourdain's accusation of "hypocrisy"); *Independent* (Apr. 4, 2014), App. B204 (discussing cases that appear that have been treated differently); *CBS* (Apr. 3, 2014), App. B19 (reporting criticism by Anthony Bourdain of alleged disparate treatment of Lawson and Toronto Mayor Rob Ford); *Independent Online* (Apr. 3, 2014) App. B141–42 (noting inconsistent treatment); *Telegraph* (Apr. 2, 2014), App. B23 ("rules are liable to change" and suggesting some level of arbitrariness in exercise of DHS discretion). The widespread media coverage of Lawson being refused entry shows the media and public question whether DHS is appropriately exercising its discretion in this area.

- **John Lennon.** In 1968, Lennon pled guilty to possession of cannabis resin in the United Kingdom and paid a $150 fine. *Lennon v. INS*, 527 F.2d 187, 188 (2d Cir. 1975). On August 13, 1971, Lennon and his wife traveled to the United States to obtain custody of Lennon's daughter by a previous marriage to an American citizen. *Id.* at 189. Statute at the time barred entry of one convicted of "illicit possession . . . of marijuana." *Id.* (internal citation omitted) (ellipsis in original). INS exercised its discretion to temporally waive excludability and Lennon was admitted on a nonimmigrant visa. *Id.* When Lennon's visa expired, the INS began deportation proceedings. *Id.* It is unclear why the INS exercised its discretion in the way it did. Eventually, the Second Circuit held that the offense in question under British law was not excludable under the then existing version of the INA as it did not require an "illicit" intent. *Id.* at 194. Lennon instituted a claim of selective prosecution claiming he was "singled out" because of "his political beliefs." *Id.* at 189 n.3.

- **Diego Maradona.** In 1991, Maradona was indicted for cocaine possession. *Sun Sentinel* (Sept. 11, 1993), App. B43. In 1993, the U.S. Consulate in Buenos Aires denied Maradona's visa application and would not let him enter the U.S. because he had previously been arrested for cocaine possession in Italy. *ABC News* (July 17, 2013), App. B41. The State Department in Washington upheld the Consulate's decision to refuse Maradona entry. *Sun Sentinel* (Sept. 11, 1993), App. B43. In 1994, Maradona was allowed into the U.S. to play on Argentina's World Cup team but was later kicked out of the tournament because he tested positive for performance-enhancing drugs. *ABC News* (July 17, 2013), App. B41. The basis for the discretionary decision to allow Maradona to enter the U.S. in 1994 is unclear. In July 2013, Maradona's visa application was rejected by the U.S. Consulate in Dubai because of his history of drug use and cocaine addiction. *Id.*

- **Kate Moss.** Moss, a model, had difficulty obtaining a U.S. work visa after a 2005 front page tabloid article titled "Cocaine Kate" showed Moss "chopping and snorting a white powder." *Independent Online* (Apr. 3, 2014), App. B142; *Independent* (Apr. 4, 2014),

App. B204; *see also Daily Mail Online* (Feb. 25, 2018), App. B170 (noting that Moss appeared to be submitting a medical questionnaire with a United States visa application). Moss's difficulty in gaining entry into the U.S. was reportedly solely due to her drug use. *Independent* (Apr. 4, 2014), App. B204.

- **Barry Rough.**  In August 2019, Rough, a 61-year-old Langley, B.C. resident, was banned for life from the U.S. because he had smoked marijuana 18 years earlier.  CTV News (Oct. 16, 2019), App. B87.  The media appears to question the wide discretion to ban foreigners from the U.S.  *Id.*

- **Amy Winehouse.**  In October 2007, Winehouse, a singer, was arrested and fined in Norway with her then husband for possession of marijuana.  *CNN* (Feb. 7, 2008), App. B9; *BBC News* (Feb. 8, 2008), App. B10; *Cape Argus Weekend* (Apr. 5, 2014), App. B134; *Saturday Star* (Apr. 5, 2014), App. B138.  In December 2007, pictures of Winehouse with a white powder in her nose appeared in tabloids.  *CNN* (Feb. 7, 2008), App. B9.  On January 24, 2008, Winehouse entered a rehabilitation clinic after a 19-minute home video was leaked shortly before that date in which she states she "just took about six Valium."  *CNN* (Feb. 7, 2008), App. B8–9.  The video then showed Winehouse inhaling something from a glass pipe on her bed.  *Id.*  Winehouse was famous for her drug addiction and had entered a rehabilitation clinic in the summer of 2007.  *Id.*  In 2008, Winehouse sought a visa to enter the U.S., but she was denied by the American Embassy in London.  *People* (Feb. 7, 2008), App. B7.  Winehouse was denied entry into the U.S. because of her drug record and drug use; therefore, Winehouse was unable to attend the Grammy Awards.  *People* (Feb. 7, 2008), App. B6; *Contra Costa Times* (Apr. 6, 2014), App. B131; *Cape Argus Weekend* (Apr. 5, 2014), App. B134; *Saturday Star* (Apr. 5, 2014), App. B138.  Winehouse had to perform via satellite from London since she was denied entry into the U.S.  *Independent* (Apr. 4, 2014), App. B204; *Independent Online* (Apr. 3, 2014), App. B141.

25.     The press has reported extensively on U.S. immigration law experts warning prospective immigrants and visitors that they could have difficulties if they admit to drug misuse. CANA News (Dec. 27, 2019), App. B152; *Newsweek* (Nov. 15, 2019), App. B89; *Express Online* (July 3, 2019), App. B155.  Britons who are "green card holders can be expelled from the U.S. and denied re-entry because of cannabis consumption, even if they used the drug in a state where it is legal[.]"  *Newsweek* (Nov. 15, 2019), App. B89.  As this reporting demonstrates, the press considers the issue of how DHS applies the discretionary aspects of Section 1182(d)(3)(A) to be a matter of public interest.  Some of this reporting has also specifically focused on

inconsistent application of the law.  *See, e.g.*, *Daily Mail Online* (Nov. 13, 2021), App. B148–50; *Cape Argus Weekend* (Apr. 5, 2014), App. B134; *Saturday Star* (Apr. 5, 2014), App. B137–38.

26.     This reporting has also focused at times on other prominent British citizens, for example, the Rt. Hon. Boris Johnson P.C. was warned that "[t]ravelling to the US on a tourist Visa could prove a 'problem'" because of prior admitted drug use.  *Express Online* (July 3, 2019), App. B155–56; *see also Independent Online* (June 11, 2019), App. B163–64 (reporting on drug use and possible visa issues for candidates in the Conservative leadership election).  In addition, British tourists and employees, including green card holders, who smoke marijuana in a state in the U.S. where it is legal, are warned that they could risk being deported, denied entry to the U.S., or permanently banned since marijuana is still illegal under federal law.  *See, e.g.*, *Noticias Financieras* (Nov. 21, 2022), App. B122–24; *Benzinga* (Aug. 23, 2022), Apr. B112; *New York Daily News* (June 6, 2022), App. B119–20; *The Guardian* (Nov. 15, 2019), App. B1–2; *CTV News* (Oct. 16, 2019), App. B87; *Guardian* (Aug. 22, 2022), App. B116–17; *Express Online* (June 18, 2019), App. B159–60.  Press has reported on the hardships this policy can cause.  *See, e.g.*, *Sunday Mirror* (Mar. 19, 1999), App. B102.  The press often reports on warnings to Canadians about admitting to marijuana use when entering the U.S. even though recreational marijuana is now legal in Canada.  *See, e.g.*, *CTV News* (Oct. 16, 2019), App. B86–88; The *Daily World* (May 3, 2017), App. B52–54; *Globe & Mail* (Sept. 9, 2014), App. B178–79; *NPR* (Mar. 29, 2013), App. B44–46; *Los Angeles Times* (Feb. 2, 2003), App. B94–100.

**HRH the Duke of Sussex's Admission of a Long History of CDS Offenses**

**Illegal Drugs in England**

27.      The Duke of Sussex has publicly admitted in his memoir *Spare* (App. D) and in

media interviews to *extensive* personal CDS possession.  Much of the admitted conduct occurred

in England.

- **August 1998 through Spring 1999.**  HRH admitted that "Sometimes my new mates and I[ . . . ]we'd head to the underside of the bridge [(Windsor Bridge)], where we could smoke tabbage [(cigarettes)] in privacy.  My mates seemed to enjoy the naughtiness of it, whereas I just did it because I was on autopilot.[ . . .]  Still, like a robot, I took every cig offered me, and in the same automatic, unthinking way, I soon graduated to weed."  App. D44.[4]

- **Summer 2001 to 2002.**  Part 1, Chapter 32, in *Spare* begins with:  "I don't remember how we got the stuff [(marijuana)].  One of my mates, I expect.  Or maybe several.  Whenever we found ourselves in possession, we'd commandeer a tiny upstairs bathroom, wherein we'd implement a surprisingly thoughtful, orderly assembly line.  Smoker straddled the loo beside the window, second boy leaned against the basin, third and fourth boys sat in the empty bath, legs dangling over, waiting their turns.  You'd take a hit or two, blow the smoke out of the window, then move on to the next station, in rotation, until the spliff was gone.[ . . .]  I knew this was bad behavior.  I knew it was wrong.  My mates knew it too.  We talked about it often, while stoned, how stupid we were to be wasting an Eton education.  Once, we even made a pact.  At the start of exam period, called Trials, we vowed to quit cold turkey, until after the final Trial.  But the very next night, lying in bed, I heard my mates in the hall, crackling, whispering.  Head to the loo. *Bloody hell, they're already breaking the pact!*  I got out of bed, joined them.  As the assembly line cranked up, bath to basin to loo, as the weed began to take effect, we shook our heads.  What idiots we were thinking we could change.  Pass the spliff mate.  One night, straddling the loo, I took a big hit and gazed up at the moon[. . . . ]Just then I saw something dart across the quad.  It froze under one of the orange streetlights.  I froze too, and leaned out of the window.  A fox!  *Staring straight at me!  Look!  What, mate?  Nothing.*  I whispered to the fox:  *Hello, mate.  How's it going?  What are you on about?  Nothing, nothing.*  Maybe it was the weed—undoubtedly it was the weed—but I felt a piercing and powerful kinship with that fox.  I felt more connected to that fox than I did to the boys in the bathroom, the other boys at Eton—even the Windsor's in the distant castle."  App. D67–68.

- **Circa 2002.**  HRH recounted the details of a "club" in the basement of the then-HRH the Prince of Wales Highgrove estate and admitted to CDS-related illegal conduct—and associated scienter—by writing:  "We were often tipsy, and sometimes smashed, and yet

---

[4]  Quotations herein from *Spare* omit the original paragraph structure for ease of formatting.

there wasn't a single time that anyone used or brought drugs down there. Our bodyguards were always nearby, which kept a lid on things, but it was more than that. We had a sense of boundaries." App. D69.

