**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| HERITAGE FOUNDATION & MIKE HOWELL | ) ) ) |
|  | ) |
| *Plaintiffs*, | ) |
|  | ) |
| v. | ) |
|  | ) |
| U.S. DEPARTMENT OF HOMELAND SECURITY | ) ) ) |
| *Defendants*. | ) ) |

Case No. 23-cv-1198 (CJN)

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................................. i

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ....................................................................................................... 1

LEGAL STANDARD ................................................................................................. 5

ARGUMENT .............................................................................................................. 7

   I.  PRELIMINARY INJUNCTIONS IN FOIA CASES ..................................... 8

  II.  PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS. ........................................................................................................ 9

     A.  Construction of 6 C.F.R. § 5.5(e)(1)(iv). ............................................... 9

     B.  Whether DHS Acted Appropriately To Admit the Duke of Sussex and to Continue His Current Immigration Status is a "Matter of Widespread and Exceptional Media Interest." ................................................................. 13

     C.  Questions as to Whether DHS Exercised Proper Discretion As Concerns the Duke of Sussex's Immigration Status Are "Possible Questions About the Integrity of the Government that Affect Public Confidence." ............................... 14

  II.  PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION. ................................................................. 17

  III.  THE EQUITIES FAVOR GRANTING A PRELIMINARY INJUNCTION ......... 23

CONCLUSION ......................................................................................................... 24

i

## TABLE OF AUTHORITIES

**Cases**

*ACLU v. DOJ*, 321 F.Supp.2d 24 (D.D.C. 2004) .................................................................. 6, 11

*Al-Fayed v. CIA*, 254 F.3d 300 (D.C. Cir. 2001)............................................................................ 5

*Am. Immigr. Council v. DHS*, 470 F.Supp.3d 32 (D.D.C. 2020)................................................. 9

*Am. Oversight v. Dep't of State*, 414 F.Supp.3d 182 (D.D.C. 2019)............................................ 9

*\*Am. Oversight v. DOJ*, 292 F.Supp.3d 501, 507–08 (D.D.C. 2018)…..………………….…..passim

*Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531 (1987) .................................................. 19

*Apotex. Inc. v. FDA*, No. 06-cv-627 (JDB), 2006 WL 1030151 (D.D.C. Apr. 19, 2023) ........... 20

*\*Brennan Ctr. v. Dep't of Com.*, 498 F.Supp.3d 87 (D.D.C. 2020) ..................................... passim

*\*CREW v. DOJ*, 436 F.Supp.3d 354 (D.D.C. 2020)............................................................ passim

*CREW v. DOJ*, 820 F.Supp.2d 39 (D.D.C. 2011)......................................................................... 13

*CREW v. DOJ*, No. 05-cv-2078 (EGS), 2006 WL 1518964, \*1 (D.D.C. June 1, 2006) ............. 13

*Ctr. for Pub. Integrity v. DOD*, 411 F.Supp.3d 5 (D.D.C. 2019) .................................................. 9

*Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288 (D.C. Cir. 2009) ....................................... 5

*Edmonds v. FBI*, 417 F.3d 1319 (D.C. Cir. 2005) ................................................................. 17, 18

*\*Edmonds v. FBI*, No. 02-cv-1294 (ESH), 2002 WL 32539613, \*3 (D.D.C. Dec. 3, 2002) passim

*Elec. Frontier Found. v. DOJ*, 563 F.Supp.2d 188 (D.D.C. 2008)............................................... 13

*Elec. Frontier Found. v. ODNI*, 542 F.Supp.2d 1181 (N.D. Cal. 2008) ....................................... 9

*Elec. Frontier Found. v. ODNI*, No. 07-cv-5278 (SI), 2007 WL 4208311 (N.D. Cal. Nov. 27, 2007) ............................................................................................................................................. 9

*EPIC v. DOJ*, 322 F.Supp.2d 1 (D.D.C. 2003)............................................................................. 6

*EPIC v. DOJ*, 416 F.Supp.2d 30 (D.D.C. 2006) (Kennedy, J.) ................................. 9, 20, 21, 22

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ........................................................... 6

*Heritage Foundation v. EPA*, No. 23-cv-748 (JEB), 2023 WL 2954418 (D.D.C. Apr. 14, 2023) ............................................................................................................................................... 22

*Jasperson v. Fed. Bureau of Prisons*, 460 F.Supp.2d 76 (D.D.C 2006) ..................................... 20

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mutual Ins. Co.*, 463 U.S. 29 (1983) ............... 7

*Muttitt v. Dep't of State*, 926 F.Supp.2d 284 (D.D.C. 2013) ...................................................... 18

*Nken v. Holder*, 556 U.S. 418 (2009) ......................................................................................... 22

*Payne Enter., Inc. v. United States*, 837 F.2d 486 (D.C. Cir. 1988) ............................................ 17

*Prot. Democracy Project v. DOJ*, 498 F.Supp.3d 132 (D.D.C. 2020) ........................................... 9

*Prot. Democracy Project, Inc. v. DOD*, 263 F.Supp.3d 293 (D.D.C. 2017) .................................. 9

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011) ....................................................................... 5

*Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971) ...................................................................... 19

*Tenn. Valley Authority v. Hill*, 437 U.S. 153 (1978) ................................................................... 20

*Wash. Post v. Dep't Homeland Sec.*, 459 F.Supp.2d 61 (D.D.C. 2006) ..................... 9, 21, 22, 23

*Wash. Post v. Dep't of State*, 685 F.2d 698 (D.C. Cir. 1982) ..................................................... 19

*Weinberger v. Romero-Barcelo*, 456 U.S. 305, 314 (1982) ........................................................ 19

*White v. DOJ*, 16 F.4th 539, 544 (7th Cir. 2021) ....................................................................... 16

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ............................................................ 5

**Statutes**

5 U.S.C. § 552(a)(6)(D) ............................................................................................................... 18

5 U.S.C. § 552(a)(6)(E) ........................................................................................................ passim

iii

5 U.S.C. § 552(a)(6)(E)(iii)................................................................................................ 7

**Regulations**

28 C.F.R. § 16.5(e)(1)(iv) ............................................................................... 10, 11, 16

28 C.F.R. § 16.5(e)(3) ............................................................................................... 11

6 C.F.R § 5.5(b) ....................................................................................................... 18

6 C.F.R. § 5.5(e)(1)(iv) ..................................................................................... passim

6 C.F.R. § 5.5(e)(3) ................................................................................................. 11

6 C.F.R. § 5.5(e)(4) ................................................................................................. 18

\*  Authorities on which we principally rely are marked with asterisks.

