**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| HERITAGE FOUNDATION & ) | |
| MIKE HOWELL ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| v. ) | Case No. 23-cv-1198 (CJN) |
| ) | |
| U.S. DEPARTMENT OF HOMELAND ) | |
| SECURITY ) | |
| *Defendants*. ) | |
| _____ ) | |

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES .................................................................................................... iii

INTRODUCTION ..................................................................................................................... 1

*BACKGROUND* ....................................................................................................................... *2*

ARGUMENT ............................................................................................................................ 4

   I.   PRELIMINARY INJUNCTIONS ARE ROUTINELY GRANTED IN FOIA CASES WHERE PLAINTIFFS HAVE SHOWN A STRONG LIKELIHOOD OF SUCCESS ON A CLAIM FOR EXPEDITED PROCESSING. ................................................................... 4

   II.  PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS. ............................ 7

      A.  Whether DHS Acted Appropriately To Admit the Duke of Sussex and to Continue His Current Immigration Status is a "Matter of Widespread and Exceptional Media Interest." ...................................................................... 7

          1.  Congressional Interest is not Necessary to Show That A Request Concerns A "Matter of Widespread and Exceptional Media Interest." ........................................... 8

          2.  DHS' Argument that Only Media DHS Deems "American" or "Mainstream" Is Relevant Is Profoundly Flawed. ........................................................................................ 9

          3.  The Appropriate Record For Expedited Processing is That at The Time Plaintiffs Filed Their Complaint. ................................................................................................... 13

          4.  Media Coverage of the Request is The Most Compelling Evidence of "Widespread and Exceptional Media Interest" in the Request. ........................................................... 15

          5.  The Request Itself Is the Subject of "Widespread and Exceptional Media Interest" ................................................................................................................................... 16

      B.  Questions as to Whether DHS Exercised Proper Discretion As Concerns the Duke of Sussex's Immigration Status Are "Possible Questions About the Integrity of the Government that Affect Public Confidence." .............................. 18

**C.  PLAINTIFFS WITHDRAW THEIR MOTION AS TO CBP**............................................21

**II. PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION.** .................................................................................. 22

**III.      THE EQUITIES FAVOR GRANTING A PRELIMINARY INJUNCTION.** .. 25

**CONCLUSION** ...................................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases:**

*ACLU v. DHS*, 810 F.Supp.2d 267 (D.D.C. 2011) .................................................................. 14, 15

*ACLU v. DHS*, No. 20-cv-3204 ("RDM"), 2023 WL 2733721 (D.D.C. Mar. 31, 2023) ............ 12

*\*ACLU v. DOJ*, 321 F.Supp.2d 24 (2004) .................................................................. 8, 9, 16, 20

*Allied Progress v. Consumer Fin. Prot. Bureau*, No. 17-cv-686 (CKK), 2017 WL 1750263
    (D.D.C. May 4, 2017) ......................................................................................................... 6

*\*Am. Oversight v. DOJ*, 292 F.Supp.3d 501 (D.D.C. 2018) .............................................. 8, 16, 20

*Animal Legal Def. Fund. v. U.S. Dep't of Agric.*, 933 F.3d 1088 (9th Cir. 2019) ....................... 10

*Baker v. Consumer Fin. Prot. Bureau*, No. 18-cv-2403 (CKK), 2018 WL 5723146 (D.D.C. Nov.
    1, 2018) .............................................................................................................................. 6

*\*Brennan Ctr. v. Dep't of Commerce*, 498 F.Supp.3d 87 (D.D.C. 2020) ...................... 5, 6, 18, 20

*CREW v. DOJ*, 436 F.Supp. 3d 354 (D.D.C. 2020) ........................................................................ 10

*CREW v. DOJ*, 870 F.Supp.2d 70 (D.D.C. 2012) .......................................................................... 20

*Dorfmann v. Boozer*, 414 F.2d 1168 (D.C. Cir. 1969) ................................................................... 7

*\*Edmonds v. FBI*, No. 02-cv-1294 (ESH), 2002 WL 32539613 (D.D.C. Dec. 3, 2002) ...... passim

*EPIC v. DOJ*, 15 F.Supp.3d 32 (D.D.C. 2014) ........................................................................ 6, 24

*EPIC v. DOJ*, 355 F.Supp.2d 98 (D.D.C. 2004) ........................................................................... 18

*\*EPIC v. DOJ*, 416 F.Supp.2d 30 (D.D.C 2006) .................................................................... 7, 23

*Fling v. Martin*, No. 19-cv-693 (CJN), 2020 WL 4569335 (D.D.C. Aug. 8, 2020) ......... 13, 15, 25

*Heritage Found. v. EPA*, No. 23-cv-748 (JEB), 2023 WL 2954418 (D.D.C. Apr. 14, 2023) ...... 24

Minute Order, *Heritage Found. v. DOJ*, No. 23-cv-669 (RDM) (Apr. 10, 2023) ....................... 25

*Morrison v. Olson*, 487 U.S. 654, 697 (1998) ............................................................................... 1

*Muchnick v. DHS*, 225 F.Supp.3d 1069 (N.D. Cal. 2016) ............................................................ 20

*N.Y. Times Co. v. Defense Health Agency*, No. 21-cv-566 (BAH), 2021 WL 1614817 (D.D.C. Apr. 25, 2021) ........................................................................................................... 6, 7, 24

*NAACP Leg. Def. Fund v. U.S. Dep't of Housing and Urban Dev.*, No. 07-cv-3378 (GEL), 2007 WL 4233008 (S.D.N.Y. Nov. 30, 2007) ................................................................................. 14

*Nat. Imm. Law Ctr. v. USCIS*, No. 14-cv-9632 (MAN), 2015 WL 12684437 (C.D. Cal. Dec. 15, 2015) ................................................................................................................... 14

*Prot. Democracy Project, Inc. v. DOD*, 263 F.Supp.3d 293 (D.D.C. 2017) ........................... 5, 17

*Prot. Democracy Project, Inc. v. DOJ*, 498 F.Supp.3d 132  (D.D.C. 2020) ................................. 6

*Rodriguez v. Penrod*, No. 18-cv-240 (CJN), 2020 WL 686012 (Feb, 11, 2020) ...........................
.............................................................................................................................. 13, 15, 25

*Treatment Action Grp. v. FDA*, No. 15-cv-976 (VAB), 2016 WL 5171987 (D. Conn. Sept. 20, 2016) ............................................................................................................... 14, 15

*United States v. Miller*, 605 F.Supp.3d 63 (D.D.C. 2022) ......................................................... 25

*Univ. of Tex. v. Camenisch*, 451 U.S. 390 (1981) ........................................................................ 7

*Wadelton v. U.S. Dep't of State*, 941 F.Supp.2d 120 (D.D.C. 2013) ......................................... 11

*\*Washington Post v. DHS*, 459 F.Supp.2d 61 (D.D.C. 2006) ................................................. 23, 25

## Statutes:

5 U.S.C. § 552(a)(4)(A)(i) ........................................................................................................... 11

5 U.S.C. § 552(a)(6)(E)(ii)(I) ...................................................................................................... 14

5 U.S.C. § 552(a)(6)(E)(iii) ............................................................................................... 7, 13, 14

## Other Authorities:

Antonin Scalia & Bryan A. Garner, *Reading Law:  The Interpretation of Texts* (2012) .............. 10

*Freedom of Information Act Regulations*, 81 Fed. Reg. 83,625 (Nov. 22, 2016) ........................ 11

George Orwell, *Animal Farm*, 112 (The Penguin Group, Toronto, Ontario, 1945) ........................ 1

Oxford English Dictionary, n. "media" ..................................................................................... 10

**Regulations:**

6 C.F.R. § 5.11(b)(6) ............................................................................................................. 11

6 C.F.R. § 5.5(e)(1)(iv) ..................................................................................................... passim

6 C.F.R. § 5.5(e)(2) ....................................................................................................... 14, 15

*Authorities upon which we principally rely are marked with an asterisk.

