<pre>
 1                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2

 3    * * * * * * * * * * * * * *   )
      HERITAGE FOUNDATION, et al.,  )   Civil Action
 4                                  )   No. 23-01198
                    Plaintiffs,     )
 5                                  )
        vs.                         )
 6                                  )
      U.S. DEPARTMENT OF HOMELAND   )   Washington, D.C.
 7    SECURITY,                     )   June 6, 2023
                                    )   2:30 p.m.
 8                    Defendant.     )
                                    )
 9    * * * * * * * * * * * * * *   )

10

11          TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
             BEFORE THE HONORABLE CARL J. NICHOLS,
12                 UNITED STATES DISTRICT JUDGE

13

14    APPEARANCES:

15    FOR THE PLAINTIFFS:      SAMUEL EVERETT DEWEY, ESQ.
                               CHAMBERS OF SAMUEL EVERETT
16                                DEWEY, LLC
                               2200 Twelfth Court North
17                             Apartment 609
                               Arlington, Virginia 22201
18
                               DANIEL D. MAULER, ESQ.
19                             ROMAN JANKOWSKI, ESQ.
                               THE HERITAGE FOUNDATION
20                             214 Massachusetts Avenue, Northeast
                               Washington, D.C. 20002
21
                               ERIC NEAL CORNETT, ESQ.
22                             LAW OFFICE OF ERIC NEAL CORNETT
                               Post Office Box 728
23                             Hyden, Kentucky 41749

24

25
</pre>

1    <u>APPEARANCES, CONT'D:</u>

2    FOR THE DEFENDANT:          JOHN BARDO, ESQ.
                                 U.S. DEPARTMENT OF JUSTICE
3                                601 D Street, Northwest
                                 Washington, D.C. 20530
4

5    REPORTED BY:               LISA EDWARDS, RDR, CRR
                                 Official Court Reporter
6                                United States District Court for the
                                    District of Columbia
7                                333 Constitution Avenue, Northwest
                                 Room 6706
8                                Washington, D.C. 20001
                                 (202) 354-3269
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURTROOM DEPUTY:  Your Honor, this is Civil

2     Case 23-1198, Heritage Foundation, et al., versus U.S.

3     Department of Homeland Security.

4          Will the parties please come forward to identify

5     yourselves for the record.  Come forward to the lectern.

6     We'll start off with Plaintiffs' counsel first this

7     afternoon.

8          MR. DEWEY:  Good afternoon, your Honor.  Samuel

9     Dewey, counsel for Plaintiffs.  With me are my co-counsel,

10    Daniel Mauler, Neal Cornett and Roman Jankowski.

11         And with me from the Heritage Foundation is

12    Dr. Nile Gardiner.

13         THE COURT:  Good afternoon, everyone.

14         MR. DEWEY:  Thank you, your Honor.

15         MR. BARDO:  Good afternoon, your Honor.  John

16    Bardo on behalf of the Department of Homeland Security.

17         THE COURT:  Good afternoon, counsel.

18         We're here on Plaintiffs' motion for preliminary

19    injunction.  I've reviewed all the materials.  I do have

20    some questions about specific -- the status of specific

21    issues, but also questions more generally about the

22    arguments that have been presented.

23         Why don't we start with Plaintiffs' counsel.  And

24    I'm happy to hear from you on why you think I should grant

25    the motion.

1     So please.

2     MR. DEWEY:  Thank you, your Honor.

3     I'd like to begin by briefly highlighting what we

4 view this case and this motion is about.  This is obviously

5 a case concerning the Duke of Sussex, but what this case is

6 truly about is DHS and DHS's compliance with the law.

7     My clients --

8     THE COURT:  What components of DHS to which the

9 FOIA request was referred have still not responded to your

10 request?

11     MR. DEWEY:  Understood, your Honor.

12     As I understand it, it's the latest communication

13 with the Department of Justice.  Our motion is live as to

14 the Department of Homeland Security's headquarters

15 component.

16     THE COURT:  Only as to headquarters?

17     MR. DEWEY:  That is correct, your Honor.

18     As to --

19     THE COURT:  Headquarters has told you it has no

20 responsive records?  It may not have finally said that in a

21 final communication.  Correct?

22     MR. DEWEY:  My understanding, your Honor, is that

23 a subcomponent of headquarters has told us that they have

24 objected to the request and will not process it.

25     My understanding is that DHS does consider the

1    issue live, though, and there is some level of confusion as

2    to exactly what the status is there as to where they are,

3    your Honor.

4             THE COURT:  But as to all other DHS components, to

5    include CBP and others, you agree that the relevant

6    component's action or denial, really, moots your request for

7    expedition?

8             MR. DEWEY:  Your Honor, yes.  We are withdrawing

9    the motion as to CBP.  We could -- there are cases that

10   would cut the other way, but we think Plaintiff on the

11   general -- or DHS is correct on the general issue, so we're

12   not going to press that here.

13            THE COURT:  Well, obviously, I want to hear from

14   Government counsel about the status of the request in the

15   various components you just identified.

16            Another question for you is:  Why does Heritage

17   have standing under *TransUnion*?  Are you familiar with

18   *TransUnion versus Ramirez*?

19            MR. DEWEY:  Yes, your Honor.  As to which aspect

20   of --

21            THE COURT:  So *TransUnion* held that the Plaintiffs

22   there did not have Article III standing with respect to

23   the -- their request -- or their attempt to get information.

