# EXHIBIT B



U.S. Department of Homeland Security
Washington, DC 20229

U.S. Customs and Border Protection

DIS-3 OT:RR:RDL:FAP
CBP-AP-2023-000828 MMC

July 5, 2023

Mr. Mike Howell
Director of the Oversight Project
Investigative Columnist at *The Daily Signal*
The Heritage Foundation
214 Massachusetts Avenue
Washington DC 20002

RE:   Amended Freedom of Information Act Appeal; Prince Henry Charles Albert David, Duke of Sussex; CBP-FO-2023-053731

Dear Mr. Howell:

This letter serves as an amendment to our May 23, 2023 decision in which we affirmed that U.S. Customs and Border Protection (CBP) can neither confirm nor deny the existence of records related to the Duke of Sussex.

In your initial request and subsequent appeal you sought, [a]ll records within the Alien File (A-File) of Prince Henry Charles Albert David (Date of Birth 09/15/1984) of the British Royal Family *aka* Prince Harry *aka* His Royal Highness Prince Henry of Wales *aka* the Duke of Sussex, including but not limited to:

• Any and all applications for immigration benefits filed, whether or not adjudicated;

• Any and all Forms I-213;

• Any and all Forms I-275; and

• Any and all Forms I-877.

Additionally, you sought [a]ll records pertaining to the Duke of Sussex in the following system of records maintained by CBP and DHS:

• Automated Targeting System (ATS, DHS/CBP-006);

• Advance Passenger Information System (APIS, DHS/CBP-005);

• Border Crossing Information System (BCIS, DHS/CBP-007);

- U.S. Customs and Border Protection TECS (DHS/CBP-011);
- Non-Federal Entity Data System (NEDS, DHS/CBP-008);
- DHS Use of the Terrorist Screening Database (TSDB) System of Records (DHS/ALL-030);
- CBP Intelligence Records System (CIRS, DHS/CBP-024);
- DHS Automated Biometric Identification System (IDENT, DHS/USVISIT-004;
- Electronic System for Travel Authorization (ESTA, DHS/CBP-009);
- Nonimmigrant Information System (NIIS, DHS/CBP-016);
- Arrival and Departure Information System (ADIS, DHS/CBP-021); and
- Electronic Visa Update System (EVUS, DHS/CBP-022).

Finally you sought, all records relating to any requests for waiver pursuant to Section 212(d)(3) of the Immigration and Nationality Act including, but not limited to, email communications within the DHS Office of the Secretary, the USCIS Office of the Director, the CBP Office of the Commissioner, or any subordinate office within those named departments or agency or a record of any communication between any of those named entities and the U.S. Department of State, the U.S. Embassy in London, the Federal Bureau of Investigation, or U.S. Immigration and Customs Enforcement.

**Appeal Determination**

Your appeal was denied on two separate grounds, first that you failed to provide authorization from the Duke of Sussex allowing for the release of agency records concerning him to you, and second that even acknowledging the existence of records would infringe upon his privacy interests. More specifically, we found that FOIA Division's interpretation of DHS Regulation 6 C.F.R. §5.3(a)(4) was within the discretionary scope of the regulation and separately, that the agency could neither confirm nor deny the existence of records related to the Duke of Sussex as doing so would betray the privacy interests protected by Exemptions (b)(6) and (b)(7)(C).

While we continue to assert CBP's interpretation of DHS Regulation 6 C.F.R. §5.3(a)(4) was within the discretionary scope of the regulation, we are now able to acknowledge that certain entry and exit records exist for the Duke of Sussex.  CBP continues to neither confirm nor deny the existence of any other requested records regarding the Duke of Sussex, as explained in our May 23, 2023 decision.

