**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ ) | |
| HERITAGE FOUNDATION & ) | |
| MIKE HOWELL ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| v. ) | Case No. 23-cv-1198 (CJN) |
| ) | |
| U.S. DEPARTMENT OF HOMELAND ) | |
| SECURITY ) | |
| *Defendant.* ) | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR**
**PARTIAL SUMMARY JUDGEMENT AND IN OPPOSITION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGEMENT**
**(ORAL ARGUMENT REQUESTED)**

## TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................................. i

TABLE OF AUTHORITIES ..................................................................................... iii

INTRODUCTION ..................................................................................................... 1

LEGAL STANDARD................................................................................................. 5

ARGUMENT ............................................................................................................. 6

I.   MATTERS NOT CURRENTLY IN DISPUTE. ................................................ 6

II.  STANDARDS OF REVIEW APPLICABLE TO DEFENDANT'S WITHHOLDINGS.. 9

   A.   Courts Subject Glomar Responses and Categorical Withholdings to An Exacting
        Standard of Review. ................................................................................. 9

   B.   Exemption 6 and 7(C)'s Three Part Test.................................................. 10

III. DEFENDANT'S EXEMPTION 6 AND 7(C) WITHHOLDINGS ARE UNLAWFUL.. 12

   A.  In the Context of the Request, the Duke of Sussex's Privacy Interests are at an Ebb.12

      1.   The Duke of Sussex Has Already Disclosed A Great Deal of Information
           Relevant Here........................................................................................ 13

      2.   The Duke of Sussex Has a Diminished Privacy Interest as a High-Ranking Public
           Official. ................................................................................................ 14

      3.   The Duke of Sussex Has a Diminished Privacy Interest as a Public Figure
           Concerning All Relevant Aspects of His Life. .................................... 16

   B.  There Is a Clear Public Interest in the Requested Information................. 17

      1.   The Record  "would warrant a belief by a reasonable person that the alleged
           Government impropriety might have occurred." *Favish*, 541 U.S. at 174. ......... 18

      2.   Understanding the Exercise of Discretion in a High-Profile Case:  Did the
           Government Pull its Punches? ............................................................. 24

i

C. Plaintiffs' Interests in Obtaining the Records Sought Outweigh the Duke of Sussex's Privacy Interests.................................................................................................... 25

   1. A Categorical Rule Against Third-Party Disclosure Does not Apply. ................. 25

   2. The *Glomars* of Records Relating to Section 1182(d)(3)(A) Waivers Are Improper.......................................................................................................... 27

   3. Defendant Cannot Categorically Withhold Immigration Related Information. ... 29

   4. The Balance of Interests Favors Disclosure........................................................ 33

      i. Privacy Interests............................................................................................ 34

      ii. Public Interests............................................................................................. 35

D. Any Doubts Should be Resolved Via Production and In Camera Review. ................. 38

CONCLUSION............................................................................................................. 41

# TABLE OF AUTHORITIES

## Cases

*ACLU v. CIA*, No. 18-cv-2784 (CJN), 2022 WL 306360 (D.D.C. Feb. 2, 2023) ....... 10, 25, 38, 40

*ACLU v. DOJ*, 655 F.3d 1 (D.C. Cir. 2011) .............................................................. 10

*\*Aguirre v. SEC*, 551 F.Supp.2d 33 (D.D.C. 2008) ............................................. passim

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................... 5

*Assoc. Press v. DOD*, 549 F.3d 62 (2d Cir. 2008) .................................................. 11

*Bales v. Dep't of State*, No. 18-cv-2779 (RC), 2020 WL 1078854 (Mar. 6, 2020) ..................... 30

*\*Bartko v. DOJ*, 898 F.3d 51 (D.C. Cir. 2018) ............................................ 9, 11, 28, 29

*Bast v. DOJ*, 665 F.2d 1251 (D.C. Cir (1981) ................................................ 36, 37, 39

*Blackwell v. FBI*, 646 F.3d F.3d 37 (D.C. Cir. 2011) ........................................ 19, 20

*Burnett v. DEA*, No. 19-cv-870 (CJN), 2021 WL 12091424 (D.D.C. Mar. 31, 2021) .......... 11, 38

*Burton v. Wolf*, 803 F. App'x. 120 (9th Cir. 2020) ........................................... 30

*Cabezas v. FBI*, No. 19-cv-145 (CJN), 2022 WL 898789 (D.D.C. Mar. 28, 2022) ..................... 7

*\*Cabezas v. Fed. Bureau of Prisons*, No. 20-cv-2484 (CJN), 2023 WL 6312349 (D.D.C. Sept. 28, 2023) ...................................................................................... passim

*Carter v. Dep't of Com.*, 830 F.2d 388 (D.C. Cir. 1987) ...................................... 11

*Ctr. For Investigative Reporting v. USCIS*, No. 18-cv-1964 (CJN),  2019 WL 6498817  (D.D.C. Dec. 3, 2019) ................................................................................... 11

*Codrea v. ATF*, No. 21-cv-2201 (RC), 2022 WL 4182189 (D.D.C. Sept. 13, 2022) ......... 9, 35, 37

*Common Cause v. Nat'l Archives & Recs. Serv.*, 628 F.2d 179 (D.C. Cir. 1980) ...................... 15

*\*CREW v. DOJ*, 746 F.3d 1082 (D.C. Cir. 2014) ("*CREW III*") ............................... passim

*CREW v. DOJ*, 846 F.Supp.2d 63 (D.D.C. 2012) ("*CREW I*") .................................... 36

*CREW v. DOJ*, 854 F.3d 675 (D.C. Cir. 2017) ("*CREW IV*")............................................ passim

*CREW v. DOJ*, 978 F.Supp.2d 1 (D.D.C. 2013) ("*CREW II*").................................................. 36, 37

*DBW Partners LLC v. U.S. Postal Serv.*, No. 18-cv-3127, 2019 WL 5549623 (D.D.C. Oct. 28, 2019) ............................................................................................................................... 8, 34

*Dep't of State v. Ray*, 502 U.S. 164 (1991)....................................................................... 33

*Ditlow v. Shultz*, 517 F.2d 166 (D.C. Cir. 1975)................................................................. 33

*DOJ v. Reporters Comm.*, 489 U.S. 749, (1989) ........................................................... 8, 11

*EPIC v. DOJ*, 18 F.4th 712 (D.C. Cir. 2021)...................................................................... 15

*EPIC v. NSA*, 678 F.3d 926 (D.C. Cir. 2012) ..................................................................... 28

*Favish v. Nat. Archives & Rec. Admin.*, 541 U.S. 157 (2004)............................................ passim

*Fling v. Martin*, No. 19-cv-693 (CJN), 2020 WL 4569335 (D.D.C. Aug. 8, 2020).................... 21

*Gatore v.DHS*, 177 F.Supp.3d 46 (D.D.C. 2016) .............................................................. 6

*Gosen v. USCIS*, 75 F.Supp.3d 279 (D.D.C 2014) ......................................................... 39

*Hemenway v. Hughes*, 602 F.Supp. 1002 (D.D.C. 1985) ............................................... 30

*Iowa Citizens for Cmty. Improvement v. U.S. Dep't. of Agric.*, 256 F.Supp.2d 946, 954–56 (S.D. Iowa 2002) ..................................................................................................................... 16

*James Madison Project v. DOJ*, 436 F.Supp.3d 195 (D.D.C. 2020)..................................... 16

*James v. Dep't of Def.*, No. 3:18-cv-28 (JWS), 2018 WL 4926302 (D. Alaska Oct. 10, 2018) .. 20

*Jefferson v. DOJ*, 284 F.3d 172 (D.C. Cir. 2002)............................................................... 26

*Judicial Watch, Inc. v. DOJ*, 394 F.Supp.3d 111 (D.D.C 2019) ..................................... 16

*Kimberlin v. DOJ*, 139 F.3d 944 (D.C. Cir. 1998) ............................................................. 34, 40

*Lennon v. INS*, 527 F.2d 187 (2d Cir. 1975)................................................................... 25

*Lepelletier v. FDIC*, 164 F.3d 37 (D.C. Cir. 1999).........................................................33

*Mezerhane de Schnapp v. USCIS*, 67 F.Supp.3d 95 (2014) .........................................40

*Morrison v. Olson*, 487 U.S. 654 (1998) .......................................................................1

*Muchnick v. DHS*, 225 F.Supp.3d 1069 (N.D. Cal. 2016)......................... 21, 22, 23, 34

*Muchnick v. DHS,* No. 15-cv-2060 (CRB), 2016 WL 730291 (N.D. Cal. Feb. 24, 2016) .........32

*Nat'l Pub. Radio v. FBI*, 486 F.Supp.3d 293 (D.D.C. 2020)........................................38

*Nation Magazine v. U. S. Customs Service,* 71 F.3d 8859 (D.C. Cir. 1995) ...................16, 26, 34

*Ocasio v. DOJ*, 70 F.Supp.3d 469 (D.D.C. 2014) ....................................................25, 32

*People for Ethical Treatment of Animals v. Nat'l Inst. of Health*, 745 F.3d 535 (2014).............. 26

*Property of the People v. DOJ*, 310 F.Supp.3d 57 (D.D.C. 2018) .........................15, 17

*Reporters Comm. for Freedom for the Press v. USCIS*, 567 F.Supp.3d 97, 126 (D.D.C. 2021)......
..................................................................................................................... 35, 37

*Rodriguez v. Penrod*, No. 18-cv-240 (CJN), 2020 WL 686012 (Feb, 11, 2020)....................... 21

*Rojas v. Fed. Aviation Admin*., 941 F.3d 392 (9th Cir. 2019) ..........................19, 24, 33

*Roth v. DOJ*, 642 F.3d 1161 (D.C. Cir. 2011) ........................................................20, 36

*SafeCard Servs. v. SEC*, 926 F.2d 1197 (D.C. Cir. 1991) ......................................25, 26

*Salas v. Office of the Inspector General*, 577 F.Supp.2d 105, 112 (D.D.C. 2008)..................... 11

*Samahon v. FBI*, 40 F.Supp.3d 498 (E.D. Penn. 2014) ..........................12, 19, 34, 40

*Sheppard v. DOJ*, No. 17-cv-1037 (NKL), 2021 WL 4304217 (W.D. Mo. Sept. 21, 2021) . 11, 34

*Showing Animals Respect & Kindness v. Department of the Inte*rior, 730 F.Supp.2d 80 (D.D.C. 2010) .....................................................................................................17

*Stein v. CIA*, 454 F.Supp.3d 1 (D.D.C. 2020)...............................................................5

*Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294 (D.C. Cir. 1987) ........................................ 5

*Ullah v. CIA.*, 435 F.Supp.3d 177 (D.D.C. 2020) ........................................................................ 5

*Union Leader Corp. v. U.S. Dep't of Homeland Sec.*, 749 F.3d 45 (1st Cir. 2014) .............. 19, 23

*Washington Post Co. v. HHS*, 690 F.2d 252 (D.C. Cir. 1982) .................................................... 33

**Statutes**

5 U.S.C. § 552(A)(4)(B) ............................................................................................................. 38

5 U.S.C. § 552(b)(6) ................................................................................................................... 33

8 U.S.C. § 1182(d)(3)(A) ..................................................................................................... passim

**Other Authorities**

Counselors of State Act 2022, c.47 ............................................................................................ 14

Declaration of Margaret S. McCarthy in *Cabezas v. DOJ*, No. 20-cv-2483 (CJN) (Sept. 21, 2022)
    (ECF No. 38-1) ...................................................................................................................... 31

George Orwell, *Animal Farm*, 112 (The Penguin Group, Toronto, Ontario, 1945) ...................... 1

HL Deb (21 Nov. 2022) (825) col. 1186 ................................................................................... 14

HL Deb (21 Nov. 2022) (825) col. 1188 ................................................................................... 14

HL Deb (23 Nov. 2022) (825) cols. 1382–1386 ........................................................................ 14

Regency Act, 1937, 1 Edw. 8 & 1 Geo. 6, c.16 § (2) ................................................................. 14

**Rules**

Fed. R. Civ. P. 56 ........................................................................................................................ 5

\*  Authorities on which we principally rely are marked with asterisks.