- **Summer 2002.** HRH recounted during this time that he was confronted by a "courtier" who informed HRH that a tabloid editor claimed to have a photo of HRH doing cocaine. The courtier stated "*this editor is willing to lock the photo into his safe forever. But in exchange he wants to sit down with you and explain that what you're doing is very damaging. He wants to give you some life advice.*" App. D76. HRH rejected the offer and "told the courtier to call the journalist's bluff, vigorously refute the claim, turn down the deal." App. D76. HRH wrote that the courtier did so. App. D76. HRH then admitted that the denial he caused the courtier to make to the press was false: "Of course . . . I *had* been doing cocaine around this time. At someone's country house, during a shooting weekend, I'd been offered a line, and I'd done a few more since. It wasn't much fun, and it didn't make me particularly happy, as it seemed to make everyone around me, but it did make me feel *different*, and that was the main goal. Feel. Different. I was a deeply unhappy seventeen-year-old boy willing to try almost anything that would alter the status quo." App. D76–77. HRH then commented on his own conduct: "That is what I told myself anyway. Back then, I could lie to myself as effortless as I'd lied to that courtier. But now I realized coke hadn't been worth the candle. The risk far outweighed the reward. Threatened with exposure, faced with the prospect of fouling up Granny's Golden Jubilee, walking a knife's edge with the mad press—nothing was worth any of that. " App. D77. HRH then continued to analyze justifications for his admitted "lie[]". "On the bright side, I'd played the game well. After I'd called the journalists bluff, he went silent. As suspected, he had no photo, and when his con game didn't work, he slithered off.[ . . .] I was ashamed for lying. But also proud. In a tight spot, a hugely scary crisis, I hadn't felt any serenity like Granny, but at least I'd managed to project it. I'd channeled *some* of her superpower, her heroic stoicism. I regretted giving the courtier a cock-and-bull story, but the alternative would've been ten times worse. So . . . job well done? Maybe I wasn't a foundling after all." App. D77.

- **2015.** In *Spare* the Duke of Sussex described his typical daily routine in 2015 as follows: "Every night I'd go straight home from work, eat over the sink, then catch up on paperwork, Friends on low in the background.[ . . .] After dinner I'd smoke a joint, trying to make sure the smoke didn't waft into the garden of my neighbor, The Duke of Kent. Then I'd turn in early. Solitary life. Strange life." App. D252–53.

- **Circa "[V]ery [E]nd of 2015".** App. D259. Contextually, the Duke of Sussex appears to write about his year in 2015 in England (as well as earlier times). However, the exact geographic locus of the admitted conduct is unclear. "Psychedelics did me some good as well. I'd experimented with them over the years, for fun, but now I'd begun to use them therapeutically, medicinally. They didn't simply allow me to escape reality for a while, they let me *redefine* reality. Under the influence of these substances I was able to let go of rigid preconcepts, to see that there was another world beyond my heavily filtered senses, a world that was equally real and doubly beautiful—a world with no red mist, no

reason for red mist.  There was only truth.  After the psychedelics wore off my memory of that world would remain:  *This is not all there is.*  All the great seers and philosophers say our daily life is an illusion.  I always felt the truth in that.  But how reassuring it was, after nibling a mushroom, or ingesting ayahuasca, to experience it for myself."  App. D255.

- **On or About July 1, 2016.**  App. D269.  HRH recounted his first date with the now Duchess of Sussex.  App. D271–73.  HRH then recounted meeting a "mate after."  App. D273.  "I recounted the entire date, then pleaded:  *Shit, mate, what am I going to do?*"  Out came the tequila.  Out came the weed.  We drank and smoked and watched . . . *Inside Out*.  An animated movie . . . about emotions.  Perfect.  I was thoroughly inside out.  Then I was peacefully numb.  *Good weed, dude.*"  App. D274.  HRH then recounted a FaceTime with the now Duchess of Sussex.  App. D274.

- **Shortly after December 2016.**  App. D305, D307.  HRH recounted the following in a therapy session: "*Do you think I have an addictive personality?*  More accurately, what I wanted to know was, if I did have an addictive personality, where would I be right now?*  Hard to say.  Hypotheticals, you know*.  She asked if I'd used  drugs.  Yes.  I told her some wild stories.  *Well, I am rather surprised you're not a drug addict.*"  App. D312.

- **Updated Admissions During** *CBS:  60 Minutes.* (Jan. 8, 2023), App. A101.  "COOPER:  You write in the book about psychedelics, Ayahuasca, psilocybin mushrooms.  
PRINCE HARRY:  I would never recommend people to do this recreationally, but doing it with the right people if you are suffering from a huge amount of loss, grief or trauma, then these things have a way of working as a medicine.  
COOPER:  They showed you something.  What did they show you?  
PRINCE HARRY:  For me, they clear the windscreen—the windshield, the misery of loss.  They cleared away this idea that I  had in my head that my mother, that I needed to cry to prove to my mother that I missed her, when in fact, all she wanted was for me to be happy."

- **Undated Admissions During an April 3, 2023, 90-minute pay for view livestreamed "chat" with Dr. Gabor Maté.**  *See, e.g.*, *Evening Standard Online* (Mar. 6, 2023), App. A15–16; *Daily Mail Online* (Mar. 4, 2023), App. A5; *Daily Mirror Online* (Mar. 4, 2023) App. A46–47.

  o  "Prince Harry went through various drugs from stimulants to psychedelics and explained what they did for him during a livestreamed Q&A with trauma expert Dr Gabor Maté[. ] Prince Harry has said that marijuana 'really helped him' mentally but taking cocaine 'did nothing for him'.  The Duke of Sussex opened up about his drug use in a live question and answer session tonight, set up to promote his memoir, Spare, where the audience paid for a ticket to tune in.  Speaking about cocaine, Prince Harry told Dr Gabor Maté:  "That didn't do anything for me.  It was more of a social thing."  He added:  'It gave me a sense of belonging for sure.  It also made me feel different to the way I was feeling, which is kind of the point.'  Moving on to

cannabis, which he has admitted to using before, Harry said: 'Marijuana is different, that actually did really help me.'" *Daily Mirror Online* (Mar. 3, 2023), App. A46.

o   "The duke also told of using psychedelics such as ayahuasca. He went on: 'It was the cleaning of the windscreen, cleaning of the windshield, the removal of life's filters just as much as on Instagram, these layers of filters. It removed it all for me and brought me a sense of relaxation, release, comfort, a lightness that I managed to hold on to for a period of time. I started doing it recreationally and then started to realize how good it was for me, I would say it is one of the fundamental parts of my life that changed me and helped me deal with the traumas and pains of the past.'" *Daily Mirror Online* (Mar. 3, 2023), App. A47.

o   "'Hallucinogens have helped me to clean the windscreen of my troubled mind': Prince Harry extols the use of Class A drug in cosy online chat with 'toxic trauma therapist' Gabor Maté[. ] For a man who demands his privacy, it was an extraordinary soul-bearing 90-minute public therapy session. Prince Harry sat down with Dr Maté for a £17 livestreamed chat last night Duke of Sussex described taking hallucinogen ayahuasca, saying it 'changed me'." *Daily Mail Online* (Mar. 4, 2023), App. A5.

o   "His choice of inquisitor was controversial as Dr Maté has been roundly criticized for advocating the use of psychedelic drugs including the South American drug ayahuasca, which makes users vomit. The Duke of Sussex cheerfully described taking the hallucinogen, saying it 'changed me' and describing it as 'cleaning the windscreen' of his troubled mind. Harry, 38, also appeared to advocate for illegal drugs, at one point saying: 'Marijuana really did help me.'" *Daily Mail Online* (Mar. 4, 2023), App. A5.

o   "Speaking to Dr Maté regarding his cocaine use, the Duke said: 'I don't think that did anything for me. It was more of a social thing, and I guess trying to get a sense of belonging, for sure. I think it also probably made me feel different to the way that I was feeling, which was kind of the point. Marijuana is different, that actually did help me.'" *Daily Star Online* (Mar. 4, 2023), App. A99.

o   "On using drugs, Prince Harry said: '(Cocaine) didn't do anything for me, it was more a social thing and gave me a sense of belonging for sure, I think it probably also made me feel different to the way I was feeling, which was kind of the point. Marijuana is different, that actually really did help me.' The duke also spoke of using plant-based psychedelics such as ayahuasca, after Dr Mate told of using it with his patients. Harry said: 'It was the cleaning of the windscreen, cleaning of the windshield, the removal of life's filters just as much as on Instagram, these layers of filters. It removed it all for me and brought me a sense of relaxation, release, comfort, a lightness that I managed to hold on to for a period of time. I started doing it recreationally and then started to realize how good it was for me, I would say it is one of the fundamental parts of my life that changed me and helped me deal with the traumas and pains of the past.'" *Independent* (Mar. 5, 2023), App. A49.

o  "Harry said he turned to the psychedelic drug ayahuasca to deal with the traumas and
   added:  'It was the cleaning of the windshield, the removal of life's filters.  And these
   layers and filters, it removed it all for me. It brought me a sense of relaxation, release,
   comfort.'  He added:  'I started doing it recreationally and started to realize how good
   it was for me.  It is one of the fundamental parts of my life that changed me and
   helped me deal with the traumas and pains of the past.'  The duke said he dabbles
   with cocaine:  'That didn't do anything for me.  It was more a social thing.  It gave
   me a sense of belonging for sure.  Marijuana is different, that did actually really help
   me.  Alcohol is certainly more of a social thing.'"  *People* (Mar. 5, 2023), App. A56.

o  "They talked about drugs:  Harry dabbled in cocaine.  He said marijuana helped him,
   and ayahuasca assisted in clearing the 'windshield.'"  *N.Y. Post* (Mar. 5, 2023), App.
   A87.

o  "**3. Harry believes some of his experiences with drugs 'helped.'**  During their chat,
   Harry admitted to taking a range of recreational drugs, including cocaine and
   marijuana.  The former, he said, 'did nothing' for him aside from giving him a
   temporary 'sense of belonging' while the latter 'actually really did help me'.  But it
   was his appreciation for psychedelics—including drink ayahuasca which is brewed
   from two plants native to South America—which was perhaps the most revealing.  'It
   was the cleaning of the windscreen, cleaning of the windshield, the removal of life's
   filters just as much as on Instagram, these layers of filters,' he said of his experiences
   of psychedelics which can cause hallucinations.  'It removed it all for me and brought
   me a sense of relaxation, release, comfort, a lightness that I managed to hold on to for
   a period of time.  I started doing it recreationally and then started to realize how good
   it was for me, I would say it is one of the fundamental parts of my life that changed
   me and helped me deal with the traumas and pains of the past.'"  *Evening Standard
   Online* (Mar. 6, 2023), App. A15–16.

o  "Anti-drug campaigners blast Prince Harry for sending 'worrying message to young
   people' after he claimed Cannabis 'really helped' his mental health in latest
   interview—before describing 'positive' experience of psychedelic drug ayahuasca[. ]
   Campaigners have criticized Prince Harry after he spoke again about using drugs,
   saying he is sending a worrying message to young people.  The Duke of Sussex told
   how using cannabis—a Class B drug—'really helped' him.  He said ayahuasca it
   'brought me a sense of relaxation, release, comfort.'  In a live-streamed interview, the
   Duke of Sussex told how using cannabis—a Class B drug—'really helped' him to
   deal with mental health issues following the death of his mother.  He also talked
   about his 'positive' experience of psychedelic drug ayahuasca, saying it 'brought me
   a sense of relaxation, release, comfort, a lightness that I managed to hold on to for a
   period of time'.  The duke, 38, made the comments in an interview with therapist Dr
   Gabor Mate, an outspoken supporter of decriminalizing drugs who has allegedly used
   Amazonian plant ayahuasca to treat patients suffering mental illness.  Harry told him:
   '[Cocaine] didn't do anything for me, it was more a social thing and gave me a sense
   of belonging for sure, I think it probably also made me feel different to the way I was

feeling, which was kind of the point.  Marijuana is different, that actually really did help me.'"  *Daily Mail Online* (Mar. 6, 2023), App. A21.

o   "He said that cocaine 'didn't do anything' for him, though it was a 'social thing' and gave him a 'sense of belonging'.  But marijuana 'really' helped him.  And ayahuasca triggered feelings of 'release' and 'comfort' that helped him deal with his trauma, Prince Harry said.  He added:  'It was the cleaning of the windscreen, cleaning of the windshield, the removal of life's filters just as much as on Instagram, these layers of filters.  It removed it all for me and brought me a sense of relaxation, release, comfort, a lightness that I managed to hold on to for a period of time.'  'I started doing it recreationally and then started to realize how good it was for me, I would say it is one of the fundamental parts of my life that changed me and helped me deal with the traumas and pains of the past.'  In a previous interview, Prince Harry said he would not recommended taking the substance recreationally.  But he added:  'Doing it with the right people if you are suffering from a huge amount of loss, grief or trauma, then these things have a way of working as a medicine.'"  *Daily Mail Online*, (Mar. 6. 2023), App. A59.

o   "At one point, the conversation turned to substances that Harry may have used, both to mask his pain and to heal it.  Cocaine "didn't do anything" for him, Harry said, while marijuana "really did help."  It's psychedelics, however, that he really rates.  "I started doing it recreationally and then started to realize how good it was for me," says Harry.  One such experience is detailed in 'Spare,' when he took magic mushrooms at a party at Courtney Cox's house and encountered a chatty garbage bin in her guest bathroom.  'I would say it is one of the fundamental parts of my life that changed me and helped me deal with the traumas and pains of the past,' Harry adds, describing taking ayahuasca as akin to cleaning a dirty windscreen.  'It removed it all for me and brought me a sense of relaxation, release, comfort, a lightness that I managed to hold on to for a period of time.'"  *Toronto Staff* (Mar. 6, 2023), App. A125.