## INTRODUCTION

The underlying case is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to compel the production of information related to the Department of Homeland Security's decisions to admit HRH Prince Henry Charles Albert David George of Wales, the Duke of Sussex, Earl of Dumbarton, and Baron Kikeel K.C.V.O. ("HRH" or "Duke of Sussex")[1] into the United States and to allow him to remain to date.  *See* Plaintiffs' FOIA Request (Mar. 8, 2023) ("Request" or "Plaintiffs' FOIA Request") (ECF No 7-2).  The Request was sent to DHS Headquarters ("DHS HQ"), Customs and Border Protection ("CBP"), and United States Citizenship and Immigration Services ("USCIS").  This motion only concerns DHS HQ and CBP.

In his recent best-selling biographical book—*Spare* (ECF No. 7-8)—and in the surrounding media campaign to sell that book, the Duke of Sussex admitted to the point of bragging about repeated and frequent illegal drug use.  While writing his tell-all, the Duke of Sussex confessed in writing to the essential elements of multiple drug offenses under the law of the United States and in other jurisdictions abroad.  U.S. immigration law, however, generally renders such a person inadmissible for entry to the United States.  To enter, such an individual would need a special DHS waiver for a nonimmigrant visa—which even when granted normally involves a complicated process.  And yet, the Duke of Sussex appears to have had no trouble gaining a visa for entry to the United States.  Plaintiffs' FOIA Request seeks documents to

---

[1]  The Duke of Sussex is frequently referred to as "Prince Harry" by both the popular press and by himself.

1

explain why and to determine if the Duke of Sussex was improperly provided preferential treatment due to his celebrity status, political views, or political affiliations.

The FOIA Request sought expedited processing because it concerned "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence." 6 C.F.R. § 5.5(e)(1)(iv). *See* Request at 7–9.

The requested information is of immense public interest as it concerns DHS' conduct in an extraordinarily high-profile case:

- Widespread and continuous media coverage has raised the question of whether DHS properly admitted the Duke of Sussex in light of the fact that he has publicly admitted to the essential elements of a number of drug offenses in both the United States and abroad.

- Intense media coverage has also surfaced the question of whether DHS may have improperly granted the Duke of Sussex a waiver to enter the Country on a non-immigrant visa given his history of admissions to the essential elements of drug offenses.

- Finally, the media coverage has surfaced the question of whether DHS' decision to admit the Duke of Sussex into the United States should be reconsidered in light of the Duke of Sussex's most recent admissions to the essential elements of numerous drug offenses both here and abroad in his 2023 memoir, *Spare*.

Such questions have repeatedly been surfaced by the press as concerns reporting on other prior high-profile cases. *See* Am. Compl. at ¶ 24 (ECF No. 7). But the case of the Duke of Sussex is perhaps unique both in its profile and in its extensive media coverage of all aspects of the issue. Boiled down, it provides a perfect window into an age-old question: Is the government applying the law evenhandedly? That is the ultimate question that has received "widespread and exceptional" media interest.

Plaintiffs attempted to get answers to these questions via the DHS FOIA process.  But they got nowhere.  As detailed in the Amended Complaint, much of DHS HQ's and CBP's responses ignored FOIA's statutory requirements and appeared to intentionally delay resolution. *See* Am Compl. at ¶¶ 57–60 (CBP), 81–84 (DHS HQ).  On the issue of expedited processing, DHS HQ and CBP ignored the statutory 10-calendar-day deadline for making a decision.  *Id.* at ¶¶ 68–69.  Rather than initiate litigation, Plaintiffs chose to attempt to work with DHS HQ and CBP, going as far as to supplement the expedited processing record in hopes of prompting the Agency to act in the face of the overwhelming merit of Plaintiffs' application for expedited processing.  *Id.* at ¶¶ 70–72.  Even restarting the 10-day clock after supplementation, DHS HQ and CBP failed to respond in the required statutory time frame.  *Id.* at ¶ 74.  After filing the Complaint the early morning of May 1, 2023, Plaintiffs still attempted to resolve the expedited processing issue informally, contacting the Department of Justice that morning to meet and confer on the question rather then immediately pressing this motion.  Declaration of Samuel Everett Dewey In Support of Plaintiffs' Motion for a Preliminary Injunction ¶ 2 (May 10, 2023) Counsel for Plaintiffs communicated with the Department of Justice on May 2 and May 3, but the Department was unable to convey any position from DHS until May 4, when DHS asked for greater clarity on Plaintiffs' litigation posture.  *Id.* at ¶¶ 3–4.  After an exchange of email correspondence and a further call on May 5, DHS HQ and CBP have not altered their position. *Id.* at ¶¶ 5–6.  DHS HQ has failed to take any position apparently upon a supposition that they likely do not have responsive records.  *Id.*  CBP's position appears to be that because they denied the Request in full and that denial is on appeal, they need not respond to Plaintiffs' expedited

processing application at all even though that application's status is still "pending."  *Id.* at. ¶¶ 5–7; *see also* Am. Compl. at ¶¶ 57–60 (denial and appeal).  Accordingly, Plaintiffs are left with no alternative but to press this motion as to those components.[2]

This is an easy case.  Because Plaintiffs supplemented the expedited processing record weeks after filing the Request, the record in Appendix C (ECF No. 7-7) contains hundreds of pages of news articles that specifically report on *the Request* and the key questions noted above.  Thus, unlike a normal case, Plaintiffs have directly *tested* whether the questions the Request raises are "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence."  The answer:  An overwhelming YES.