## INTRODUCTION

As Plaintiffs stated in their Moving Papers (ECF. No. 10) ("Mot."), this Motion is relatively simple.  Using the immensely high profile case of HRH Prince Henry Charles Albert David George, the Duke of Sussex, Earl of Dumbarton, and Baron Kikeel K.C.V.O. ("HRH" or "Duke of Sussex"), Plaintiffs' FOIA Request (ECF No. 7-2) ("Request") seeks to answer an age-all question:  Are we a "government of laws and not of men"[1] or are "[a]ll animals . . . equal, but some animals are more equal than others."[2]  To reiterate the key questions—all of which are grave and have extensive factual and legal predication:

- Did DHS properly admit the Duke of Sussex even though he has publicly admitted to the essential elements of multiple drug offenses in both the United States and abroad?

- Did DHS improperly grant the Duke of Sussex a waiver to enter the Country on a non-immigrant visa given his history of admissions to the essential elements of drug offenses?

- Should DHS reconsider its decision to admit the Duke of Sussex into the United States in light of the Duke of Sussex's most recent admissions to the essential elements of numerous drug offenses both here and abroad in his 2023 memoir, *Spare*?

Seeking to answer these questions, the Request is "[a] matter of widespread and exceptional media interest in which there exist possible questions about the government's integrity which affect public confidence."  6 C.F.R. § 5.5(e)(1)(iv).  How do we know?  The vast number of articles submitted in Appendix C *directly cover* both the Request and the questions it raises.  Because Plaintiffs have established their regulatory and statutory entitlement to the time- and priority-based right to expedited processing, denial of that right constitutes irreparable harm.

---

[1]  *Morrison v. Olson*, 487 U.S. 654, 697 (1998) (Scalia, J., dissenting).
[2]  George Orwell, *Animal Farm*, 112 (The Penguin Group, Toronto, Ontario, 1945).

The Department of Homeland Security's ("DHS") Opposition to Plaintiffs' Motion for a Preliminary Injunction (ECF No. 14) ("Opp.") does nothing to alter that conclusion. Rather, it spills much ink on matters that are not in dispute, devoting its response to the arguments it thinks (or wishes) Plaintiffs made in contrast to Plaintiffs' actual arguments, and advances any number of undeveloped (and hence waived) arguments that are barely colorable. On Plaintiffs' actual submissions, DHS says very little, attempts to engraft words into FOIA's text, and advances submissions directly contrary to DHS' own regulations and caselaw.

As to DHS Headquarters ("DHS HQ") Plaintiffs have presented an overwhelming case of statutory and regulatory entitlement to expedited processing and of irreparable harm. As to Customs and Border Protection ("CBP"), Plaintiffs withdraw the Motion in light of CBP's intervening May 23, 2023 Administrative Appeal Decision ("Appeal Decision") affirming on non-colorable grounds CBP's denial of the Request without conducting a search.

## BACKGROUND

"Background" in a Reply is unusual, but it is necessary here due to the failure of DHS to keep even *their own counsel* fully informed—let alone Plaintiffs. Plaintiffs believe clarification of the record is necessary out of a duty of transparency to the Court. *See* Second Declaration of Samuel Everett Dewey in Support of Plaintiffs' Motion for a Preliminary Injunction at ¶ 3–9. (June 2, 2023) ("2d Dewey Decl."). To summarize:

*First*. On May 23, 2023, well after Plaintiffs filed the pending Motion, CBP issued a determination on Plaintiffs' Administrative Appeal. (ECF No. 14-1, Ex. A) ("Appeal Denial"). The Appeal Denial purported to "affirm" the one paragraph original form denial on two separate

grounds.  *See* Am. Compl. ¶ 57 (ECF No. 7); Appeal Denial at 3.  First, it determined that "FOIA Division Used its Regulatory Discretion to Require the Requester Obtain Authorization from the Subject of the Request."  *Id.* at 3.  Second, it divined an alternate ground in the Initial Denial (which under any fair reading was not present) and "affirm[ed] the FOIA Division's second grounds for denial that the agency can neither confirm nor deny the existence of records related to the Duke of Sussex as doing so would betray the privacy interests protected by Exemptions (b)(6) and (b)(7)(C)."  *Id.* at 3–4.  Counsel for Plaintiffs have repeatedly urged DOJ to cause CBP to reverse this position as Plaintiffs believe it indefensible and it is in no one's interest for DOJ to maintain CBP's administrative position here only to reverse it in short order when Plaintiffs file subsequent motions.  2d Dewey Decl. ¶ 8.

*Second*.  While DHS concedes the Motion is ripe as to DHS HQ, there is considerable confusion as to which DHS HQ sub-components have actually responded and to what extent. Plaintiffs learned for the first time on May 26, 2023 when the Opposition was filed that DHS HQ purported to "transfer[]" the request to DHS' Office of Biometric Identity Management ("OBIM") via an April 6, 2023 Letter.  (ECF No. 14-2).  Plaintiffs did not originally receive this letter because it was sent via email and misaddressed.  *Id.*  Despite several attempts, Plaintiffs have been unable to obtain a clear explanation as to why DHS HQ sent two seemingly contradictory letters to Plaintiffs on April 6, 2023.  2d Dewey Decl. ¶ 6.

*Third*.  Plaintiffs have received no explanation for DHS' statement that DHS HQ "did not have any responsive records" (Opp. at 5) other than a statement from Counsel for DHS that DHS made this representation to him.  2d Dewey Decl. ¶ 9.  Plaintiffs have repeatedly requested

clarification on this point.  *Id.*  DHS' cited authority does not *remotely* support this proposition. *See* (ECF No. 14-2); (ECF No. 7-18).

   *Fourth.*  On May 25, 2023, OBIM transmitted an email to Plaintiffs purporting to issue a "final response."  2d Dewey Decl. Ex. 1, at 1.  The basis for the response was that Plaintiffs failed to provide an "[a]lien Number, Fingerprint Identification Number or a completed Fingerprint Card from the requester" and that the Request would be denied under Exemption (b)(6) and the Privacy Act regardless.  *Id.*  The Opposition does not discuss this email despite it being sent over a day *prior* to the Opposition being filed.  *Id.*  Counsel for DHS stated on June 1, 2023 he had not previously seen the May 25, 2023 email, but he indicated that, as far as he understood, that position was the final position of OBIM.  *Id.*

## ARGUMENT

## I.   PRELIMINARY INJUNCTIONS ARE ROUTINELY GRANTED IN FOIA CASES WHERE PLAINTIFFS HAVE SHOWN A STRONG LIKELIHOOD OF SUCCESS ON A CLAIM FOR EXPEDITED PROCESSING.