24   And it seems to me that a lot of what the Supreme Court said

25   there is to suggest that FOIA plaintiffs don't generally

1    have Article III standing unless they allege something more

2    than just a desire to get the information subject to the

3    FOIA request.

4         So why doesn't *TransUnion*, applied here, mean that

5    Heritage lacks standing?

6         MR. DEWEY:  Certainly, your Honor.

7         This is part of a broader examination by Heritage

8    of DHS's conduct.  Heritage conducts research on issues as

9    to whether DHS is complying with the law.  Heritage conducts

10   investigations on those issues.  There are three other cases

11   on your Honor's docket dealing with FOIA requests as to DHS

12   specifically.

13        As to the broader issue, when Heritage conducts

14   research, when Heritage conducts investigations, that

15   information is analyzed.  There are policy experts.

16   Dr. Gardiner, for example, is head of the Thatcher Center.

17   He analyzes that information.  Other experts analyze it and

18   it is presented, be it to the media or oftentimes in papers

19   or even in congressional testimony.

20        Heritage is testifying tomorrow on DHS issues

21   related to various legal issues in front of the Senate

22   judiciary subcommittee that has jurisdiction -- or House

23   judiciary subcommittee that has jurisdiction.

24        So this information and this request is in that

25   much broader context, that Heritage has a concern

1    institutionally that DHS does not comply with the law.

2    Heritage would respectfully submit that there are numerous

3    instances where there is a substantial record to support

4    those concerns, and they are examining those concerns.

5          For example, in the other cases in front of your

6    Honor, it has to do with the alleged, now-admitted-not-to-

7    have-occurred, whipping of migrants and how that issue was

8    handled.  Heritage has cases in front of one of your Honor's

9    colleagues dealing with how DHS collects information.  That

10   is going to be analyzed, hopefully, when we receive records

11   by the relative policy expert in that area to provide the

12   report.  So it is very much an integrated operation to

13   obtain the information and analyze it.

14         THE COURT:  And that's in your view the kind of

15   injury in fact that has a historical analog at the common

16   law of the kind *TransUnion* says we have to look for?

17         MR. DEWEY:  I think it does, your Honor, in

18   that --

19         THE COURT:  What would that common law --

20         MR. DEWEY:  The common law --

21         THE COURT:  -- injury have been?

22         MR. DEWEY:  -- analog would be a discrete denial

23   of a statutory right to access.  And there are historical

24   instances of statutory right to access.  And I think the

25   analysis on that point would follow the analysis that --

1    it's not exactly the same issue, but I think the panel of

2    *Maloney* certainly dealt with this issue in the context of a

3    congressional information statute and said, you know, as we

4    feel it -- and I know that the Supreme Court has granted

5    cert in *Maloney*, but I think for now *Maloney* would speak

6    pretty directly to that issue, that the denial of

7    information that is requested that someone has said they are

8    going to use for the purposes under FOIA, which is making

9    information available to the public, which often includes

10   getting it, assimilating it, analyzing it and publishing it,

11   that there is a sufficient basis there.

12           THE COURT:  So let's assume there is -- there

13   still is at least one DHS component that has not at a

14   minimum responded to the FOIA request and you want that

15   response expedited and that you have standing to seek the --

16   well, not just to seek expedition, of course, but to pursue

17   the FOIA claims.

18           What is it about this case that warrants not just

19   resolution of the expedition request, but actually an

20   injunction from me requiring that?

21           MR. DEWEY:  Two responses to that, your Honor.

22   The first is to the substantive standard in question.  It's

23   6 CFR 5.5(e)(1)(iv).  And it says -- and this is the

24   department's own regulation, so the keys are in their hand.

25   They chose to expand the statutory criteria to include this

1    criteria:  "a matter of widespread and exceptional media

2    interest in which there exist possible questions about the

3    government's integrity which affect public confidence."

4           And our submission is that the case falls within

5    that standard, which again is DHS's standard.  And as one of

6    your colleagues has pointed out in *Edmonds*, the Court, you

7    know, is applying their regulations.  And as I think Judge

8    Moss just pointed out, if the department has a problem with

9    a reg, they can obviously amend it by notice and comment.

10          THE COURT:  Right.  So that might establish that

11   expedition is warranted, and you can challenge the failure

12   to expedite.

13          But you also have to get -- convince me that a

14   preliminary injunction is warranted here.

15          MR. DEWEY:  Correct, your Honor.  And that's the

16   second point that I wish to make.

17          THE COURT:  Yes.  So what makes this case one of

18   those cases uniquely suited to -- or suited to a preliminary

19   injunction in connection with a FOIA request for expedition?

20          MR. DEWEY:  Our submission, your Honor, is

21   structural looking at the statute, the regulation and

22   federal equity principles; and in particular, the D.C.

23   Circuit's observation in *Soucie* that in this statute -- and

24   I will quote this to make sure I don't get it wrong, your

25   Honor -- quote:  "Congress clearly has the power to

1    eliminate ordinary discretionary barriers to injunctive

2    relief, and we believe that Congress intended to do so

3    here."