**Entry and Exit Records**

To find entry and exit records concerning the Duke of Sussex we searched the TECS[1] system for those records. TECS is an overarching law enforcement information collection, analysis, and sharing environment that securely links telecommunications devices and personal computers to a

---

[1] For a full explanation of what the TECS system of records contains, see the TECS system of records notice (SORN) at 73 Fed.Reg. 77778 (December 19, 2008).  For example, border crossing information resides on the TECS information technology platform.  See 81 Fed. Reg. 89957 (December 13, 2016).  These, as well as all other CBP SORNs and Privacy Impact Assessments (PIA), can be viewed at https://www.dhs.gov/system-records-notices-sorns and https://www.dhs.gov/privacy-impact-assessments, respectively.

central system and database. This environment is comprised of several modules designed to collect, maintain, and screen data as well as conduct analysis, screening, and information sharing.  TECS includes border crossing information on travelers entering and departing the United States.

We found two types of entry and exit records by searching TECS: Person Encounter Lists and Person Encounter Detail records.  A Person Encounter List is a list that indicates when a person has entered or exited the United States through U.S. federal air, land, and sea inspection sites and may include information regarding multiple encounters. A Person Encounter Detail record includes additional travel, manifest and carrier information for an individual encounter with a person.  We are withholding these records in full pursuant to Exemptions (b)(6,) (b)(7)(C) and (b)(7)(E).

**Exemptions 6 and 7(C) of the FOIA, 5 U.S.C. § 552(b)(6), (7)(C)**

FOIA Exemption (b)(6) was applied to the entry and exit records to protect personal information of the Duke of Sussex (the Duke) and the names and identifying information of CBP employees. The Duke's personal information includes but is not limited to the type of document the Duke used to travel, that document's number, document country, the date and time the Duke arrived in or left the United States, the date he is admitted until, what airport he arrived or left from, his class of admission, etc.

FOIA Exemption (b)(6) provides for the exemption from disclosure of "personnel and medical files and similar files." 5 U.S.C. §552(b)(6). The United States Supreme Court held that the phrase "personnel and medical and similar files" was to be broadly interpreted and includes all information that "applies to a particular individual[2]." Unquestionably, these records, created by the agency in furtherance of its mission qualify as "similar files" within the terms of the exemption.

Once the threshold requirement that the records are "personnel and medical and similar files" is met, the issue becomes whether disclosure of the information "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. §552(b)(6). The resolution of this issue involves a balancing of the public's right to know the information against the individual's right to privacy.[3]

In addition to the application of Exemption (b)(6), the names and other identifying information of CBP employees as well as the Duke's personal information are withheld under Exemption (b)(7)(C). Exemption (b)(7)(C) exempts from disclosure "records and information compiled for law enforcement purposes" the disclosure of which "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. §552(b)(7)(C). Exemption (b)(7) applies to civil, criminal, and administrative law enforcement proceedings, and protects, among other information, the identity of law enforcement personnel and third parties referenced in files compiled for law enforcement purposes.

---

[2] *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 601 (1982).
[3] *See Rose*, 425 U.S. at 372.

3

The identified TECS records that we withhold today meet the requirement for being compiled for law enforcement purposes. CBP is a law enforcement agency with enforcement responsibilities for more than 400 federal statutes. Therefore, many of the files created and maintained by CBP are directly related to law enforcement operations. CBP's mission is to protect the borders of the United States by enforcing the customs and immigration laws of the United States and fostering our Nation's economy through lawful international trade and travel. Given the nature of your request and the location of the responsive records, the records being withheld by this letter are law enforcement records because such records are compiled in direct relation to CBP's law enforcement mandate to protect the U.S. borders.

Here, Exemption (b)(7)(C) is asserted to protect the personal information of the Duke of Sussex and the names and identifying information of CBP employees responsible for creating the records in question and conducting the law enforcement activities.

Both Exemption (b)(6) and Exemption (b)(7)(C) have been found to protect the privacy interests of all persons mentioned in law enforcement records, including investigators, suspects, witnesses and informants.  Courts have 'long recognized,' the mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation.  Not only the targets of law-enforcement investigations, but also 'witnesses, informants, and investigating agents' have a substantial interest in ensuring that their relationship to the investigations remains secret.[4] We therefore find the privacy interest of both the Duke and the CBP Officers[5] mentioned in the records to be significant.