## INTRODUCTION

The underlying case is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to compel the production of records related to the Department of Homeland Security's ("DHS") decisions to admit HRH Prince Henry Charles Albert David George, the Duke of Sussex, Earl of Dumbarton, and Baron Kikeel K.C.V.O. ("HRH" or "Duke of Sussex")[1] into the United States and to allow him to remain to date in light of HRH's public disclosure in his "tell all" autobiography *Spare* of habitual, adult, and recreational illegal drug use.

Every aspect of this case involves the Duke of Sussex.  Legally, this is a somewhat unique case with highly limited precedential application because, save for HRH's extensive disclosure of illegal drug use in *Spare* and elsewhere for commercial gain, this case could not have been brought.  But at the end of the day, it is not a case about the Duke of Sussex or his conduct.  It is a case both about how our Government operates and shining the light on probable government misconduct in favor of the rich, famous, and powerful in an extraordinarily high-profile case.  The celebrity, notoriety, and extensive public coverage of the case of the Duke of Sussex makes a perfect vessel to answer an age-old question:  Are we a "government of laws and not of men"[2]  or are "[a]ll animals . . . equal, but some animals are more equal than others"?[3]  To repeat the grave questions Plaintiffs have asked throughout this litigation.

- Did DHS properly admit the Duke of Sussex even though he has publicly admitted to the essential elements of multiple drug offenses in both the United States and abroad?

- Did DHS improperly grant the Duke of Sussex a waiver to enter the Country on a non-immigrant visa given his history of admissions to the essential elements of drug offenses?

---

[1] The Duke of Sussex is frequently referred to as "Prince Harry" by both the popular press and by himself.
[2] *Morrison v. Olson*, 487 U.S. 654, 697 (1998) (Scalia, J., dissenting).
[3] George Orwell, *Animal Farm*, 112 (The Penguin Group, Toronto, Ontario, 1945).

1

- Should DHS reconsider its decision to admit the Duke of Sussex into the United States in light of the Duke of Sussex's most recent admissions to the essential elements of numerous drug offenses both here and abroad in his 2023 memoir, *Spare*?

Defendant now moves for summary judgment.  *See* Defendant's Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgement (ECF No. 23-1) ("Defendant's Motion" or "Def. Mot.").  Defendant's position is at the end of the day simple.  The public does not get answers to these questions because the Duke of Sussex's privacy interests are weighty and there is no public interest in disclosure.  In fact, in DHS's telling, the Duke of Sussex's privacy interests are so compelling, and the public interest is so minimal, that DHS has refused to even acknowledge whether certain types of records exist—a *Glomar* response—and has categorically refused to hand over those records it does acknowledge.  This position is based on pretext and *ipse dixit*, belies the factual reality in the vast amount of factual material in the record, and ignores the law.  Defendant's Motion should be denied.  Moreover, Plaintiffs' Cross-Motion for Summary Judgement should be granted and Defendant should be required to conduct a complete search, produce responsive records with appropriate redactions, and provide a *Vaughn* Index—at a minimum.

## BACKGROUND

Plaintiffs' FOIA Request (ECF No. 7-2) ("Request") seeks:

Section 1) All records within the Alien File (A-File) of Prince Henry Charles Albert David (Date of Birth 09/15/1984) of the British Royal Family *aka* Prince Harry *aka* His Royal Highness Prince Henry of Wales *aka* the Duke of Sussex, including but not limited to:

- Any and all applications for immigration benefits filed, whether or not adjudicated;
- Any and all Forms I-213;
- Any and all Forms I-275; and
- Any and all Forms I-877.

Section 2) All records pertaining to the Duke of Sussex in the following system of records maintained by CBP and DHS:

- Automated Targeting System (ATS, DHS/CBP-006);
- Advance Passenger Information System (APIS, DHS/CBP-005);
- Border Crossing Information System (BCIS, DHS/CBP-007);
- U.S. Customs and Border Protection TECS (DHS/CBP-011);
- Non-Federal Entity Data System (NEDS, DHS/CBP-008);
- DHS Use of the Terrorist Screening Database (TSDB) System of Records (DHS/ALL-030);
- CBP Intelligence Records System (CIRS, DHS/CBP-024);
- DHS Automated Biometric Identification System (IDENT, DHS/USVISIT-004);
- Electronic System for Travel Authorization (ESTA, DHS/CBP-009);
- Non immigrant Information System (NIIS, DHS/CBP-016);
- Arrival and Departure Information System (ADIS, DHS/CBP-021);and
- Electric Visa Update System (EVUS., DHS/CBP-022).

Section 3) All records relating to any requests for waiver pursuant to Section 212(d)(3) of the Immigration and Nationality Act including, but not limited to, email communications within the DHS Office of the Secretary, the USCIS Office of the Director, the CBP Office of the Commissioner, or any subordinate office within those named departments or agency or a record of any communication between any of those named entities and the U.S. Department of State, the U.S. Embassy in London, the Federal Bureau of Investigation, or U.S. Immigration and Customs Enforcement.

Request at 1–2.  These records implicate 3 DHS components, DHS Headquarters ("DHS HQ"), Customs and Border Protection ("CBP"), and United States Citizenship and Immigration Services ("USCIS").

Plaintiffs understand the status of each component's response to be as follows.

**DHS HQ.**  DHS HQ has not stated whether it has conducted any search in response to the Request.  Defendant's Motion notes that an agency is not *required* to run a search prior to issuing a *Glomar* response (Def. Mot. at 8), but that does not preclude DHS HQ having run a search to inform its decision to issue a *Glomar*.  DHS HQ issued a *Glomar* response asserting Exemption 6 and 7(C) as to:  (1) certain biometrics data systems; and (2) as to any records relating to waivers of inadmissibility under 8 U.S.C. § 1182(d)(3)(A) ("Section 1182(d)(3)(A)").  *See* Declaration of Catrina Pavlik-Keenan ¶¶ 24–25 (Aug. 28, 2023) (ECF No. 28-8) ("Pavlik-

Keenan Decl."); Exhibit 1 to the Third Declaration of Samuel Everett Dewey (Oct. 9, 2023) ("3d Dewey Decl.").[4]

**USCIS.** *First*. USCIS conducted a search for records of the Duke of Sussex's "A-File". USCIS has categorically withheld the results of that search under Exemption 6, while admitting USCIS "[d]oes maintain documents related to Prince Harry." *See* Declaration of Jarrod Panter ¶¶ 14–16 (Aug. 28, 2023) (ECF No. 23-3) ("Panter Decl."). The Motion can be read to suggest that all DHS withholdings were also made under Exemption 7(C) (Def. Mot. at 7–8), but that is not correct. USCIS only invoked Exemption 6, categorically, as to the records in its possession "related to Prince Harry." Panter ¶ 16. Exemption 7(C) and (E) were only invoked narrowly as to USCIS personnel and specific law enforcement sensitive information. *See id.* ("USCIS acknowledges that it does maintain documents related to Prince Harry, but has determined that all of the responsive records are categorically exempt from disclosure pursuant to FOIA Exemption 6 and in part based on Exemption (b)(7)(C) and (b)(7)(E)"); *id.* at ¶ 29 (limiting invocation of Exemption 7(c) to "protect personal information pertaining to USCIS and DHS employees in the documents responsive to the Plaintiffs' FOIA request.").

*Second*. USCIS "clarifi[ed]" in the Panter Declaration that USCIS was issuing a *Glomar* response as concerns Section 1182(d)(3)(A) waivers. Panter Decl. ¶ 13. USCIS does not state whether a search was conducted for such records. This *Glomar* response was issued only under Exemption 6. *Id.* at ¶ 32.

**CBP.** *First*. CBP conducted a search of databases tracking certain information when an individual enters or exits the United States. Declaration of Shari Suzuki at ¶¶ 15–16 (Aug. 28,

---

[4] Such a waiver is also referred to by citation to the Immigration and Nationality Act and thus deemed a "Section 212(d)(3) waiver." *E.g.*, Pavlik Keenan Decl. ¶ 25.

2023) (ECF No. 23-5) ("Suzuki Decl.").  This information was categorically withheld under Exemption 6 and (7)(C).  Suzuki Decl. ¶¶ at 17, 25–26. Exemption 7(C) was also invoked as to specific information regarding agency personnel as was Exemption 7(E) as to certain law enforcement techniques and procedures.  ECF No. 23-6.  *Second*.  CBP issued a *Glomar* as to: (1) any other CBP databases; and (2) Section 1182(d)(3)(A) waivers.  *Id.* at ¶ 37.  The *Glomar* invoked Exemption 6 and 7(C).  *Id.*

## LEGAL STANDARD

Under Federal Rule of Procedure 56, a court will grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  A factual dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "material" only when it involves facts that "might affect the outcome of the suit under the governing law."  *Id.*

"FOIA cases typically and appropriately are decided on motions for summary judgment."  *Ullah v. CIA.*, 435 F.Supp.3d 177, 181 (D.D.C. 2020) (internal quotation marks omitted).  "In considering a motion for summary judgment for the Defendant, the court analyzes all underlying facts and inferences in the light most favorable to the FOIA requester."  *Stein v. CIA*, 454 F.Supp.3d 1, 15 (D.D.C. 2020) (citing *Unrow Human Rights Impact Litig. Clinic v. U.S. Dep't of State*, 134 F.Supp.3d 263, 271 (D.D.C. 2015)).  The party seeking summary judgment "bears the heavy burden of establishing that the merits of his case are so clear that expedited action is justified."  *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 297 (D.C. Cir. 1987).  "The court will grant summary judgment to the government in a FOIA case only if the agency can prove 'that it has fully discharged its obligations under the FOIA, after the underlying facts and the

inferences to be drawn from them are construed in the light most favorable to the FOIA requester.'" *Gatore v. DHS*, 177 F.Supp.3d 46, 50 (D.D.C. 2016) (citing *Friends of Blackwater v. Dep't. of Interior*, 391 F.Supp.2d 115, 119 (D.D.C. 2005)).

## ARGUMENT

## I.      MATTERS NOT CURRENTLY IN DISPUTE.

Defendant raises a number of points in Defendant's Motion (presumably for purposes of preservation) which are not in dispute or which require clarification as to the scope of the Parties' current dispute.  After conferring with Counsel for Defendant the only matters currently in dispute are the validity of Defendant's *Glomars* and categorical withholdings.

*First*.  Defendant's Motion raises the specter that Plaintiffs seek a mass of private material about the Duke of Sussex covering many facets of his personal life.  Def. Mot. at 13. That is a red herring.  Plaintiffs do not challenge the application of privacy related Exemptions except in the context of understanding Defendant's actions relating to the Duke of Sussex's drug use.  Plaintiffs have never disputed and have made clear during the meet and confer process that whatever privacy interest the Duke of Sussex has left—after selling virtually every aspect of his and other's private lives for massive commercial gain (Am. Comp. ¶¶ 48–51)—in say "health information" or "financial information" or "family relationships" unrelated to his drug use may be properly redacted under Exemption 6 or 7(C).