28.     Recall, that under Section 1182(a)(2)(A)(i)(II) the key issue governing admissibility to the United States is whether there was an admission of the essential elements of a CDS violation under the law of the country in which the conduct occurred, here, England (the United Kingdom).  The Misuse of Drugs Act 1971, c.38 criminalizes a broad array of conduct related to CDS.  Section 5(1) provides "Subject to any regulations under section 7 of this Act for the time being in force, it shall not be lawful for a person to have a controlled drug in his possession."  Section 7 of the Act generally provides for use of CDS by, or under the authorization of, doctors and researchers.  Section (5)(2) provides that "[s]ubject to section 28 of

this Act and to subsection (4) below, it is an offence for a person to have a controlled drug in his

possession in contravention of subsection (1) above."  Section (5)(3) provides as to the element

of knowledge "[f]or the purposes of this Act the things which a person has in his possession shall

be taken to include any thing subject to his control which is in the custody of another." Section

(5)(4) provides certain defenses to simple lawful possession if "possession" of the drug was

taken either to prevent a crime and destroy the drug or deliver it to authorities, or to deliver the

drug to a person in authority.

29.     Section 2 of the Act provides for "Schedul[ing]" of drugs via statute and Orders in

Counsel approved in draft by each House of Parliament.

30.     Since the Drugs Act 2005 c. 17 Pt 4 s.21 "[f]ungus (of any kind) which contains

psilocin or an ester of psilocin" is Scheduled as a Class A drug.  Misuse of Drugs Act 1971 c.38

Schedule 2, Part 1.  "Coca leaf" and "Cocaine" has been scheduled as a Class A Drug the entire

relevant time-period at issue.  *Id.*  The psychedelic "ayahuasca" contains the active ingredient

"dimethyltryptamine", which has long been scheduled as a Class A drug.  *Id.*  During the time

period relevant to this Complaint, "Cannabinol.  Cannabinol derivatives Cannabis and cannabis

resin" were scheduled as Class C drugs until the Misuse of Drugs Act 1971 (Amendment) Order

2008/3130 art.2(2)(a) (Jan. 26, 2009), which rescheduled those drugs as Class B.

31.     The House of Lords spoke at length to the elements of possession of CDS under

the Misuse of Drugs Act 1971 in *R. v. Lambert*, [2001] UKHL 37 (appeal taken from Eng.).  As

summarized by Lord Clyde:

> The meaning of possession for the purposes of the Misuse of Drugs Act 1971 is now well
> established.  The first of the two elements, control, involves a physical control.  The
> concept is enlarged by section 37(3) of the Act which states that "things which a person
> has in his possession shall be taken to include any thing subject to his control which is in
> the custody of another".  The second element involves that the defendant knows that the
> thing in question is under his control.  He need not know what its nature is, but so long as

he knows that the thing, whatever it is, is under his control, it is in his possession (*Ashton-Ricktardt* (1977) 65 Cr.App.R. 67, [1978]1 W.L.R. 37).  The prosecution requires to prove that the defendant had control of the thing, that he knew he had control of it, and that the thing was the controlled drug which the prosecution allege it to have been.

*Id.* at [122]; *accord id.* at [16] (Lord Slynn of Hadley) (similar); *id.* [61] (Lord Hope of

Craighead) ("[T]here are two elements to possession.  There is the physical element, and there is

the mental element.  The physical element involves proof that the thing is in the custody of the

defendant or subject to his control.  The mental element involves proof of knowledge that the

thing exists and that it is in his possession.  Proof of knowledge that the thing is an article of a

particular kind, quality or description is not required.  It is not necessary for the prosecution to

prove that the defendant knew that the thing was a controlled drug which the law makes it an

offence to possess."); *id.* at [180–81] (Lord Hutton).

32.     A defense may be set up under Section 28 of the Misuse of Drugs Act 1971 as it

relates to the lack of knowledge of the defendant that what he possessed was in fact a scheduled

substance.  Under the authority of *R. v. Lambert,* that defense only requires the defendant to

discharge an evidentiary burden.  Accordingly, actual knowledge may be considered an element

for purposes of analysis under Section 1182(a)(2)(A)(i)(II) *if* the defendant discharged their

evidentiary burden to put the matter at issue.  *See R. v. Lambert*, [2001] UKHL 37 (Eng.) [17]

(Lord Slynn); *id.* [42] (Lord Steyn); *id.* [91–92] (Lord Hope); *id.* [158] (Lord Clyde).  In any

event, it is not implicated here, as HRH admits he knowingly possessed CDS.

33.     As to the timing and length of requisite possession, the rule was set down by Lord

Chief Justice Lord Parker in *Hambelton v. Cullinan* [1968] 2 Q.B. 427 [432].  Lord Parker, after

ruling a defendant cannot be convicted of possession of a drug at the time of a positive drug test

in that the drug in question had by that time been changed in essential character by biological process stated:

> But before leaving the matter, I confess that I myself can see no reason why in another case the time when the possession was said to have taken place should not be a time prior to the consumption, because as it seems to me the traces of, in this case, amphetamine powder in the urine is at any rate prima facie evidence—which is all the prosecution need—that the man concerned must have had it in his possession, if only in his hand prior to raising his hand to his mouth and consuming it.  Accordingly, it seems to me that the possible difficulty that the decision in this case raises for the police does not arise in practice because the date of his possession can always be laid prior to the consumption.

Thus, possession antecedent to use is sufficient to establish the element of possession.  *See, e.g.*, *R. (on the Application of Muizarajs v. Latvia*, [2022] EWHC 2751 (Admin); *Spitans v. Latvia*, [2022] EWHC 472 (Admin).

34.    While that disposes of the analysis of the "essential elements" under United Kingdom law, it is relevant to set out briefly that while possession of CDS is not considered a grave crime, it is a crime nonetheless that *can* receive a custodial sentence.  The range of sentences for possession of CDS is helpfully set out by HM Government:

**Types of drugs**

The maximum penalties for drug possession, supply (selling, dealing or sharing) and production depend on what type or 'class' the drug is.

|  | Drug | Possession | Supply and production |
|---|---|---|---|
| Class A | Crack cocaine, cocaine, ecstasy (MDMA), heroin, LSD, magic mushrooms, methadone, methamphetamine (crystal meth) | Up to 7 years in prison, an unlimited fine or both | Up to life in prison, an unlimited fine or both |
| Class B | Amphetamines, barbiturates, cannabis, codeine, ketamine, methylphenidate (Ritalin), synthetic cannabinoids, synthetic cathinones (for example mephedrone, methoxetamine) | Up to 5 years in prison, an unlimited fine or both | Up to 14 years in prison, an unlimited fine or both |
| Class C | Anabolic steroids, benzodiazepines (diazepam), gamma hydroxybutyrate (GHB), gamma-butyrolactone (GBL), piperazines (BZP), khat | Up to 2 years in prison, an unlimited fine or both (except anabolic steroids - it's not an offence to possess them for personal use) | Up to 14 years in prison, an unlimited fine or both |

[5]

---

[5]  *See* https://www.gov.uk/penalties-drug-possession-dealing (last visited Apr. 29, 2023).

35.     Prior to the Coroners and Justice Act of 2009, c.25, guideline cases from the

Court of Appeal established that first time simple possession almost never justified a custodial

sentence, but that in a case of "repeated flouting of law and previous convictions", a custodial

sentence could be necessary.  *R. v. Batey*, 2005 EWCA Crim 120 [6–9].

36.     Under the current Sentencing Guidelines regime while the starting point for a first

offense of simple possession is a simple fine, there are several aspects of the Duke of Sussex's

admitted conduct that are properly considered as aggravating, namely his repeated and chronic

use, his flouting of the law via use calculated to evade detection by his Security Officers, abuse

of public office, clear guilty intent and concealment, and probable impact that his admission and

advocacy of illegal drug use have had on the community.  *See*

https://www.sentencingcouncil.org.uk/offences/magistrates-court/item/possession-of-a-

controlled-drug-2/ (last visited Apr. 29, 2023);

https://www.sentencingcouncil.org.uk/offences/crown-court/item/possession-of-a-controlled-

drug-2/ (last visited Apr. 29, 2023).  On the last point, the record is replete with recent criticism

of the Duke of Sussex.[6]  Of course, hitherto good character, lack of prior conviction, and

---

[6]  *See, e.g.*, *Daily Mail Online* (Mar. 6, 2023), App. A21–22 ("'Our work is with under-18s and
our concern is that this can send a message that is going to make young people think that drugs
are going to help them with stuff that is really difficult,' she said.  'It is a time when a lot of them
are struggling with their mental health.'  Numbers have really increased and access to support
services is a real struggle as services are incredibly stretched.  'Unfortunately young people are
getting the message from somewhere that drugs are going to help with their problems and
anything that reinforces that is a concern for us.  Using drugs as a coping strategy is more likely
to lead to dependence than other motivations because that becomes how you are coping with
something.'  She added of Harry:  'He has been very public about his drug use, which is one
thing, but the statement that it helped him is a concern for young people.'  TV presenter Kirstie
Allsopp also criticized the duke, tweeting:  'If you have a vast platform you don't mouth off
about using illegal drugs, the trade which kills people.'  In his memoir Spare, Harry admitted
using cocaine, cannabis and magic mushrooms and was accused of being 'irresponsible' and
glorifying drugs."); *Express Online* (Mar. 6, 2023), App. A24 ("Prince Harry's praise for a drug

unfortunate childhood experiences could be considered in mitigation. *See* https://www.sentencingcouncil.org.uk/offences/magistrates-court/item/possession-of-a-controlled-drug-2/ (last visited Apr. 29, 2023). All that is to say, the offense is a criminal offense under applicable domestic law and the Duke of Sussex's offense conduct has characteristics that might quite properly militate against discretionary relief by DHS.

**Illegal Drugs in Lesotho**

37.     **2004 (Sometime before March).**  The Duke of Sussex admitted in *Spare* that after sitting for a stressful and aggravating press interview in which he was accused (incorrectly) of having been to rehab, "[a]fter the interview I went and found George and we drank beer.  A lot of beer.  Gallons of beer.  I believe that was also the night I smoked an entire shopping bag of weed.  I don't recommend it.  Then again, it might have been another night.  Hard to be precise when it comes to a shopping bag full of weed."  App. D92–93.