A final word is necessary to ensure that this motion is not misconstrued.  This is *not* a case focused on the morality or probity of the Duke of Sussex.  The key question raised by the Request is how *DHS* acted towards the Duke of Sussex; that it also concerns the Duke of Sussex only goes to the immense public interest, appropriateness of DHS' responses (if any) to the Duke of Sussex's conduct, and questions of evenhanded application of law.  And this is an unusual case as concerns the Duke of Sussex.  Normally, even public figures tend to keep matters relating to drug use private.  But the Duke of Sussex relinquished any privacy interest regarding his drug use when he wrote about it in his best-selling book.  In fact, HRH affirmatively *sold* any privacy

---

[2] It is unclear what position USCIS has or is taking as regarding Plaintiffs' application for expedited processing.  Plaintiffs continue to confer with USCIS which has been the only component receptive to working cooperatively with Plaintiffs on the Request.  *See* Am. Compl. at ¶¶ 61–63.

interest regarding drug related conduct—at immense profit—when he published *Spare* and went on an intentional, wide-ranging, and highly choreographed publicity tour.  *See* Am. Compl. ¶¶ 27, 37, 39, 44.  In other words, the Duke of Sussex has sold virtually every aspect of his life normally kept private even by famous figures for immense commercial gain.  *Id.* ¶¶ 47–51.

## LEGAL STANDARD

1.      A plaintiff "seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  It is unclear whether the D.C. Circuit still follows the "'sliding scale'" approach under which "if the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor" (*Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009)), or reads *Winter* as requiring a showing of both a likelihood of success on the merits and irreparable harm.  *Compare Davis*, 571 F.3d at 1292 (reserving) *with Davis*, 571 F.3d at 1288 (Kavanaugh, J., concurring) (*Winter* requires showing "*both* a likelihood of success *and* a likelihood of irreparable harm, among other things"); *Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011) (suggesting the *Davis* concurrence may be correct, but ultimately reserving while noting a Circuit split on the issue).  Regardless, the issue is merely academic because Plaintiffs prevail under either standard.

2.      Review of a denial of expedited processing under FOIA generally is *de novo*.  *See Al-Fayed v. CIA*, 254 F.3d 300, 308 (D.C. Cir. 2001) (Garland, J.).  But when the ground for

expedition arises under a regulation promogulated by an agency pursuant to its authority under

FOIA (5 U.S.C. § 552(a)(6)(E)(i)(II)) to create grounds for expedited processing in addition to

the statutory "compelling need" ground, a different standard of review governs:

> A regulation promulgated in response to such an express delegation of authority to an individual agency is entitled to judicial deference, *see United States v. Mead Corp.*, 533 U.S. 218, ——, 121 S.Ct. 2164, 2171, 150 L.Ed.2d 292, —— (2001), as is each agency's reasonable interpretation of its own such regulations, *see United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, —— – ——, 121 S.Ct. 1433, 1444–45, 149 L.Ed.2d 401 (2001).

*Id.* at 307 n.7.  Therefore, the *Al-Fayed* Court analyzed whether "the agencies reasonably

determined" in that case that the expedited processing requests "did not meet the expanded

criteria."  *Id.*

   Courts have not agreed on the application of *Al-Fayed's* standard for non-statutory

expedited processing to a particular case.  But that dispute is not in issue here, because Plaintiffs

easily succeed under the view most deferential to the agency which reads *Al-Fayed* to require a

*State Farm* reasonableness review of the agency's action as well as deference to the agency's

construction of its own regulation.  *See, e.g.*, *CREW v. DOJ*, 436 F.Supp.3d 354, 359–60 (D.D.C.

2020); *EPIC v. DOJ*, 322 F.Supp.2d 1, 5 n.1 (D.D.C. 2003) ("EPIC I"), *vacated as moot*, No. 04-

5063, 2004 WL 2713119 (D.C. Cir. Nov. 24, 2004); *see also ACLU v. DOJ*, 321 F.Supp.2d 24,

31 (D.D.C. 2004) (applying "the reasonableness test").

   That standard, while deferential, requires "that an agency provide [a] reasoned

explanation for its action."  *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009).  If

an agency changes course, it must "ordinarily . . . display awareness that it *is* changing position,"

as well as "that there are good reasons for the new policy.  *Id.*; *see also Motor Vehicle Mfrs.*

*Ass'n of U.S. v. State Farm Mutual Ins. Co.*, 463 U.S. 29, 52 (1983).  Applying these principles to the specific context of entitlement to expedited processing under 6 C.F.R. § 5.5(e)(1)(iv), an agency receives little-to-no deference when it fails to provide a basis for its denial of expedited processing.  Under such circumstances, there simply is no agency decision to which to defer. *See CREW*, 436 F.Supp.3d at 361 ("Since the agency did nothing more than parrot its own regulatory language, and offered no reasoning or analysis, its decision, as in the APA context, is entitled to little deference.").  Post hoc justifications are not sufficient.  *Id.* at 361 n. 2 ("Since the agency did not identify any deficiency in this regard as a basis for its decision, it cannot argue now that its decision was appropriate based on some newly developed theory that was not stated in the record before the Court for review.").

    **3.**    Judicial review of an expedited processing determination is "based on the record before the agency at the time of the determination."  5 U.S.C. § 552(a)(6)(E)(iii).  As there is no determination on expedited processing at issue here, Plaintiffs view the relevant record as that existing as of filing this case.

## ARGUMENT

Plaintiffs are entitled to a preliminary injunction.  Courts in this District have regularly granted preliminary injunctions to enforce the timing provisions of FOIA's expedited processing provisions.  Plaintiffs have a clear likelihood of success on the merits.

Plaintiffs have presented overwhelming evidence that the Request concerns a matter of "widespread and exceptional media interest."  Indeed, because Plaintiffs supplemented the record, it is replete with articles reporting *directly on* Plaintiffs' FOIA Request.  Moreover, these

articles go directly to the key questions described above.  Extensive reporting of questions concerning whether DHS exercised its discretion "without fear or favor" raises "possible questions about the government's integrity which affect public confidence."