   The Opposition devotes a considerable amount of ink to advancing the proposition that "Preliminary Injunctions Are Generally Not Appropriate in FOIA Cases."  Opp. at 6–10.  There is no dispute between the parties on that point.  *See* Mot. at 8.  Plaintiffs have only ever advanced the proposition that "motions for preliminary injunctions *are* regularly brought where the requestor seeks but is denied expedited processing.  Numerous courts—including in this District—have entered preliminary injunctions to compel expedited processing."  *Id*. at 8. Plaintiffs simply submit that because this is one of the unusual cases in which expedited processing is appropriate, preliminary injunctive relief is warranted.

DHS does not dispute that Plaintiffs have cited authority in support of the proposition that preliminary injunctions are regularly granted to compel expedited processing—they merely attempt to isolate that authority with distinctions that cannot survive close examination.

Take DHS' claim that "in most of these cases, the defendant agencies had granted the plaintiffs' requests for expedited processing—agreeing that they met the standard for expedited treatment—and the requesters were instead challenging agencies' alleged failures to in fact process their FOIA requests in an expedited manner." Opp. at 8–9. As an initial matter, that is not even accurate of its own accord. DHS lumps within that proposition cases where some agency components granted expedited processing and others denied it and stuck by that denial in litigation. (Opp. at 8–9). So then what? Necessarily, the issue was controverted and put before the court for judicial resolution; the opinions analyzed the denial of expedited processing and granted a preliminary injunction to reverse that denial. *See Brennan Ctr. v. Dep't of Commerce*, 498 F.Supp.3d 87, 98–103 (D.D.C. 2020) (full analysis granting PI); *Prot. Democracy Project, Inc. v. DOD*, 263 F.Supp.3d 293, 298–301 (D.D.C. 2017) ("Prot. Democracy I") (same). And even of its own accord, the later form of relief is not only relief as to expedited processing, it is the more aggressive form of expedited processing relief. *See Brennan Ctr.*, 498 F.Supp.3d at 99. The Motion only seeks an order as to the speed with which the records are processed. Plaintiffs do not seek—although they could—an order mandating production by a date certain. That courts in this District regularly approve the more aggressive form of relief only reinforces Plaintiffs' submission that preliminary injunctions are routinely granted in the small subset of FOIA cases where expedited processing is warranted.

DHS also submits that cases in this District such as *Brennan Ctr.*, 498 F.Supp.3d 87 and

*Prot. Democracy Project, Inc. v. DOJ*, 498 F.Supp.3d 132, 140 (D.D.C. 2020) ("Prot.

Democracy II") represent "extraordinary circumstances." But even accepting DHS' reading of

those cases that is a fact-bound merits issue—it says nothing about the legal proposition DHS

asserts.

Turning to cases cited by DHS as denying preliminary injunctions seeking expedited

processing, of course "courts in this jurisdiction routinely deny requests for preliminary

injunctions in FOIA cases." Opp. at 7. Again, so what? In litigation, plaintiffs at times do not

make out valid cases for expedited processing. As to the cases themselves, none speak to the

general premise DHS jousts at. *EPIC v. DOJ* noted that expedited processing had been

effectively granted and denied a preliminary injunction for immediate production on the merits

of the claim—not an objection to entitlement to expedition. 15 F.Supp.3d 32 (D.D.C. 2014)

("EPIC III"). *N.Y. Times Co. v. Defense Health Agency*, No. 21-cv-566 (BAH), 2021 WL

1614817 (D.D.C. Apr. 25, 2021); *Baker v. Consumer Fin. Prot. Bureau*, No. 18-cv-2403 (CKK),

2018 WL 5723146 (D.D.C. Nov. 1, 2018); and *Allied Progress v. Consumer Fin. Prot. Bureau*,

No. 17-cv-686 (CKK), 2017 WL 1750263 (D.D.C. May 4, 2017) all denied preliminary

injunctions on the merits—*i.e.*, they did not dispute the propriety of the relief sought, they simply

found plaintiff had not met its burden.

Viewed in this light, DHS' statement that "courts in this jurisdiction routinely deny

requests for preliminary injunctions in FOIA Cases" is a non sequitur. This is not a run-of-the-

mill case.  In the context of the unusual case presenting serious claims of entitlement to

expedited processing, preliminary injunctions *are* routinely granted.[3]

## II.      PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS.

### A.      Whether DHS Acted Appropriately To Admit the Duke of Sussex and to Continue His Current Immigration Status is a "Matter of Widespread and Exceptional Media Interest."

DHS does not directly attack Plaintiffs' clear showing that the Request concerned a

"matter of widespread and exceptional media interest," but instead seeks to pick away at the

showing by advancing a number of minor premises to diminish the whole.  These arguments are

unavailing and do nothing to diminish Plaintiffs' overwhelming showing—via a host of articles

---

[3] DHS' objection that a preliminary injunction in this context would "bypass the litigation process and achieve rapid victory" elides the central point.  Opp. at 7.  Plaintiffs only seek an order compelling expedited processing, a temporally limited right of timing and relative priority. Am. Compl. at Relief A.  They do this because without such an order that right evaporates and can neither be preserved nor vindicated.  Plaintiffs do not seek—although they could—a further injunction compelling production by a date certain pursuant to the statutory requirement that an agency process a request granted expedited processing as "soon as practicable."  5 U.S.C. § 552(a)(6)(E)(iii).  *See EPIC v. DOJ*, 416 F.Supp.2d 30, 43 (D.D.C 2006) ("EPIC I") (granting such an injunction).  Further, the order Plaintiffs seek would not impact the other four substantive counts of the Amended Complaint going to the merits of production, withholding, and fees.  *See* Am. Compl. ¶¶ 86–132.  These facts distinguish DHS' authority.  *See* Opp. at 7. *N.Y. Times* involved a request for production by a date certain.  2021 WL 1614817, at *4.  In *Dorfmann v. Boozer*, the preliminary injunction released funds deposited by rent withholding tenants to a nearly insolvent landlord.  414 F.2d 1168 (D.C. Cir. 1969).  The underlying issue was whether the rent was properly withheld, and the D.C. Circuit held that ordering the release of those funds not only provided the landlord with his requested relief, it so significantly shifted the relative risks that it destroyed the balance of the parties.  *Id.* at 1174.  Not so here.  An award of expedited processing neither changes the balance of the parties nor guarantees the Plaintiffs records, only that processing occurs expeditiously.  Similarly, *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) rested on the fact that preliminary injunctions are necessarily granted "on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."  *Id.*  Those concerns are not applicable in the standard FOIA case.

specifically discussing and analyzing every aspect of the Request—that the Request is a "matter of widespread and exceptional media interest" by any understanding of the term.

### 1.     Congressional Interest is not Necessary to Show That A Request Concerns A "Matter of Widespread and Exceptional Media Interest."