4              And if I can break that down for your Honor,

5    within that context our submission is, if Plaintiff proves

6    an entitlement, a clear entitlement to expedited processing,

7    be it under the statutory standard or the regulatory

8    standard, there is necessarily irreparable harm because of

9    the nature --

10             THE COURT:  So that means any plaintiff that can

11   establish that the plaintiff has satisfied the DHS

12   regulatory standard is entitled to a preliminary injunction?

13             MR. DEWEY:  On our view of the structure of the

14   statute and the principles of general federal equity

15   jurisdiction --

16             THE COURT:  So that would then collapse the

17   agency's decision around expedition with my consideration of

18   whether the four injunctive factors have been met.

19             MR. DEWEY:  That is --

20             THE COURT:  They would make them irrelevant.

21             MR. DEWEY:  That is largely correct, your Honor.

22   That is our submission.

23             THE COURT:  So, for example, imagine that there

24   was actually nothing really that important about this matter

25   for another year, that, like, there's some immigration

1    hearing in a year and a half or that there was one next

2    month.  That would be altogether irrelevant in your view for

3    my consideration of whether to grant a PI, because nothing

4    about the immediacy of the question is something that I

5    should be considering.  The only question is whether

6    expedition as defined by the regulations is required.

7              MR. DEWEY:  Two responses to that, your Honor.

8              The first is that, yes, that is our submission,

9    that it does collapse.  There may be some case that I can't

10   think of where on another equitable factor it might be a

11   different result.  But we have always submitted it does

12   collapse.

13             And the second point that I want to make is:  Why?

14   We're dealing with a right that is time-based and

15   time-limited, and there is a specific jurisdictional cutoff.

16   It cannot be reviewed after a determination.

17             So it's a right about timing; it's a right about

18   priority, because under the DHS regulations there are

19   different tracks.  If you're in the expedited track, you go

20   first.

21             So it is a timing and a priority component.  It is

22   jurisdictionally time-limited, as we have seen, here in that

23   the CBP motion was live.

24             THE COURT:  Has any court held that the inquiry is

25   basically a collapsed inquiry in the sense that you've

1   articulated here?

2           MR. DEWEY:  Your Honor, I think a fair reading of

3   the opinion in what we referred to in our briefing as *EPIC*

4   *II* has.  It's focused specifically on the nature of the

5   harm, the limited statutory timeframe and has come to that

6   conclusion.

7           And we think, fairly read, the *Washington Post*

8   case that we cite in our papers also reaches that threshold.

9   We think it had essentially two holdings:  one collapsing;

10  the other saying, yes, there was some extra urgency.

11          I would also like to point out, your Honor, in

12  this context that you're questioning that the traditional

13  two statutory expedition factors require either a showing of

14  some sort of, you know, threat to life and limb or under the

15  D.C. Circuit's opinion in *Al Fayed* require a showing that is

16  very close to traditional irreparable harm.

17          And I'd again come back, your Honor, to the point

18  that the keys are in DHS's hand as to the standard.

19          So accepting our submission does not necessarily

20  mean that in every case that this would occur.  It would

21  simply mean if DHS chooses to maintain the regulation, it

22  would occur.

23          THE COURT:  Right.  Well, your view is that DHS,

24  having -- through the adoption of these regulations has

25  defined a universe where not only is expedition required,

1    but preliminary injunctions are as a matter of course

2    granted if sought?

3              MR. DEWEY:  Yes, in the sense of they control the

4    first prong.

5              And the second prong, I think it flows from the

6    statute; and I think it flows, as I said, from the comment

7    in *Soucie,* "Traditional equitable factors are dispensed with

8    under FOIA," certainly on the merits phase, and then from

9    the structure of the statute.

10             And we also discussed in our papers, you know, the

11   general federal equity jurisprudence that if to achieve full

12   relief it is necessary, then you read the statute in that

13   specific context to dispense with that finding.  And that's

14   what we're arguing here:  Because it's so time-based,

15   because it's priority and because it's ephemeral, it truly

16   requires this accelerated approach.

17             And we did note in our reply brief, your Honor,

18   there are other instances where you're dealing with a

19   short -- potentially short window, time-based rights, where

20   courts have collapsed the inquiry.

21             THE COURT:  But to be very clear and to go back to

22   my question before, there isn't some event looming in the

23   not-too-distant future that you think this information is

24   highly pertinent to.  Really, it's more that there is in

25   your view public attention on this question that I suppose

1    could dissipate.  Is that what creates, not in the statutory

2    sense, but in the injunctive relief sense, a need for this

3    to happen even faster than it would otherwise?

4         Because there are some cases that do permit -- or

5    in which injunctive relief has been granted to force

6    expedition where the Court is aware of an event in the

7    imminent future that the information could be relevant to:

8    a census, an election, some actual date.

9         We don't have that here.  Correct?

10        MR. DEWEY:  No, we do not, your Honor.  And that's

11   always been our argument.

12        We again --

13        THE COURT:  Well, I'm not suggesting you argue to

14   the contrary.

15        MR. DEWEY:  We would certainly suggest that *EPIC*

16   held -- made the structural holding and that DHS had the

17   structural holding.

18        And then I think it is important to note, your

19   Honor, the line of cases you identified never really

20   addressed the structural argument.  It was raised in front

21   of Judge Jackson in what we term *EPIC III* in our filings.

22   But she disposed of the case on the fact that, there, the

23   injunction sought production by a date certain.  So there

24   was a requirement for irreparable harm.