Our analysis then turns to whether you as a requester have identified a public interest sufficient to overcome the privacy interest of those individuals. That public interest can only be the one that furthers FOIA's lone goal: "to open agency action to the light of public scrutiny."[6]

In this case you assert that the public interest outweighs the Duke's right to privacy. Although courts have found that an individual's status as a public figure might in some circumstances factor into the privacy balance of Exemptions (b)(6) and (b)(7)(C),[7] a public figure does not, by virtue of their status, forfeit all rights of privacy.[8] You argue that there is an overriding public

---

[4] *Lewis v. Dep't of Justice,* 609 F. Supp. 2d 80, 84 (D.D.C. 2009).  See also *Roth v. Dep't of Justice*, 642 F.3d 1161, 1174 (D.C. Cir. 2011)

[5] Personnel of a "security agency," have a substantial privacy interest in that information not being released to the public. See 5 CFR §293.311; Memorandum from CBP Acting Commissioner Mark Morgan, *All CBP Designated as a Security Agency under Office of Personnel Management* (January 31, 2020).

[6] *Rose*, 425 U.S. at 372.

[7] See, e.g., *Rosenfeld v. DOJ*, No. 07-3240, 2012 WL 710186, at *4 (N.D. Cal. Mar. 5, 2012) (finding that privacy interest "is low because . . . the subject is a public figure") (Exemptions 6 and 7(C)); *Jud. Watch, Inc. v. DOJ*, No. 00-0745, 2001 U.S. Dist. LEXIS 25731, at *13 (D.D.C. Feb. 12, 2001) (noting that pardoned prisoners "arguably bec[a]me public figures through their well-publicized pleas for clemency and [given] the speeches some have made since their release" and that EOUSA had failed to demonstrate that their privacy interests outweighed the public interest in disclosure) (Exemption 7(C)).

[8] See *Forest Serv. Emps. for Env't. Ethics v. U.S. Forest Serv.*, 524 F.3d 1021, 1025 (9th Cir. 2008) (noting that "while the privacy interests of public officials are 'somewhat reduced' when compared to those of private citizens, 'individuals do not waive all privacy interests . . . simply by taking an oath of public office'") (quoting *Lissner v. U.S. Customs Serv.*, 241 F.3d 1220, 1223 (9th Cir. 2001)); *Kimberlin v. DOJ*, 139 F.3d 944, 949 (D.C. Cir. 1998) (stating that "although government officials, as we have stated before, may have a 'somewhat diminished' privacy interest, they 'do not surrender all rights to personal privacy when they accept a public appointment'") (quoting

interest in release of any records because public confidence in the government would undoubtedly suffer if CBP failed to properly vet such a high-profile case. Moreover, you argue that if the Duke of Sussex was granted preferential treatment that too would undermine public confidence in CBP's application of equal justice under the law.

Not all assertions of "public interest" under Exemptions 6 and 7(C) are legitimately entitled to any real weight in the balancing process.[9] A "bare suspicion" of agency misconduct is insufficient. A FOIA requester must produce evidence that would warrant a belief by a reasonable person that alleged Government impropriety might have occurred.[10] An allegation of "public interest" that is nothing more than a general public curiosity in the subject matter of requested records is legally insufficient.[11] You assert that public confidence in the government would undoubtedly suffer if CBP failed to properly vet such a high-profile case and/or if the Duke of Sussex was granted preferential treatment. You have submitted a significantly large number of articles concerning behavior that describe activities that could result in the Duke of Sussex facing heightened scrutiny at the border. You therefore argue the Duke of Sussex's travel and inspection records should be released to the public to determine if he was granted preferential treatment because such treatment would undermine public confidence in CBP's application of equal justice under the law.

All persons, baggage and merchandise arriving in the Customs territory of the United States from places outside thereof are liable to inspection by a CBP officer.[12] Unless exempt by diplomatic