To reiterate, this is *not* a case focused on the morality or probity of the Duke of Sussex. Nor is it a case about obtaining information of admittedly great public interest on normally private matters the Duke of Sussex has made public for profit.  Regardless of how much the public may wish to read a hypothetical surgeon's report in an immigration file detailing lasting

effects from the Duke of Sussex's "frostnipped" "todger" (App. D183)[5] and the efficacy of

HRH's "bespoke cock cushion" in mitigating those hypothetical effects (App. D231), this

lawsuit is not about that.  It is about how the *Government* acts in high-profile cases; how *DHS*

acted towards the Duke of Sussex; and the appropriateness of *DHS's* responses (if any) to the

Duke of Sussex's illegal drug related conduct.[6]

*Second*.  Plaintiffs do not contest for the purposes of Defendant's Motion that the records

sought by the Request were "compiled for law enforcement purposes" within the expansive

provisions of Exemption 7(C) invoked by DHS HQ and CBP.  Mot. at 8–9.  To be clear,

Plaintiffs do not concede that Exemption 7(C) applies to Section 1182(d)(3)(A) waivers to

USCIS.  USCIS did *not* invoke that exemption, even though DHS HQ and CBP did.  *Compare*

Panter Decl. ¶ 32 *with* Pavlik-Keenan Decl. ¶¶ 24–25 and Suzuki Decl. ¶ 37.  USCIS is bound by

its considered litigation position adopted in its Declaration.  *See*, *e.g.*, *CREW v. DOJ*, 854 F.3d

675, 679–80 (D.C. Cir. 2017) ("*CREW IV*").

*Third*.  Plaintiffs do not dispute that because the law enforcement threshold is met where

it is properly invoked and Exemption 7(C) is less deferential to privacy interests than Exemption

6, the Court need only conduct an Exemption 7(C) analysis where both Exemptions are properly

invoked because any Exemption 6 analysis is subsumed therein.  *See, e.g.*, *Cabezas v. FBI*, No.

19-cv-145 (CJN), 2022 WL 898789, at *9 (D.D.C. Mar. 28, 2022).[7]

---

[5]  Citations to the Request Appendices are in the form "App. __".
[6]  Tellingly, Defendant's Declarants do not even consider the highly limited nature of Plaintiffs'
position.  That omission alone is fatal to Defendant's Motion.
[7]  The Supreme Court has helpfully explained the differences in the Exemptions:

> Exemption 7(C)'s privacy language is broader than the comparable language in
> Exemption 6 in two respects.  First, whereas Exemption 6 requires that the invasion of
> privacy be "clearly unwarranted," the adverb "clearly" is omitted from Exemption

*Fourth*.  Plaintiffs believe the resolution of the question of adequacy of search (Def. Mot. 5–8) is premature.  As an initial matter, it is entirely unclear if all searches have, in fact, been performed by DHS HQ, CBP, or USCIS as to *Glomar'd* records.  If this Court sustains the *Glomars*, the search is adequate.  If not, the adequacy of the searches will be determined through negotiation by the Parties and additional briefing as necessary.  As to the other searches, because the withholding was categorical, Plaintiffs currently lack information on which to form a definitive opinion as to the adequacy of those searches.  Again, if the categorical withholding is sustained, that is the end of the matter.  If the withholding is not sustained, then that issue is fit for additional discussion and judicial resolution if necessary.  *See, e.g.*, *DBW Partners LLC v. U.S. Postal Serv.*, No. 18-cv-3127, 2019 WL 5549623, at *3 n.1 (D.D.C. Oct. 28, 2019) (overruling agency *Glomar* and taking this approach).

*Fifth*.  Defendant seeks to withhold the names of certain agency officials under Exemption 7(C).  Def. Mot. at 20–21.  As a general proposition, Plaintiffs have no quarrel with this position.  But because Defendant has issued either *Glomar* responses or categorical withholdings, Plaintiffs have been unable to evaluate a production or *Vaughn* Index to determine if there are exceptions to that general position.  For example, Plaintiffs may seek disclosure of an agency official who, in a hypothetical email, admitted to engaging in illegal conduct to ensure the Duke of Sussex was able to enter the Country.  Again, in Plaintiffs' view, resolution of this

---

7(C). . . .  Second, whereas Exemption 6 refers to disclosures that "would constitute" an invasion of privacy, Exemption 7(C) encompasses any disclosure that "could reasonably be expected to constitute" such an invasion. . . .  Thus, the standard for evaluating a threatened invasion of privacy interests resulting from the disclosure of records compiled for law enforcement purposes is somewhat broader than the standard applicable to personnel, medical, and similar files.

*DOJ v. Reporters Comm.*, 489 U.S. 749, 756 (1989).

issue is premature.  If the *Glomars* and categorical withholdings are sustained, this issue is

effectively moot.  If the *Glomars* and categorical withholdings are overruled, this issue should be

resolved in the normal manner, with production, redactions where exemptions are claimed, a

*Vaughn* Index, discussion between the parties, and briefing if necessary.

## II.     STANDARDS OF REVIEW APPLICABLE TO DEFENDANT'S WITHHOLDINGS.

### A.     Courts Subject Glomar Responses and Categorical Withholdings to An Exacting Standard of Review.

In order to sustain a *Glomar* response, the Government must show that "'the existence or

nonexistence of the requested records' is *itself* information protected by Exemption 6 or 7(C)."

*Bartko v. DOJ*, 898 F.3d 51, 64 (D.C. Cir. 2018) (quoting *Roth v. DOJ*, 642 F.3d 1161, 1178

(D.C. Cir. 2011) (internal alteration omitted)) (emphasis added).  While the *Glomar* response is

evaluated at the level of the existence of the requested records, the underlying public interest

analysis is conducted not only based on the existence of records, but the content of those records

as well.  *See, e.g.*, *Codrea v. ATF*, No. 21-cv-2201 (RC), 2022 WL 4182189, at *9 (D.D.C. Sept.

13, 2022) (collecting authorities).

As to categorical treatment, it "may be used '[o]nly when the range of circumstances

included in the category 'characteristically support[s] an inference' that the statutory

requirements for exemption are satisfied.'"  *CREW v. DOJ*, 746 F.3d 1082, 1088–89 (D.C. Cir.

2014) ("*CREW III*") (quoting *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 893 (D.C.

Cir. 1995) (internal citation omitted)).  As this Court emphasized last month, "'[b]ecause the

myriad of considerations involved in the Exemption 7(C) balance defy rigid

compartmentalization, *per se* rules of nondisclosure based upon the type of document requested,

the type of individual involved; or the type of activity inquired into, are generally disfavored.'"

*Cabezas v. Fed. Bureau of Prisons*, No. 20-cv-2484 (CJN), 2023 WL 6312349, at *3 (D.D.C.

Sept. 28, 2023) (quoting *CREW IV*, 854 F.3d at 683).

 This Court explained that for the purposes of Exemption 7(C) the agency "bears 'the

burden of explaining why disclosure of any records would categorically be

'reasonably . . . expected to constitute an unwarranted invasion of' the officers' personal privacy,

when balanced against the public interest in disclosure.'' *Bartko v. DOJ*, 898 F.3d 51, 66 (D.C.

Cir. 2018)." *Cabezas*, 2023 WL 6312349, at *2.  Exemption 6 and 7(C) are "simply not well-

suited to categorical determinations." *CREW IV*, 854 F.3d at 683.

 **B.** **Exemption 6 and 7(C)'s Three Part Test.**

 Courts have instructed that the analysis of privacy under either Exemption 6 or 7(C) takes

place in three parts.

 *First*.  *The Government* must demonstrate that a privacy interest protected by a privacy

exemption is "present."  *Favish v. Nat. Archives & Rec. Admin.*, 541 U.S. 157, 172 (2004); *see*

*also ACLU v. DOJ*, 655 F.3d 1, 6 (D.C. Cir. 2011); *ACLU v. CIA*, No. 18-cv-2784 (CJN), 2022

WL 306360, at *11 (D.D.C. Feb. 2, 2023) ("disclosure must compromise a privacy interest").

 *Second*.  As this Court has previously explained:

> But even when disclosure implicates private interests, the government may be required to
> disclose documents if the individual seeking the information demonstrates
>
> > a public interest in the information that is sufficient to overcome the privacy
> > interest at issue.  In order to trigger the balancing of public interests against
> > private interests, a FOIA requester must (1) show that the public interest sought to
> > be advanced is a significant one, an interest more specific than having the
> > information for its own sake, and (2) show the information is likely to advance
> > that interest.  If the public interest is government wrongdoing, then the requester
> > must produce evidence that would warrant a belief by a reasonable person that the
> > alleged Government impropriety might have occurred.
>
> *Boyd v. Crim. Div. of U.S. Dep't of Just.*, 475 F.3d 381, 386–87 (D.C. Cir. 2007) (internal
> quotation marks and citations omitted).

*Burnett v. DEA*, No. 19-cv-870 (CJN), 2021 WL 1209142, at *4 (D.D.C. Mar. 31, 2021).  Here, the burden is on the *requester*.  *See, e.g.*, *Ctr. For Investigative Reporting v. USCIS*, No. 18-cv-1964 (CJN),  2019 WL 6498817, at *3 (D.D.C. Dec. 3, 2019).

The Supreme Court has explained, that for the purpose of determining what constitutes a "public interest" in the privacy context, the "purposes for which the request for information is made" are irrelevant.  *DOJ v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 771 (1989) The inquiry "turn[s] on the nature of the requested document and its relationship to 'the basic purpose of the Freedom of Information Act 'to open agency action to the light of public scrutiny.'"  *Id.* at 772 (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 372 (1976)).  That purpose includes the fact "the Act was designed to create a broad right of access to 'official information'" *Id.* (quoting *EPA v. Mink*, 410 U.S. 73, 80 (1973)), that is to say "citizens' right to be informed about 'what their government is up to.'"  *Id.* at 773 (quoting *Rose*, 425 U.S. at 360–61)).

*Third.*  Here, the *Government* bears "the burden of making an across-the-board showing that the privacy interest the government asserts categorically outweighs any public interest in disclosure."  *Bartko*, 898 F.3d at 64; *see also CREW III*, 746 F.3d at 1096; *Sheppard v. DOJ*, No. 17-cv-1037 (NKL), 2021 WL 4304217, at *9 (W.D. Mo. Sept. 21, 2021).[8]

---

[8] Defendant argues that "Plaintiffs have the burden to establish that disclosure of this information would otherwise sufficiently serve the public interest so as to overcome Prince Harry's privacy interests."  Def. Mot. at 17.  That argument is imprecise as it collapses the 3-part burden-shifting nature of the inquiry.  *Carter v. Dep't of Com.*, merely stands for the proposition that the requestor bears the burden of showing a public interest.  830 F.2d 388, 391 n.13 (D.C. Cir. 1987).  So to *Assoc. Press v. DOD*, 549 F.3d 62, 66 (2d Cir. 2008).  And the quoted portion of *Salas v. Office of the Inspector General* on its face only speaks to the requestor's burden to show public interest—not the balancing.  577 F.Supp.2d 105, 112 (D.D.C. 2008).

### III.   DEFENDANT'S EXEMPTION 6 AND 7(C) WITHHOLDINGS ARE UNLAWFUL.

#### A.   In the Context of the Request, the Duke of Sussex's Privacy Interests are at an Ebb.

As an initial matter Defendant cannot—and does not—dispute the fact that the Duke of Sussex has trumpeted his drug use to the entire world.  *Spare*—a book deal worth many millions of dollars and its attendant publicity tour not only "tells all," but reveals HRH's drug use in a manner that tends to glorify the habitual use of illegal drugs for recreational purposes.  The Duke of Sussex has no cognizable privacy interest on those points.  Thus, Defendant's *actual* asserted privacy interest at issue is not in the *fact* of the drug use, but *how* that admitted drug use factors into HRH's immigration status.  Def. Mot. at 12, 16.  Moreover, the asserted "law enforcement files" (as to DHS HQ and CBP) do not relate to a criminal investigation.

Plaintiffs do not dispute that there is a sufficient privacy interest to clear the low bar of a privacy interest cognizable under Exemption 6 and 7(C).  But the presence of *some* privacy interest sufficient to invoke an exception says nothing about the weight of that privacy interest which is critical to the required balancing of the privacy interest and public interest in disclosure.  *See, e.g.*, *Samahon v. FBI*, 40 F.Supp.3d 498, 517 (E.D. Penn. 2014) ("But to say that prior disclosure of information does not automatically terminate privacy interests is not to suggest that prior disclosure is irrelevant to the inquiry.  On the contrary, the extent to which a fact is already public affects the significance of the privacy rights at stake.").  Defendant's Motion misses this point entirely.  Def. Mot. at 14.