38.     The United Kingdom's Lesotho travel advice states that "[p]ossession of drugs is a serious offence and punishments can be severe."  *Local Laws and Customs—Lesotho Travel*

---

has been criticized by the family of a woman who died after taking the psychedelic substance."); *Daily Mail Online* (Mar. 6, 2023), App. A59 ("Experts are now worried that Prince Harry's latest comments could 'promote' the 'quack therapy' [(use of ayahuasca)], which is illegal in the UK, US and Canada, as a way to 'remove life's filters'."); *id.* at App. A60 ("Experts warn ayahuasca and similar potions could trigger underlying mental health conditions or heart problems."); *id* at App. A60–61 ("Dr Max Pemberton, an NHS psychiatrist in London and columnist for The Daily Mail, said the Duke of Sussex's comments are 'highly irresponsible' and 'promoting yet another quack therapy'.  'Harry plainly has no understanding of the serious damage these substances can wreak on users—damage that I see on mental health hospital wards with upsetting frequency,' he said.  Dr Pemberton warned that Prince Harry has been 'seduced by the fashionability of the drug, which is popular among the trendy middle classes'."); *Daily Mail Online* (Mar. 6, 2023), App. A60–61 ("Meanwhile, the family of Jennifer Spencer, who died by suicide aged 29 in 2019 after taking ayahuasca in Peru, said his comments were 'irresponsible'.  Ms Spencer suffered severe psychosis as a result of her experience with the drug.  Her aunt, Fiona Chase, 73, told The Sun:  'He should not be speaking positively about this drug.  It's irresponsible because a lot of people look up to him.'").

*Advice*, *found at* https://www.gov.uk/foreign-travel-advice/lesotho/local-laws-and-customs (last visited Apr. 29, 2023).

### Illegal Drugs in the United States

39.     The Duke of Sussex has also admitted to the essential elements of drug offenses in the United States on several occasions:

- **January 2016, Los Angeles, California.**  The Duke of Sussex recounted attending a house party in Los Angeles.  App. D259–60.  When a refrigerator door was opened in that house, HRH recounts that the following ensued:  "While the door was open we spotted a huge box of black diamond mushroom chocolates.  Someone behind me said they were for everybody.  *Help yourself, boys!*  My mate and I grabbed several, gobbled them, washing them down with tequila.[ . . .]  We took ourselves outside, sat down by a firepit, and waited.  I remember after a time standing up and wandering back into the house to use the loo.  It was hard to navigate the house, with its angular modern furniture and clean glass surfaces.  Also, there weren't many lights on.  But in time I managed to find the loo.  Lovely room, I thought, shutting the door.  I looked all around.  Beautiful hand soaps.  Clean white towels.  Exposed wood beams.  Mood lighting.  Leave it to the Yanks.  Beside the toilet was a round silver bin, the kind with a foot pedal to open the lid.  I stared at the bin.  It stared back.  *What—staring?*  Then it became . . . a head.  I stepped on the pedal and the head opened its mouth.  A huge open grin.  I laughed, turned away, took a piss.  Now the loo become a head too.  The bowl was its gapping maw, the hinges of the seat were its piercing sliver eyes.  It said:  *Aaah.*  I finished, flushed, closed its mouth.  I turned back to the silver bin, stepped on the pedal, fed it an empty packet of cigarettes from my pocket.  *Open wide. Aaah. Thank you mate. You're welcome mate.*  I left the bathroom, giggling, and walked straight into my mate.  *What's so funny?*  I told him he needed to walk into that loo right now and have the experience of a lifetime.  *What experience?  Can't describe it.  You have to see for yourself.*[ . . .]  He was wearing a big puffer jacket with a furry collar.[ . . .]  Without taking it off he walked into the loo.  I went to make myself another tequila.  Minutes later my mate appeared at my side.  His face was white as a sheet.  *What happened?  Don't want to talk about it.  Tell me.  My puffer jacket . . . became a dragon.  A dragon?  In the Loo?  And tried to eat me.  Oh dear.  You sent me into a dragon's lair.  Shit.  Sorry, mate.*  My delightful trip had been his hell.  How unfortunate.  How interesting.  I led him outside gently, told him it would all be OK."  App. C261–62.

- **January 2016, Los Angeles, California.**  "The next day[—after the conduct described at App C261–62—]we went to another house party.[ . . .]  More tequila, more names thrown at me.  And more mushrooms.  We all started playing some kind of game, some kind of charades—I think?  Someone handed me a joint.  Lovely.  I took a hit, looked at the rinsed creamy blue of the California sky.[ . . .]  I left him, set off across the yard, and the memory trails away for a time.  I seem to remember yet another house party . . . that day?  The next?  Eventually, somehow, we made our way back to Monica's.  That is,

Courtney's.  It was night.  I walked down some stairs to her beachfront and stood with my toes in the ocean, watching the lacy surf come forward, recede, come forward, for what felt like ages.  I looked from the water to the sky, back and forth.  Then I stared directly at the moon.  It was speaking to me.  Like the bin and the toilet.  What was it saying?  That the year ahead would be good.  *Good how?  Something big?  Really?  Big.  Not more of the same?  No, something special.  Really, Moon?  Promise.  Please don't lie to me.*"  App. D262–63.

- **Circa March 2020, Los Angeles, California.**  HRH recounted his nightly routine while living at Tyler Perry's residence with the Duchess of Sussex and his young son.  App. D389.  HRH wrote "[l]ate at night, with everyone asleep, I'd walk the house, checking the doors and windows.  Then I'd sit on the balcony or the edge of the garden and roll a joint."  App. D390.

40.     Under United States law, it is illegal for "any person knowingly or intentionally to possess a controlled substance," unless such substance was obtained via valid medical procedures or via other narrow exceptions not applicable here.  21 U.S.C. § 844.  At all times relevant here, "[m]arijuana" and "[t]etrahydrocannabinols, except for tetrahydrocannabinols in hemp" were scheduled under Schedule 1.  *See* 21 U.S.C. § 812, Schedule 1(c)(10), (17).  So too "[p]silocybin" and "[p]silocyn"  *Id.* at (15)–(16).  "Dimethyltryptamine" the active ingredient of "ayahuasca" is also on Schedule I.  *Id.* at (6).

41.     "The basic elements of a simple possession offense are (1) knowing or intentional (2) possession (3) of a controlled substance."  *United States v. Lacy*, 446 F.3d 448, 454 (9th Cir. 2006); *accord United States v. Colon*, 268 F.3d 367, 375 (9th Cir. 2001).

42.     The requirement of "knowing" possession does not require criminal intent.  *See United States v. Powell*, 932 F.2d 1337, 1342 (9th Cir. 1991) ("Powell could be convicted of simple possession under 21 U.S.C. § 844 even if he only possessed the cocaine for the purpose of destroying it").  It is not necessary to show that the defendant knew "that possession of a controlled substance was illegal."  *United States v. Cain*, 130 F.3d 381, 384 (9th Cir. 1997) (A defendant "only had to know that the substances he possessed were controlled substances").

43.    One has "possession" of an object "'if the person knows of its presence *and* has physical control of it, or has the power and intention to control it.'  Manual of Model Criminal Jury Instructions for the Ninth Circuit, § 3.16 (1992 ed.) (emphasis added)."  *Cain*, 130 F.3d at 382.  "[I]t is not a defense to an otherwise established simple possession offense that the defendant did not possess the substance because he merely used or consumed it."  *United States v. Courtney*, 979 F.2d 45, 49 (5th Cir. 1992).  Here HRH's admitted conduct plainly includes an admission of physical possession *prior* to use.

### Extensive Media Coverage Concerning DHS's Actions in Admitting HRH The Duke of Sussex to the United States with His Admitted Extensive History with CDS.

44.    In 2023, media has extensively and consistently covered all aspects of the Duke of Sussex's admission to the essential elements of numerous CDS crimes.  This coverage has repeatedly surfaced issues concerning HRH's CDS related conduct and United States immigration status.  This coverage has also regularly surfaced questions concerning whether or not DHS acted, and is acting, appropriately as concerns HRH's immigration status:

- *Daily Mail* (Jan. 7, 2023), App. C211 ("US officials confirmed allegations of drugtaking would not lead to California resident Harry being banned from entering America.  Under US law, foreign nationals who have admitted taking drugs can be turned away at the border and refused a visa.  But American immigration lawyer Christi Jackson told GB News that admissions of drug use in the pages of a book would not be considered 'valid'.").

- *Sunday Telegraph* (Jan 8, 2023), App. C219 ("Immigration lawyers The Sunday Telegraph spoke to confirmed the Duke of Sussex would have been required to detail that history when he made the decision to permanently relocate to California with his wife Meghan in 2020.  'He would have been asked [about drug use].  If he was truthful in his answers, he should have been denied,' said Prof Alberto Benítez, director of George Washington University's Immigration Clinic.  The law professor said it would be in Harry's 'best interest' to acknowledge his illicit drug use, adding 'otherwise, he's perjuring himself on an official US government document'.  He suggested the Duke may have been granted some discretion by immigration officials because of his status.  'If he was 'Fred Jones' and he had this kind of a background, he'd have a lot more scrutiny and I could see the green card being denied,' Prof Benitez said.  If the Duke failed to declare

29

it, Prof Benitez said: 'One of the repercussions, whatever visa he has, is that it would be revoked.'"); *see also Telegraph Online* (Jan. 7, 2023), App. C239–40.

- *Daily Mail Online* (Jan. 8, 2023), App. C229 ("Most applicants with a history of drug use would be denied American visas, however immigration decisions are made on a 'case-by-case' basis, The Sunday Times reported.  US immigration rules state an individual's 'current and/or past actions, such as drug or criminal activities . . . may make the applicant ineligible for a visa'.").

- *Daily Mirror Online* (Jan. 8, 2023), App. C237 (reporting that HRH's admissions regarding CDS in *Spare* may place his immigration status at risk).

- *Daily Record* (Jan. 9, 2023), App. C215–16 ("IT is feared that Harry's revelations about drug use could put his US visa at risk.  The Prince admits in his memoir that he has taken cannabis, cocaine and magic mushrooms.  Experts argue that he could have been denied residency in America if he had disclosed his drug use when applying.  And he could even have it revoked now if it is determined that he 'lied' during the process, a leading authority on US immigration has argued.  Professor Alberto Benítez, director of George Washington University's Immigration Clinic, said: 'He would have been asked [about his drug use].  If he was truthful in his answers, he should have been denied.'").

- *Daily Star Online* (Jan. 9, 2023), App. C232 ("There are countless examples of people being refused entry or a visa to the United States due to admissions of past illegal drug use, but is has yet to happen to a Prince.  Prince Harry could be banned from the States after admitting he took drugs, immigration experts have warned.").

- *Metro (UK)* (Jan. 11, 2023), App. C225 ("Cannabis was legalized for recreational use in California in 2016 but there is speculation Harry's drug taking admission could put his US visa at risk.  The 38-year old also admits in Spare he took cocaine at the age of 17 and once hallucinated on magic mushrooms at a celebrity party in California.  When quizzed about the royal's visa and drug use, the US state department said: 'All applications are adjudicated on a case-by-case basis.  Visa records are confidential under US law: therefore, we cannot discuss the details of individual cases.'").

- *Cannabis News Today* (Jan. 13, 2023), App. C217 ("Prince Harry has revealed he would 'roll a joint' at Tyler Perry's house while wife Meghan Markle and son Archie slept in another room as they house-hunted for themselves.  Harry, the Duke of Sussex, made the admission in his tell all book, 'Spare,' in which he admitted to smoking weed, doing cocaine and also magic mushrooms.  The duke, then 36, said he rolled joints while staying at US actor Tyler Perry's home in Los Angeles in 2020, before settling in nearby Montecito.  'Late at night, with everyone asleep, I'd walk the house, checking the doors and windows.  Then I'd sit on the balcony or the edge of the garden and roll a joint.  The house looked down onto a valley, across a hillside thick with frogs.  I'd listen to their late-night song, smell the scented air,' he states.  Cannabis was legalized for recreational use in California in 2016 but there is speculation his drug taking admission could put his US visa at risk.").