Plaintiffs will suffer irreparable harm absent a preliminary injunction.  They have a statutory entitlement concerning *timing*—they have a statutory right to have their request processed *more quickly* than other requests.  That statutory right is exclusively about time and priority in a set temporal window; if lost it cannot be remedied by other relief and thus it is the entire game.  Because that right originates from a statute that *requires* entry of injunctive relief upon proof of Plaintiffs' case on the merits, denial of that right yields irreparable harm.  And in cases where a preliminary injunction is sought to compel expedited processing, the public interest and the equities largely merge with the merits.  Accordingly, those equities weigh in favor of granting Plaintiffs' motion for a preliminary injunction.

In sum, Plaintiffs are entitled to a preliminary injunction compelling DHS HQ and CBP to process the Request on an expedited basis pursuant to 5 U.S.C. § 552(a)(6)(E) and 6 C.F.R. § 5.5(e)(1)(iv).

## I.  PRELIMINARY INJUNCTIONS IN FOIA CASES.

To be sure, a motion for a preliminary injunction does not typically arise in the garden-variety FOIA case.  But motions for preliminary injunctions *are* regularly brought in the procedural sub-set of FOIA cases where the requestor seeks but is denied expedited processing.  Numerous courts—including in this District—have entered preliminary injunctions to compel expedited processing:

- *Brennan Ctr. v. Dep't of Com.*, 498 F.Supp.3d 87 (D.D.C. 2020) (Kelly, J.);
- *Prot. Democracy Project v. DOJ*, 498 F.Supp.3d 132 (D.D.C. 2020) (Sullivan, J.) ("Prot. Democracy II");
- *Am. Immigr. Council v. DHS*, 470 F.Supp.3d 32 (D.D.C. 2020) (Hogan, J.);
- *Am. Oversight v. Dep't of State*, 414 F.Supp.3d 182 (D.D.C. 2019) ("Am Oversight II") (Cooper, J.);
- *Ctr. for Pub. Integrity v. DOD*, 411 F.Supp.3d 5 (D.D.C. 2019) (Kollar-Kotelly, J.);
- *Prot. Democracy Project, Inc. v. DOD*, 263 F.Supp.3d 293 (D.D.C. 2017) (Cooper, J.) ("Prot. Democracy I");
- *Elec. Frontier Found. v. ODNI*, 542 F.Supp.2d 1181 (N.D. Cal. 2008) ("EFF II");
- *Elec. Frontier Found. v. ODNI*, No. 07-cv-5278 (SI), 2007 WL 4208311 (N.D. Cal. Nov. 27, 2007) ("EFF I");
- *EPIC v. DOJ*, 416 F.Supp.2d 30 (D.D.C. 2006) (Kennedy, J.) ("EPIC II"); and
- *Wash. Post v. Dep't Homeland Sec.*, 459 F.Supp.2d 61 (D.D.C. 2006) (Urbina, J.).

Per the first principles set forth in the statute, this makes sense—a plaintiff with a statutory entitlement to expedited processing has a statutory right to expedition, *i.e.*, to have their request processed *more quickly*.  Every day that Plaintiffs are made to wait longer and have the Request processed in the "regular" track, their statutory timing right to expedited processing is violated. That right can only be vindicated by preliminary relief.

## II.     PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS.

In this posture, Plaintiffs must demonstrate that they are "'entitled to *expedited* processing and not just whether [they are] entitled to a response.'"  *Ctr. For Pub. Integrity*, 411 F.Supp.3d at 11 (quoting *Landmark Legal Found. v. EPA*, 910 F.Supp.2d 270, 274 (D.D.C. 2012)); *accord Brennan Ctr.*, 498 F.Supp.3d at 96.  Plaintiffs easily do so.

### A.     Construction of 6 C.F.R. § 5.5(e)(1)(iv).

DHS' regulation provides that expedited processing shall be granted as to a request concerning  "[a] matter of widespread and exceptional media interest in which there exists

possible questions about the government's integrity which affect public confidence."  6 C.F.R.

§ 5.5(e)(1)(iv).  While there is no judicial construction of this regulation, the Department of

Justice's identical regulatory expedited processing standard has been judicially construed.  *See*

28 C.F.R. § 16.5(e)(1)(iv) ("DOJ Regulation").

Courts have held that the DOJ Regulation requires the requester to show:  (1) that the

request involves a "matter of widespread and exceptional media interest"; and (2) that the matter

is one "in which there exists possible questions about the integrity of the government that affect

public confidence."  *Id.*; s*ee also Brennan Ctr.*, 498 F.Supp.3d at 97; *Edmonds v. FBI*, No. 02-

cv-1294 (ESH), 2002 WL 32539613, *3 (D.D.C. Dec. 3, 2002).  There is no "third" prong of this

test requiring Plaintiffs to show "prejudice or a matter of current exigency to the American

public" to satisfy the DOJ Regulation.  *Edmonds*, 2002 WL 32539613, at *3.

*Part 1 of the Test.*  The DOJ Regulation requires showing that the relevant questions of

government integrity are also the subject of widespread national media attention.  *See Am.*

*Oversight v. DOJ*, 292 F.Supp.3d 501, 507–08 (D.D.C. 2018) ("*Am. Oversight I*") (denying

motion for expedited processing because general media interest in Solicitor General's

nomination is insufficient to show media interest in possible ethics questions concerning the

nomination).  There need not be a showing that the disclosure would shed considerable light on

agency operations; only that there is "exceptional" and "widespread" media interest.  *See*

*Edmonds*, 2002 WL 32539613, at *3; *cf. CREW v. DOJ*, 870 F.Supp.2d 70, 81 n.14 (D.D.C.

2012), *rev'd on other grounds*, 746 F.3d 1082 (D.C. Cir. 2014).  While the media interest needs

to be "widespread" and "exceptional," it need not be overwhelming.  *See, e.g.*, *Brennan Ctr.*, 498

10

F.Supp.3d at 97 (test met by requestor's citation to "more than fifty recent articles" on the subject of the request, which was "considerably more than has sufficed in other cases"); *ACLU*, 321 F.Supp.2d at 31–32 (rejecting DOJ's position that requester's citation to what the court described as "only a handful of articles" was insufficient to show "widespread and exceptional media interest" because those articles "were published in a variety of publications and repeatedly reference the ongoing national discussion about the Patriot Act and Section 215" (second quotation added)); *Edmonds*, 2002 WL 32539613, at *3 (numerous national newspaper and network television broadcasts concerning a whistleblower's allegations of security lapses in FBI translator program met test).[3]

The fit between the call of the request and the matter of "widespread and exceptional" media interest need not be exact—mere reasonableness suffices. *See Brennan Ctr.*, 498 F.Supp.3d at 98.