As a threshold matter, DHS makes a confusing submission that appears to be intended to controvert some of Plaintiffs' statement of the applicable legal principles surrounding expedited processing under 6 C.F.R. § 5.5(e)(1)(iv).  Specifically, DHS submits that Plaintiffs' showing is insufficient in that "in many of these cases, the courts were convinced that widespread media interest existed, in part, because members of Congress has raised questions about the information in the requested records" and no such submission has been made here.  Opp. at 17.  DHS cites *ACLU v. DOJ*, 321 F.Supp.2d 24 (2004) and *Edmonds v. FBI*, No. 02-cv-1294 (ESH), 2002 WL 32539613 (D.D.C. Dec. 3, 2002) as authority.  Opp. at 17.  The import of this submission is unclear—if Congressional interest is not a necessary condition to demonstrate "widespread and exceptional" media interest but merely a type of proof, yet again, so what?  The absence of one type of proof says nothing about the strength of the case on another equally acceptable type of proof.  If DHS submits Congressional interest *is* a necessary condition, then they are mistaken.  As a basic matter, there is a profound logical disconnect in the submission that one can evaluate the scope and intensity of media interest merely by looking to Congressional letters or floor statements divorced from any media coverage itself.  The issue is media coverage—period.  *See Am. Oversight v. DOJ*, 292 F.Supp.3d 501, 507–08 (D.D.C. 2018).  (Media coverage *of* Congressional statements is a different matter and at its base is simply media coverage).  Moreover, neither of DHS' cases support this submission.  *ACLU* cites articles reporting on

Congressional statements and thus says nothing about the import of Congressional statements vel non.  321 F.Supp.2d at 32.  Moreover, it cited those articles for the proposition that "the articles plaintiffs cite also illustrate that the information they have requested implicates government integrity."  *Id.*  To be sure, *Edmonds* discusses Congressional interest, but in no way limits its holding that the Plaintiff there "easily" demonstrated "widespread and exceptional media interest" by reference to that fact.  2002 WL 32539613, at *3.  Fairly read, Congressional interest was but ornamentation on an already baked and iced cake.

### 2. DHS' Argument that Only Media *DHS* Deems "American" or "Mainstream" Is Relevant Is Profoundly Flawed.

DHS argues (effectively) that much of the record in Appendices B & C (ECF Nos. 7-6 & 7-7)[4] must be disregarded because they are:

> [A]rticles from niche publications such as *The Daily Mail*, *The Sunday Telegraph*, *Express Online*, and *Cannabis News Today,* many of which are based in the United Kingdom. Am. Compl. ¶¶ 44-45.  None of these publications are what Americans generally consider to be mainstream media.  Elisa Shearer et al., *Broad agreement in U.S. – even among partisans – on which news outlets are part of the 'mainstream media,'* Pew Research Center (May 7, 2021) https://www.pewresearch.org/short-reads/2021/05/07/broad-agreement-in-u-s-even-among-partisans-on-which-news-outlets-are-part-of-the-mainstream-media/.  This contrasts with the cases upon which Plaintiffs rely, which cite American mainstream media sources.  *See e.g. ACLU v. Dep't of Just.*, 321 F. Supp. 2d 24, 32 (D.D.C. 2004) (referencing articles from the *Washington Pos*t, the *Boston Globe*, and the *San Francisco Cornicle*); *Edmonds v. FBI*, Civ. A. No. 02-1294, 2002 U.S. Dist. LEXIS 26578, *10 (Dec. 3, 2002) (referencing articles from the *Associated Press*, the *Washington Post*, the *Chicago Tribune,* and broadcast television

---

[4]  This argument is necessarily incremental in that DHS would be hard pressed to argue, for example, that *The N.Y. Post* (*see* Am. Compl. ¶ 44) one of the oldest operating newspapers in the United States founded by Alexander Hamilton is not "media" within the definition of 6 C.F.R § 5.5(e)(1)(iv).  Indeed, it is considered "mainstream media" under DHS' own authority.  *See* Opp. at 17 (citing Elisa Shearer et al., *Broad agreement in U.S.—even among partisans—on which news outlets are part of the "mainstream media"*, Pew Research Center (May 7, 2021)).

news stories).

Opp. at 17; *see also* Opp. at 19 (terming such publications ("obscure sources").

This is an argument entirely divorced from law and reality.

**1.** Start with 6 C.F.R. § 5.5(e)(1)(iv). It requires a showing of "media" interest. As there is no DHS determination on expedited processing and the agency has provided no such interpretation in its Opposition, there is no agency construction to which to defer. *See CREW v. DOJ*, 436 F.Supp. 3d 354, 361 (D.D.C. 2020); *Edmonds*, 2002 WL 3259613, at*3 n.3; *cf.* Decl. of Sarah Isgur Flores ¶¶ 6–7 in *Am. Oversight v. DOJ*, 17-cv-848 (RJL) (D.D.C. June 23, 2017) (ECF No. 19-1) (setting forth DOJ's construction of the regulation). So, we apply normal rules of construction.

6 C.F.R. § 5.5(e)(1)(iv) says "media." It does not say "American media," "media based in America", "mainstream media", or "American mainstream media sources." Look to the common usage of "media" in public and dictionaries. *See, e.g.*, *Animal Legal Def. Fund. v. U.S. Dep't of Agric.*, 933 F.3d 1088, 1093 (9th Cir. 2019) (applying this rule of construction to "individual" in statutory expedited processing provisions). *E.g.*, Oxford English Dictionary, n. "media" "—The main means of mass communication, esp. newspapers, radio, and television, and (from the later 20th century) content accessed via the internet, regarded collectively."

Look to other uses of the term "media" as DHS's FOIA regulations should have consistent usage absent distinguishing contexts. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Texts*, 170–173 (2012). DHS regulations concerning FOIA fee waivers define "Representative of the News Media" to be:

10

any person or entity that actively gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience. The term "news" means information that is about current events or that would be of current interest to the public.

6 C.F.R. § 5.11(b)(6). FOIA itself has a similarly broad definition.[5] *Cf. Freedom of Information Act Regulations*, 81 Fed. Reg. 83,625, at 83,628 (Nov. 22, 2016) ("The standard identified in the final rule [regarding the "media" fee waiver category], as revised in response to public comments, allows DHS to classify a requester as a member of the news media on a case-by-case basis without a rigid requirement of audience size"); *Wadelton v. U.S. Dep't of State*, 941 F.Supp.2d 120, 123 (D.D.C. 2013) ("articles on this topic appear on a specialized blog dedicated to the Foreign Service and are read by 'several thousand people' do not support showing of 'urgency to inform'").

The sources cited by Plaintiffs fall comfortably within this standard; the regulation contains simply no warrant to discriminate based upon where press outlets are "based" or some subjective determination of "mainstream" status. And at the end of the day, if DHS wishes to make special favorites of outlets it subjectively deems to be both "American" and "mainstream,"

---

[5]  5 U.S.C. § 552(a)(4)(A)(i) ("In this clause, the term 'a representative of the news media' means any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience. In this clause, the term 'news' means information that is about current events or that would be of current interest to the public. Examples of news-media entities are television or radio stations broadcasting to the public at large and publishers of periodicals (but only if such entities qualify as disseminators of 'news') who make their products available for purchase by or subscription by or free distribution to the general public. These examples are not all-inclusive. Moreover, as methods of news delivery evolve (for example, the adoption of the electronic dissemination of newspapers through telecommunications services), such alternative media shall be considered to be news-media entities.").