25        And to be clear, we're only talking about here an

1    order for timing.

2         I would agree with your Honor that the factors

3    would not collapse if we were seeking your Honor to enter an

4    order saying:  Complete production in a month.  That would

5    be different.  We're talking only on the timing-based right,

6    the priority-based right that is ephemeral.

7         And, you know, I would say, as we've seen here,

8    CPB has responded; and it could be the case that your Honor

9    may disagree with their response.  We could be back to a

10   production and they may very well make the argument that

11   it's not expedited; we're not going to treat it quickly; and

12   we'd be back in front of your Honor on that issue in a

13   different context.

14        And FOIA does prefer that, you know, these matters

15   be adjudicated at the agency level, which is what we've

16   tried to do here.

17        And I recognize, your Honor, that this is an

18   argument that may not have been advanced in other cases.  I

19   do think it was advanced in the *EPIC* line.  And I recognize

20   it is a more structural argument than an event-based

21   argument.

22        But again, we think the structure compels this

23   conclusion.  And as I said, you know, I think the *Apotex*

24   case, there it was dealing with a 180-day exclusivity window

25   for generics.  But one of your colleagues essentially held,

1    Well, it's a time-limited window and there's a statutory

2    right.  And that's all that's required.

3            And there were other cases on that line.  You

4    would certainly not be breaking any new ground as a matter

5    of federal equity jurisprudence to follow the Court's

6    teachings that as a general proposition, if you're in this

7    type of context where a PI is necessary to grant full

8    relief, then you have a collapsing of those two factors, and

9    in the specific context of applying it to a time-based right

10   that is ephemeral.

11           THE COURT:  Anything else you'd like to add,

12   counsel?  I'd like to ask the Government both about the

13   status of the other components and the Government's position

14   on some of these issues.

15           MR. DEWEY:  I'm --

16           THE COURT:  But I'm happy to hear from you.

17           MR. DEWEY:  Your Honor, I'm happy to rest on the

18   briefs as to the merits of whether or not we've reached the

19   test.  But certainly if your Honor has any questions about

20   the application of the regulation to the facts in this case,

21   I would be happy to answer them.

22           THE COURT:  I'm going to certainly allow you the

23   opportunity to have rebuttal.  So why don't we just see how

24   it goes with Mr. Bardo and then we can take it from there.

25   Okay?

1          MR. DEWEY:  Thank you, your Honor.

2          THE COURT:  Mr. Bardo.

3          MR. BARDO:  Good afternoon, your Honor.

4          THE COURT:  Good afternoon.

5          Can we start with the status question?

6          MR. BARDO:  Yes, your Honor.

7          As of today, USCIS -- that's U.S. Citizenship and

8    Immigration Services -- U.S. Customs and Border Protection

9    and the biometric identity office have all issued a

10   determination at the administrative level that Plaintiff is

11   not entitled to any records.  And that's mainly because a

12   person's visa status is confidential.

13          Now, regarding DHS HQ, the expedited processing

14   issue is still live.

15          DHS HR on April 6th, 2023, had issued a letter to

16   Plaintiff saying that they had not reasonably described the

17   record sought.  The letter did not specify this, but the

18   letter was meant to say that they were specifically

19   concerned about Section 3 of Plaintiffs' request, where they

20   ask for communications generally about the request for

21   waiver under the Immigration and Nationality Act.

22          But now that the request is in litigation, DHS HQ

23   is willing to take another look at the request and work with

24   Plaintiff to see what -- what, if anything, we would need to

25   produce from the headquarters.

1     THE COURT:  So that means -- well, is DHS HQ

2     willing to expedite the request?

3     MR. BARDO:  No, your Honor.  DHS HQ contends that

4     Plaintiff is not entitled to expedited processing.

5     THE COURT:  But it intends to in the normal

6     course, then, working with the Plaintiff decide whether the

7     Plaintiff is entitled to any records?

8     MR. BARDO:  That's correct, your Honor.

9     THE COURT:  So we therefore don't have with

10    respect to HQ what we have with the other three components,

11    which is a denial, which makes the request for expedition

12    effectively moot.

13    MR. BARDO:  That's correct, your Honor.

14    THE COURT:  So because DHS HQ is unwilling to

15    expedite this request, I have to decide whether expedition

16    is warranted.

17    MR. BARDO:  That's correct, your Honor.

18    THE COURT:  Which seems like a waste of time to

19    me, frankly, because we have three components that have

20    already acted on the request and then just one component

21    that hasn't.

22    And so rather than getting to the merits of

23    whether the withholdings, denials and the like are

24    appropriate and lawful, because we are of course not at that

25    stage yet in this case -- and to be very clear for everyone,

 1     even if I were to grant all of the relief requested by the

 2     Plaintiff today, that would not result in the production as

 3     a result of my order of any records.  It would just result

 4     in at most requiring DHS headquarters to expedite the

 5     processing of the FOIA request.

 6              But it seems to me that having to resolve that

 7     question is a bit anomalous when we already have three other

 8     components having actually passed on the request, not on an

 9     expedited fashion, I guess, but just because they knew that

10     they were going to deny them.

11              So assuming that DHS HQ is going to adhere to that

12     position, you're going to have to have a discussion about

13     whether the Plaintiff is entitled to the injunction that it

14     seeks as to HQ.  Right?