---

*Quinon v. FBI*, 86 F.3d 1222, 1230 (D.C. Cir. 1996)) (Exemption 7(C)); *Fund for Const. Gov't v. NARA*, 656 F.2d 856, 865 (D.C. Cir. 1981); *Jud. Watch, Inc. v. DOJ*, 394 F. Supp. 3d 111, 118 (D.D.C. 2019) (finding that subject's FBI-related notoriety certainly weakens their privacy interest but that their status as a "public figure with a well-known association with the FBI does not, to be sure, destroy his privacy interest in other communications he may have had with the FBI") (Exemptions 6 and 7(C)); *Citizens for Resp. & Ethics in Wash. v. DOJ*, 840 F. Supp.2d 226, 233 (D.D.C. 2012) (observing that "'individuals have a strong interest in not being associated unwarrantedly with alleged criminal activity'" and "this may be especially true for politicians who rely on the electorate to return them to public office") (quoting *Stern v. FBI*, 737 F.2d 84, 91-92 (D.C. Cir. 1984)); *Citizens for Resp. & Ethics in Wash. v. DOJ*, 846 F. Supp. 2d 63, 71 (D.D.C. 2012) (observing that "despite the fact that [a congressman's] privacy interest is 'somewhat diminished' by the office he holds, he nevertheless 'd[id] not surrender all rights to personal privacy when [he] accept[ed] a public appointment'") (quoting *Quinon v. FBI*, 86 F.3d 1222, 1230 (D.C. Cir. 1996)) (Exemption 7(C)); *Taitz v. Astrue*, 806 F. Supp. 2d 214, 219 (D.D.C. 2011) (noting that "an individual's status as a public official does not, as plaintiff contends, 'make exemption 6 irrelevant to him and his vital records'"), summary affirmance granted, No. 11-5304, 2012 WL 1930959 (D.C. Cir. May 25, 2012); *Nat'l Sec. News Serv. v. Dep't of the Navy*, 584 F. Supp. 2d 94, 96 (D.D.C. 2008) (finding that "[d]isclosure of the requested patient admission records only would reveal who was admitted to the Naval Medical Center; it would reveal nothing about the Navy's own conduct" and "[t]his is so irrespective of whether one of the persons then admitted to the hospital is now a public figure"); "do not forfeit all vestiges of privacy"); *Phillips v. ICE*, 385 F. Supp. 2d 296, 305 (S.D.N.Y. 2005) (disregarding requester's unsupported claim that former foreign government officials have no "legitimate privacy interest[s]"); *Wolk v. United States*, No. 04-0832, 2005 WL 465382, at *5 (E.D. Pa. Feb. 28, 2005) ("[O]fficials do not surrender all of their rights to personal privacy when they accept a public appointment.") (Exemptions 6 and 7(C)); cf. *McNamera v. DOJ*, 974 F. Supp. 946, 959 (W.D. Tex. 1997) (stating that "[s]imply because an individual was once a public official does not mean that he retains that status throughout his life," and holding that three years after a disgraced sheriff resigned, he was "a private, not a public figure") (Exemption 7(C)).

[9] See, *Church of Scientology v. Department of the Army*, 611 F.2d 738, 747 (9th Cir. 1980) ("There could be no legitimate public purpose served by disclosure of this information.").
[10] Aguirre v. SEC, 551 F. Supp. 2d 33, 56 (D.D.C. 2008)
[11] *Fund for Constitutional Government v. National Archives & Records Service*, 656 F.2d 856, 866 (D.C. Cir. 1981).
[12] 19 C.F.R. 162.6

status, all persons entering the United States, including U.S. citizens, are subject to examination and search by CBP officers. CBP officers must determine the nationality of each applicant for admission and, if determined to be a noncitizen, whether or not the applicant meets the requirements of the Immigration and Nationality Act for admission to the United States. CBP processed more than 179 million travelers at the ports of entry in FY2021, including more than 44 million travelers at airports.[13] CBP's information systems are constantly updated with timely and relevant information, such as a person's behavior and demeanor at subsequent interactions. Furthermore, information that may have subjected a traveler to additional scrutiny at one time has the possibility of being considered untimely and irrelevant at a later date. Given these facts, one person's CBP entry and exit records, even a famous person's, is insufficient evidence to undermine public confidence in CBP and its application of equal justice under the law. As such we find that you have not provided sufficient public interest to outweigh the Duke of Sussex's right to privacy concerning his entry and exit records.

Without an individual's consent or an overriding public interest, providing the Duke's entry and exit records would constitute a clearly unwarranted invasion of personal privacy pursuant to Exemption 6 and could reasonably be expected to constitute an unwarranted invasion of personal privacy pursuant to Exemption 7(C).