The Duke of Sussex's privacy interest in this case is extraordinarily attenuated because: (1) the combined weight of his disclosures regarding drug use—and the implications of that drug use on his life—actually reveal a considerable amount about the Duke of Sussex's immigration

status; (2) he is a high-ranking public official; and (3) he is the paradigmatic public figure. Collectively, these factors significantly diminish HRH's privacy interests.

### 1.     The Duke of Sussex Has Already Disclosed A Great Deal of Information Relevant Here.

A great deal of information regarding the Duke of Sussex is already widely publicly known.

Defendant admits that the Duke of Sussex has entered and exited the United States. Suzuki Decl. ¶ 16.  Indeed, the Duke of Sussex's *Netflix* series and *Spare* expressly detail the timing and manner of his entry to take up residence and the details of his decision to maintain residence in the United States.  App. D388, 391.  Both of those sources demonstrate that the Duke of Sussex has no qualms publicly discussing his travel to, and residence in, the United States.  *See also generally* App. C.  The Duke of Sussex has resided in the United States since 2020.  That means as a matter of law he must have presented himself for examination and have been found admissible to enter the Country and been granted some form of legal status.  To be sure, the Duke of Sussex has not spoken to every specific detail of his "immigration status" publicly, but he has admitted to the broader fact that his name would appear in the records related to examination and admission that must exist.

Both in *Spare* and in attendant media, the Duke of Sussex has given a startlingly candid and comprehensive account of his illegal drug use.  The account is neither fleeting nor incidental. *See* Am. Compl ¶¶ 27, 37, 39.  Indeed, some have heavily criticized the account as glorifying— and hence encouraging—illegal drug use.  *See* Am. Compl. ¶ 38.

Moreover, assuming the Duke of Sussex did not lie to DHS, he must have obtained a Section 1182(d)(3)(A) waiver based on HRH's admission of entry to take up residence and his extensive prior drug use.  Declaration of Andrew Arthur at ¶ 14–15 (Oct. 5, 2023) ("Arthur

Decl."); Declaration of Leonard D.M. Saunders at ¶¶ 11–12 (Oct. 9, 2023) ("Saunders Decl.").

Thus, Defendant's submission that "[a]ll components appropriately refused to confirm or deny whether they had communications regarding any request for a waiver by Prince Harry because the mere acknowledgment of whether responsive records exist would reveal whether Prince Harry sought a waiver, which in turn would provide insight into Prince Harry's immigration status" (Def. Mot. at 16) misses the essential point.  The interplay of HRH's public admissions—he took up residence in the United States and he used a *vast* amount of illegal drugs—and statute make plain that we *do* know HRH either:  (1) lied or (2) was granted a Section 1182(d)(3)(A) waiver.

### 2.     The Duke of Sussex Has a Diminished Privacy Interest as a High-Ranking Public Official.

The Duke of Sussex's status as a high-ranking public official reduces his privacy interests. While he is no longer a "working Royal," he is still a Royal Duke and Counselor of State.  *See* Regency Act, 1937, 1 Edw. 8 & 1 Geo. 6, c.16 § (2).  That is a high office.  And his United States residence and apparent immigration to the United States has caused debate in Parliament over whether he should retain that Office.[9]

Courts have repeatedly emphasized that one's status as "public official" diminishes his or her privacy interest.  *See, e.g.*, *Project for Priv. & Surveillance Accountability, Inc. v. DOJ*, No.

---

[9] During debate on the Counselors of State Act 2022, c.47 in the House of Lords last year, Viscount Stansgate prefaced an amendment (later withdrawn) to remove the Duke of Sussex from the list of Counselors of State by noting the Duke of Sussex "ha[d] left the country."  HL Deb (21 Nov. 2022) (825) col. 1186.  Lord Berkley added, "[t]he Duke of Sussex is abroad, as we all know, and Section 6 of the Regency Act 1937 appears to exclude those who are absent from the UK.  I do not know whether that means absent for a short or a long time.  We can form our own views on it, but it is pretty clear that he is away for quite a long time and I question whether he should still be on the list."  HL Deb (21 Nov. 2022) (825) col. 1188.  *See also*, HL Deb (23 Nov. 2022) (825) cols. 1382–1386.

20-cv-3657 (BAH), 2022 WL 4365745, at *14 (D.D.C. Sept. 19, 2022) ("Plaintiff fairly describes

the named individuals to be 'nationally prominent public-office holders,' whose privacy interests

may be diminished in certain contexts by dint of their public office."); *EPIC v. DOJ*, 18 F.4th 712,

719 (D.C. Cir. 2021) ("public officials may have a somewhat diminished privacy interest in the

Exemption 7(C) balancing analysis."(quotations omitted)); *CREW III*, 746 F.3d at 1092 (Cong.

Tom "DeLay, as a public official at the time, 'may have a somewhat diminished privacy interest,'

public officials "'do not surrender all rights to personal privacy when they accept a public

appointment.'" (internal quotations and citations omitted)); *Common Cause v. Nat'l Archives &*

*Recs. Serv.*, 628 F.2d 179, 184 (D.C. Cir. 1980) ("the individuals whose privacy interests are

argued here were candidates for federal office, not private citizens.  As such, they may have been

"public figures" with less privacy interest than others in information relating to their

candidacies.").[10]

---

[10] Defendant's citation to *Property of the People v. DOJ*, 310 F.Supp.3d 57 (D.D.C. 2018) actually proves *Plaintiffs'* point.  Def. Mot at 14 (citing Prop. of the People, 310 F.Supp.3d at 69–70.  Defendant omits the language on page 68 of the opinions:

> [Plaintiffs] argue, and the Court agrees, that as President of the United States (and, formerly, as a prominent businessman and celebrity), Trump naturally has a diminished expectation of privacy.  *See* Pl. MSJ at 3.  "It is well established, however, that government officials do not surrender all rights to personal privacy when they accept a public appointment."  *Bast v. DOJ*, 665 F.2d 1251, 1254–55 (D.C. Cir. 1981).  "While an individual's official position may enter the 7(C) balance, it does not determine, of its own accord, that the privacy interest is outweighed."  *Id.* at 1255 (internal citation omitted).

*Prop. of the People*, 310 F.Supp.3d at 68.  That language supports Plaintiffs.  Moreover, the portion of *Property of the People* Defendant actually cites sustained the Exemption 7(C) because "even if Trump's privacy interest is somewhat diminished, the proffered public interest is still insufficient to tip the scales."  *Id.* at 69.  In other words, the Court accepted President Trump's public office weighted into the balance, but concluded at the end of the day the requestor's public interest was lacking.  As to the citation to *Phillips v. ICE*, 385 F.Supp.2d 296 (D.D.C. 2005), Plaintiffs do not quarrel with the proposition that the Duke of Sussex has a cognizable privacy interest.  Plaintiffs' submission merely goes to the *weight* of that interest in light of the Duke of Sussex's current high office.

3.     **The Duke of Sussex Has a Diminished Privacy Interest as a Public Figure Concerning All Relevant Aspects of His Life.**

The Duke of Sussex's notoriety is not limited to his official status; he is also perhaps *sui generis* as a public figure.  He has long been a public figure in virtually every aspect of his life.  He is not one who is famous as an athlete or as an artist and nothing more than by profession.  He is famous in almost all aspects of his life.  And he has sold his personal privacy in all those areas, increasing his notoriety for profit while correspondingly greatly diminishing his privacy interests.  Simply put, the Duke of Sussex is the paradigmatic public figure.  Defendant admits that fact.  *See* Def. Mot. at 14 ("he is a public figure").

Courts have long held when assessing exemptions asserted under Exemption 6 and 7(C), that this type of status as public figure diminishes the asserted privacy interest.  *See, e.g.*, *Nation Magazine v. U. S. Customs Service,* 71 F.3d 885, 894, n.9 (D.C. Cir. 1995) (finding H. Ross Perot's status as a presidential candidate diminished, but not eliminated, his expectation of privacy under FOIA); *James Madison Project v. DOJ*, 436 F.Supp.3d 195, 205 (D.D.C. 2020) (distinguishing the public-figure status of the former CIA Chief of Counterterrorism Operations in Pakistan from the former House Majority Leader, CIA Director, or senior executive at the National Security Agency, and suggesting the latter group would have diminished privacy interests under FOIA); *Judicial Watch, Inc. v. DOJ*, 394 F.Supp.3d 111, 118–19 (D.D.C 2019) (while noting that "Trump Dossier" author Christopher Steele's "FBI-related notoriety certainly weakens his privacy interests," the court ordered the defendant to conduct a search for records and rejected the agency's blanket 6 and 7(C) exemption claims); *Iowa Citizens for Cmty. Improvement v. U.S. Dep't. of Agric.*, 256 F.Supp.2d 946, 954–56 (S.D. Iowa 2002) (finding that the nominee for Undersecretary of Agriculture for Rural Development's "public-figure status

lessens" his privacy interests under FOIA and that the contents of the records sought highlighted a "concern of official wrongdoing" thereby favoring disclosure).[11]

**B.    There Is a Clear Public Interest in the Requested Information.**

Plaintiffs have consistently advanced two distinct public interests in this matter.

*First*.  Plaintiffs have been clear that they have established a sufficient basis to raise the question of whether DHS committed misconduct or acted negligently in either admitting the Duke of Sussex or in allowing him to stay within the United States.  *See* ECF No. 6 at 1–2; ECF No. 16 at 1, 19–20.

*Second*.  Plaintiffs have also been clear that they seek to better understand how DHS conducts itself and exercise official discretion in high-profile cases involving the admission of high-profile and influential individuals who have engaged in illegal drug use.  As Plaintiffs put it as the preliminary injunction phase, the case of the Duke of Sussex is, in effect, a case study of this broader question because "it provides a perfect window into an age-old question:  Is the government applying the law evenhandedly?"  ECF No. 10 at 2.  Plaintiffs case focuses specifically on the Duke of Sussex because it is "perhaps unique both in its profile and in its extensive media coverage of all aspects of the issue."  ECF No 16 at 2.  "This is obviously a case concerning the Duke of Sussex, but what this case is truly about is DHS and DHS's compliance with the law."  Trans. of Oral Arg. at 4:4–6 (June 5, 2023) (ECF No. 19).

---

[11] Defendant's citation to *Showing Animals Respect & Kindness v. Department of the Inte*rior, 730 F.Supp.2d 80, 193 n. 14 (D.D.C. 2010) does not alter this analysis.  First, there, the Defendant disputed the public figure status.  *Id.*  Defendant here concedes the Duke of Sussex is a "public figure."  Def. Mot at 14.  Second, the court's conclusion linking "public figure" status to "public office or candidates for such office" (730 F.Supp.2d at 193 n. 14) is contrary to later cases, including, *Property of the People*.

*That* question is not one of misconduct, but one of allowing the public to see how they are governed, how the government exercise discretion, and if fame and influence cause the Government to "pull its punches."  That broader question—and the need for more information about *how* the government conducts its business—is why Plaintiffs have illustrated that these "questions have repeatedly been surfaced by the press as concerns reporting on other prior high-profile cases" involving DHS immigration decisions and illegal drug use.  *See* Am. Compl. at ¶ 24 (ECF No. 7)"  ECF No. 10 at 2.

      1.      **The Record "would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred."  *Favish*, 541 U.S. at 174.**

As to the question of possible agency misconduct, there is no dispute between the parties as to the applicable standard.  Plaintiffs accept Defendant's statement that "[t]o assert a public interest, Plaintiffs would need to 'produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred."  Def. Mot. at 18 (*Favish*, 541 U.S. at 174).  The dispute focuses on how that standard has been construed and the application of law to fact.