30

- *BuzzFeed* (Jan. 14, 2023), App. C1–4 (discussing intense media interest in the topic of whether HRH's admissions relating to CDS in *Spare* could lead to revocation of his immigration status in the United States; also discussing United States law on that point and the discretion inherent in that law; recounting conflicting expert opinions as to whether DHS properly admitted HRH or whether his status caused him to receive "slack").

- *CE Latin Am. Migration Newswire* (Mar. 7, 2023), App. A27 ("Once again Prince Harry is in trouble, now he is at risk of having his U.S. visa revoked after revealing that he used drugs, reported the Mirror. The Duke of Sussex revealed in Spare, his memoirs, that in his youth he repeatedly used cocaine and other drugs, as it helped him to improve his life. Prince Henry revealed that he started using marijuana and ayahuasca to cope with all the traumas of his past and said he realized that it did him good to use them in his daily life. 'I started doing it recreationally and then I started to realize how good it was for me,' he told Dr. Gabor Mate. The Mirror reported that U.S. immigration officials take a tough stance when it comes to non-U.S. citizens using drugs in the country, so the Duke of Sussex risks having his visa revoked. In recent years British citizens have had problems entering the United States such as Nigella Lawson, who was prevented from taking a flight to the country after using cocaine beforehand.").

- *Sun* (Mar. 8, 2023), App. A94 ("Prince Harry, in his need to talk about his mental health, confessed that he used psychedelic and other drugs, such as marijuana and cocaine, during a talk that was broadcast live with controversial physician Gabor Mate for the program 'The Myth of Normal: Trauma, Illness, and Healing in a Toxic Culture.' 'I started doing it recreationally and then realized how good it was for me,' recounted Henry, Duke of Sussex. However, these statements that caused astonishment to more than one could cause him problems with the U .S. government since if the son of Charles III did not mention that in his past he used intoxicants, the authorities could revoke his permission to live in California. According to U.S. Citizenship and Immigration Services, visa applicants 'who are determined to be drug abusers or addicts are inadmissible.' '(Authorities) frown upon drug use by non-U.S. citizens,' Piers Morgan said. 'Another compelling reason why we don't want them at the King's coronation, as we could end up keeping them forever,' he added referring to Harry and Meghan. Australia's 'Sky News' recalled the time in 2014 when chef Nigella Lawson was banned from taking a flight to the United States after confessing to cocaine use during a trial. Later, her case was subjected to analysis and she was given a pardon after an appeal.").

- *Express Online* (Mar. 20, 2023), App. C197–98 ("Prince Harry could see his visa revoked after admitting to using drugs in a televised therapy session, Piers Morgan pointed out.").

- *N.Y. Post* (Mar. 22, 2023), App. C208 ("BEST-selling author Prince Harry (above) may find himself in hot water for being too honest about his past drug use, a legal expert tells Page Six, while others assert the British royal is in the clear. 'An admission of drug use is usually grounds for inadmissibility,' former federal prosecutor Neama Rahmani told

The Post's Eileen Reslen of Harry's status in the States. 'That means Prince Harry's visa should have been denied or revoked because he admitted to using cocaine, mushrooms and other drugs' in his blockbuster memoir 'Spare.' But another legal expert, James Leonard, said, 'I don't see any issue with the disclosures . . . regarding recreational experimentation with drugs.'").

45.     The press has extensively and consistently covered the Request.  This coverage repeatedly surfaces and explores the question of whether DHS acted appropriately in admitting the Duke of Sussex.  It also surfaces related questions of whether DHS *is* acting appropriately in light of HRH's recent admissions in *Spare*.  Coverage also surfaces questions concerning the Duke of Sussex's CDS related admissions on his immigration status.

- *Daily Mirror Online* (Mar. 21, 2023), App. C202–03 (reporting on the Request and questions regarding both whether DHS acted appropriately in admitting HRH and whether DHS is acting appropriately as concerns HRH's current immigration status).

- *Daily Mail Online* (Mar. 21, 2023), App. C204–07 (reporting on the Request and questions regarding both whether DHS acted appropriately in admitting HRH and whether DHS is acting appropriately as concerns HRH's current immigration status).

- *Daily Mail Online* (Mar. 21, 2023), App. C204–07 (reporting on the Request and questions regarding both whether DHS acted appropriately in admitting HRH and whether DHS is acting appropriately as concerns HRH's current immigration status).

- *Daily Mirror* (Mar. 22, 2023), App. C132 (reporting on the Request).

- *Newsweek* (Mar. 22, 2023), App. C33–38 (reporting on the Request).

- *CE Latin American Migr. Newswire* (Mar. 22, 2023), App. C152; *Daily Mirror Online* (Mar. 21, 2023), App. C202–03 (reporting on the Request and questions regarding both whether DHS acted appropriately in admitting HRH and whether DHS is acting appropriately as concerns HRH's current immigration status).

- *Daily Mail Online* (Mar. 22, 2023), App. C176–80 (reporting on the Request and questions regarding both whether DHS acted appropriately in admitting HRH and whether DHS is acting appropriately as concerns HRH's current immigration status).

- *Mercury News* (Mar 22, 2023), App. C51–54 (reporting on the Request and questions regarding both whether DHS acted appropriately in admitting HRH and whether DHS is acting appropriately as concerns HRH's current immigration status).

- *The Sun* (Mar. 22, 2023), App. C55–60 (reporting on varying legal opinions as to whether HRH's CDS related admissions in *Spare* place his immigration status in legal jeopardy).

- *Daily Star Online* (Mar. 22, 2023), App. C200–01 ("Prince Harry's admission of drug use in bombshell book Spare may lead to legal troubles down the line, a former attorney has claimed after they say there is 'no exception' to drug use[. ] Prince Harry may find his US visa revoked after revelations about his drug use were aired in Spare, the Duke's bombshell autobiography.  A legal expert believes that the truthful Duke may have paved a way toward losing his right to reside in the United States because of his book.  Others, however, have said that the Duke of Sussex should be fine, so long as he does not find himself in prison for any other reason in the future.").

- *The Daily Signal* (Mar. 23, 2023), App. C14 (reporting extensively on the Request).

- *The Mercury* (Mar. 23, 2023), App. C134 (reporting on the Request and questions regarding whether DHS acted appropriately in admitting HRH; reporting "Eyebrows were raised over Harry's legal status in the US after the release of Spare in January, and the subsequent media blitz that mined the depths of his drug use.").

- *Hindustan Times* (Mar 22, 2023), App. C39–41 (reporting on the Request).

- *Daily Mail* (Mar. 23, 2023), App. C61–68 (extensively reporting on varying legal opinions as to whether HRH's CDS related admissions in *Spare* place his immigration status in legal jeopardy).

- *Express Online* (Mar. 23, 2023), App. C148–49 (reporting on the Request and questions regarding both whether DHS acted appropriately in admitting HRH and whether DHS is acting appropriately as concerns HRH's current immigration status; reporting on claims that the Duchess of Sussex and others should have "warned" HRH regarding discussing conduct involving CDS).

- *Express Online* (Mar. 23, 2023), App. C159–60 (reporting on the Request and questions regarding both whether DHS acted appropriately in admitting HRH and whether DHS is acting appropriately as concerns HRH's current immigration status).

- *Daily Star Online* (Mar. 23, 2023), App. C162–63 (reporting on the Request).

- *Daily Mail Online* (Mar. 24, 2023), App. C108–09 (reporting on the Request).

- *Express Online* (Mar. 24, 2023), App. C115–16 (reporting on the Request; reporting on an interview with a retired DHS Agent concerning process for admission to the United States).

- *Express Online* (Mar. 24, 2023), App. C136–37 (reporting on the Request and questions regarding both whether DHS acted appropriately in admitting HRH and whether DHS is acting appropriately as concerns HRH's current immigration status).

- *Express Online* (Mar. 24, 2023), App. C154–55 (reporting on the Request and questions regarding whether DHS acted appropriately in admitting HRH).

- *Express Online* (Mar. 24, 2023), App C156–57 (reporting on the Request and questions regarding both whether DHS acted appropriately in admitting HRH and whether DHS is acting appropriately as concerns HRH's current immigration status).

- *Yahoo!Life* (Mar. 25, 2023), App. C8–10 (discussing intense media interest in the topic of whether HRH's admissions relating to CDS in *Spare* could lead to revocation of his status in the United States; also discussing United States law on that point and discretion inherent in that law; recounting conflicting expert opinions as to whether DHS properly admitted HRH).

- *Express Online* (Mar. 26, 2023), App. C100 (reporting on the Request).

- *Sky News AU* (Mar. 27, 2023), App. C16–19 (discussing possible immigration consequences from HRH's CDS related admission in *Spare* and noting commentators' opinions that "[a]ll eyes will be on him because obviously situations that involve high-profile individuals you want to fairly apply the law because it could become quite scandalous if it's seen that Prince Harry is getting favorable treatment.").

- *Daily Mirror Online* (Mar. 27, 2023), App. C82–83 (reporting on varying legal opinions as to whether or not HRH's CDS related admissions in *Spare* place his immigration status in legal jeopardy; reporting on legal expert opinion that HRH is unlikely to face "immigration consequences" post revelations in *Spare*).

- *Express Online* (Mar. 27, 2023), App. C85–86 ("Meghan Markle 'should have warned' Prince Harry about drug use visa risk[. ] Meghan Markle should have warned Prince Harry that revealing his past drug use could put his US visa status at risk, a royal biographer has said.").

- *Noticias Financieras* (Mar. 27, 2023), App. C91–92 (reporting on the Request and questions regarding whether DHS acted appropriately in admitting HRH; reporting that "speaking to Page Six, former federal prosecutor Neama Rahmani noted that 'an admission of drug use is usually grounds for inadmissibility.  That means Prince Harry's visa should have been denied or revoked because he admitted to using cocaine, mushrooms and other drugs,' he added.  'There is no exception for royalty or recreational use.'").

- *Independent Online* (Mar. 28, 2023), App C350 (reporting on the Request).

- *Express Online* (Mar. 29, 2023), App. C80–81 (reporting on varying legal opinions as to whether or not HRH's CDS related admissions in *Spare* place his immigration status in legal jeopardy; reporting on legal expert opinion that HRH is unlikely to face "immigration consequences" post revelations in *Spare*).

- *Daily Mail Online* (Apr. 1, 2023) App. C339–40 (extensively reporting on the Request); *see also Daily Mirror Online* (Apr. 1, 2023), App. C343–44.

- *Daily Beast* (Apr. 2, 2023), App. C394–35 (reporting on the Request).

- *Telegraph Online* (Apr. 4, 2023) App. C412–13 (reporting on the Request and questions regarding whether DHS acted appropriately in admitting HRH and stating "a source close to the Duke and Duchess of Sussex said that Prince Harry had been truthful on his visa application, but would not be drawn on the extent to which he detailed his drug-taking").

- *Daily Mail Online* (Apr. 5, 2023), App. C398 ("Prince Harry 'may have to update US officials on his drug use' when he reapplies for visa this year—as pressure grows on authorities to reveal if Duke of Sussex was given special treatment when it was granted Prince Harry must renew his US visa this year, it has emerged, as pressure mounts for his original application to be published following his admissions of drug use.  In his memoir The Duke said he would 'roll a joint' and smoke it by himself at 36[. ] Sources say he has been honest with drug use to officials in US visa application[. ] The Duke of Sussex moved to California with his wife Meghan Markle in March 2020, meaning the typical three-year visa given to those who emigrate to the States should be coming to an end. The 38-year-old, who admitted past use of cannabis, magic mushrooms and cocaine in his bombshell memoir Spare, will therefore have to apply for a new visa, Green Card or full-blown citizenship if he wants to remain in the country.  But according to US immigration laws, foreigners who are 'determined to be a drug user' are classed as 'inadmissible'.  While officials can use their discretion to waive the rule, some American conservative voices fear Harry—who admitted in his memoir to 'rolling a joint' as recently as 2020—may have enjoyed special treatment.  Sources close to the Duke insisted last night that he was 'truthful' when he applied for residency in California, suggesting he informed immigration officials of his past drug use."); *see also id.* at C399–400 (reporting on the Request).