*Part 2 of the Test*. The DOJ Regulation requires showing that "'there exists *possible* questions about the government's integrity that affect public confidence.'" *CREW*, 436 F.Supp.3d at 361 (quoting 28 C.F.R. § 16.5(e)(1)(iv)). It does not "require the requester to prove wrongdoing by the government in order to obtain documents on an expedited basis." *Id.* Nor does it require "suggest[ing] any dishonesty." *Brennan Ctr.*, 498 F.Supp.3d at 97. Merely raising questions as to the "soundness" of a high-profile government decision suffices. *Id.* at 97

---

[3] *Cf.* 6 C.F.R. § 5.5(e)(3) ("The existence of numerous articles published on a given subject can be helpful in establishing the requirement that there be an 'urgency to inform' the public on the topic."); 28 C.F.R. § 16.5(e)(3) (same).

("*see* Integrity, Black's Law Dictionary (11th ed. 2019) (defining 'integrity' to include 'soundness'); Integrity, American Heritage Dictionary (5th ed. 2018) (same)").

"The primary way to determine whether such possible questions exist is by examining the state of public coverage of the matter at issue, and whether that coverage surfaces possible ethics issues so potentially significant as to reduce public confidence in governmental institutions." *Am. Oversight I*, 292 F.Supp.3d at 508.  This is not a high bar.  *See, e.g.*, *Brennan Ctr.*, 498 F.Supp.3d at 97 (possible questions regarding accuracy or legality of census calculations implicate "government integrity"); *CREW*, 436 F.Supp.3d at 361 (complaint sufficient to survive a motion to dismiss where it alleged Attorney General's action regarding disclosure of Mueller Report "supported an inference that at best, the Attorney General undertook to frame the public discussion on his own terms while the report itself remained under wraps, and at worst, that he distorted the truth"); *ACLU*, 321 F.Supp.2d at 32 (allegations in press that Section 215 of the Patriot Act *may* be unconstitutional, was subject to proposed repeal, and reports that Members of Congress were concerned about *potential* abuses of Section 215 even though that statute apparently "'had never been used'" "implicate[] government integrity" and hence are sufficient to meet test despite appearing to be necessarily speculative (internal citation omitted)); *Edmonds*, 2002 WL 32539613, at *3–4 (test met where plaintiff sought records about their whistleblower disclosures regarding allegations of security lapses in FBI translators program, national news

covered the issue, and two Senators expressed concern regarding "the significant security issues raised by plaintiff's allegations and the integrity of the FBI").[4]

### B.   Whether DHS Acted Appropriately To Admit the Duke of Sussex and to Continue His Current Immigration Status is a "Matter of Widespread and Exceptional Media Interest."

Start and end with a review of the media coverage. *See Am. Oversight I*, 292 F.Supp.3d at 508.  As detailed in the Amended Complaint, the expedited processing record shows *immense* press interest in whether DHS acted appropriately by:  (1) admitting the Duke of Sussex; and (2) continuing the Duke of Sussex's current immigration status. *See* Am. Compl. ¶¶ 44–45.  Recall that only a "handful" of articles suffices (*Brennan Ctr,*, 498 F.Supp.3d at 97 (internal citations and quotation omitted); *ACLU*, 321 F.Supp.2d at 32), and "more than fifty" is more than sufficient. *Brennan Ctr.*, 498 F.Supp.3d at 97.

There is no doubt that the coverage directly raises "possible questions about the government's integrity." *Cf. Brennan Ctr.*, 498 F.Supp.3d at 98 (nexus required between

---

[4]  Judicial reports indicate that DOJ grants expedition under the DOJ Regulation in a number of circumstances. *See, e.g.*, *CREW*, 870 F.Supp.2d at 81 n. 14 (expedition granted to request seeking records on FBI's closed investigation of Congressman Tom DeLay for misconduct which did not result in charges, but received considerable media attention); *CREW v. DOJ*, 820 F.Supp.2d 39, 42, 46 (D.D.C. 2011) (expedition granted to request seeking information concerning possible deletion of Office of Legal Counsel emails where the possible deletion was flagged as a hindrance in an internal investigation, covered in the media, and was the subject of Congressional concerns); *Elec. Frontier Found. v. DOJ*, 563 F.Supp.2d 188, 189–91 (D.D.C. 2008) (expedition granted to request seeking information regarding storage of information obtained by National Security Letters in FBI's Data Warehouse); *CREW v. DOJ*, No. 05-cv-2078 (EGS), 2006 WL 1518964, *1 (D.D.C. June 1, 2006) (expedition granted to request concerning government's decision to seek a reduced penalty in tobacco litigation where government's decision was subject to intensive news coverage and prompted concern from "several Congressman" which caused a request for an Inspector General investigation of "improper political interference" with the decision).

extensive media coverage and "possible questions about the government's integrity"); *Am. Oversight I*, 292 F.Supp.3d at 507–08 (similar).

Recall that when DHS HQ and CBP failed to comply with the statutory deadline to decide on Plaintiffs' application for expedited processing, Plaintiffs did not immediately rush to court, but instead supplemented their application for expedited processing in hopes that further overwhelming evidence of its merits would prod DHS HQ and CBP to action. *Id.* at ¶ 70.  In that supplement, Appendix C specifically collected a host of articles that reported on *the Request*. Am. Compl. ¶ 70; App. C (ECF No. 7-7).  These articles probed in detail the questions raised *by the Request*.  Accordingly, via supplementation, the Plaintiffs have provided the most direct possible evidence of "widespread and exceptional media interest in which there exists possible questions about the government's integrity which affect public confidence"—the Request *itself* received massive press coverage.