DHS can simply amend 6 C.F.R. § 5.5(e)(1)(iv).  *See ACLU v. DHS*, No. 20-cv-3204 ("RDM"),

2023 WL 2733721, at *6 (D.D.C. Mar. 31, 2023); *cf. Edmonds*, 2002 WL 32539613, at *4 ("the

Court is constrained to enforce the regulation as written).

      **2.**      Turning to fact, start with DHS' specific argument that where media is "based"

somehow affects its definition as "media" for the purposes of 6 C.F.R. § 5.5(e)(1)(iv).  Opp. at

17.  In today's world of international media, where a company is "based" is largely irrelevant to

any sort of consideration of circulation or interest within the United States.  The internet has

made almost all media truly global.  A news outlet may be "based" abroad, and yet have robust

United States coverage—including reporters and physical assets within the United States.

      Turn to data.  DHS cites an article for the proposition that "[n]one of these publications

are what Americans generally consider to be mainstream media."  Opp. at 17 (citing Elisa

Shearer et al., *Broad agreement in U.S.—even among partisans—on which news outlets are part

of the "mainstream media"*, Pew Research Center (May 7, 2021)).  2d Dewey Decl. Ex. 6.  But

that article did not purport to undertake a comprehensive survey; rather it took a "representative

sample" to learn more how Americans thought about "13 different news outlets."  *Id.* at 1.  It is

elemental logic that such a survey says nothing about *The Daily Mail* (to take an example)

because *The Daily Mail* was not polled.

      Data that *is* significant under DHS' view of 6 C.F.R. § 5.5(e)(1)(iv)—analysis of visits

within the United States to news websites in April of 2023—shows that DHS is simply wrong on

fact.  Take *The Daily Mail*, which Plaintiff deems "niche" and "obscure."  Opp. at 17, 19.  It

received 113.6 million visits in April of 2023, only slightly behind the "American" "mainstream"

*Washington Post* which had 121.2 million visits.  *See* 2d Dewey Decl. ¶ 10.  Continuing on, *The Sun* had some 74.7 million views, *The Independent* 25 million.  *Id.*  Not found within the top 50 news sites by traffic in April of 2023 (which bottomed out at 18.8 million views or less than one-fifth of *The Daily Mail's* views in that month), DHS' "American mainstream media sources" (Opp. at 17) *The Boston Globe*, *The Chicago Tribune*, or *The San Francisco Chronicle*.  *See* 2d Dewey Decl. ¶ 10.[6]

> **3.    The Appropriate Record For Expedited Processing is That at The Time Plaintiffs Filed Their Complaint.**

DHS' next effort to chip away at Plaintiffs' overwhelming showing of "widespread and exceptional media interest" is to attack the temporal scope of the record, arguing "because the statute provides that 'judicial review shall be based on the record before the agency at the time of the determination,' 5 U.S.C. § 552(a)(6)(E)(iii), Plaintiffs cannot rely on articles about the FOIA request that is the subject of this lawsuit to show widespread media interest."  Opp. at 17.  Why so?  Defendant offers no explanation nor cites to any authority.  As an initial matter, Defendant's perfunctory *ipse dixit* waives any argument it might have had.  *See Fling v. Martin*, No. 19-cv-693 (CJN), 2020 WL 4569335, at*2 n.5 (D.D.C. Aug. 8, 2020) (Nichols, J.); *Rodriguez v. Penrod*, No. 18-cv-240 (CJN), 2020 WL 686012, at *9 n.5 (Feb, 11, 2020) (Nichols, J.).

Addressing the merits out of caution, Plaintiffs agree with DHS that the appropriate record is the one existing as of the agency's determination on expedited processing.  *See* 5

---

[6]  Of course, online visits are but one of many methods to analyze media outlets' United States presence.  Other methods may be internally less accurate (*e.g.*, surveys and polls) or focus on a different sort of media (*e.g.*, print only).  This mass of variation only reinforces Plaintiffs' central point—DHS' legal submission is in error.

U.S.C. § 552(a)(6)(E)(iii)("judicial review shall be based on the record before the agency at the time of the determination."); 5 U.S.C. § 552(a)(6)(E)(ii)(I) ("a determination of whether to provide expedited processing shall be made, and notice of the determination shall be provided to the person making the request, within 10 days after the date of the request"). But DHS tellingly does not identify *when* the "determination" it posits occurred.[7] DHS' silence is presumably because neither DHS nor CBP actually *made* a determination in this matter prior to Plaintiffs filing their Complaint. *See* Am. Compl. ¶¶ 57, 81; 2d Dewey Decl. Ex. 4 (SecureReleasePortal *still* states DHS Expedited processing is "[p]ending" and CBP expedited processing is "[p]ending [d]ecision")); ECF No. 14-1, at ¶ 12.[8] Given that the statute expressly authorizes review in such

---

[7] Although DHS makes the implication, the date of filing a request cannot be that of "determination". *See* 5 U.S.C. § 552(a)(6)(E)(ii)(I) (10 days from receipt of request to make a "determination"); 6 C.F.R. § 5.5(e)(2) ("A request for expedited processing may be made at any time.").

[8] That CBP initially "denied" the Request via form email is of no moment. That form did not deny the expedited processing application on the merits or as moot, and in any event the agency processing was still under way in that Plaintiffs had lodged an agency appeal. *See* Am. Comp. ¶¶ 57–58; *cf. Nat. Imm. Law Ctr. v. USCIS*, No. 14-cv-9632 (MAN), 2015 WL 12684437, at *2 (C.D. Cal. Dec. 15, 2015) (agency appeal of denial of expedited processing deemed "moot" by agency due to issuance of final decision prior to appeal); *NAACP Leg. Def. Fund v. U.S. Dep't of Housing and Urban Dev.*, No. 07-cv-3378 (GEL), 2007 WL 4233008, at *2 (S.D.N.Y. Nov. 30, 2007) (agency denial of expedited processing request as "moot"). Resolution of that appeal— and any subsequent agency processing—could still be expedited even under DHS' view of mootness. Moreover, there is nothing unusual under baseline principles of administrative law in asking an agency to reconsider a decision based on new factual evidence. *See, e.g.*, *ACLU v. DHS*, 810 F.Supp.2d 267, 270–71 (D.D.C. 2011) (noting DHS OIG declined a request to reconsider a denial of expedited processing and that Immigration and Customs Enforcement granted a similar request); *Treatment Action Grp. v. FDA*, No. 15-cv-976 (VAB), 2016 WL 5171987, at *4 n.5 (D. Conn. Sept. 20, 2016) ("these cases discuss situations where the agency proactively chose to reconsider initial denials of requests for expedited processing without court intervention, potentially allowing for expansion of the agency record after the agency's initial denial"). So even under DHS' erroneous view of the matter, Plaintiffs supplementation of the

a case of "failure by an agency to respond in a timely manner" (5 U.S.C. § 552(a)(6)(E)(iii)),

*i.e.*, via constructive exhaustion, the proper record was, as Plaintiffs stated in their opening

papers, "that existing as of filing this case."  Mot. at 7.[9]

### 4.    Media Coverage of the Request is The Most Compelling Evidence of "Widespread and Exceptional Media Interest" in the Request.