15              MR. BARDO:  That's correct, your Honor.

16              THE COURT:  Okay.

17              MR. BARDO:  And --

18              THE COURT:  Why hasn't it satisfied at least the

19     regulatory requirements for expedition, putting aside the

20     preliminarily injunction question?

21              MR. BARDO:  Well, your Honor, we contend that they

22     haven't satisfied the regulatory requirements because all

23     they've cited are a bunch of articles from various obscure

24     publications, many of which are based in the United Kingdom,

25     that simply speculate about the Duke of Sussex's immigration

1    status and whether he may be facing some kind of imminent

2    adverse action.

3            THE COURT:  Well, the issues here are more

4    interesting to the public than your traditional FOIA

5    request, you would concede.

6            MR. BARDO:  That might -- in certain social

7    circles, perhaps.  Yes, your Honor.

8            THE COURT:  Just in general.  I mean, take your

9    FOIA request in the main.  This has more public attention to

10   at least the issues around the Duke than -- and perhaps his

11   immigration situation -- than your run-of-the-mill FOIA

12   case.

13           MR. BARDO:  That may be true, your Honor.

14           THE COURT:  So what --

15           MR. BARDO:  But this still doesn't meet the type

16   of -- this isn't the type of request that fits into the

17   regulations, because it doesn't question the Government's

18   integrity.

19           And I know the Plaintiffs have cited case law

20   saying you don't need to show that the Government is doing

21   something unlawful.

22           But in all the cases where the Courts have found

23   that the request does call into question the government's

24   integrity, the requester has been able to articulate some

25   kind of suspicion, some -- they even used the term

1    "reasonable suspicion" -- that some government official did

2    or is doing something wrong that the public needs to be

3    informed about.

4          And that's not what we have here.

5          THE COURT:  Does that have to be -- the suspicion

6    of government wrongdoing, does that have to be, for example,

7    reflected in the media articles?  Or is it enough that the

8    plaintiff, the FOIA requester, wants to get to the bottom of

9    whether there might have been?

10         MR. BARDO:  It would need to be reflected in media

11   articles, your Honor.  I believe one of the *American*

12   *Oversight* cases -- it's an opinion by Judge Leon -- rules on

13   that specifically.  I believe in that case, the Court found

14   that the Plaintiff was not entitled to expedited processing

15   of records regarding a nominee for solicitor general because

16   the article cited did not necessarily talk about the

17   specific wrongdoing that the requester believed the nominee

18   for solicitor general was engaged in.

19         THE COURT:  So here, even if there was even more

20   widespread media attention than the Plaintiff has

21   demonstrated and even if that widespread media attention was

22   entirely in the United States, the media attention in the

23   Government's view would have to raise a concern about

24   government misconduct; and if it didn't, then the fact that

25   the Plaintiff had as part of its FOIA request would be

1   inadequate under the regs?

2           MR. BARDO:  That's correct, your Honor.

3           THE COURT:  So let's just imagine

4   hypothetically -- and I understand your argument -- that

5   Plaintiff here has satisfied the regulatory standard for

6   expedition.  I get that that's not your position.

7           Plaintiff obviously argued today and in the papers

8   that that inquiry essentially collapses with the PI inquiry.

9   The Government disagrees with that.

10          But can you walk me through the Government's view

11  on that question?

12          MR. BARDO:  Yes, your Honor.

13          Plaintiffs -- the position Plaintiff is

14  encouraging you to adopt is a position that's never been

15  adopted by a court in this jurisdiction before.

16          These preliminary injunctions and expedited

17  processing cases are only granted in cases where there's

18  some sort of upcoming date certain where the information

19  would become stale.  There's been cases like an upcoming

20  election, an upcoming vote in Congress, the census, as your

21  Honor mentioned earlier.

22          And this is the position that your colleague Judge

23  Boasberg took in a case recently involving the same

24  Plaintiff, that these types of preliminary injunctions are

25  only granted in cases where there is an imminent event where

1     the information will be stale.

2              THE COURT:  Right.  I take Judge Boasberg's view

3     to be something like, satisfying the regulatory requirement

4     for expedition is a necessary but not sufficient condition

5     to getting a PI.  To get a PI, you have to take the subset

6     of cases where expedition is satisfied in the regulatory

7     sense and then you have to decide which of those cases

8     warrant the extra step of a PI.  Yes?

9              MR. BARDO:  Yes.  Yeah.  It's a necessary portion

10    of --

11             THE COURT:  But not sufficient?

12             MR. BARDO:  -- the analysis.  Yes.

13             THE COURT:  And here, I think it is true at least

14    for purposes of the PI record that there isn't some date

15    like a census or like an election looming in the

16    not-too-distant future.

17             But I think Plaintiff argues that there is

18    interest and attention, the very reason that expedition is

19    warranted in a regulatory sense now, and that interest may

20    wane.  And that, rather than being a hard-and-fast deadline

21    like an election, is a reason to think an injunction is

22    warranted here.

23             MR. BARDO:  Well, we disagree, your Honor.

24             I mean, it's speculation that the interest may

25    wane.  Say, hypothetically, these documents were produced a

1    year from now.  There is no basis to assume that the

2    interest would wane at that point.

3             And again, making that kind of ruling would be

4    inconsistent with the types of cases where the Court has

5    issued preliminary injunctions for expedited processing in

6    the past.