**Exemption (b)(7)(E) of the FOIA, 5 U.S.C. § 552(b)(7)(E)**

We additionally withhold law enforcement techniques and procedures practiced by CBP personnel while evaluating individuals for international travel to or from the United States pursuant to Exemption (b)(7)(E), which exempts material that was compiled for law enforcement purposes and that would disclose previously unknown "techniques and procedures" or "guidelines" for "law enforcement investigations or prosecutions." 5 U.S.C. § 552(b)(7)(E).

While application of the exemption is limited to cases in which disclosure could reasonably be expected to risk circumvention of the law, Exemption (b)(7)(E) "sets a relatively low bar for the agency to justify withholding."[14] To clear that relatively low bar, an agency must demonstrate only that release of a document might increase the risk that a law will be violated or that past violators will escape legal consequences. Once determined that information falls within Exemption (b)(7)(E)'s purview, it does not suffer a balancing test similar to other exemptions. Rather, it is "categorically exempt" from disclosure.[15]

The fields of data withheld pursuant to Exemption (b)(7)(E) in the Person Encounter Lists and Person Encounter Detail records, which appear in such records for all travelers, are routinely withheld by CBP as they contain otherwise unknown, specific law enforcement techniques, procedures, and guidelines followed by CBP when performing its law enforcement mandate of securing this nation's borders. The information indicates what circumstances might trigger additional scrutiny while processing international travelers for entry into the country and provides instructions to CBP personnel related to which law enforcement techniques ought to be

---

[13] CBP Trade and Travel Report Fiscal Year 2021| April 2022 p.4
[14] *Blackwell v. Fed. Bureau of Investigation*, 646 F.3d 37, 42 (D.C. Cir. 2011).
[15] *Fisher v. Dep't of Justice*, 772 F. Supp. 7, 12 at n. 9 (D.D.C. 1991).

practiced in those circumstances. Disclosure of this information "would illustrate the agency's strategy in implementing these specific techniques," and, in turn, "could lead to decreased effectiveness in future investigations by allowing potential subjects to anticipate… and identify such techniques as they are being employed."[16]

As a general matter, "it would appear obvious that those immediately and practically concerned with such matters would be individuals embarked upon clandestine and illicit operations, the detection of which would be frustrated if they were privy to the methods employed… to ferret them out."[17]

Although this matter is already the subject of litigation, we are required by law to advise you that the Freedom of Information Act, particularly Title 5 U.S.C. § 552 (a)(4)(B), provides you with the opportunity to seek judicial review of this administrative appeal. You may institute judicial review in the United States District Court in the district in which you reside, have a principal place of business, where the agency records are located, or in the United States District Court for the District of Columbia.

As part of the 2007 FOIA amendments, the Office of Government Information Services (OGIS) was created to offer mediation services to resolve disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to litigation. Using OGIS services does not affect your right to pursue litigation. If you are requesting access to your own records (which is considered a Privacy Act request), you should know that OGIS does not have the authority to handle requests made under the Privacy Act of 1974.

You may contact OGIS in any of the following ways: Office of Government Information Services, National Archives and Records Administration, Room 2510,
8601 Adelphi Road, College Park, MD 20740-6001
E-mail: ogis@nara.gov  Telephone: 301-837-1996: Toll-free: 1-877-684-6448
Facsimile: 301-837-0348

        Sincerely,

        *Shari Suzuki*

        Shari Suzuki, Chief
        FOIA Appeals and Policy
        Regulations and Rulings Directorate
        Office of International Trade
        Customs and Border Protection

---

[16] *Lewis-Bey v. Dep't of Justice*, 595 F. Supp. 2d 120, 138 (D.D.C. 2009), *Buffalo Evening News, Inc. v. U.S. Border Patrol*, 791 F. Supp. 386, 393 (W.D.N.Y. 1992) (protecting records that "would clearly disclose the USBP's techniques for apprehending excludable aliens").

[17] *Caplan v. Bureau of Alcohol, Tobacco & Firearms*, 587 F.2d 544, 547 (2d Cir. 1978).