    1.      Start with *Favish*.  In *Favish*, the record established that "plaintiff's accusations were wholly unfounded and had been refuted by five separate government investigations."  *Aguirre v. SEC*, 551 F.Supp.2d 33, 57 (D.D.C. 2008).  *Favish* itself is clear that its standard requires more than "bare suspicion", but in light of "FOIA's prodisclosure purpose" the *Favish* standard is "*less* stringent" than that required to rebut the presumption of regularity.  541 U.S. at

174 (emphasis added).  Accordingly, Defendant's invocation of that presumption (Mot at 18) is misplaced.[12]

In applying *Favish*, courts have repeatedly emphasized that a circumstantial showing of *possible* misconduct or *possible* negligence is sufficient.  Take for example, *Union Leader Corp. v. U.S. Dep't of Homeland Sec.*, where the First Circuit confronted a claim that DHS was negligent in failing to timely remove criminal aliens.  749 F.3d 45, 54 (1st Cir. 2014).  The *Union Leader* Court emphasized:

> Union Leader can point to "evidence that would warrant a belief by a reasonable person" that such negligence might have occurred:  namely, the redacted I–213 forms ICE has already produced, which document the apprehension of aliens who had been convicted of crimes and/or ordered removed from the United States as long as 23 years before their 2011 arrests.  *Favish*, 541 U.S. at 174[].  Although that delay is hardly conclusive evidence of negligence, or other wrongdoing on the part of ICE, we believe that it is at least enough to warrant a reasonable belief "that the alleged Government impropriety *might* have occurred."  *Id.* (emphasis added).

*Union Leader*, 749 F.3d at 56.  Other cases are in agreement.  *See, e.g.*, *Rojas v. Fed. Aviation Admin.*, 941 F.3d 392, 398–400, 406–07 (9th Cir. 2019) (relying on criticism by press and Congress, circumstantial evidence that FAA hiring test was designed to increase air traffic controller diversity, and evidence that minority air traffic controller associations facilitated cheating led court to conclude "[b]ased on the evidence provided, a reasonable person would believe that 'the alleged Government impropriety might have occurred' in the FAA's decision to change its hiring practices.  [*Favish*, 541 U.S. at 174]; *see also Union Leader*, 749 F.3d at 56 (noting that evidence of misconduct was 'hardly conclusive evidence of negligence, or other

---

[12] To be sure, the D.C. Circuit termed the test "demanding" in *Blackwell v. FBI*, 646 F.3d 37, 41 (D.C. Cir. 2011).  The test is "demanding" because of its context.  FOIA requests are made to allow the public access to information *not yet public*.  By definition, a FOIA requestor seeking information to explore government misconduct faces an uphill battle in obtaining from other sources the very information it seeks to obtain from the Government.  *See, e.g.*, *Samahon*, 40 F.Supp.3d at 521.  It is a classic Catch-22 which is in a word "demanding."

wrongdoing,' but was enough to satisfy the standard set out in *Favish*)"); *Roth v. DOJ*, 642 F.3d 1161, 1180 (D.C. Cir. 2011) ("The fact that the FBI withheld . . . information [favorable to criminal defendant] until 2001, approximately seventeen years after Bower's trial, 'would warrant a belief by a reasonable person' that the FBI 'might' have other potentially exculpatory information in its files"); *James v. Dep't of Def.*, No. 3:18-cv-28 (JWS), 2018 WL 4926302, at *4 (D. Alaska Oct. 10, 2018) (holding circumstantial evidence sufficient to meet *Favish* standard); *Aguirre*, 551 F.Supp.2d at 56 ("potential improprieties" are sufficient).

    **2.**    Plaintiffs easily clear the *Favish* bar on the present record.  To reiterate, the Duke of Sussex himself has admitted to extensive drug use on the one hand, but on the other hand still entered the Country with ease.  Plaintiffs' Amended Complaint lays out in exhaustive detail the vast amount of circumstantial evidence showing the extreme and extraordinary mismatch between the Duke of Sussex's admitted drug use, the law governing admission, and the ease of HRH's admission.  This demonstrates both the known facts about HRH's admission and immigration status and how those facts do not appear to comport with the law.  It also lays out that regardless of how the "binary" as to whether HRH was truthful is resolved, DHS may very well have committed misconduct.  And that evidence comes in great part from the Duke of Sussex *himself* in *Spare* and other public statements.[13]

---

[13] Defendant submit that nonetheless here, Plaintiffs "recount[ed] a litany of allegedly suspicious circumstances [that] lack[ed] any substantiation."  *Blackwell*, 646 F.3d at 41.  To start with that is pure *ipse dixit*.  Nowhere in its papers does Defendant grapple with the detailed factual showing in the Amended Complaint.  Plaintiffs have not been shy that they allege possible agency misconduct circumstantially.  *See, e.g.*, ECF No. 16 at 19 ("Moreover, Plaintiffs set out in the Amended Complaint the factual and legal detail to question whether DHS has given—or is giving—the Duke of Sussex preferential treatment.  Am. Comp. ¶¶ 10–22, 27–43.").  Despite this the Defendant's Motion does not engage with these facts at all.  Defendant's declarants fare no better.  *See* Pavlik-Kennan Decl. ¶ 26 (*ipse dixit* that Plaintiff failed to comply with *Favish*); Suzuki Decl. Ex. 1 (declining to grapple at all with the question and merely stating "You have

Were there any doubt on this point, Plaintiffs have provided two expert Declarations, one from Leonard D.M. Saunders, a recognized expert who confronts the specific legal and factual questions at issue in the Duke of Sussex's case everyday as a practitioner and one from Andrew Arthur, an immigration policy expert and retired immigration judge who adjudicated over 15,000 cases.  Both Declarations explain in detail that based on the declarant's experience, HRH's admissions, and application of relevant law, the *Favish* standard has been met.  *See* Arthur Decl. at ¶ 20 ("it is my opinion that the current record 'warrant[s] a belief by a reasonable person that the alleged Government impropriety might have occurred.' *Nat. Archives & Records Admin. v. Favish*, 541 U.S. 157, 159 (2004)"); *id.* at ¶¶ 19–33; Saunders Decl. at ¶ 15–29 .

Moreover, in the only other case to consider a directly analogous situation, the Court held the *Favish* standard was easily satisfied.  *Muchnick v. DHS*, 225 F.Supp.3d 1069 (N.D. Cal. 2016) is on all fours with this case.  There, the requestor sought immigration records relating to George Gibney, an Irish Olympic Swimming Coach who was charged with—but never convicted

---

submitted a significantly large number of articles concerning behavior that describe activities that could result in the Duke of Sussex facing heightened scrutiny at the border"); Panter Decl. ¶ 22 (concluding only that "Plaintiffs point to newspaper articles that speculate about Prince Harry's status in the US and speculate about why he should not be admitted into the US based on statements of drug use in his published book.  While some of the media articles speculate on his inadmissibility, they also speculate on why he would not be inadmissible based on the statements in the book.").  None of this authority remotely parses Plaintiffs' detailed evidentiary showing.  Accordingly, this Court has discretion to treat Defendant as having conceded this point.  *See Fling v. Martin*, No. 19-cv-693 (CJN), 2020 WL 4569335, at*2 n.5 (D.D.C. Aug. 8, 2020); *Rodriguez v. Penrod*, No. 18-cv-240 (CJN), 2020 WL 686012, at *9 n.5 (Feb, 11, 2020).

Additionally, the quoted language in *Blackwell* is selectively quoted, the full passage actually supports *Plaintiffs*.  The D.C. Circuit found the *Favish* test was not met because "[t]he *only support Blackwell offers for his allegation of government misconduct is his own affidavit*, which recounts a litany of *allegedly* suspicious circumstances but lacks any substantiation.  646 F.3d at 41 (emphases added).  In other words "inflammatory allegation[s]" in the requestors declaration "utterly unsupported" by evidence are insufficient.  *Id.*  That is night and day from Plaintiffs' detailed submissions.

of—sexually abusing "young female swimmers."  *Id.* at 1073.  The facts surrounding these events were widely reported in the media and the subject of a comprehensive book.  *Id.* at 1076. Little was known about Gibney's immigration history other than the fact that he was admitted to the United States and then lived there.  *Id.*  The requestor alleged DHS misconduct in admitting Gibney and allowing him to take up residence, and the requestor suggested that the "American Swimming Coaches Association greased the wheels for Gibney's relocation."  *Id.*  Unlike this case where prior illegal drug related conduct renders one inadmissible, prior sexual misconduct without a conviction is generally *not* a categorical bar to admissibility.  The District Court squarely rejected DHS's argument that the *Favish* test was not met writing:

> Muchnick has made that showing.  Charges against Gibney came to light no later than 1993.  *See* Muchnick Decl. (dkt. 17–1) Ex. C.  In 1994, the Irish Supreme Court put an end to the case—not for lack of evidence, but because the statute of limitations had run. *See id.*  This was no secret.  But it did not stop American authorities from allowing Gibney to enter the United States and remain here ever since.  *See id.*  So although the information Muchnick seeks "is tied solely to one individual," Mot. at 9, much of it sheds light on multiple decisions by multiple DHS personnel.  It details what they knew about Gibney's past and when they knew it.  Those details shed light on DHS's performance of its statutory duties and most certainly lets citizens know "what their government is up to."  *See Dep't of Defense* [*v. FLRA*], 510 U.S. [487,] 497 [(1994)] (internal quotation marks omitted).  And given Gibney's past, it is enough to "warrant a belief by a reasonable person" that—perhaps—more should have been done.  *See Nat'l Archives*, 541 U.S. at 174.

*Muchnick*, 225 F.Supp.3d at 1076–77.  So to here.[14]

---

[14]  *See also Phillips*, 385 F.Supp.2d at 305–06 ("Nevertheless, plaintiff identifies a legitimate public interest in gathering information on the decision to admit or grant asylum to Garcia and Vides–Casanova.  Both individuals were publicly accused of complicity in notorious human rights violations and, without resolving that issue, it is a legitimate inquiry to ask via a FOIA request what INS knew of the generals' alleged roles at the time it granted them admission to or asylum in the United States.").

Remarkably, even though Plaintiffs have repeatedly cited *Muchnick* as leading authority (*see* ECF No. 16 at 20; ECF No. 21 at 8), Defendant's Motion does not even address that case. Defendant evidently has no answer for *Muchnick*.

3.      Defendant waives its hand at an argument that the disclosure sought here does not sufficiently advance the public interest because "Prince Harry is but one foreign national who obtained admission into the United States, and Courts have recognized that there is a minimal amount of information of interest to the public in a single incident or investigation, and any such marginal public interest does not overcome an individual's privacy interests."  Def. Mot. at 19.

But courts have routinely held that there is a great benefit to the public in obtaining information regarding cases of possible government misconduct or negligence.  As the *Muchnick* Court wrote into rejecting that precise argument, "the public has a strong interest in understanding how and why their government allowed a man with a far-worse-than-checkered past (and perhaps present) to stay here for more than two decades."  *Muchnick*, 225 F.Supp.3d at 1077; *see also Union Leader*, 749 F.3d at 56 (rejecting submission that identities of six arrestees allowed to remain in the Country for extended periods of time while removable would not further public interest in learning about "an agency's own conduct", holding their disclosure will advance the legitimate public interest in "knowing what [the] Government is up to," (citations omitted)); *Aguirre*, 551 F.Supp.2d at 58–59 (strong interest in understanding possible SEC misconduct in a specific case); *Phillips v. ICE*, 385 F.Supp.2d 296, 305–306 (D.D.C. 2005) (legitimate public interest in obtaining information about grant of asylum to two former high-ranking government officials linked to human rights abuses).[15]

---

[15] Defendant's authority is not to the contrary.  In *Burton v. Wolf*, the requestor had failed to make the required showing under *Favish*.  803 Fed.Appx. 120, 122 (9th Cir. 2020).  Thus, the

2.      **Understanding the Exercise of Discretion in a High-Profile Case:  Did the Government Pull its Punches?**

The D.C. Circuit has "repeatedly recognized a public interest in the manner in which the DOJ carries out substantive law enforcement policy."  *CREW III*, 746 F.3d at 1093.  As the D.C. Circuit has explained, relevant to that interest (in the context of a specific criminal investigation) is "the diligence of the FBI's investigation and the DOJ's exercise of its prosecutorial discretion: whether the government had the evidence but nevertheless pulled its punches."  *Id.*; *accord id.* at 1093–94 (collecting authorities); *CREW IV*, 854 F.3d at 682 (same); *cf. Roja*s, 941 F.3d at 405–06 ("We have also recognized that '[t]here is a clear public interest in public knowledge of the methods through which well-connected corporate lobbyists wield their influence[]' [(]*Elec. Frontier Found.* [*v. ODNI*], 639 F.3d [876,] 887 [9th Cir. 2010[)] . . . because '[w]ith knowledge of the lobbyists' identities, the public will be able to determine how the Executive Branch used advice from particular individuals and corporations in reaching its own policy decisions,' *id.* at 888").