- *Daily Star Online* (Apr. 5, 2023), App C402–03 (reporting on the Request and questions regarding whether DHS acted appropriately in admitting HRH and stating, "Prince Harry reportedly did inform US authorities about the drug use mentioned in his bombshell memoir Spare.").

- *Express Online* (Apr. 5, 2023), App. C405–06 (reporting on the Request and questions regarding whether DHS acted appropriately in admitting HRH and stating "Prince Harry told custom officials in the US about his past drug use, an insider has claimed, adding that the 38-year-old was 'truthful' on his visa application"; "The taking of these drugs, which are Class A and Class B, was confirmed on the forms Harry had to fill out as he applied for a visa to live in the US, alongside his wife Meghan Markle and their two young children, Archie and Lilibet, the insider has claimed.").

- *Daily Beast* (Apr. 5, 2023), App. C409 (reporting on the Request and questions regarding whether DHS acted appropriately in admitting HRH and stating "Prince Harry's camp has suggested that he admitted to drug use when applying for an American visa").

46.     On April 11, 2023, *Newsweek* reported on the Request and questions regarding whether DHS acted appropriately in admitting the Duke of Sussex into the United States. *Newsweek* (Apr. 11, 2023) (Ex. 8).  That article also contained the results of a nationwide poll of 1,500 registered voters.  "Asked 'Given his admission in his book *Spare* that he previously consumed drugs, should Prince Harry's visa application be reviewed by the Department of Homeland Security?'  54 percent of respondents said 'yes,' while 29 percent said 'no' and 17 percent 'don't know.'"  This clearly shows the intense public interest in the issues raised by the Request.

## HRH the Duke of Sussex's Revelation of the Most Intimate of Life Details for Commercial Gain.

47.     To be sure, even public figures have privacy interests.  This is particularly so as regards the aspects of their life that are not implicated by their public status and which they take steps to separate from their public life and keep confidential.

48.     The Duke of Sussex, however, has made the *affirmative choice* to put almost every aspect of his life on display—including those aspects traditionally kept private by public figures.  In so doing, he has publicized not only his own most personal and private moments, but also those of HM the King, HRH The Prince and Princess of Wales, and the late HM the Queen. Moreover, these revelations have been made *explicitly* for massive commercial gain.  At the beginning of 2023, *Forbes* reported that since the Duke of Sussex stepped down as a working Royal, "Harry's bestselling *Spare* . . . —along with movies, television and podcasts . . . have an estimated value of more than $135 million."  Carlie Proterfield & Jonathan Ponciano, *Here's*

*What We Know About Prince Harry And Meghan Markle's $135 Million Deals*, Forbes (Jan. 19, 2023) (Ex. 9).  The article elaborated:

- **Spare.**  Forbes reported rumors that HRH received a $20 million dollar advance for *Spare*.  *Id.*  The "1.4 million copies" sold on release day led to *Spare* "becom[ing] the fastest-selling nonfiction book of all time, according to Guinness World Records."  *Id.*

- **Netflix.**  "Still perhaps their most lucrative deal yet, the couple signed a five-year, $100 million contract with Netflix in September 2020 to produce documentaries, docuseries, feature films, scripted shows and children's programming."  *Id.*

- **Spotify.**  "In December 2020, the former working royals penned a three-year podcasting deal with Spotify worth between $15 million to $18 million, according to industry sources, but some reports indicate it could be as much as $25 million."  *Id.*

49.     These various transactions made public details of virtually every aspect of the

Duke of Sussex's private life, including aspects normally kept private by other senior Royals.

Only a few examples are necessary to make this point.

50.     Take only those admissions made in *Spare* (which the Duke of Sussex personally

read for the audiobook):

- The Duke of Sussex reported on the then-HRH the Prince of Wales' neck and back injuries and his method of using headstands to treat pain from the same.  App. D14.

- The Duke of Sussex revealed that his father still carried with him his childhood teddy bear.  App. D40.

- The Duke of Sussex detailed losing his virginity in sensational language:  "Inglorious episode, with an older women.  She liked horses, quite a lot, and treated me not unlike a young stallion.  Quick ride, after which she'd smacked my rump and sent me off to graze.  Among the many things about it that were wrong:  It happened in a grassy field behind a busy pub."  App. D70.

- The Duke of Sussex revealed intimate details concerning his discomfort during his brother's wedding due to his "todger" being "frostnipped" from a trip to the North Pole.  App. D183.  After confirming that he had been circumcised and pondering why he had not discussed his frostbit "todger" with his father, brother, and others present at a pre-wedding dinner at Clarence House (App. D183), HRH proceeded to discuss intimate details of medical treatment for his condition.  "My penis was oscillating between extremely sensitive and borderline traumatized.  The last place I wanted to be was Frostnipistan.  I'd been trying some home remedies, including one recommended by a

friend.  She'd urged me to apply Elizabeth Arden cream.  *My Mum used that on her lips. You want me to put that on my todger?  It works, Harry.  Trust me.*  I found a tube, and the minute I opened it the smell transported me through time.  I felt as if my mother was right there in the room.  Then I took a smidge and applied it . . . down there.  'Weird' doesn't really do the feeling justice."  App. D188.  HRH then proceeded to describe the details of his treatment by a Harley Street specialist.  App. D188–89.  HRH later described that when preparing for a trip to the South Pole "one very close mate hired a seamstress to make me a bespoke cock cushion.  Square, supportive, it was sewn from pieces of the softest fleece and . . . Enough said."  App. D231.

- The Duke of Sussex recounted details of odd intensely personal moments, such as the now Duchess of Sussex's distress during an incident of food poisoning:  "From the floor she said softly:  *Please tell me you're not having to hold back my hair while I'm vomiting.  Yes.  I am.*"  App. D288.

- The Duke of Sussex recounted details of an argument with the now Duchess of Sussex after which she told him to seek therapy.  App. D306.

- The Duke of Sussex recounted not just the (commonly made public) fact of seeking therapy or its role in helping him, but he also recounted details of those therapy sessions.  App. D308–14.

- The Duke of Sussex recounted a highly personal conversation with his brother in which HRH claimed his brother "attacked" him.  App. D359–60.

- The Duke of Sussex recounted that during the birth of his first son he had "two ways of enhancing [his] calm"  App. D363.  The first was "Nando's chicken."  "Two:  A canister of laughing gas beside Meg's bed.  I took several slow, penetrating hits.  Meg[ . . . ] laughed and rolled her eyes.  I took several more hits and now I was bouncing, too.  When her contractions began to quicken, and deepen, a nurse came and tried to give some laughing gas to Meg.  There was none left.  The nurse looked at the tank, looked at me, and I could see the thought slowly dawning.  Gracious, the husband's had it all.  *Sorry*, I said meekly.  Meg laughed, the nurse had to laugh, and quickly changed the canister."  App. D363.

- The Duke of Sussex revealed the details of personal conversations with HM the Queen.  *E.g.*, App. D377.

- The Duke of Sussex recounted details of his security arrangements and relative threat levels assigned to the Royal Family.  App. D 387; *see also R. (on the Application of Duke of Sussex v. Sec. of State for the Home Dep't*, [2022] EWHC (Admin) 682 [6, 11] (sealing details in filings related to Royal security, including, "the level of threat assessments and persons for whom they have been carried out").

- The Duke of Sussex recounted the details of his "tell all" Oprah Winfrey interview.  He recounted that "[s]everal close mates and beloved figures in my life, including one of

Hugh and Emilie's sons, Emilie herself, and even Tiggy [HRH's nanny and at times surrogate mother], had chastised me for *Oprah*.  How could you reveal such things?  About your family?"  App. D397.

- The Duke of Sussex recounted the details of an intimate conversation between himself, his father, and his brother after HRH the Prince Phillip's funeral.  App. D5–7; App. D398–400.  The details reported were remarkable for revealing the most intimate parts of the now-HM the King's relationship with his sons:  "He stood between us, looking up at our flushed faces:  *Please, boys—don't make my final years a misery.*"  App. D6.

51.     The foregoing history of revealing virtually every aspect of private life for

commercial gain is perhaps best expressed by *South Park*'s biting and equal opportunity satire.

*South Park* deemed the contradiction between HRH's claims of privacy and his repeated public

actions to be so great they devoted an entire episode—*The World Wide Privacy Tour*—to

satirizing HRH.[7]  Under the old adage "a picture is worth a 1,000 words", a screenshot follows:



---

[7] For the avoidance of doubt, Plaintiffs take no position on the precise content or propriety of the satire.  Rather it is cited only to demonstrate public perception.

## PLAINTIFFS' FOIA REQUEST

### The Request

52.     Plaintiffs submitted their FOIA Request on March 9, 2023.  Pursuant to DHS's

decentralized FOIA system, the Request was sent to DHS Headquarters, USCIS, and CBP.  *See*

6 C.F.R. § 5.1(c).

53.     The Request sought the following information:

Section 1) All records within the Alien File (A-File) of Prince Henry Charles Albert
David (Date of Birth 09/15/1984) of the British Royal Family *aka* Prince Harry *aka* His
Royal Highness Prince Henry of Wales *aka* the Duke of Sussex, including but not limited
to:

- Any and all applications for immigration benefits filed, whether or not
  adjudicated;
- Any and all Forms I-213;
- Any and all Forms I-275; and
- Any and all Forms I-877.

Section 2) All records pertaining to the Duke of Sussex in the following system of
records maintained by CBP and DHS:

- Automated Targeting System (ATS, DHS/CBP-006);
- Advance Passenger Information System (APIS, DHS/CBP-005);
- Border Crossing Information System (BCIS, DHS/CBP-007);
- U.S. Customs and Border Protection TECS (DHS/CBP-011);
- Non-Federal Entity Data System (NEDS, DHS/CBP-008);
- DHS Use of the Terrorist Screening Database (TSDB) System of Records
  (DHS/ALL-030);
- CBP Intelligence Records System (CIRS, DHS/CBP-024);
- DHS Automated Biometric Identification System (IDENT, DHS/USVISIT-004);
- Electronic System for Travel Authorization (ESTA, DHS/CBP-009);
- Non immigrant Information System (NIIS, DHS/CBP-016);
- Arrival and Departure Information System (ADIS, DHS/CBP-021);and
- Electric Visa Update System (EVUS., DHS/CBP-022).

Section 3) All records relating to any requests for waiver pursuant to Section 212(d)(3) of
the Immigration and Nationality Act including, but not limited to, email communications
within the DHS Office of the Secretary, the USCIS Office of the Director, the CBP
Office of the Commissioner, or any subordinate office within those named departments
or agency or a record of any communication between any of those named entities and the

U.S. Department of State, the U.S. Embassy in London, the Federal Bureau of
Investigation, or U.S. Immigration and Customs Enforcement.

Request at 1–2.

54.     The Request sought a fee waiver based on the public interest in understanding
whether DHS acted properly in admitting the Duke of Sussex to the United States given his
repeated admissions of drug use and questions as to whether any immigration action should be
revoked post-HRH's extensive admissions of drug use in *Spare*.  *See id.* at 4–5.

55.     The Request also sought expedited processing pursuant to 6 C.F.R.
§ 5.5(e)(1)(iv), which provides for expedited processing for "[a] matter of widespread and
exceptional media interest in which there exist possible questions about the government's
integrity which affect public confidence."  *See* Request at 6–8.