### C. Questions as to Whether DHS Exercised Proper Discretion As Concerns the Duke of Sussex's Immigration Status Are "Possible Questions About the Integrity of the Government that Affect Public Confidence."

Plaintiffs have consistently asked a number of simple questions in this matter concerning DHS' actions in an extraordinarily high-profile case:

- Did DHS properly admit the Duke of Sussex in light of the fact that he has publicly admitted to the essential elements of a number of drug offenses in both the United States and abroad?

- If DHS granted the Duke of Sussex a waiver to enter the Country on a non-immigrant visa was that waiver proper given HRH's history of admissions to the essential elements of drug offenses?

- Is DHS acting appropriately regarding whether to reexamine the Duke of Sussex's immigration status in light of the Duke of Sussex's most recent admissions to the

essential elements of numerous drug offenses both here and abroad in his 2023 memoir,
*Spare*.

- Is DHS treating like cases alike when granting waivers to bars of admissibility?

These questions and the attendant "widespread and exceptional" media coverage plainly
raise *possible* questions about the government's integrity which affect public confidence.  *See*
Am. Compl. at ¶¶ 44–45; *see also id.* at ¶ 24 (raising questions concerning DHS' past application
of drug related bars to admissibility and waivers of those bars in in past prominent cases).
Indeed, that the questions bulleted above are repeatedly raised in media reports is itself largely
dispositive on this issue.  *See Am. Oversight I*, 292 F.Supp.3d at 508.

To be sure, these questions do not focus on a specific allegation of illegality or
criminality.  But that is not required.  Mere allegations of *possible* improper exercises of
discretion—such as due to political favoritism—are more than sufficient.  *See, e.g.*, *Brennan
Ctr.*, 498 F.Supp.3d at 97 (standard met by reports that census calculation methods may produce
inaccurate request); *id.* (media coverage "need not suggest any dishonesty or intentional
wrongdoing on Defendants' part"); *id.* (questioning wisdom of government action suffices; "see
Integrity, Black's Law Dictionary (11th ed. 2019) (defining "integrity" to include "soundness");
Integrity, American Heritage Dictionary (5th ed. 2018) (same)"); *CREW*, 436 F.Supp.3d at 361
("CREW stated in its request that the Attorney General of the United States had mischaracterized
some of the core conclusions contained in a report of great public significance, written by the
Department's own duly appointed Special Counsel, in advance of its public release.  CREW's
submission supported an inference that at best, the Attorney General undertook to frame the
public discussion on his own terms while the report itself remained under wraps, and at worst,

15

that he distorted the truth."); *ACLU*, 321 F.Supp.2d at 32 (standard met by *potential* abuses of statute).

That these questions concern DHS' action in a particular case also are of no moment— what matters is the *profile* of DHS' actions in that case. *Edmonds*, 2002 WL 32539613, at *3 (records concerning whistleblowers' allegations of FBI wrongdoing met test where they received extensive coverage:  "This flurry of articles and television coverage, which has continued at least until last month, cannot be cast aside by a sleight-of-hand as defendant attempts to do by categorizing plaintiff's requests as being merely "personal to her" and of no "wider public concern." (Def.'s Opp. at 8.)"); *cf. White v. DOJ*, 16 F.4th 539, 544 (7th Cir. 2021) (expedited processing properly denied because prisoner's attack on his conviction did not meet expedition criteria); *CREW*, 870 F.Supp.2d at 75 n.1, 81 n.14 (DOJ granted expedited processing concerning high profile criminal investigation of a Congressman that resulted in no political charges).

Again, that the widespread media reports only raise questions (supported by a robust factual basis) and do not provide proof does not undermine Plaintiffs' case.  "'*[P]ossible* questions about the government's integrity that affect public confidence'" are sufficient.  *CREW*, 436 F.Supp.3d at 361 (quoting 28 C.F.R. § 16.5(e)(1)(iv)); *accord Brennan Ctr.*, 498 F.Supp.3d at 97 (articles that "raise questions" going to "'the government's integrity' that 'affect public confidence'" and then report on those issues are sufficient (quoting 28 C.F.R. § 16.5(e)(1)(iv)); *Edmonds*, 2002 WL 32539613, at *3 (widely reported whistleblower *allegations* meet standard).

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION.

Plaintiffs have demonstrated a likelihood of success on the merits, *i.e.*, that they have demonstrated a statutory right to *expedited* processing.  *See, e.g.*, *Brennan Ctr.*, 498 F.Supp.3d at 96; *Ctr. For Pub. Integrity*, 411 F.Supp.3d at 11.  That right is entirely focused on *time*: Plaintiffs are statutorily entitled to receive their documents *more quickly* than garden variety requestors.  That is the fundamental basis of the statutory right—*timing*.  *See* 5 U.S.C. § 552(a)(6)(E) (entire section of FOIA providing "[e]ach agency shall promulgate regulations, pursuant to notice and receipt of public comment, providing for expedited processing of requests for records" and establishing statutory framework for regulatory implementation of the same.); *see also, e.g., Edmonds v. FBI*, 417 F.3d 1319, 1324 (D.C. Cir. 2005) (Garland, J.) ("The 1996 FOIA amendments underlined Congress' recognition of the value in hastening release of certain information, by creating a statutory right to expedited processing and providing for judicial review of its denial.").  That timing decision is made by Congress and DHS through 6 C.F.R. § 5.5(e)(1)(iv).  DHS concluded that there is substantial public interest in having information about "a matter of widespread and exceptional media interest in which there exists possible questions about the government's integrity which affect public confidence" produced *more quickly*.  That decision necessarily reflects a judgement that this category of information is most useful to the public *now* rather than later.  *See Edmonds*, 417 F.3d at 1324 ("We reject the government's further suggestion that whatever benefit Edmonds obtained from expedited processing was too insubstantial to entitle her to a fee award. . . .  Plainly, there is value to obtaining something earlier than one otherwise would.  That is why people commonly pay—and

delivery services commonly charge—a premium for next-day delivery of important documents."); *cf. Payne Enter., Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988) ("stale information is of little value").