Finally, DHS attacks the relevance of post-Request news reports with the submission that

"[t]he Department and its components were not required to accept Plaintiffs' subjective view that

its FOIA request was important as evidence meeting the requirements of 6 C.F.R.

§ 5.5(e)(1)(iv)."  Opp. at 17–18.  That single-sentence-germ of an argument is waived.  *See*

*Fling*, 2020 WL 4569335, at*2 n.5; *Rodriguez*, 2020 WL 686012, at *9 n.5.

Going to the merits again out of caution, DHS entirely misses the point.  DHS' statement

is literally correct in so far as it goes.  DHS is not required to accept Plaintiffs' view standing

alone.  But as a factual matter it is erroneous—numerous other sources reiterate and amplify the

questions Plaintiffs have raised.  *See* Am. Compl. at ¶¶ 43–44. And again, Plaintiffs make no

such submission.  What matters here is whether the topic of the Request is subject to

"widespread and exceptional" media coverage.  *See* Mot. at 10–11, 13–14.  At a high and

---

expedited processing record well after the initial denial merely operated as request for
reconsideration.  And that is entirely proper.

[9]  To the extent DHS' real objection is to the supplementation of the expedited processing
applications they have failed to articulate any basis for this argument; therefore it is waived.  *See*
*Fling*, 2020 WL 4569335, at*2 n.5; *Rodriguez*, 2020 WL 686012, at *9 n.5.  In any event, there
is no reason an application cannot be supplemented.  Under DHS regulations "[a] request for
expedited processing may be made at any time."  6 C.F.R. § 5.5(e)(2).  And it is entirely proper
to supplement an administrative record or seek administrative reconsideration.  *ACLU*, 810
F.Supp.2d at 270–71; *Treatment Action Grp.*, 2016 WL 5171987, at *4.

admittedly general view, the *sine quo non* of 6 C.F.R. § 5.5(e)(1)(iv) is does the media care a great deal about the topic of the Request?  Media coverage is—largely—the whole ballgame. *See, e.g.*, *Am. Oversight*, 292 F.Supp.3d at 507–08; *ACLU*, 321 F.Supp.2d at 31–32; *Edmonds*, 2002 WL 32539613, at *3.  It does not matter who the media is quoting, commenting upon, criticizing, or questioning as concerns the Request as long as the coverage is "widespread and exceptional."  Every day, the press affirmatively declines to report on (or devotes little attention to) FOIA requests and attendant statements by a variety of groups.  Plaintiffs could choose to hold a press conference and the media may choose to *completely* ignore it. What matters here is that *the media* made the informed affirmative *choice* to deem the Request and Plaintiffs' related statements (along with those of many others) to be of exceptional newsworthiness and to accordingly cover them extensively.  And that is all the standard requires.  That evidence is the best possible evidence of "widespread and exceptional" media interest.  Plaintiffs directly tested the key proposition and passed with flying colors.

## 5. The Request Itself Is the Subject of "Widespread and Exceptional Media Interest"

DHS argues as a fallback position that "[e]ven assuming that Prince Harry's status in the United States is a topic of media interest, Plaintiffs' request for expedited processing does not demonstrate that the specific categories of records sought by Plaintiffs concern matters of exceptional media interest."  Opp. at 16.  Again, as Plaintiffs freely admit, there needs to be a "fit between the call of the request and the matter of 'widespread and exceptional' media interest" (Mot. at 11), and the dispute appears to be one of degree and fact.  As to nexus, there need not be an exact "fit"; the test is one of reasonableness.  For example, in *Brennen Center*, parts 1–3 of

the operative FOIA request related to specific controversial aspects of the 2020 census.  498

F.Supp.3d at 98.  Part 4 sought "records 'relating to the 2020 Census' to the extent 'there is any

mention of, involvement in, or communication with' a list of individuals and organizations the

Brennan Center believes may have been involved in the matters covered by Parts 1–3." *Id.*

(internal citation omitted).  The Government submitted that Part 4 "is 'far broader' than any

'widespread and exceptional' interests at stake." *Id.* (internal citation omitted).  The Court

rejected this argument:

> Although this part will capture a broader set of documents, it still seeks records "relating
> to the 2020 Census," which, as explained above, includes matters "of widespread and
> exceptional interest" that raise "questions" about "the Government's integrity."
> Moreover, in most cases, the Brennan Center links these individuals and organizations
> with advocacy or involvement relating to the areas covered by Parts 1–3 of its requests.

*Id.*  The Court noted in dicta that "[a]s for those handful of individuals and organizations for

which the Brennan Center fails to make such a showing, it has probably not made out a sufficient

case for expedition." *Id.* n.4.[10]

Applying that metric here, Plaintiffs clear the bar with room to spare.  As an initial

matter, regardless of the test applied, the requisite nexus is present in that Plaintiffs have

presented a host of articles that specifically concern *the Request*.  There is no need to guess or

approximate at fit between articles and the call of the Request like in DHS' authority.  *See* Opp.

---

[10] *See also Prot. Democracy I*, 263 F.Supp.3d at 299 (under the statutory expedited processing
standard, the necessary nexus was present when the FOIA request concerned the legality of a
military strike and news coverage focused on "both the April 6 strike and its legality").  It is also
worth noting that, even as framed by DHS, the test is whether the "*records* sought" bear the
required relationship.  It may very well be that a record addresses several topics and only one of
those topics is the subject of "widespread and exceptional media interest."  But by Defendant's
own admission, that is sufficient.

at 12–13 (citing *EPIC v. DOJ* which held that "[t]he fact that Plaintiff has provided evidence that there is some media interest in data mining as an umbrella issue does not satisfy the requirement that Plaintiff demonstrate interest in the specific subject of Plaintiff's FOIA request, the Verity K2 Enterprise software program" 355 F.Supp.2d 98, 102 (D.D.C. 2004) ("EPIC I").  The Request *itself* is the subject of widespread and exceptional media interest.  *See* Am. Compl. ¶ 44. Plaintiffs plainly and clearly opened this point.  *See* Mot. at 13–14.  DHS does not respond to that submission other than to argue those articles do not count—an argument devoid of merit. *See supra* at 19.

Even setting that point aside the proper nexus is present.  *Brennan Center* lucidly explains that a record can be central to the matter of "widespread and exceptional media interest" even if it does not directly speak to that topic.  By way of example, records that only identify the type of visa granted to the Duke of Sussex do not on their face discuss admission and drug use, but they are necessary to analyzing the propriety of DHS' heavily questioned actions.  *See* Am. Compl. ¶ 14 (applications of certain waivers limited to *nonimmigrant* visas (emphasis added)). That "broader set of documents" is necessary to fairly evaluate DHS' conduct.  *Brennan Ctr.*, 498 F.Supp.3d at 98.  It is not the same as asking only about the specific and failing to explain its nexus to the general.  *See EPIC I*, 355 F.Supp.2d at 102.