7             They've always required a requester to identify

8    some kind of imminent event where the information will no

9    longer be relevant.

10            THE COURT:  What if -- I understand your argument

11   earlier about the articles, that the regulatory question

12   about possible government misconduct has to be identified

13   not just by the FOIA requester, but it has to be -- come

14   from the public interest in the question.

15            But what if that is implicit rather than explicit

16   in the articles?  If an article says, you know, Hey,

17   so-and-so got a visa, not the Duke here, but so-and-so got a

18   visa, notwithstanding the fact that that person had been

19   convicted of some crime, and didn't say, "As a result, we

20   should wonder why the visa was issued," but that's implied,

21   is that enough?

22            MR. BARDO:  I don't think so, your Honor, because

23   visas -- I know we're getting into visa law, but it's highly

24   fact-specific whether someone is going to be granted a visa.

25   Just a commentator making some kind of speculation about

1     whether someone might be denied a visa we don't believe is

2     enough.

3             THE COURT:  I guess I'm asking a slightly finer

4     point, maybe, which is to say:  If you had a ton of, like,

5     100 percent domestic and substantial media attention to the

6     granting of the visa to someone -- again, I'm talking about

7     a different hypothetical, someone from wherever, and that

8     person had a criminal history.  And all of the articles

9     identified both the visa and the fact that you normally

10    don't get visas if you have a criminal history and the

11    person still got a visa.  Nowhere in those articles,

12    however, was it said there should be a concern or we are

13    concerned that the government acted improperly in granting

14    the visa.  That's one world.

15            Now, contrast that with a world where some of the

16    articles made that last statement.

17            In your view, in the latter world, that might be

18    sufficient to support expedition in the regulatory

19    context --

20            MR. BARDO:  It --

21            THE COURT:  -- and not the former?

22            MR. BARDO:  It might be if they can point to some

23    suggestion that the government might be doing something

24    wrong.

25            If it just -- if it's just rank speculation, Oh,

1    this person has a criminal record and they have a visa, that

2    wouldn't be enough.

3            THE COURT:  Do we know or do you know, really,

4    whether -- just to go back to where I started with making

5    sure I understood the state of play here -- whether DHS HQ

6    actually has any responsive documents?

7            MR. BARDO:  They haven't done a search yet, your

8    Honor.  But as your Honor knows, in order to move for

9    summary judgment, we'll need to provide a search declaration

10   and show that we did do a search.

11           THE COURT:  Right.  I just didn't know if you knew

12   the answer to that.

13           MR. BARDO:  Yeah.  They have not, your Honor.

14           THE COURT:  Okay.  Does the Government have a view

15   on how *TransUnion* applies in FOIA cases?

16           MR. BARDO:  Your Honor, I have not looked into

17   that *TransUnion* case.  I don't cite it in my brief.  So I am

18   not able to talk about that today.

19           THE COURT:  So I take it from your papers and what

20   you said earlier today that to establish entitlement under

21   the regulation to expedition, Heritage would need to

22   identify media attention or public attention to this

23   question that specifically identified in a fairly specific

24   way potential government misconduct and it would have to be

25   more substantial in either volume or type of publication or

1   U.S.-centric publication.   Correct?

2           MR. BARDO:  That's correct, your Honor.

3           THE COURT:  So on the latter point, or with

4   respect to just media attention generally -- put aside the

5   question of whether the media attention identifies

6   government misconduct.

7           But just on the question of the Duke and his

8   immigration status and I guess alleged past drug use, what

9   more in the department's view would the Plaintiff have to

10  establish by way of number of articles, kinds of papers,

11  views?

12          Because the Plaintiff here identifies in its brief

13  how at least a number of the U.K. publications actually get

14  as many page views or something like that in the United

15  States as some of the U.S. publications.  So what more just

16  on the attention front do you think they would need to show?

17          MR. BARDO:  They would have to show articles from

18  mainstream publications, like *The Washington Post*, *The Wall

19  Street Journal*, *The New York Times*, the television networks,

20  the types of publications that have been identified in the

21  cases where expedited processing has been granted.

22          And they would have to -- those articles would

23  need to show some reason, some type of basis, some type of

24  reasonable suspicion that the Government in allowing Prince

25  Harry to be here is doing something wrong.

1              THE COURT:  Where does that standard or principle

2     come from that it has to be from mainstream media of the

3     kind you have identified?

4              MR. BARDO:  It comes just based -- just from

5     reading the cases where they have ruled on this issue.

6     Those are the types of publications that have been cited in

7     every single one of those cases.

8              Not only that --

9              THE COURT:  Have they said they're necessary or

10    have they said they're sufficient?

11             MR. BARDO:  They don't say that, your Honor.  But

12    I mean, in today's world, a Russian troll farm could make up

13    articles, and that obviously you couldn't say is sufficient

14    for widespread media attention.  Those are the types of

15    cases in the past, your Honor, where the expedited

16    processing has been granted.

17             THE COURT:  Thank you, counsel.  Anything you'd

18    like to add?  I want to allow Plaintiffs' counsel time for

19    rebuttal.

20             MR. BARDO:  Your Honor, I just want to emphasize

21    that there is no irreparable harm here.  There's no specific

22    date in which this information is no longer going to be

23    relevant.  And adopting Plaintiffs' argument about the

24    structure collapsing on itself would be -- would essentially

25    allow a preliminary injunction anytime somebody can satisfy

1    the elements of the regulation.  That's not what preliminary

2    injunctions are for.