Necessarily, that interest is applicable even to a specific case, especially a high-profile one.  *See CREW III*, 746 F.3d at 1094 ("Although the DOJ's actions in this case may reflect only one data point regarding the performance of its statutory duties, *cf. Boyd v. Dept of Justice*, 475 F.3d 381, 388 (D.C. Cir. 2007), it is a significant one:  It may show whether prominent and influential public officials are subjected to the same investigative scrutiny and prosecutorial zeal as local aldermen and little-known lobbyists.");  *accord CREW IV*, 854 F.3d at 679; *see also*

---

interest in understanding potential government misconduct was not even in play.  Moreover, *Burton* involved a run of the mill case.  The case of the Duke of Sussex cannot possibly have higher profile.  *Salas v. Office of Inspector General* also involved a case where there was no finding that the *Favish* standard had been meet.  577 F.Supp.2d at 112.  And the opinion makes clear that court considered the alleged misconduct was run of the mill.  Again, not so here.

*Ocasio v. DOJ*, 70 F.Supp.3d 469, 482–83 (D.D.C. 2014).  The Duke of Sussex's case is perhaps the highest profile case ever involving drugs and immigration—at least since the attempted deportation of John Lennon.  *See Lennon v. INS*, 527 F.2d 187, 188 (2d Cir. 1975).

Plaintiffs have shown that public interest.  As Plaintiffs' experts have explained, DHS exercises some measure of discretion in determining whether to grant a waiver under Section 1182(d)(3)(A).  *See* Arthur Decl. at ¶ 37 Saunders Decl. at ¶ 33.  As Plaintiffs catalogued in the Amended Complaint, DHS's exercise of that discretion has been consistently criticized for favoritism and hotly debated in the press.  Am. Compl. ¶ 24.  And while DHS's discretion is not boundless, understanding the application of that discretion in a case as high-profile as the Duke of Sussex will inform public policy debate.  *See* Arthur Decl. at ¶¶ 38–40; Saunders Decl. ¶¶ 33–37.  Disclosure will also inform practitioners as they deal with Section 1182(d)(3)(A) related issues in a host of other cases.  *See* Saunders Decl. ¶¶ 33–37.  And the same principle applies to when DHS takes enforcement action.  *See* Arthur Decl. at ¶ 41.

### C.    Plaintiffs' Interests in Obtaining the Records Sought Outweigh the Duke of Sussex's Privacy Interests.

#### 1.    A Categorical Rule Against Third-Party Disclosure Does not Apply.

Defendant's Motion could be read to suggest that information related to the Duke of Sussex is categorically exempt under *SafeCard Servs. v. SEC*, 926 F.2d 1197 (D.C. Cir. 1991) because it is third-party information in a law enforcement file.  That submission fails for two reasons. [16]

---

[16] Of course, *SafeCard* cannot apply at all to *USCIS's* withholdings in that it did not invoke Exemption 7(C).  *See, e.g.*, *Jefferson*, 284 F.3d at 179; *ACLU*, 2022 WL 306360, at *11 (applying non-categorical balancing to third-parties in Exemption 6 case).

*First*.  The fact that Plaintiffs have discharged their burden to show misconduct under *Favish* takes the case entirely outside of *SafeCard*.  *See, e.g.*, *Aguirre*, 551 F.Supp.2d at 58; *cf. Jefferson v. DOJ*, 284 F.3d 172, 180 (D.C. Cir. 2002) (SafeCard categorically does not apply when evidence "raise[s] a claim of illegal agency activity").

*Second*.  *SafeCard* has no application here under its own logic.  *SafeCard* adopted a rule only as to "access to the names and addresses of private individuals appearing in files within the ambit of Exemption 7(C)" in the context of an interest in utilizing names of "witnesses or litigants" in understanding *SafeCard's* investigative file.  *SafeCard*, 926 F.2d at 1205–06.  That is necessarily not the case here when we deal not with redactions in records, but the file *itself*.  *See, e.g.*, *CREW III*, 746 F.3d at 1094 (*SafeCard* does not bar disclosure of entire files only identifies in files); *cf. Neese*, 2022 WL 898827, at *10 (applying *SafeCard* to third parties "incidentally mentioned" in file of investigation of requestor); *People for Ethical Treatment of Animals v. Nat'l Inst. of Health*, 745 F.3d 535, 543–44 (2014) (applying *ad hoc* balancing to sustain *Glomar* of release of information concerning targets of law enforcement investigations).

*Third*.  This case is even further afield from *SafeCard's* holding.  It is not the case of an anonymous witness who is wholly unassociated with a file, but rather a case involving the Duke of Sussex who has very publicly admitted to immigrating to the United States (App. D388) and taking up residence there (App. D391).  As USCIS and CBP (finally) admit, that means that the Duke of Sussex necessarily has interacted repeatedly with immigration authorities.  That public disclosure—even though it lacks precise overlap—takes the case well out of *SafeCard* and the concerns underlying it.  *See, e.g.*, *CREW IV*, 854 F.3d at 682–63; *CREW III*, 746 F.3d at 1091–92; *Nation Mag*, 71 F.3d at 896.

2.    **The *Glomars* of Records Relating to Section 1182(d)(3)(A) Waivers Are Improper.**

USCIS, CBP, and DHS all issued *Glomar* responses as to Specification 3 of the Request seeking records relating to Section 1182(d)(3)(A).

1.    As an initial matter, before even reaching the matter of balancing the competing interests, it is unclear how the *Glomar* can be maintained.  Defendant's Motion justifies the *Glomar* writing:  "All components appropriately refused to confirm or deny whether they had communications regarding any request for a waiver by Prince Harry because the mere acknowledgment of whether responsive records exist would reveal whether Prince Harry sought a waiver, which in turn would provide insight into Prince Harry's immigration status."  Def. Mot. at 16.

But Defendant's Declarants do not even state that much; rather, all they state is the fact that a waiver application may be revealed.[17]

---

[17] *See* Painter Decl. ¶ 32 ("Such a response is necessary because to reveal whether such a waiver has been sought would reveal privacy protected information."); Suzuki Decl. ¶ 32 ("the general public interest claimed by Plaintiffs in their assertions regarding the Duke's admission to the United States are insufficient to outweigh the Duke's privacy interests in any additional CBP records about him that may or may not exist."); ¶ 37 ("Any other response would necessarily acknowledge the existence of records and reveal, for example, whether the Duke of Sussex applied for particular immigration benefits, was the subject of any adverse actions, or requested a waiver under the Immigration and Nationality Act.  Immigration status implicates significant privacy interests. Confirmation of any adverse action or immigration applications would necessarily reveal the precise information that Exemption 6 and 7(C) shield.  The minimal amount of information of interest to the public revealed by the treatment of one individual does not shed enough light on CBP's conduct to overcome the Duke of Sussex's privacy interest in his encounters with CBP or in any information in CBP's records related to his immigration status"); Pavlik-Keenan Decl. ¶¶ 25–26 ("simply identifying whether records regarding any requests for a waiver pursuant to Section 212(d)(3) of the Immigration and Nationality Act exist would confirm that the Duke of Sussex may have required a waiver before any travel to the United States.  The release of such information would be a violation of his privacy interests.  Plaintiff alleges in its FOIA request that "[i]t is unclear at this juncture whether DHS complied with the law, if in admitting Prince Harry, did so without a waiver or any interview with CBP . . . "

To sustain a *Glomar*, agency declarations must explain in "reasonable specificity of detail rather than conclusory statements" why revelation of the existence of the record would harm the interest protected by the exemption.  *EPIC v. NSA*, 678 F.3d. 926, 932 (D.C. Cir. 2012)  (internal quotations and citations omitted).  A bare-bones affidavit that fails to explain how the anticipated harm would come about is insufficient.  This Court just explained the application of this standard to an investigative file at length in *Cabezas*:

> With this *Glomar* response, OPR has failed to satisfy its obligation to "measure" the public interest in disclosure and "weigh" it against the privacy interests at stake.  *Bartko*, 989 F.3d at 66.  As the Court of Appeals has stated, "OPR cannot issue a blanket proclamation that a loss of privacy would be 'unwarranted' without considering whether there is a public interest that might well warrant it."  *Id.*  But that is exactly what OPR has done here.  OPR offers nothing more than conclusory claims regarding the public interest, simply asserting that "disclosure of the files would not significantly contribute to the public's understanding of the operations or activities of the government."  Defs.' Mot. at 8.

*Cabezas*, 2023 WL 6312349, at *2.  This Court went on to explain:

> OPR also "ignores altogether its obligation to specifically identify the privacy interest at stake."  *Bartko*, 898 F.3d at 66.  OPR contends generally that "even to acknowledge the existence of records related to claims of misconduct by an individual would constitute a clearly unwarranted invasion of personal privacy."  Defs.' Mot. at 8.  But the privacy interests at stake when disclosing OPR records "can vary based on many factors, including frequency, nature, and severity of the allegations."  *Bartko*, 898 F.3d at 66.

*Cabezas*, 2023 WL 6312349, at *3.

*Cabezas* is fatal to Defendant's Declarations.  Nowhere do they explain why merely acknowledging application for a Section 1182(d)(3)(A) waiver would *actually* and *concretely* cause the harm protected by Exemption 6 and 7(C).  Nor do they balance any interests against

---

Merely alleging wrongdoing, however, is insufficient to establish public interest; the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety may have occurred.  Plaintiff has failed to provide such evidence in this case.  As such, Plaintiff has failed to show that public interest outweighs the Duke of Sussex' right to personal privacy").

that fact.  For example, the Suzuki Declaration's canard that disclosure of single file would not further a public purpose is almost exactly the rationale rejected as conclusory in *Cabezas*.

2.      To boot, the conclusory nature of the Declarations here are particularly egregious in that they ignore the record in this case.  The Duke of Sussex has publicly admitted at length to extensive illegal drug use.  And the Duke of Sussex has publicly proclaimed his residency in this Country since March of 2020.  As Plaintiffs experts explain, unless the Duke of Sussex committed a felony, those two publicly available facts *require* him to have a Section 1182(d)(3)(A) waiver.  Arthur Dec. at ¶¶ 14–15; Saunders Decl. at ¶¶ 11–12.  However, none of Defendant's Declarants grapple with this fact.  One cannot maintain a *Glomar* against that which is already public from the mouth of the individual in question.  *See, e.g.*, *CREW III*, 746 F.3d at 1091–92.[18]

### 3.      Defendants Cannot Categorically Withhold Immigration Related Information.

USCIS is categorically withholding the Duke of Sussex's A-file under Exemption 6. CBP is likewise doing so as to certain immigration related databases it maintains under Exemption 6 and 7(C).  Recall that the D.C. Circuit disfavors categorical rules of withholding as to Exemption 6 and 7(C).  Recall also that to succeed on a categorical invocation, Defendant must "run" the proverbial board and show "that there would be a single answer to every balancing of interests involving" each of the requested records"  *Cabezas*, 2023 WL 6312349, at * 3(quoting *Bartko*, 898 F.3d at 66).  An agency also cannot rely upon a "near-verbatim

---

[18] The foregoing analysis applies with even greater force to USCIS withholding as it occurs under the much less protective Exemption 6.

recitation of the statutory standard" to sustain an exemption.  *CREW III*, 746 F.3d at 1102; *see also Bartko*, 898 F.3d at 65 (collecting authorities).[19]

Neither USCIS nor CBP comes close to providing competent evidence to meet this burden.  A few examples suffice.