56.     Plaintiffs' application for expedited processing was supported via a 126-page
Appendix A, which compiled "news articles and national TV transcripts covering the issue of
substance abuse by Prince Harry, including the Prince's own admissions regarding the use of
drugs such as cocaine and marijuana in his recent book *Spare*."  Request at 6; App. A.

### CBP's Denial and Plaintiffs' Administrative Appeal

57.     On March 9, 2023, CBP responded with what clearly was a "form" email and
assigned the Request the number CBP-FO-2023-053731.  Email from CBP to Mike Howell
(Mar. 9, 2023) (Ex. 10).  That response stated:

> Your FOIA request was reviewed as a third-party request and did not include
> authorization that information on this individual, or business, can be released to you.  All
> third party FOIA requests must include a signed G-28 or G-639 form, or a signed
> statement from the individual verifying that his/her information may be released to you.
> Or, if requesting records pertaining to a business or company, a signed statement on
> company letterhead.  Due to privacy concerns, CBP cannot confirm nor deny the
> existence of records on this individual or business.  Your FOIA request has been closed
> as insufficient.  Please resubmit your FOIA request, along with the required information,
> by logging into your existing SecureRelease account.

*Id.*  The email not only contained obvious form language (*e.g.*, "his/her"), but also contained

absolutely no mention of Plaintiffs' applications for expedited processing or a fee waiver.  It also

did not even consider the highly unusual nature of any privacy analysis of the Request given it

involves a case in which substantial media coverage surfaces the question (and attendant matter

of high public interest) of whether DHS acted appropriately in adjudicating a high-profile case of

entry into the United States by a celebrity figure who has affirmatively placed virtually every

hitherto private aspect of his life in the public domain for commercial gain.  DHS regulations

require such an analysis.  *See* 6 C.F.R. § 5.10(c) (DHS must produce records covered by the

Privacy Act to a third-party if FOIA requires disclosure of those records); *cf. id.* at § 5.3(a)(4)

("Where a request for records pertains to a third party, a requester *may* receive greater access by

submitting . . . a notarized authorization signed by that individual . . . ." (emphasis added)).  The

email also contained zero analysis of the specific showing in Appendix A that the Duke of

Sussex has a severely diminished privacy interest in the core factual privacy issues implicated by

the Request—the appropriateness of DHS' actions concerning his entry to, and status in, the

United States given his repeated public admissions of being a serial CDS violator.

58.     Plaintiffs administratively appealed this "denial" on April 15, 2023.  *See* Letter

from Mike Howell to CBP Appeals Office (Mar. 15, 2023) (Ex. 11) ("CPB Appeal").  Plaintiffs

began their appeal by noting that the form email they were sent on the same day they transmitted

the Request violated a host of DHS' own regulations regarding the procedures required to deny

or otherwise "close" a FOIA request:

> I am appealing the adverse determination denying my request in full because CBP
> violated DHS FOIA regulations, specifically, sections § 5.6(e), § 5.6 (e)(1), § 5.6 (e)(2),
> and § 5.6 (e)(3).  There was a violation of § 5.6(e) because no one signed off on the
> denial as required per statute.  There was a violation of § 5.6(e)(1), because there was no
> name, no title, no position of the person responsible for the denial as required by statute.

> There was a violation of § 5.6(e)(2), because there were no descriptions of the FOIA exemptions applied by CBP in denying the request, even though the statute states there should be a brief statement of the reasons for the denial, including any FOIA exemption applied by CBP in denying the request.  There was a violation of § 5.6(e)(3), because there was no estimate of the volume of the records withheld, or a statement that it was protected by an applicable exemption as required.

CBP Appeal at 2.  Plaintiffs then continued to explain why the all-but-certain "form" response appeared to have simply not even considered the unusual facts driving the merits of the Request:

> I am also appealing this request because I am questioning the adequacy of the search as per §5.8 (a)(1).  A third-party release is not necessary for this request because there is an overwhelming countervailing public interest in the disclosure.  Public confidence in the government would undoubtedly suffer if DHS, CBP, and USCIS failed to properly vet such a high-profile case.  Moreover, if Prince Harry was granted preferential treatment that would undermine public confidence in DHS, CPB, and USCIS's application of equal justice under the law.

*Id.*; *see also* 6 C.F.R § 5.10(c).  To be frank, the entirety of the CBP "denial" is acrid with the stench of deliberate unjustified delay.

59.     By statute and regulation, CBP is required to respond to the CBP Appeal in 20 business days.  5 U.S.C. § 552(a)(6)(A)(ii); 6 C.F.R. § 5.8(d).

60.     Plaintiffs have heard nothing further from CBP.

### USCIS Meet and Confer

61.     On or about March 13, 2023, Counsel for Plaintiffs received a call from USCIS indicating that they were having difficulty locating the Duke of Sussex's A-File.  USCIS indicated that they were contacting Plaintiffs in hopes of conferring and gathering more information to process the Request.

62.     No matter how an alien is authorized to enter the Country, they will have an A-File in some form.  USCIS makes commonly requested A-Files publicly available in their FOIA electronic reading room.  *See* USCIS, Electronic Reading Room, *found at* https://www.uscis.gov/records/electronic-reading-

room?topic_id%5B%5D=33658&ddt_mon=&ddt_yr=&query=&items_per_page=10 (last visited

Apr. 29, 2023).

63.     Counsel for Plaintiffs immediately engaged with USCIS and explained that

because of conventions applicable to the naming of senior members of the Royal Family, it is

possible that the Duke of Sussex used any number of names on immigration forms.  For

example, counsel for Plaintiffs posited that HRH could have given his last name as "Windsor",

"Wales", or "Sussex".  USCIS thanked Counsel for Plaintiffs for their assistance.  Counsel for

Plaintiffs made clear that USCIS should not hesitate to contact them if additional questions arose

and that they were committed to being helpful.  Counsel for Plaintiffs subsequently stated on the

record to numerous press outlets that Plaintiffs greatly appreciated USCIS' cooperation and

thought the call was productive.  *See, e.g.*, *Express UK* (Mar. 23, 2023), App. C121.

64.     Regrettably, Plaintiffs have received nothing further from USCIS.

**Plaintiffs Supplement Their Expedited Processing Applications**

65.     DHS, CBP, and USCIS were required by law to make a determination on

Plaintiffs' application for expedited processing 10 days from receipt of the Request.  5 U.S.C.

§ 552(a)(6)(E)(ii)(I); 6 C.F.R. § 5.5(e)(4).

66.     Ten days from March 9, 2023 is March 19, 2023.  And even if DHS attempts to

allege some issue with internal routing of the Request and invoke regulatory tolling, a

determination on Plaintiffs' expedited processing application would be due by April 3, 2023 at

the latest.  *See* 6 C.F.R. § 5.5(e)(2) & (4).

67.     On April 5, 2023, these statutory and regulatory deadlines having come and gone,

Plaintiffs transmitted a letter to DHS, CBP, and USCIS supplementing their claims for expedited

processing in hopes of prompting some form of action on the underlying application for

expedited processing.  Letter from Mike Howell to DHS (Apr. 5, 2023) (Ex. 13); Letter from

Mike Howell to CBP (Apr. 5, 2023) (Ex. 14); Letter from Mike Howell to USCIS (Apr. 5, 2023)

(Ex. 15) ("Expedition Supps.").  These identical letters submitted three additional Appendices,

B, C, and D.

- **Appendix B** "contains a number of news reports and articles reporting on Department of Homeland Security ("DHS") denials of entry to the United States based on admissions of drug use or other similar conduct.  Many of these articles question whether DHS is consistently and fairly discharging the law in this area."  Expedition Supps. at 1.

- **Appendix C** "contains a number of articles that specifically cover the issue of HRH the Duke of Sussex KCVO's drug use and its interaction with HRH ability to lawfully enter and remain in the United States.  Many of these articles question the role of the DHS in this process and thus raise 'possible questions about the government's integrity that affect public confidence' in that they suggest there was some impropriety in HRH's admission to the United States. . . .  Many of these articles specifically comment on the Request and the 'possible questions about the government's integrity that affect public confidence' it surfaces via asking questions about HRH's long and admitted history of drug use and admission to the United States.  They thus clearly demonstrate on-going and intense public interest in 'possible questions about the government's integrity that affect public confidence' surfaced by the Request."  *Id.*

- **Appendix D** "is an Amazon Kindle redemption code to allow DHS to obtain a copy of HRH's book *Spare* and formally enter that entire book into the record."  *Id.*

68.     Appendices B and C were provided by static URL link.  *See id.* at 1 n.1 & n.2; *see also* http://thf_media.s3.amazonaws.com/2023/Oversite_Project/PrinceHarry_Appendix_B-C.pdf

69.     Appendix D was provided by Amazon Kindle redemption link.  *See* Expedition Supp. at 1.

70.     Ten days from April 5, 2023 is April 15, 2023.  And even if DHS attempts to allege some issue with internal routing, the applicable calculation from the date of supplementation would be April 30, 2023 at the latest.  *See* 6 C.F.R. § 5.5(e)(2) & (4).

71.    On April 13, 2023, Plaintiffs were contacted by the CBP FOIA and Appeals

Policy Branch.  *See* Secure Message via SecureRelease Portal (Ex. 15).  The message asked

Plaintiffs to "send Appendix B and C again (the various articles you provided)."  The message

explained that "[u]nfortunately, we experienced a technical difficulty and now we cannot gain

access to them.  I apologize for the inconvenience this causes."  *Id.*

72.    Because Appendices B and C were transmitted by static link, there is no apparent

logical explanation for CBP's April 13, 2023 request other than delay.

73.    Plaintiffs did not receive this message until on or about April 19, 2023.  Plaintiffs

replied with the static URL link on April 20, 2023.  *Id.*

**Plaintiffs Constructively Exhaust Their Administrative Remedies.**

74.    Twenty business days from March 9, 2023 is April 6, 2023.

75.    Thirty business days from March 9, 2023 is April 20, 2023.

76.    Twenty business days from March 15, 2023 is April 12, 2023.

77.    On April 6, 2023, Plaintiffs received an acknowledgement from DHS

Headquarters.  *See* Letter from Jimmy Wolfrey to Mike Howell (Apr. 6, 2023) (Ex. 16) ("DHS

Letter").  This correspondence assigned the Request tracking number 2023 HQFO-01164.  The

DHS letter stated:

> After careful review of your FOIA request, we determined that your request is too broad
> in scope, did not specifically identify the records which you are seeking, or only posed
> questions to the agency.  Records must be described in reasonably sufficient detail to
> enable government employees who are familiar with the subject area to locate records
> without placing an unreasonable burden upon the agency.  For this reason, §5.3(b) of the
> DHS regulations, 6 C.F.R. Part 5, require that you describe the records you are seeking
> with as much information as possible to ensure that our search can locate them with a
> reasonable amount of effort.  Whenever possible, a request should include specific
> information about each record sought, such as the date, title or name, author, recipients,
> and subject matter of the records, if known, or the CISA program office you believe
> created and/or controls the record.  The FOIA does not require an agency to create new

records, answer questions posed by requesters, or attempt to interpret a request that does not identify specific records.

DHS Letter at 1–2.  The DHS letter said nothing about Plaintiffs' fee waiver and expedited processing applications.

78.     This statement is factually inaccurate, takes a frivolous position, and almost certainly was transmitted for the purpose of improper delay.