Because this statutory right turns entirely on timing, it cannot be remedied *post hoc*. FOIA records improperly withheld in a run-of-the-mill FOIA case can always be produced after adjudication down the road.  FOIA records produced slowly are eventually produced so there is substantial remedy.  But here the *entire* candle is time; the statutory entitlement to expedition only matters while the records are being processed, after that finite temporal window the point is moot.  *See* 5 U.S.C. § 552(a)(6)(E)(iv) ("[a] district court of the United States shall not have jurisdiction to review an agency denial of expedited processing of a request for records after the agency has provided a complete response to the request."); *see also, e.g.*, *Edmonds*, 417 F.3d at 1324 ("When, pursuant to court order, the FBI finished processing Edmonds' request two months earlier than it would have in the absence of the order, she vindicated that statutory right."); *Muttitt v. Dep't of State*, 926 F.Supp.2d 284, 296–97 (D.D.C. 2013) (expedited processing claim mooted by final production).  Thus, a failure to expedite effectively destroys the entire statutory right.

Expedited processing is also a right of relative priority assigned via statute and regulatory determinations of which FOIA requests are more important.  DHS multitracks their FOIA requests.  Under FOIA "[e]ach agency may promulgate regulations, pursuant to notice and receipt of public comment, providing for multitrack processing of requests for records based on the amount of work or time (or both) involved in processing requests."  5 U.S.C. § 552(a)(6)(D).

18

DHS has done so.  *See* 6 C.F.R. § 5.5(b).  And an expedited request takes priority.  *Id.* at § 5.5(e)(4) ("If expedited processing is granted, the request shall be given priority, placed in the processing track for expedited requests, and shall be processed as soon as practicable.").  Thus, denying expedited processing denies priority—an entitlement pointedly provided by statute and regulation that is time based and cannot be restored when lost.

Moreover, the decision on timing embodied in 6 C.F.R. § 5.5(e)(1)(iv) is a decision made against the background of FOIA's unusual requirement that generally a court must grant equitable relief if plaintiffs prevail.  *See, e.g.*, *Wash. Post v. Dep't of State*, 685 F.2d 698, 704 (D.C. Cir. 1982) (holding court lacks equitable discretion to refuse to order disclosure of non-exempt documents regardless of how grave the potential consequences of disclosure and explaining "[t]he most that a court could do in such a situation would be, in response to a strong showing of imminent and demonstrable danger to a compelling national interest, to stay its judgment for a time to give Congress an opportunity to correct its oversight, if such it be."), *vacated as moot*, 464 U.S. 979 (1983) (mem.); *Soucie v. David*, 448 F.2d 1067, 1076 (D.C. Cir. 1971) ("Congress clearly has the power to eliminate ordinary discretionary barriers to injunctive relief, and we believe that Congress intended to do so here").

Accordingly, a wrongful denial of a statutory right to expedited processing necessarily causes irreparable harm because the statutory right is solely one of relative timing and the clock cannot be wound back to restore to Plaintiffs the time lost each day the Request is not expedited. The statutory right concerns timing in a limited temporal window; effective relief cannot come via another mechanism or *post hoc*.  Put differently, as to a claim of expedited processing "only

an injunction could vindicate the objectives of [FOIA]" *Weinberger v. Romero-Barcelo*, 456

U.S. 305, 314 (1982); *see also Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542–43

(1987).  That an injunction is the only effective relief here means that the harm is irreparable.

Plaintiffs' submission on this point is narrow—it applies only where Plaintiffs have

shown they *are* entitled to expedited processing.  Thus, a holding that an improper denial of

expedited processing is itself irreparable harm would have no application in the vast majority of

FOIA cases.  Plaintiffs freely admit that this submission collapses the likelihood of success on

the merits with a showing of irreparable harm, but there is nothing new in such an analysis where

only an injunction can effectively remedy the statutory violation.  *See, e.g.*, *Tenn. Valley

Authority v. Hill*, 437 U.S. 153, 193–94 (1978) (under statutory scheme violation of the statute

required entry of injunction per Congress' balancing of the equities itself in the statutory

scheme).[5]  It is the correct analysis in this context as is demonstrated by several FOIA opinions

in the district.

---

[5] There is nothing improper about a court largely collapsing the questions of success on the
merits on a statutory violation and irreparable harm where the statutory violation concerned a
question of timing.  *See, e.g.*, *Jasperson v. Fed. Bureau of Prisons*, 460 F.Supp.2d 76, 90–91
(D.D.C 2006) (failure to provide a prisoner with legally required individualized assessment as to
suitability for placement in a halfway house prior to incarceration would constitute irreparable
harm "from the moment he surrenders to BOP custody"); *Apotex. Inc. v. FDA*, No. 06-cv-627
(JDB), 2006 WL 1030151, at *17 (D.D.C. Apr. 19, 2023) ("But unlike the harm that Apotex
allegedly faces, the potential injury that the intervenor-defendants face is not 'merely economic.'
Rather, they stand to lose a statutory entitlement [(180 day generic exclusivity period)], which is
a harm that has been recognized as sufficiently irreparable.  *See, e.g.*, *Mova [Pharm. Corp. v.
Shalala]*, 140 F.3d [1060,][] 1067 n. 6 [(D.C. Cir. 1998)].  Once the statutory entitlement has
been lost, it cannot be recaptured.").

Take *EPIC II*.  There DOJ argued as to "Irreparable Injury" that because DOJ had granted EPIC expedited processing, EPIC had received full relief and was not entitled to an order compelling production by a date certain.  416 F.Supp.2d at 40–41.  The Court rejected this argument, writing that "[a]s EPIC contends, 'merely paying lip service' to EPIC's statutory right does not negate 'the harm that results from the agency's failure to *actually* expedite its processing.'  Pl.'s Reply at 7 (emphasis in original).  Unless the requests are processed without delay, EPIC's right to expedition will be lost."  *Id.* at 41.  EPIC did not involve any claim that records would lose saliency by a date certain.  The court went on to again link the merits of the expedited processing claim to irreparable harm.  *See id.* ("Moreover, DOJ's arguments challenging the irreparable nature of the harm sustained by EPIC as a result of DOJ's delay is severely undermined by its determination that EPIC's FOIA requests merit expedition.  Such a determination necessarily required DOJ to find that there was an '*urgency* to inform the public' about the warrantless surveillance program.  Pl.'s Mot., Exhs. 12, 13 (emphasis added).  Given this concession, the court finds it hard to accept DOJ's current argument that disclosure is not urgent and that further delay will not harm EPIC.").  Lest there be any doubt, the court then when on to write "[b]eyond losing its right to expedited processing, EPIC will *also* be precluded, absent a preliminary injunction, from obtaining in a timely fashion information vital to the current and ongoing debate surrounding the legality of the Administration's warrantless surveillance program", *i.e.*, the nature of the asserted right was a separate ground of irreparable harm.  *Id.* (emphasis added).