**B.    Questions as to Whether DHS Exercised Proper Discretion As Concerns the Duke of Sussex's Immigration Status Are "Possible Questions About the Integrity of the Government that Affect Public Confidence."**

DHS does not appear to dispute Plaintiffs' articulation of the relevant legal principles. *Compare* Mot. at 11–13 *with* Opp. at 18–19.  Instead, DHS disputes the facts.

- Submission 1:  "None of the articles that Plaintiffs quoted suggest that the government did something wrong; they simply speculate that Prince Harry's past drug use could put his visa or his ability to remain in the United States at risk."  Opp. at 18.

- Submission 2:  All Plaintiffs have shown is "media speculation about whether Prince Harry's past drug use could prevent him from remaining in the United States" and "speculation about the status of Prince Harry's visa"  *Id.* at 18, 19.

- Submission 3:  All Plaintiffs have shown is "obscure sources speculating as to whether a celebrity who has admitted to some immoral conduct may be subject to some adverse action by the government."  *Id.* at 19.

False.  Just read paragraphs 43 and 44 of the Amended Complaint.  While DHS may wish to "excise" a number of those articles from consideration, DHS' statements are categorical.  To repeat a few examples:

- *Sunday Telegraph* (Jan 8, 2023), App. C219 ("'He would have been asked [about drug use]. If he was truthful in his answers, he should have been denied,' said Prof. Alberto Benítez, director of George Washington University's Immigration Clinic . . . [Benítez] suggested the Duke may have been granted some discretion by immigration officials because of his status."

- *BuzzFeed* (Jan 14, 2023), App. C1–4  (recounting conflicting expert opinions as to whether DHS properly admitted HRH or whether his status caused him to receive "slack").

- *N.Y. Post* (Mar 22, 2023), App. C208  ("'An admission of drug use is usually grounds for inadmissibility,' former federal prosecutor Neama Rahmani told The Post's Eileen Reslen of Harry's status in the States. 'That means Prince Harry's visa should have been denied or revoked because he admitted to [drug use in his book].'").

Moreover, Plaintiffs set out in the Amended Complaint the factual and legal detail to question whether DHS has given—or is giving—the Duke of Sussex preferential treatment.  Am. Comp. ¶¶ 10–22, 27–43.  The Amended Complaint also compiled past prominent cases concerning drug use and alien entry to the United States to highlight questions concerning DHS

inconsistencies and possible playing of favorites. *Id.* at ¶¶ 23–26. On this basis alone, Plaintiffs' showing is miles from mere "speculat[ion]." Opp. at 19.

Again, ultimately, the Court should look to the coverage. What matters is how the media view the issues—does their coverage surface "possible questions about the integrity of the government that affect public confidence." *See, e.g.*, *Brennan Ctr.*, 498 F.Supp.3d at 97; *Am. Oversight*, 292 F.Supp.3d at 507–08. On this record, "widespread and exceptional" media interest clearly surfaces grave and specific questions as to whether DHS acted appropriately in admitting the Duke of Sussex. If DHS applies one rule for a Prince who is a friend and political ally of the current President and another for the common man, woman, and child, that is a profound issue going directly to public confidence in DHS' equal enforcement of law. *Cf. CREW v. DOJ*, 870 F.Supp.2d 70, 81 (D.D.C. 2012), *rev'd on other grounds*, 746 F.3d 1082 (D.C. Cir. 2014) (DOJ grant of expedited processing to request seeking information to "review" DOJ declination in high profile criminal investigation of former Congressman Tom DeLay); *cf. also Muchnick v. DHS*, 225 F.Supp.3d 1069 (N.D. Cal. 2016) (ordering disclosure of immigration records of former Irish Olympic swimming coach, who DHS allowed to enter and reside in the United States, related to extensive allegations of sexual assault and possible political influence in obtaining admission into the United States).

Administrations have been crippled by—and even fallen on—the basic issue of favoritism toward a high profile political ally. It is of course a different type of issue than, say for example, questions about *potential* abuses of a statutory provision which *may* be unconstitutional, but was never used. *Cf. ACLU*, 321 F.Supp.2d at 32. But it is no less grave.

### C.     PLAINTIFFS WITHDRAW THEIR MOTION AS TO CBP.

DHS argues that "[b]ecause CBP determined that Plaintiffs' FOIA request could not be processed without a privacy waiver, Plaintiffs' request for expedited processing from CBP is moot."  Opp. at 14.  Not so as to Initial Denial, *see supra* at n.8.  After the Appeal Denial, however, Plaintiffs will not press the point.  But two observations are in order.

*First*.  CBP has taken a frivolous position possibly in an effort to moot out this Motion.  To take a regrettable example, CBP has *Glomar*'d *all* "records related to the Duke of Sussex as [not] doing so would betray the privacy interests protected by Exemptions (b)(6) and (b)(7)(C)." *Id*. at 4.  Specifically:

> [S]imply identifying whether records you seek exist confirms that the Duke of Sussex applied for entry into the United States and therefore was inspected by CBP.  The records from the systems you request would provide any history of the Duke of Sussex's travel to and from the United States as well as any potential CBP violation he may have incurred.

*Id*.  It is frivolous to *Glomar* whether the Duke of Sussex has "applied for entry into the United States."  *Id.  Anyone* who is not living under a massive boulder knows that the Duke of Sussex has applied for entry to the United States.  His Netflix Series, *Harry & Meghan*, Episode 6, opens with a selfie video of HRH flying via private jet into the United States to take up extended residence in Los Angeles on March 14, 2020 at around 6:00 a.m.!  HRH's international travel is heavily reported by the press—witness his travel to and from HM The King's Coronation.  One cannot *possibly Glomar* such a fact.  Pointedly, United States Customs and Immigration Services *did not Glomar* the Request and conducted a search.  *See* 2d Dewey Decl. Ex. 3.  The only colorable justification for CBP's *Glomar* is if HRH is here illegally.  Is CBP really representing that the Duke of Sussex is or may be an illegal alien?

21

*Second*.  Should this Court order CBP to conduct a search, CBP should be considered to be estopped from opposing an accelerated production schedule on the grounds that this is not an "expedited processing" case.

## II.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION.

DHS spends considerable time belaboring the point that Plaintiffs have not shown records are needed by a certain date or before an "imminent event" after which the records will lose salience.  Opp. at 11–12.  And they complain that Plaintiffs' argument "collapses two separate elements of the preliminary injunction standard" (success on the merits and irreparable harm). Opp. at 12.  What of it?  That *is* Plaintiffs' argument, and it was stated in black and white in the Motion.  Mot. at 20.  Lest there be even a hint of ambiguity, Plaintiffs concede that they lose this Motion if a showing the records sought are "'time-sensitive and highly probative, or even essential to the integrity, of an imminent event, after which event the utility of the records would be lessened or lost'" (Opp. at 11 (citations omitted)) is required for the Court to find irreparable harm in the expedited processing context.

Yet again, on the issue of irreparable harm, what DHS does *not* say carries all the import.