3              So for that reason, I would urge the Court to deny

4    the preliminary injunction.

5              THE COURT:  Thank you, counsel.

6              MR. BARDO:  Thank you, your Honor.

7              THE COURT:  Mr. Dewey?

8              MR. DEWEY:  Thank you, your Honor.

9              If I may, I'd like to start with your -- briefly

10   on the status of the case.

11             You know, it seems we have a live issue.  I just

12   wanted to note that Plaintiffs' general posture in this case

13   is to get matters in front of you as efficiently as

14   possible.  And we've detailed our efforts to do that in both

15   of my declarations.  Anything that moves it along my clients

16   are amenable to.

17             I want to talk about the regulation and the

18   discussion you had with my friend.  I think it's important

19   to note at the outset, this is their regulation.  The keys

20   are in their hand.

21             My colleague mentioned the *American Oversight*

22   case.  There, the Department of Justice came forward with a

23   declaration from the deciding official saying:  This is our

24   considered construction.  Here's the history of application.

25             That would, under circuit precedent in *Al Fayed*,

1    Note 5, get at least *Cleveland Indians* deference.  That

2    didn't happen here, your Honor.  We have nothing on the

3    construction of the regulation.

4         THE COURT:  I didn't hear Mr. Bardo argue that I

5    should defer to the agency's interpretation.  He just argued

6    that you don't satisfy it.

7         MR. DEWEY:  Understood, your Honor.

8         But I raise that broader context to say that we

9    are operating within that field and the regulation says

10   "media."  It doesn't say "American media"; it doesn't say

11   "mainstream media."  And DHS could write a regulation that

12   says:  If in our subjective judgment media is American and

13   mainstream, you get expedited processing.  If not, you

14   don't.

15        Turning to the merits of the discussion, your

16   Honor correctly identified our submission is media is

17   global.  Most Americans get their media online or through a

18   source that is easily accessible online.

19        The statistics that are in Paragraph 10 of my

20   second declaration are the best that Heritage could find in

21   consultation with its experts as to how to make a

22   comparator.  And that was a website use where, as we noted,

23   you know, there were publications that received an immense

24   amount of use.

25        And we would submit that's what matters.  It

1      doesn't matter if you're based in U.K., if you have a U.S.

2      operation, you have U.S. political reporters, you cover it

3      and over 100 million Americans have consumed your media, in

4      the case of *The Daily Mail* in April of 2023.  We don't think

5      that's obscure or niche.  We don't think it's permissible

6      under the regulation which says "media," period, as we've

7      discussed in our papers, your Honor.

8              As to the application of that regulation here, our

9      respectful submission is that the discussion you had with my

10     friend is somewhat academic, because we have come forward

11     with specific articles that raise the specific question

12     here.  In the *American Oversight* case my friend referred to,

13     Judge Leon correctly in our view held the identical

14     Department of Justice standard doesn't apply because the

15     articles don't even discuss the ethics issue plaintiff was

16     pursuing.

17             Here, we have a number of articles specifically on

18     issue.  This is from Page 19 of our reply brief, quoting

19     Professor Alberto Benitez, director of GW Law's immigration

20     clinic:  "He would have been asked about drug use.  If he

21     was truthful in his answers, he should have been denied,

22     period."

23             He went on to suggest that the Duke may have been

24     granted some discretion because of his status.

25             Interviews with former prosecutors who reviewed

1    the case, quote:  "Prince Harry's visa should have been

2    denied or revoked," closed quote.  There is no speculation

3    here, your Honor.

4          The issue is squarely in the articles; and your

5    Honor correctly identified, you look to the media coverage

6    in making that question, and that is where you go.

7          And this is not, we would respectfully submit, a

8    point of speculation.  You know, we've detailed in our

9    complaint the publicly available evidence.  The conduct

10   admitted in writing by the Duke in *Spare*, which, to be sure,

11   isn't on oath, but as I would note would be admissible in

12   court.  It's an admission by him in writing.  And then you

13   look at the relevant standards.  And we go through that.

14   This has been an issue that has been in the media before.

15   Is DHS applying the bar in a preferential manner?

16          Finally, your Honor, I'd like to point out at

17   Paragraph 45 of the amended complaint, because we

18   supplemented our expedited processing request, there are any

19   number of articles which specifically report on the request.

20   They specifically report on the request and the specific

21   questions Heritage has raised.

22          As we noted in our papers, the standard is

23   media-dependent.  If we hold a press conference and no one

24   attends, that's not relevant.  If we hold one and people

25   attend, well, that's the press's call.  And this standard

1    defers to the media.

2          And then finally on the irreparable harm, your

3    Honor, I would just state that, first, I disagree with my

4    friend's reading of *EPIC II* and *Washington Post*.  I think

5    those are helpful authority.

6          And as we noted in our reply, I really don't think

7    my friend's argument directly addresses *Soucie* and the other

8    structural cases that your Honor referenced -- I think was

9    referencing in your questions as to the abbreviated nature

10   of the right and as to the fact that it is ephemeral and

11   could go away for any number of reasons.

12          So again, we don't think your Honor would be

13   breaking new ground.  We think it's supported by those cases

14   we cited that I don't think my friend directly addressed.