**Example 1**.  Neither Declaration considers the public interest in understanding how DHS exercised its discretion in a high-profile immigration case involving repeated admissions to use of illegal drugs.  Failure to consider that entire question is fatal.  *See, e.g.*, *Cabezas*, 2023 WL 6312349, at *2 ("As the Court of Appeals has stated, 'OPR cannot issue a blanket proclamation that a loss of privacy would be 'unwarranted' without considering whether there is a public interest that might well warrant it.'" (internal citation omitted)).

---

[19]  The Motion can be read to assert there is a categorical *rule* against disclose of information related to "visa of immigration status."  *See* Def. Mot. at 12 ("Courts consistently hold that a person's visa or immigration status is private, personal information exempt from disclosure under Exemption 6.  *Burton v. Wolf*, 803 F. App'x. 120, 121 (9th Cir. 2020) (allowing government to categorically withhold a third-party Alien file under Exemption 6 because the subject has a privacy interest in her immigration information)").  But Defendant's cases not only do not support such a rule, but they are conclusive against it.  *Burton did not* "categorically withhold a third-party Alien file under Exemption 6 because the subject has a privacy interest in her immigration information."  Def. Mot at 12.  To the contrary, *Burton* sustained withholding the entire A-File simply because Burton failed to provide any cognizable public interest.  803 Fed. App'x at 121–22.  *Bales v. Dep't of State*, No. 18-cv-2779 (RC), 2020 WL 1078854 (Mar. 6, 2020) is even further afield as there the court analyzed the specific application of an interest it found sufficient, but concluded it would not be furthered by the disclosure sought.  *Id.* at *5.  The cited portion of *Washington Post* says nothing about categorical treatment— *on its face* it speaks to balancing.  *See* Def. Mot. at 12–13 ("[*Dep't of Stat v.*] *Wash. Post*, 456 U.S. [595,] 602 [(1982)] (holding that "citizenship information" regarding third parties can be withheld under Exemption 6 "upon a showing by the Government that release of the information would constitute a clearly unwarranted invasion of personal privacy")").  And the cited page of *Hemenway v. Hughes* was explicit that it was engaging in careful *ad hoc* balancing.  602 F.Supp. 1002, 1006 (D.D.C. 1985) ("In this instance careful balancing of the interests of both parties weighs in favor of exempting the requested citizenship information from disclosure.").  To the broader points, of course, a categorical rule is different from a categorical withholding on the facts of the specific case and is disfavored.  *See CREW IV*, 854 F.3d at 682–83.  And again, Defendant has no answer for *Muchnick* which ordered such disclosure.

**Example 2.**  Again, the Suzuki Declaration relies almost entirely on the same conclusory analysis that was rejected out of hand in *Cabezas*.  *See Cabezas*, 2023 WL 6312349, at *2; *compare* Suzuki Decl. ¶ 21 ("the general allegations made regarding the existence of public interest in the Duke's personal information do not outweigh the Duke's privacy interests, as one person's CBP entry and exit records, even a famous person's, is insufficient evidence to undermine public confidence in CBP and its application of equal justice under the law.'") *with* Declaration of Margaret S. McCarthy in *Cabezas v. DOJ*, No. 20-cv-2483 (CJN) (Sept. 21, 2022) (ECF No. 38-1) ("Even assuming that OPR had investigated the conduct of the Department attorneys and law enforcement agents named by Plaintiff, the conduct of individual staff-level attorneys and agents in a single prosecution is not likely to contribute significantly to the public's understanding of the operations or activities of the government.").

**Example 3.**  Neither Declaration comes close to explaining how the harms they cite would come about, let alone balancing those harms against the public interest.  Each Declaration is entirely conclusory as to the how and why that release of information would cause harm.  *See* Suzuki Decl. ¶ 21 ("The Duke's personal information includes, but is not limited to, the type of document the Duke used to travel, that document's number, document country, the date and time the Duke arrived in or left the United States, the duration of his lawful admission, the port at which he arrived or from which he left, and his class of admission.  Release of the Duke's personal information to a third party without the Duke's authorization would constitute a clearly unwarranted invasion of privacy."); Panter Decl. ¶ 16 ("to provide specific details regarding each record would provide or would allow someone to determine the type of status for Prince Harry in the United States, which is the very information that is protected pursuant to Exemption 6. USCIS has determined that it also cannot provide a page count as that would potentially reveal

Prince Harry's status given that certain immigration/non-immigration benefits require a certain

volume of records.").[20]

Furthermore, Defendant has no answer for *Muchnick* which rejected almost to a word the

categorical argument made here (albeit in the contest of segregability as in *Muchnick* DHS

produced a *Vaughn* Index (found to be deficient, but withheld all files as non-segregable)):

> DHS argues that none of the information in the 40 documents at issue here contains any
> information that is reasonably segregable from exempt information.  To support this
> sweeping claim, DHS states that
>
>> the mere disclosure of which immigration forms are included in the A-file would
>> disclose private information pertaining to Mr. Gibney that warrants protection
>> under the law.  If DHS is required to disclose non-exempt segregable information
>> contained within the A-file, Plaintiff and third parties would know information
>> that would be unique to the individual alien, including:  (1) the specific law
>> enforcement actions that DHS may have instituted against him; (2) the different
>> immigration benefits or specific relief that he may have requested; (3) allegations
>> that may have been raised against him; (4) or other actions and information that is
>> only specific to him, to whom the A-file belongs.
>
> *See* Motion at 20–21.  DHS, however, cites no controlling authority and no on-point
> persuasive authority indicating that information contained in an "A-file" is "categorically
> exempt" from disclosure or from a document-by-document segregability analysis, and no
> authority indicating that those four types of information are categorically exempt.

*Muchnick v. DHS,* No. 15-cv-2060 (CRB), 2016 WL 730291, at *2, *4 (N.D. Cal. Feb. 24,

2016).  Of course *Cabezas* is fatal here too.  *See* 2023 WL 6312349, at *2–3; *see also Ocasio*, 70

F.Supp.3d at 485.

---

[20]  The Panter Declaration notes a host of other information that "may" be in withheld records
(¶ 18), but again provides no connection between those categories of information and the
mechanism of harm from a failure to *categorically* withhold that information.  Moreover, it does
not address at all the fact that Plaintiffs have no issue with USCIS redacting and withholding
much of that information.

### 4.    The Balance of Interests Favors Disclosure.

Even setting aside the multitude of infirmities in the justification for Defendant's

*Glomars* and categorical withholdings, none can survive on the merits—the weighty public

interests present here outweigh the Duke of Sussex's privacy interests.[21]  Recall that the burden

here is on *Defendant* and that at the end of the day, FOIA's "strong presumption in favor of

disclosure," *Dep't of State v. Ray*, 502 U.S. 164, 173 (1991) serves as a "kicker" in terms of

resolving close issues in favor of disclosure.  *See, e.g.*, *Rojas*, 941 F.3d at 406.

Again, this case can be resolved simply by following the only case on all fours—

*Muchnick*.  Defendant again has no answer for *Muchnick*.  There, the Court minced no words in

rejecting DHS's balancing arguments, many of which are made here:

> *Hunt v. F.B.I.*, 972 F.2d 286 (9th. Cir. 1992), is not to the contrary.  There, the
> requester alleged that a female FBI agent used sexual favors to induce him to waive his
> right to counsel and plead guilty.  *Id.* at 288.  He wanted the FBI to hand over its
> investigation file.  *Id.* at 287.  The Ninth Circuit refused him, reasoning that the agent's
> privacy interests outweighed the public interest in disclosure.  *Id.* at 287–88.  The
> plaintiff sought only a "single file" with information "about one particular [FBI] agent,"
> which the court held would not "shed any light on whether all such FBI investigations are
> comprehensive or whether sexual misconduct by agents is common."  *Id.* at 288–89.
> Furthermore, the file detailed a "thorough investigation" into the allegations and

---

[21]  Recall again that USCIS only asserted Exemption 6 as to the withholding of the Duke of
Sussex's A-File.  Exemption 6 shields records from disclosure that include "personnel and
medical files and similar files the disclosure of which would constitute a *clearly unwarranted*
invasion of personal privacy."  5 U.S.C. § 552(b)(6) (emphasis added).  In assessing the validity
of Exemption 6 assertions, "a court must weigh 'the privacy interest in non-disclosure against the
public interest in the release of the records in order to determine whether, on balance, the
disclosure would work a clearly unwarranted invasion of personal privacy.'"  *Lepelletier v.
FDIC*, 164 F.3d 37, 46 (D.C. Cir. 1999) (quoting N*at'l Ass'n. of Retired Fed. Employees v.
Homer*, 879 F.2d 873, 874 (D.C. Cir. 1989).  "In addition to [FOIA's] general presumption of
disclosure, the 'clearly unwarranted invasion of personal privacy' language expressed 'a
carefully considered congressional policy favoring disclosure' which 'instructs the court to tilt
the balance in favor of disclosure.'"  *Ditlow v. Shultz*, 517 F.2d 166, 169 (D.C. Cir. 1975)
(internal citations omitted).  When assessing Exemption 6 assertions, "the presumption in favor
of disclosure is as strong as can be found anywhere in [FOIA]."  *Washington Post Co. v. HHS*,
690 F.2d 252, 261 (D.C. Cir. 1982).  Thus, the analysis here applies *a fortiorari* to USCIS and
any close questions should be resolved in favor of disclosure as to USCIS.

"contained credible evidence" that the misconduct had not occurred.  *Id.* at 289.  On the other side of the scale, the allegations were "lewd," "highly personal," and not widely known.  *Id.* at 288.

This is a different case. For a start, the privacy interests at stake here are lower than in *Hunt*.  The world already knows about the sexual abuse allegations facing Gibney, lewd as they are.  And although he has a privacy interest in DHS immigration decisions, the public has a strong interest in understanding how and why their government allowed a man with a far-worse-than-checkered past (and perhaps present) to stay here for more than two decades.  In other words, the allegations here are far better substantiated than those in *Hunt*—and with them the claim of possible government misfeasance.

*Muchnick*, 225 F.Supp.3d at 1077.  Accordingly, the *Muchnick* Court ordered DHS to "disclose substantive information contained in the A–File about Gibney's alleged crimes, decisions about immigration benefits he sought, and the dates any documents containing such information were created", but allowed DHS to "continue to withhold identifying information about third parties other than Gibney, as well as Gibney's past addresses, salary history, A-number, and the like." *Id.* at 1078.

Even if this Court does not simply follow *Muchnick*, the Duke of Sussex's privacy interests in this case are diminished in three separate ways.  Moreover, the public interest is extraordinarily strong due to a number of factors.

### i.   **Privacy Interests.**

1. Because the Duke of Sussex has already publicly revealed so much about his illegal drug use and entrance to, and residence in, the United States his privacy interests in those topics are attenuated.  *See, e.g.*, *Kimberlin v. DOJ*, 139 F.3d 944, 949 (D.C. Cir. 1998); *Nation Mag.*, 71 F.3d at 896; *DBW Partners*, 2019 WL 5549623, at *5.  So to the extensive information "largely publicly available" via third-party book or other publication.  *Samahon*, 40 F.Supp.3d at 516; *see also Muchnick*, 225 F.Supp.3d at 1076 (diminished privacy interest in information previously published in relevant third parties book); *Sheppard*, 2021 WL 4304217, at *11

34

("public reporting" linking "individuals to the underlying arson investigation" the subject of the withheld files "diminished" privacy interest).[22]  To gauge the extent to which the Duke of Sussex's prior disclosures have reduced his privacy interest consider:  This case could not be brought had the Duke of Sussex not disclosed what he did in *Spare*.   Put differently, the Duke of Sussex's extensive disclosures blasted out by his public relations machine to the world are the entire reasons we are here.