79.     As an initial matter, the DHS Letter plainly never conducted a "careful review" of the Request.  *Id.* at 1.  Far from it.  The DHS Letter is clearly a "form" letter, purporting to describe the content of the Request in the *disjunctive*.  S*ee id.* at 1 ("we determined that your request is too broad in scope, did not specifically identify the records which you are seeking, *or* only posed questions to the agency"(emphasis added)).  Moreover, the form language chides Plaintiffs for failing to provide (among other things) the "subject matter of the records"— immediately after quoting language seeking specific records about specific forms related to the Duke of Sussex.  The DHS Letter closed by requesting:

> Please resubmit your request containing a reasonable description of the records you are seeking.  This is not a denial of your request.  Upon receipt of a perfected request, you will be advised as to the status of your request.  If we do not hear from you within 30 days from the date of this letter, we will assume you are no longer interested in this FOIA request, and the case will be administratively closed.

Neither FOIA nor DHS regulations permit such a non-response response.

80.     Plaintiffs responded on April 24, 2023, via email, writing:

> This is a response to your April 6, 2023 letter, regarding 2023-HQFO-01164.  This correspondence . . . is factually inaccurate (clearly it is a form document and reflects no sort of requisite individualized consideration), frivolous, and almost certainly sent for improper delay.  The Request is clear and legal[ly] sufficient.  Please process it.

81.     Plaintiffs have received no further correspondence regarding the Request or Appeal.

**FIRST CLAIM FOR RELIEF**
**Violation of FOIA, 5 U.S.C. § 552**
**Failure to Conduct Adequate Searches for Responsive Records.**

82.    Plaintiffs re-allege paragraphs 1–81 as if fully set out herein.

83.    FOIA requires all doubts to be resolved in favor of disclosure.  "Transparency in government operations is a priority of th[e Biden] . . . Administration."  Attorney General, *Memorandum for Heads of Executive Departments and Agencies:  Freedom of Information Act Guidelines*, at 4 (Mar. 15, 2022).

84.    Plaintiffs properly requested records within the possession, custody, and control of Defendant.

85.    Defendant is subject to FOIA, and therefore must make reasonable efforts to search for requested records.

86.    Defendant has failed to promptly review agency records for the purpose of locating and collecting those records that are responsive to Plaintiffs' FOIA Request.

87.    Defendant's failure to conduct searches for responsive records violates FOIA and DHS regulations.

88.    Plaintiffs have a statutory right to the information they seek.

89.    Defendant is in violation of FOIA.

90.    Plaintiffs are being irreparably harmed by reason of Defendant's violation of FOIA.  Plaintiffs are being denied information to which they are statutorily entitled and that is important to carrying out Plaintiffs' functions as a non-partisan research and educational institution and publisher of news.  Plaintiffs will continue to be irreparably harmed unless Defendant is compelled to comply with the law.

91.    Plaintiffs have no adequate remedy at law.

92.     Plaintiffs have constructively exhausted their administrative remedies.

## SECOND CLAIM FOR RELIEF
### Violation of FOIA, 5 U.S.C. § 552
### Wrongful Withholding of Non-Exempt Responsive Records

93.     Plaintiffs re-allege paragraphs 1–92 as if fully set out herein.

94.     FOIA requires all doubts to be resolved in favor of disclosure.  "Transparency in government operations is a priority of th[e Biden] . . . Administration."  Attorney General, *Memorandum for Heads of Executive Departments and Agencies:  Freedom of Information Act Guidelines*, at 4 (Mar. 15, 2022).

95.     Plaintiffs properly requested records within the possession, custody, or control of Defendant.

96.     Defendant is subject to FOIA, and therefore must release to a FOIA requester any non-exempt records and provide a lawful reason for withholding any records.

97.     Defendant is wrongfully withholding non-exempt records requested by Heritage by failing to produce any records responsive to Plaintiffs' FOIA Request.

98.     Defendant is wrongfully withholding non-exempt agency records requested by Plaintiffs by failing to segregate exempt information in otherwise non-exempt records responsive to Plaintiffs' FOIA Request.

99.     Defendant's failure to provide all non-exempt responsive records violates FOIA and DHS regulations.

100.    Plaintiffs have a statutory right to the information they seek.

101.    Defendant is in violation of FOIA.

102.    Plaintiffs are being irreparably harmed by reason of Defendant's violation of FOIA.  Plaintiffs are being denied information to which they are statutorily entitled and that is

important to carrying out Plaintiffs' functions as a non-partisan research and educational institution and publisher of news.  Plaintiffs will continue to be irreparably harmed unless Defendant is compelled to comply with the law.

103.    Plaintiffs have no adequate remedy at law.

104.    Plaintiffs have constructively exhausted their administrative remedies.

<u>THIRD CLAIM FOR RELIEF</u>
**Violation of FOIA, 5 U.S.C. § 552**
**Wrongful Denial of Fee Waiver**

105.    Plaintiffs re-allege paragraphs 1–104 as if fully set out herein.

106.    FOIA requires all doubts to be resolved in favor of disclosure.  "Transparency in government operations is a priority of th[e Biden] . . . Administration."  *Attorney General, Memorandum for Heads of Executive Departments and Agencies:  Freedom of Information Act Guidelines*, at 4 (Mar. 15, 2022).

107.    Plaintiffs properly requested records within the possession, custody, or control of Defendant.

108.    Defendant has constructively denied Plaintiffs' application for a fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(ii) & (iii) and 6 C.F.R. § 5.11(d)(2).

109.    The Request does not have a commercial purpose because Heritage is a 501(c)(3) nonprofit, Howell acts in his capacity as a Heritage employee, and release of the information sought does not further Plaintiffs' commercial interest.

110.    Plaintiffs are members of the news media as they "gather[] information of potential interest to a segment of the public, use[] . . . [their] editorial skills to turn the raw materials into a distinct work, and distribute[] that work to an audience" via Heritage's major news outlet, *The Daily Signal*.  5 U.S.C. § 552(a)(4)(a)(ii).

111.    Disclosure of the information sought by the Request also "is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government."  5 U.S.C. § 552(a)(4)(A)(iii).

112.    Defendant has "failed to comply with a[]time limit under paragraph (6)" as to the Request.  5 U.S.C. § 552(a)(4)(A)(viii)(I).

113.    Plaintiffs have a statutory right to a fee waiver.

114.    Defendant is in violation of FOIA by denying a fee waiver.

115.    Plaintiffs are being irreparably harmed by reason of Defendant's violation of FOIA.  Plaintiffs are being denied a fee waiver to which they are statutorily entitled and that is important to carrying out Plaintiffs' functions as a non-partisan research and educational institution and publisher of news.  Plaintiffs will continue to be irreparably harmed unless Defendant is compelled to comply with the law.

116.    Plaintiffs have no adequate remedy at law.

117.    Plaintiffs have constructively exhausted their administrative remedies.

**FOURTH CLAIM FOR RELIEF**
**Violation of FOIA, 5 U.S.C. § 552**
**Statutory Bar Against Charging Fees**

118.    Plaintiffs re-allege paragraphs 1–117 as if fully set out herein.

119.    FOIA requires all doubts to be resolved in favor of disclosure.  "Transparency in government operations is a priority of th[e Biden] . . . Administration."  Attorney General, *Memorandum for Heads of Executive Departments and Agencies:  Freedom of Information Act Guidelines*, at 4 (Mar. 15, 2022).

120.    Plaintiffs properly requested records within the possession, custody, or control of Defendant.

121.    The Request does not have a commercial purpose because Heritage is a 501(c)(3) nonprofit, Howell acts in his capacity as a Heritage employee, and release of the information sought does not further Plaintiffs' commercial interest.

122.    Plaintiffs are members of the news media as they "gather[] information of potential interest to a segment of the public, use[] . . . [their] editorial skills to turn the raw materials into a distinct work, and distribute[] that work to an audience" via Heritage's major news outlet, *The Daily Signal*.  5 U.S.C. § 552(a)(4)(a)(ii).

123.    Disclosure of the information sought by the Request also "is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government."  5 U.S.C. § 552(a)(4)(A)(iii).

124.    Defendant has "failed to comply with a[]time limit under paragraph (6)" as to the Request.  5 U.S.C. § 552(a)(4)(A)(viii)(I).

125.    Defendant is currently statutorily barred from charging fees related to Plaintiffs' FOIA Request.  Therefore, Plaintiffs have a statutory right to have their request processed without being charged any fees.

126.    Plaintiffs are being irreparably harmed by reason of Defendant's violation of FOIA.  Plaintiffs will continue to be irreparably harmed unless Defendant is compelled to comply with the law.

127.    Plaintiffs have no adequate remedy at law.

128.    Plaintiffs have constructively exhausted their administrative remedies.

### FIFTH CLAIM FOR RELIEF
**Violation of FOIA, 5 U.S.C. § 552**
**Wrongful Denial of Expedited Processing**

129.    Plaintiffs re-allege paragraphs 1–128 as if fully set out herein.

130.    FOIA requires all doubts to be resolved in favor of disclosure.  "Transparency in government operations is a priority of th[e Biden] . . . Administration."  *Attorney General, Memorandum for Heads of Executive Departments and Agencies:  Freedom of Information Act Guidelines*, at 4 (Mar. 15, 2022).

131.    Plaintiffs properly requested records within the possession, custody, or control of Defendant.

132.    Plaintiffs properly asked that DHS expedite the processing of Plaintiffs' FOIA Request, based upon Plaintiffs' showing that the Request concerns "an urgency to inform the public about an actual or alleged federal government activity, if made by a person who is primarily engaged in disseminating information."  6 C.F.R. § 5.5(e)(1)(ii).

133.    Defendant refused in part to expedite Plaintiffs' FOIA Request, contrary to the factual and legal showing Plaintiffs made demonstrating their entitlement to expedition.

134.    Defendant is in violation of FOIA.

135.    Plaintiffs are being irreparably harmed by reason of Defendant's violation of FOIA.  Plaintiffs are being denied information to which they are statutorily entitled to on an expedited basis and that is important to carrying out Plaintiffs' functions as a non-partisan research and educational institution and publisher of news.  Plaintiffs will continue to be irreparably harmed unless Defendant is compelled to comply with the law.

136.    Plaintiffs have no adequate remedy at law.

**WHEREFORE** as a result of the foregoing, Plaintiffs pray that this Court:

A.    Enter a preliminary and permanent injunction compelling Defendant to process Plaintiffs' FOIA Request on an expedited basis.

B.      Order Defendant to conduct a search or searches reasonably calculated to uncover all records responsive to Plaintiffs' FOIA Request;

C.      Order Defendant to produce, within twenty days of the Court's order, or by such other date as the Court deems appropriate, any and all non-exempt records responsive to Plaintiffs' FOIA Request and indexes justifying the withholding of any responsive records withheld in whole or in part under claim of exemption;

D.      Enjoin Defendant from continuing to withhold any and all non-exempt records responsive to Plaintiffs' FOIA Request;

E.      Enjoin Defendant from assessing fees or costs for Plaintiffs' FOIA Request;

F.      Retain jurisdiction over this matter as appropriate;

G.      Award Plaintiffs their costs and reasonable attorneys' fees in this action as provided by 5 U.S.C. § 522(a)(4)(E); and

H.      Grant such other and further relief as this Court may deem just and proper.

Dated:  May 1, 2023              Respectfully submitted,

                        /s/ Samuel Everett Dewey
                     SAMUEL EVERETT DEWEY
                     (No. 999979)
                     Chambers of Samuel Everett Dewey, LLC
                     Telephone:  (703) 261-4194
                     Email:  samueledewey@sedchambers.com

                     DANIEL D. MAULER
                     (No. 977757)
                     The Heritage Foundation
                     Telephone:  (202) 617-6975
                     Email:  Dan.Mauler@heritage.org

                     ROMAN JANKOWSKI
                     (No. 975348)
                     The Heritage Foundation

Telephone:  (202) 489-2969
Email:  Roman.Jankowski@heritage.org

*Counsel for Plaintiffs*