*Wash. Post v. DHS*, to be sure, cites the nature of the asserted "urgency," (459 F.Supp.2d at 74–75) but it *also* quite clearly holds:  "Turning to the irreparable injury component of the preliminary injunction analysis, the plaintiff argues that the "very nature of the right that plaintiff seeks to vindicate in this action—expedited processing—depends on timeliness." Pl's Mot. at 15. The court agrees."  *Id.* at 74.  The court reinforced this point, writing "[w]ithout a preliminary injunction directing the Secret Service to process the plaintiff's FOIA request in an expedited fashion, the plaintiff would lose out on its statutory right to expedited processing *and* on the time-sensitive public interests which underlay the request."  *Id.* at 75 (emphasis added).  Plainly by the use of a conjunctive, the *Wash. Post* court recognized the denial of the statutory right can cause irreparable harm in this context.  If the decision rises or falls on urgency, then the conjunctive is unnecessary.

*Heritage Foundation v. EPA* is not to the contrary.  No. 23-cv-748 (JEB), 2023 WL 2954418 (D.D.C. Apr. 14, 2023).  There, the court addressed an argument Plaintiffs did not make—that "they will suffer irreparable harm because '[t]ime cannot be wound back,' and so '[t]he time lost to Plaintiffs . . . is thus irreparable.'"  *Id.* at *5 (internal citation omitted).  But Plaintiffs' argument was the same as it makes here—where Plaintiffs have shown they are entitled to expedited processing a denial of that expedition is irreparable because it is a statutory right that is entirely about time that cannot be restored.  The opinion in *Heritage Foundation v. EPA* says nothing about *this* statutory argument because the court did not consider it.

22

### III.     THE EQUITIES FAVOR GRANTING A PRELIMINARY INJUNCTION.

Where the government is a party, the equities and the public interest merge.  *See, e.g.*,

*Nken v. Holder*, 556 U.S. 418, 435 (2009); *Brennan Ctr.*, 498 F.Supp.3d at 103.

The public interest expects faithful enforcement of FOIA and Department Regulations.

*See, e.g.*, *Wash. Post*, 459 F.Supp.2d at 76 ("If anything, the public's interest in this case is best

assessed through the statutory provisions passed by the public's elected representatives."); *EPIC*

*II*, 416 F.Supp.2d at 42 ("The public interest prong is met because 'there is an overriding public

interest . . . in the general importance of an agency's faithful adherence to its statutory

mandate.'" (internal citation omitted)).  There is also a public interest that is "best 'served by the

expedited release of the requested documents because it furthers FOIA's core purpose of

''shed[ding] light on an agency's performance of its statutory duties.'''  *Protect Democracy*, 498

F.Supp.3d at 144 (quoting *Elec. Privacy Info. Ctr.*, 416 F.Supp.2d at 42 (alteration in original)

(citation omitted)).  This is especially so when the topic of the request—as here—has received

"great public and media attention."  *See, e.g.*, *EPIC II*, 416 F.Supp.2d at 42.

Accordingly, in the context of a motion for a preliminary injunction seeking to compel

expedited processing of a FOIA request, the public interest largely merges with the merits.  *See,*

*e.g.*, *Brennan Ctr.*, 498 F.Supp.3d at 103 (finding that expedition is warranted leads directly to

conclusion that the public interest favors a preliminary injunction).

As to harm, to be sure, the expedition of Plaintiffs' FOIA request will place some burden

on limited DHS resources and will disfavor other requestors by placing Plaintiffs' FOIA Request

ahead of theirs.  But the entire point of expedited processing under FOIA and the DHS' own

regulations is a judgement by both Congress and the agency that these harms and burdens are outweighed by the need to process certain requests on an expedited basis to ensure transparency into salient and time-sensitive issues of the day.  *See, e.g.*, *Edmonds*, 2002 WL 32539613, at *4 ("While defendant could justifiably argue that the Court's application of the relevant regulation will result in an even greater burden on its already strained resources and will disadvantage other FOIA requesters, the Court is constrained to enforce the regulation as written.").  Part of the statutory entitlement *is* priority.  Accordingly, Plaintiffs have shown a likelihood of success on the merits under the existing statutory and regulatory judgement that expedition is required.  *See, e.g.*, *Wash. Post*, 459 F.Supp.2d at 76 ("pursuant to the statutory provision mandating expedited treatment, the public's interest in expedited processing of the plaintiff's request outweighs any general interest that it has in first-in-first-out processing of FOIA requests.").

## CONCLUSION

This Court should enter a preliminary injunction compelling DHS components DHS HQ and CBP to process Plaintiff's FOIA Request on an expedited basis pursuant to 5 U.S.C. § 552(a)(6)(E) and 6 C.F.R. § 5.5(e)(1)(iv).

Dated: May 10, 2023                    Respectfully submitted,

                                       /s/ Samuel Everett Dewey
                                       SAMUEL EVERETT DEWEY
                                       (No. 999979)
                                       Chambers of Samuel Everett Dewey, LLC
                                       Telephone:  (703) 261-4194
                                       Email:  samueledewey@sedchambers.com

DANIEL D. MAULER
(No. 977757)
The Heritage Foundation
Telephone:  (202) 617-6975
Email:  Dan.Mauler@heritage.org

ROMAN JANKOWSKI
(No. 975348)
The Heritage Foundation
Telephone:  (202) 489-2969
Email:  Roman.Jankowski@heritage.org

*Counsel for Plaintiffs*