*First*.  Plaintiffs' argument is a structural one, grounded in statute, regulation, and principles of Federal equity jurisdiction.  *See* Mot. at 17–22.  DHS' Opposition says virtually nothing about *that* argument other than a claim that the cases cited by Plaintiffs do not support Plaintiffs' argument because those cases contain an "imminent event or a time certain where the information that they are seeking will no longer be useful to them."  Opp. at 12–13.  But this statement ignores the entirety of both Plaintiffs' careful citation to, and exploration of, both

22

applicable cases construing FOIA's expedited processing structure and applicable cases construing principles of federal equity.  And yet again, DHS has not responded at all to *that* argument.

Moreover, Defendant's criticism falls on its own terms.  To be sure, as Plaintiffs stated in their opening papers, *Washington Post v. DHS*, 459 F.Supp.2d 61 (D.D.C. 2006), did involve records sought to be obtained prior to a mid-term election.  *Compare* Mot. at 22 *with* Opp. at 12.  But *Washington Post also* clearly concluded that in addition to the irreparable harm of the specific urgency at issue, irreparable harm arose from the denial of the statutory right to expedition.  DHS does not respond at all to Plaintiffs' submission that *Washington Post* contained, in effect, two sufficient irreparable harm holdings.

The same criticism applies to DHS' view of *EPIC II*.  There, DHS would have the holding rest on the fact that:

> [D]enial of emergency relief would deprive the requester of "timely" access to "vital" information bearing on current and ongoing debates about specific government policies, *Elec. Privacy Info. Ctr. v. Dep't of Just.*, 416 F.Supp.2d 30, 41 (D.D.C. 2006) (information sought was vital to the "debate surrounding the legality of the Administration's warrantless surveillance program").

Opp. at 12–13.  But that fact (again plain on the face of the Motion (Mot. at 21)) says nothing about the *EPIC II* Court's careful structural parsing of the statute and its conclusion that irreparable harm arose because only a preliminary injunction could vindicate the ephemeral timing based expedited processing right.  *See id.*  Again, *that* is the argument Plaintiffs *actually* make, and DHS says nothing about *that* argument.

*Second*.  DHS cites opinions by other judges in this District to support their preferred test:

> "Courts in our district have generally found irreparable harm in FOIA preliminary-injunction cases only where the requested documents are 'time-sensitive and highly probative, or even essential to the integrity, of an imminent event, after which event the utility of the records would be lessened or lost.'" *Heritage Found.* [*v. EPA*, No. 23-cv-748 (JEB)], 2023 WL 2954418, at *4 [(D.D.C. Apr. 14, 2023)] (citing *N.Y. Times*, 2021 WL 1614817, at *8).

Opp. at 11; *see also* Opp. at 11–12 (citing *EPIC III*, 15 F.Supp.3d at 39 (D.D.C. 2014)). Yes, other judges have articulated that test. But they never addressed Plaintiffs' argument here founded in structure and equitable first principles. As Plaintiffs already explained, *Heritage Foundation*, by its own framing of the issue did not address this argument. Mot. at 22. So too *N.Y. Times*. 2001 WL 1614817, at * 8 (summarizing plaintiff's irreparable harm arguments). Although the opinion in *EPIC III* is far from clear, it appears the argument was made, but was not addressed by the Court. There, the Court was confronted with a situation where the Department represented it was processing the underlying request on an expedited basis and in which Plaintiffs *also* sought an injunction compelling production by a date certain. 15 F.Supp.3d at 35. Although less than clear, the Court appeared to view the issue of statutory entitlement to expedition to turn on whether the underlying request received expedited status (as opposed to the date of actual production). *Id.* at 44–45. Accordingly, the Court held that because:

> DOJ ha[d] submitted uncontroverted evidence that the agency has, in fact, expedited EPIC's FOIA Request . . . even assuming that the loss of a "right to expedition" can properly be characterized as irreparable harm, in light of DOJ's uncontested representations, EPIC has failed to establish that its right to expedition has been, or will be, extinguished absent a preliminary injunction.

*Id.* at 45.[11]  Even if at the end of the day, other judges *had* addressed Plaintiffs' argument, those

opinions are not binding and should not be followed if they fail to persuade.  *See United States v.*

*Miller*, 605 F.Supp.3d 63, 66 (D.D.C. 2022) (Nichols, J.).

## III.   THE EQUITIES FAVOR GRANTING A PRELIMINARY INJUNCTION.

DHS does not dispute (at least in part) (Opp. at 20–21) that in this context "public interest

largely merges with the merits."  Mot. at 23.  The remainder of DHS' arguments are best

addressed by Congress as they indirectly attack the existence of an expedited processing scheme

or are circular in that they claim that somehow entering preliminary relief here to remedy DHS'

*admitted violation* of FOIA's timing provisions would somehow unduly prejudice those without

resources to litigate to vindicate their rights.  Opp. at 20.  The answer to both is for DHS to

comply with the statute Congress wrote; not complain when parties stand on their rights.

### CONCLUSION

This Court should enter a preliminary injunction compelling DHS sub-component DHS

HQ to process Plaintiffs' FOIA Request on an expedited basis pursuant to 5 U.S.C.

§ 552(a)(6)(E) and 6 C.F.R. § 5.5(e)(1)(iv).

---

[11] Defendant waves its hand at an argument that FOIA litigation is accelerated (Opp. at 4) and that relief here would do violence to Congress' "specialized procedural framework" for FOIA. *Id.* at 6.  It is waived.  *See Fling*, 2020 WL 4569335, at*2 n.5; *Rodriguez*, 2020 WL 686012, at *9 n.5.  And that argument blinks reality, federal defendants routinely seek and obtain opposed enlargement of FOIA's accelerated timeline.  *See* Minute Order, *Heritage Found. v. DOJ*, No. 23-cv-669 (RDM) (Apr. 10, 2023) (granting 30 day extension of time to answer over Plaintiffs' objection citing to EPA's opposition in *Heritage Foundation*'s discussion of the supposedly expedited statutory timelines to answer a FOIA complaint).  At bottom, Defendant's argument is a veiled homage to delay and is wrong.  *See Wash. Post*, 459 F.Supp.2d at 66 ("To afford the plaintiff less than expedited judicial review [via granting preliminary injunctive relief] would all but guarantee that the plaintiff would not receive expedited agency review of its FOIA request.").

Dated: June 2, 2023                    Respectfully submitted,

                                       /s/ Samuel Everett Dewey
                                       SAMUEL EVERETT DEWEY
                                       (No. 999979)
                                       Chambers of Samuel Everett Dewey, LLC
                                       Telephone:  (703) 261-4194
                                       Email:  samueledewey@sedchambers.com

                                       DANIEL D. MAULER
                                       (No. 977757)
                                       The Heritage Foundation
                                       Telephone:  (202) 617-6975
                                       Email:  Dan.Mauler@heritage.org

                                       ROMAN JANKOWSKI
                                       (No. 975348)
                                       The Heritage Foundation
                                       Telephone:  (202) 489-2969
                                       Email:  Roman.Jankowski@heritage.org

                                       *Counsel for Plaintiffs*