15          And then third, your Honor, I don't think you

16   would have to say you're disagreeing with Judge Boasberg,

17   because Judge Boasberg did not address the structural

18   argument.  He only addressed a general argument of, Time is

19   ephemeral.  And that argument alone without reference to the

20   structure or anything else is insufficient.

21          So we do not read his opinion as being on point

22   here.  We read it as simply not speaking to the detailed

23   structural analysis of the statute, *Soucie*'s gloss,

24   dispensing with traditional equitable requirements under

25   FOIA generally and then the specific application of those

1    facts to the broader equitable principles.

2                 And with that, I would conclude, unless the Court

3    had any questions.

4                 THE COURT:  No.  Thank you very much.

5                 So I'm going to take the motion under advisement.

6                 But as is often the case, I'm somewhat frustrated

7    by being presented with having to resolve an issue that is

8    not actually even close to the merits of the case, because

9    here, as we've discussed, there are three DHS components

10   that have actually acted on the request and then another DHS

11   component that both has not yet acted on the request and has

12   not been willing to grant expedition.

13                And so we have this anomalous, to some extent,

14   situation in which the motion for a PI is moot as to three

15   of four components, but live as to one component.

16                And if we could get that other component to the

17   point of the other three, we would actually advance this

18   case to actually litigating whether and to what extent

19   Heritage is entitled to any of the records it seeks, because

20   we're not even there yet.

21                I will, of course, decide that question here if I

22   have to.  But what I'm going to ask Government counsel to do

23   is to go back to your client and express to your client that

24   my view is it would be better to get this case to a point

25   where -- as soon as possible -- all of the components'

1    responses are essentially parallel from a processing or

2    response perspective.  Obviously, three components have

3    already been able to deny the request on the grounds they

4    denied it; and then we have a fourth that hasn't done

5    anything.

6          If that can happen, either by acting on the

7    request, as those other three components have done, or by

8    acting on the expedition request and expediting, that would

9    essentially mean that I wouldn't have to decide the

10   questions that we're talking about here, which are of the

11   most highly technical and procedural FOIA questions rather

12   than the underlying question of whether the records get

13   produced or not or are withholdable.

14         Again, I will decide the question if I have to.

15   But what I would ask you to do, Mr. Bardo, is I would like

16   you to have a conversation with your client and see if HQ

17   can either -- well, see if HQ can either decide on its

18   response to the request or expedite the request, just to see

19   if either of those are possible, and to inform me by a week

20   from today -- and we'll start with a communication through

21   Mr. Coates, copied to opposing counsel -- whether -- again,

22   whether DHS might be willing to expedite -- and that's DHS

23   HQ, obviously -- or believes that it would in the very near

24   future actually decide the request, as the other components

25   would have.

1          If we learn that, then that will have implications

2     for the case and then we would very likely be off and

3     potentially litigating summary judgment if there's a

4     response.

5          If there's agreement to expedite, then we'll have

6     a schedule for that.  But at least for purposes of the

7     motion, the motion would become unnecessary and then I would

8     be in the process of managing the schedule that DHS intends

9     to adhere to.

10          So I'd like to know within a week whether your

11     client is willing to undertake that.

12          And again, I'm not attempting to duck the

13     question.  But it does seem that we have a world where for

14     three of the four relevant components, the motion is

15     completely unnecessary to be resolved and irrelevant, but as

16     to the fourth is still live and could either be resolvable

17     if HQ were to take either of those courses of action.

18          So I'm going to take the motion under advisement

19     as to HQ.  I'm going to wait to hear what DHS's view is by

20     next Tuesday.  And if DHS says, "No, thanks" to both of

21     those, I'll decide the motion.  Okay?

22          Anything else in light of that from Plaintiffs'

23     counsel?

24          MR. DEWEY:  Nothing further, your Honor.  Thank

25     you very much.

1     THE COURT:  Anything else, Mr. Bardo?

2     MR. BARDO:  Yes, your Honor.

3     Just to clarify, you don't want this response

4 filed on the docket.  You would like us to email your clerk?

5     THE COURT:  Yes.  Email Mr. Coates.

6     MR. BARDO:  Mr. Coates.

7     THE COURT:  Copy opposing counsel, of course.  And

8 then, depending on what it says, I may ask for a status

9 conference or for the parties to, if it makes sense, to meet

10 and confer around the implications of the email for the case

11 and to perhaps submit something by way of a stipulation or

12 an order.  But if we're not there, the email will be just

13 fine.  And then I'll just take up the motion.  Okay?

14     MR. BARDO:  Understood, your Honor.  Thank you.

15     THE COURT:  Thank you very much.

16     Thank you all.

17     (Proceedings concluded.)

18

19

20

21

22

23

24

25

1                          **<u>CERTIFICATE</u>**

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4      certify that the foregoing constitutes a true and accurate

5      transcript of my stenographic notes, and is a full, true,

6      and complete transcript of the proceedings produced to the

7      best of my ability.

8

9

10                   Dated this 6th day of June, 2023.

11

12              <u>/s/ Lisa Edwards, RDR, CRR</u>
                Official Court Reporter
13              United States District Court for the
                  District of Columbia
14              333 Constitution Avenue, Northwest
                Washington, D.C. 20001
15              (202) 354-3269

16

17

18

19

20

21

22

23

24

25