    **2.**    The Duke of Sussex's privacy interests are further attenuated by his status as the prototypical public figure and the fact that he is a high-ranking public official.

    **3.**    Finally, although DHS HQ and CBP have invoked Exemption 7(C) and any "law enforcement" action carries with it a substantial privacy interest, neither agency has made a claim that the Duke of Sussex's case involves a *criminal* investigation.  *Cf. Codrea*, 2022 WL 4182189, at *10 (fact that investigation is "criminal" heightens privacy interest).

        **ii.**    **Public Interests.**

    Turn to the public interests.  There are a number of factors that make it remarkably strong in this case.

    **1.**    That Plaintiffs carried their burden under *Favish* to show probable misconduct or negligence carries significant weight of its own accord.  It is the most compelling of interests in favor of disclosure.  *See, e.g.*, *Reporters Comm. for Freedom for the Press v. USCIS*, 567 F.Supp.3d 97, 126 (D.D.C. 2021) ("whether agency 'acted negligently or otherwise improperly in the performance of [its] duties' is a significant public interest under Exemption 7(C)" (quoting *Favish*, 541 U.S. at 173)) .

---

[22] Again, to reiterate, Plaintiffs do not challenge withholding unrelated information that admittedly would be further afield from the disclosures that attenuate the privacy interests at issue in this case.

**2.**     Because this is an extraordinarily high-profile case, the salience of the public

interests at play are significantly increased.  *See CREW III*, 746 F.3d at 1092–94 ("On the other

side of the scale sits a weighty public interest in shining a light on the FBI's investigation of

major political corruption and the DOJ's ultimate decision not to prosecute a prominent member

of the Congress for any involvement he may have had."); *Bast v. DOJ*, 665 F.2d 1251, 1255

(D.C. Cir (1981)  ("important public interest" in declination to prosecute in high-profile case);

*CREW v. DOJ*, 978 F.Supp.2d 1, 13 (D.D.C. 2013) ("*CREW II*"); ("the public profile of the

subject of the investigation all contribute to the public's interest in disclosure" in learning more

about a decision not to prosecute a former Senator for conduct in office); *CREW v. DOJ*, 846

F.Supp.2d 63, 73–74 (D.D.C. 2012) ("*CREW I*") (similar).[23]

**3.**     The extensive reporting of the precise questions asked by Plaintiff—whether there

was in fact misconduct or negligence and whether an examination of DHS's exercise of

discretion in this case will reveal it "pulled its punches" for a rich, famous, and powerful Royal

Duke—also adds weight to the public interest.[24]  *Roth*, 642 F.3d. at 1176 (deeming interest in

"potential innocence" of death row inmates substantial in part based on fact that "this interest has

manifested itself in several media, including newspaper articles, editorials, journalistic exposés,

---

[23] That many of these cases involve a high-ranking official is of relevance only in-so far as the
rank of the official ran to the *profile* of the case.  *See, e.g.*, *CREW II*, 978 F.Supp.2d at 13
(focusing not on fact that a former Senator was involved, but the "public profile").  And courts
have repeatedly emphasized that "relevant public interest is not to find out what DeLay himself
[*i.e.*, the target of the investigation] was 'up to' but rather how the FBI and the DOJ carried out
their respective statutory duties to investigate and prosecute criminal conduct."  *CREW III*, 746
F.3d at 1093.  Plaintiffs admit there may be a measure of how "weighty" the interest is with the
Duke of Sussex versus a prominent member of Congress, but that is to quibble over whether it is
impressive to bench press 350 pounds regularly versus 400 pounds—both are impressive.
[24] *See generally* App. C, Am Compl. ¶ 45 (discussing extensive media coverage of the Request);
3d Dewey Decl. Ex 7 (collecting media coverage of the June 6, 2023 preliminary injunction
hearing).

novels, and plays."); *CREW II*, 978 F.Supp.2d at 13 ("widespread media attention" "contribute[s] to the public interest in disclosure"); *Codrea*, 2022 WL 4182189 at *9.

4.      The fact of Congressional interest—and the on-going policy debate—also strengthen the weight of the asserted interest.[25]  *See, e.g.*, *CREW II*, 978 F.Supp.2d at 13 ("ongoing public policy discussion" "contribute[s] to the public's interest in disclosure").

5.      The fact that there does not appear to be another way to obtain the information— in other words the information sought goes directly to the point at issue—further strengthens the interest in disclosure.  *See, e.g.*, *Aguirre*, 551 F.Supp.2d at 55, 58; *cf. Bast*, 665 F.2d at 1255 ("While these are important public interests, we note that they have been served to a large extent by the substantial release of information already made in this case. Thus, it is the incremental advantage to the public of releasing the undisclosed portions of the twelve documents which must be weighed against the invasion of personal privacy."); *Reporters Comm.*, 567 F.Supp.3d at 126 (finding balance favored privacy where "[k]nowledge of the employees' names would not matter here.").

6.      There is no dispute that DHS has authority to take action against the Duke of Sussex itself.  *Cf. Codrea*, 2022 WL 4182189, at 11 (fact that agency could merely "refer" a matter investigated for action undercuts public interest).  Nor is there a claim that action is rarely taken in these types of cases.  *Cf. Codrea*, 2022 WL 4182189, at *11 (public interest lessened when prosecutions of crime investigate are "exceedingly rare").  The record is to the contrary. *See generally* App. B; 3d Dewey Decl. Ex. 7.

---

[25] *See generally* App. C and 3d. Dewey Decl. Exs. 3–5 (collecting Congressional action likely prompted by this case).

Simply put, the privacy side of the scale is diminished on three separate fronts.  The

public interest side hits on virtually every factor Courts have held strengthens the public interest.

And the kicker—as always—favors disclosure.  Disclosure is required.

### D.    Any Doubts Should be Resolved Via Production and In Camera Review.

Plaintiffs have shown disclosure is required in this case because the Duke of Sussex's

privacy interests are greatly reduced and are outweighed by significant public interests.  But if

this Court has any doubt regarding the resolution of Defendant's *Glomars* and categorical

withholdings, the appropriate procedure is to order an *in camera* review.

FOIA provides District Judges with wide ranging authority to "examine the contents of

such agency records *in camera* to determine whether such records or any part thereof shall be

withheld under any of the exemptions."  5 U.S.C. § 552(A)(4)(B).  As this Court has held, it "has

'broad discretion' to decide whether conducting *in camera* inspection would be helpful."  *ACLU*,

2022 WL 306360, at *2.  This Court has also held that discretion includes the authority to

conduct *in camera* review as an aid to decision out of an "abundance of caution."  *Nat'l Pub.*

*Radio v. FBI*, 486 F.Supp.3d 293, 305 (D.D.C. 2020), *on reconsideration*, 539 F.Supp.3d 1

(D.D.C 2021).

The application of Exemption 6 and 7(C) are a matter well suited for *in camera* review.

The content of the document is critical given the discretionary nature of the court's inquiry as

well as the case specific nature of balancing.  Moreover, judicial economy is often well served in

that the number of records is relatively small and review of those records is almost always

dispositive, mooting judicial resolution of the underlying complex legal and factual questions.

*See Burnett*, 2021 WL 1209142, *7 ("judicial economy" and "disputes" over the "content of

document" factors considered in granting *in camera* review).

Here, under the scenario where Plaintiffs are correct that something was amiss, *in camera* review will confirm 'that the alleged Government impropriety [actually] . . . occurred" (*Favish*, 541 U.S. at 174) and highlight the value of the records sought by the Request in demonstrating to the public how the government exercises its authority and (potentially) pulls its punches for the rich and famous.  Thus, if Plaintiffs are correct, the review will show Plaintiffs are almost certainly entitled to disclosure.

Conversely, if the records fail to shed light on those questions, or show that in fact the expected impropriety did not occur then the case immediately is at an end; there is no need to evaluate the sufficiency of Plaintiffs' asserted public interest or conduct the complex balancing inquiry.  Judgement may simply be entered for Defendant.

Cases adopting this precise approach—using the result of an *in camera* examination to inform or resolve close legal questions and complex analysis presented by assertions of Exemption 6 and 7(C)—are legion.  *See, e.g.*, *Duckelberger v. DOJ*, 906 F.2d 779, 781 (D.C. Cir. 1990) ("Having examined those documents *in camera*, we agree with the district judge's conclusion that there is nothing in them that would "support plaintiff's argument for concluding that disclosure would be in the public interest." (citation omitted)); *Bast*, 665 F.2d at 1255 (*in camera* review "persuades us that, as to all but one portion of one document, the privacy interest far outweighs the incremental benefit to the public"); *Phillips*, 385 F.Supp.2d at 306 ("since none of these documents refer or relate to any possible human rights violations by Garcia, or anyone else for that matter, they shed no light on the issue of whether INS considered such allegations in deciding to grant Garcia's request for asylum."); *Gosen v. USCIS*, 75 F.Supp.3d 279, 289–90 (D.D.C 2014) ("this Court need not delve into which of Plaintiff's suggested public interests, if any, may outweigh the privacy interest USCIS has identified because the documents themselves

simply do not shed any light on this matter—Exemption 6 and 7(C) have been used here to redact only names and some identifying information, and nothing that could possibly help to prove or disprove USCIS's alleged misconduct"); *Mezerhane de Schnapp v. USCIS*, 67 F.Supp.3d 95, 103–104 (2014) ("But in the end, the Court's *in camera* review gets USCIS off the hook, as it confirmed USCIS's (otherwise, mostly conclusory) representations about the minimal public interest in the withheld information, and disproved Mezerhane's assertions that disclosure would reveal agency misconduct.  Quite simply, the withheld information neither confirms nor refutes Mezerhane's allegations of misconduct."); *Samahon*, 40 F.Supp.3d at 510–512 (detailed description of records reviewed *in camera* that drove the court's decision).

Indeed, this Court has previously taken that approach.  *See ACLU*, 2022 WL 306360, at *11 (examining a sample of records *in camera* and holding "the Court also concludes that the ACLU has not set forth a countervailing public interest that would outweigh these important privacy interests.  What's more, the Court's in camera review of the material underlying Entries 35, 36, 45, 66, 77, 85, 105, 106, 126, and 129, which all involve withholdings pursuant to Exemption 6, supports these conclusions.").

Some courts have even gone further.  The D.C. Circuit has utilized a procedure where not only records, but government briefing was reviewed *in camera*.  *See Kimberlin*, 139 F.3d at 947.  And in *Samahon*, the court ordered an *in camera ex parte* hearing to decipher records that confirmed Government misconduct in fact occurred.  40 F.Supp.3d at 508.

Again, on this record, Defendant's *Glomars* and categorical withholdings fail.  But if the Court has any doubts, it should conduct an *in camera* review.

## CONCLUSION

Defendant's Motion for Summary Judgement should be denied.  Plaintiffs' Cross-Motion for Summary Judgement should be granted; Defendant's *Glomars* and categorical withholding rejected; and Defendant should be required to produce appropriately redacted records with a record-by-record *Vaughn* Index.

Dated: October 10, 2023                 Respectfully submitted,

/s/ Samuel Everett Dewey
SAMUEL EVERETT DEWEY
(No. 999979)
Chambers of Samuel Everett Dewey, LLC
Telephone:  (703) 261-4194
Email:  samueledewey@sedchambers.com

ERIC NEAL CORNETT
(No. 1660201)
Law Office of Eric Neal Cornett
Telephone:  (606) 275-0978
Email: neal@cornettlegal.com

DANIEL D. MAULER
(No. 977757)
The Heritage Foundation
Telephone:  (202) 617-6975
Email:  Dan.Mauler@heritage.org

ROMAN JANKOWSKI
(No. 975348)
The Heritage Foundation
Telephone:  (202) 489-2969
Email:  Roman.Jankowski@heritage.org

*Counsel for Plaintiffs*