**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| HERITAGE FOUNDATION & MIKE HOWELL | ) ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | Case No. 23-cv-1198 (CJN) |
| U.S. DEPARTMENT OF HOMELAND SECURITY | ) ) ) | |
| *Defendant*. | ) ) ) | |

**DECLARATION OF LEONARD D.M. SAUNDERS**

1.      My name is Leonard D.M. Saunders.  I am an immigration attorney with an expertise in the application of the drug related bar to admissibility, 8 U.S.C. § 1182(a)(2)(A)(i)(II) ("Section 1182(a)(2)(A)(i)(II)"), and relief from this bar via discretionary waiver, 8 U.S.C. § 1182(d)(3)(A) ("Section 1182(d)(3)(A)").  I have handled several hundred such cases, including those of celebrities.  I make this Declaration at the request of Plaintiffs' Counsel.  I have received no renumeration.

2.      In arriving at the opinions contained herein, I have reviewed relevant background material such as pleadings in this case and prior public statements made by HRH Prince Henry Charles Albert David George, the Duke of Sussex, Earl of Dumbarton, and Baron Kilkeel K.C.V.O. ("HRH" or "Duke of Sussex").

**BACKGROUND**

3.      I have been licensed in Washington State since 1998 and have practiced exclusively U.S. immigration law since 2003.  My law firm is located in Blaine, Washington,

which is near the Peace Arch Port of Entry, the third busiest border crossing on the northern border.

4.     Due to the proximity to U.S. border, my practice involves a large volume of waiver applications for individuals who are inadmissible to the United States.  On average I submit one U.S. waiver application per day.  Over the past 20 years I have submitted thousands of U.S. waiver applications for clients.

5.     I have testified as an expert witness in Ottawa, Canada in front of the Canadian Senate when the Government of Canada was contemplating legalizing cannabis and have appeared in major U.S. media outlets such as *The Washington Post*, the *LA Times*, *Rolling Stone Magazine*, *CBS News*, *Fox News*, and *Newsweek Magazine* to name a few.

## APPLICATION OF IMMIGRATION LAW TO THE DUKE OF SUSSEX.

6.     I have reviewed Defendant's Memorandum of Points And Authorities in Support of Defendant's Motion for Summary Judgement (ECF No. 23-1) ("Mem."); Declaration of Jarrod Painter (ECF No. 23-3) ("Painter Decl."); Declaration of Shari Suzuki (ECF No. 23-5) ("Suzuki Decl."); Declaration of Catrina M. Pavlik-Keenan (ECF No. 23-8) ("Pavlik-Keenan Decl.") in this matter and believe Defendant omits a number of relevant facts in their analysis of what is actually publicly known about the Duke of Sussex's immigration status.  For the purposes of my analysis, I assume that the Duke of Sussex has lawful status in this Country.

7.     The Duke of Sussex is one of the highest profile individuals in the world from politics to pop culture.  I have represented other celebrities in immigration proceedings, but without a doubt, the matters related to the Duke of Sussex's drug use and his immigration status are the highest profile immigration proceedings I have seen in my lifetime.  In my experience

representing celebrities, I believe the Duke of Sussex to be *sui generis* in terms of disclosing virtually every aspect of his private life for commercial gain.

8.      I do not believe any of the Defendant Department of Homeland Security's ("DHS") Declarants dispute that HRH *would* have been required to answer the question of whether he used drugs in writing prior to lawfully entering the United States. *Cf.* Painter Decl. ¶ 24 (admitting a standard form, DS-160 asks drug related questions).  That is the law.  One must answer that question when applying for admission into the United States.  If HRH were not asked about drug use prior to admission to this country, it would be an abdication of Defendant's legal duties.

9.      Start with that basic fact.  From it, we have a binary that drives all analysis in this Declaration.  The Duke of Sussex either told the truth or did not.

### *Scenario 1:  The Duke of Sussex told the Truth*.

10.     Assume the Duke of Sussex told the truth.  He is inadmissible under Section 1182(a)(2)(A)(i)(II) which provides:

> Except as provided in clause (ii), any alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of— . . .
>> **(II)** a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of Title 21), is inadmissible.

11.     The only way the Duke of Sussex could overcome that bar and lawfully be in the country in such a scenario is if he received a wavier under Section 1182(d)(3)(A) which provides:

> Except as provided in this subsection, an alien (i) who is applying for a nonimmigrant visa and is known or believed by the consular officer to be ineligible for such visa under subsection (a) (other than paragraphs (3)(A)(i)(I), (3)(A)(ii), (3)(A)(iii), (3)(C), and clauses (i) and (ii) of paragraph (3)(E) of such subsection), may, after approval by the

3

Attorney General of a recommendation by the Secretary of State or by the consular officer that the alien be admitted temporarily despite his inadmissibility, be granted such a visa and may be admitted into the United States temporarily as a nonimmigrant in the discretion of the Attorney General, or (ii) who is inadmissible under subsection (a) (other than paragraphs (3)(A)(i)(I), (3)(A)(ii), (3)(A)(iii), (3)(C), and clauses (i) and (ii) of paragraph (3)(E) of such subsection), but who is in possession of appropriate documents or is granted a waiver thereof and is seeking admission, may be admitted into the United States temporarily as a nonimmigrant in the discretion of the Attorney General. The Attorney General shall prescribe conditions, including exaction of such bonds as may be necessary, to control and regulate the admission and return of inadmissible aliens applying for temporary admission under this paragraph.

Put differently, we know HRH sought and was granted a Section 1182(d)(3)(A) waiver if he told the truth.[1]

12.     Accordingly, I do not understand the basis for the repeated statements by Defendant's Declarants that "simply identifying whether records regarding any requests for a waiver pursuant to Section 212(d)(3) of the Immigration and Nationality Act exist would confirm that the Duke of Sussex may have required a waiver before any travel to the United States" (Pavlik Decl. at ¶ 25) or that "to reveal whether such a waiver has been sought would reveal privacy protected information" Panter Decl. at ¶ 33; *see also* Suzuki Decl. ¶ 37. Again, the option is binary. Either the Duke of Sussex applied for and has such a waiver or he lied and in so doing rendered himself immediately deportable under Section 212(a)(6)(C)(i) of the Immigration and Nationality Act for Material Misrepresentation/Fraud.

### *Scenario 2: The Duke of Sussex Lied*

13.     If the Duke of Sussex lied about his drug use, in my professional experience and opinion he should either be denied entry to the United States on his next attempted entry and advised that he needs a waiver if he possesses a non-immigrant visa, or be placed in

---

[1] The only exception to that rule is entry under a category A visa which applies solely to diplomatic entry. I do not understand the Defendant to assert that HRH is an accredited diplomat.

removal/deportation proceedings if he was previously granted an immigrant visa (also known as a "green card").

## DHS's MISCONDUCT

14.     Defendant's treatment of the Duke of Sussex's immigration status raises substantial questions as to whether, at best, Defendant engaged in improper or negligent conduct by giving preferential treatment to HRH.[2] If the Duke of Sussex truthfully disclosed his now publicly admitted drug use at the time of his entry, it is my opinion that Defendant may well have acted improperly in granting a Section 1182(d)(3)(A) waiver. Conversely, if the Duke of Sussex lied at time of entry, it is my opinion that Defendant almost certainly acted improperly in failing to take immediate action against him in the aftermath of *Spare* and its attendant media rollout.

15.     Eitherway, it is my opinion that the current record "warrant[s] a belief by a reasonable person that the alleged Government impropriety might have occurred." *Nat. Archives & Records Admin. v. Favish*, 541 U.S. 157, 159 (2004).

### *Scenario 1: The Duke of Sussex Disclosed His Drug Use and DHS Likely Granted an Improper Section 1182(d)(3)(A) Waiver*

16.     There are no set written standards governing Section 1182(d)(3)(A) waivers. But based on my considerable experience, I believe that under the normally applied DHS standards, the Duke of Sussex would have faced considerable challenges in obtaining a Section 1182(d)(3)(A) waiver; if he received one at all, which would be a close question. Any waiver would likely require a lengthy processing time and a number of affirmative steps to examine his drug use.

---

[2] The basis for the preferential treatment does not affect my opinion.

17.     Start with the nature of the Duke of Sussex's drug use.  I have closely reviewed HRH's drug use discussed in paragraphs 23–43 of the Amended Complaint and in my experience the following facts would make HRH obtaining a Section 1182(d)(3)(A) waiver an extremely difficult and a lengthy process (if a waiver was issued at all).

18.     *First*.  The conduct in question is not incidental, fleeting, or occasional.  It is longstanding and frequent.  For long periods of time, it was part of HRH's daily routine.

19.     *Second*.  None of the use was pursuant to lawful medical guidance and the "therapeutic" use was unlawful.  Moreover, much of the use was not temporary and incidental to an emotional trauma or in response to a medical event.  It was deliberate and for recreation.

20.     *Third*.  Although HRH's drug use began as a minor, HRH's drug use was more egregious as an adult.  In my experience that pattern of conduct would not be discounted as a youthful indiscretion or experimentation.  The drug use was not youthful indiscretion; it was a deliberate and on-going adult choice.

21.     *Fourth*.  The conduct is not confined to marijuana use in small doses but reveals the use of a number of other scheduled drugs and admits to heavy drug use impeding basic functioning.

22.     *Fifth*.  The conduct was illegal in the country in which it occurred.

23.     *Sixth*.  In my experience  the conduct would be seen as aggravated because much of the chronic drug usage occurred in England while the Duke of Sussex was a senior working Royal and held Government Office.  *See* Regency Act, 1937, 1 Edw. 8 & 1 Geo. 6, c. 16 § 6(2). The chronic commission of such offense, while in office, in Windsor Castle grounds, and while protected by a government security detail would be seen as showing disrespect for the law.

24.     I have had countless clients who with far less drug use be deemed inadmissible to the United States. For example, Barrie Rough, mentioned on Page 14 of the Plaintiff's Amended Complaint, happens to be one of my clients. Mr. Rough, a citizen of Canada, was denied entry to the United States on July 9, 2019 after admitting to U.S. Customs and Border Protection Officers at the Sumas, Washington Port of Entry that he had recreationally used marijuana. Mr. Rough was deemed inadmissible to the U.S. and subsequently applied for and was granted a non-immigrant waiver.

25.     HRH's actual entry to the United States to take up residence is documented via selfie video of his family flying in via private jet on March 14, 2020, at around 6:00 a.m. *See Harry & Meghan*, Netflix, Episode 6. The Duke of Sussex writes in *Spare*—obviously prior to March 14, 2023: "In March 2020 the World Health Organization declared a global pandemic, and Canada began to discuss the possibility of closing its borders. But Meg had zero doubts. *They're definitely going to close those borders, so we need to figure out somewhere else to go . . . and get there*." *Spare* at 388. Apparently, the Duke of Sussex was able to enter the Country in a matter of weeks.

26.     Again, in my experience the process of obtaining a Section 1182(d)(3)(A) waiver is lengthy and complex, especially during and after the Covid-19 pandemic when many U.S. Embassies and Consulate were closed for most routine visa appointments or had lengthy delays of months to years for available appointments.

27.     Currently the wait time for a standard visitor visa appointment at the U.S Embassy in London, England is 110 calendar days while the U.S. Consulate in Vancouver, Canada is 721 days. This wait time does not include the processing time for waivers adjudicated by the Admissibility Review Office which currently is averaging 5 to 6 months.

7

**Scenario 2:  The Duke of Sussex Lied and DHS Failed to Take Appropriate Action.**

28.    After the publication of *Spare*—and attendant publicity—it would be impossible for DHS to ignore the fact that HRH answered "no" as to use of drugs, but admitted in writing to the drug related conduct in *Spare*.

29.    In my experience when it comes to DHS's attention that an applicant for admission blatantly lied in order to obtain that admission, that individual would either be denied entry the U.S. and advised that they need a non-immigrant waiver to enter the U.S. in the future or issued a Notice to Appear for Removal/Deportation is they previously had been granted an Immigrant Visa (also known as a "green card").

## PUBLIC INTEREST IN HOW THE DUKE OF SUSSEX'S DRUG RELATED ISSUES WERE PROCESSED

30.    I have been asked to evaluate whether disclosure of the Duke of Sussex's immigration information related to his drug use would inform "how [Defendant] . . . carried our their respective statutory duties" that is to say how Defendant "carries out substantive law enforcement policy", and whether the Defendant "pulled its punches" in cases involving the powerful and famous.  *CREW v. DOJ*, 746 F.3d 1082, 1093 (D.C. Cir. 2014).

31.    In a similar vein I have been asked as a practitioner and expert to evaluate the Defendant's submissions that learning how DHS handled an extraordinarily high-profile drug related immigration case would not provide substantial information to the public.  Mot. at 19. ("Further, Prince Harry is but one foreign national who obtained admission into the United States, and Courts have recognized that there is a minimal amount of information of interest to the public in a single incident or investigation"); Suzuki Decl. ¶ 21 ("one person's CBP entry and exit records, even a famous person's, is insufficient evidence to undermine public confidence in CBP and its application of equal justice under the law." (internal citation omitted)); Panter Decl.

¶ 19 ("In most cases, there is no discernable public interest in disclosure of such information because disclosure of private information in USCIS files regarding specific third-parties does not shed light on the activities of USCIS, and as a result disclosure would constitute a clearly unwarranted and unwarranted invasion of their personal privacy.").

32.     Again, analysis of this question requires a binary.  Either the Duke of Sussex disclosed his drug use or he lied about it.  In my opinion given the immense profile and public interest in the Duke of Sussex's immigration status *vis a vis* his drug use, there would be considerable public benefit in understanding how the Defendant conducted itself under either scenario.

### Scenario 1:  The Duke of Sussex Was Honest About His Drug Use

33.     Because the Section 1182(d)(3)(A) waiver process has no written standards and involves a large amount of prosecutorial discretion information about specific cases can tell a great deal to the public.  I have sought thousands of Section 1182(d)(3)(A) waivers on behalf of clients.  From that experience it is my opinion that any information that allow the public to better understand how Defendant exercises and cabins its discretion is invaluable in informing the public *how* Defendant goes about enforcing immigration law.

34.     Studies can only tell so much about DHS's exercise of prosecutorial discretion.  Case studies are also necessary.  That is particularly so when it comes to allowing the public to understand if high-profile aspects of the case, from the immigrant to the amount of press or political attention, affect DHS decision-making.  Indeed, understanding if the DHS "pulls its punches" in the case of the rich and powerful immigrants to the country realistically can only be judged by the public via a case study.

35.    In my opinion understanding how DHS adjudicated the Duke of Sussex's Section 1182(d)(3)(A) waiver would provide the public with not only the ability to know if the government "pull[ed] its punches" in a high-profile case, but would more importantly provide the public with valuable lessons about *how* DHS is exercising its discretion.  Such information would inform widely covered debates over immigration policy.

36.    For instance, after an admission to recent drug use, many applicants are required by the Admissibility Review Office to attend a medical exam with U.S. Department of State "Panel Physician."  The panel physician renders an opinion regarding any possible drug addiction based upon a physical assessment, psychiatric examination, drug screen and/or other testing, psychological/neuropsychological testing, etc. in order to verify the diagnosis, determine if there is any associated harmful behavior and/or associated psychoactive substance abuse or dependence.

### Scenario 2:  The Duke of Sussex Lied About Using Drugs

37.    Ordinarily, if DHS comes across information that someone blatantly lied to obtain admission to the country they will take prompt enforcement action that would quickly become public in a high profile case.  For instance, Ross Rebagliati, another client of my law firm, is an Olympian who briefly lost his Gold Medal at the 1998 Nagano Games after testing positive for cannabis.  Mr. Rebagliati denied consuming marijuana and his gold medal was reinstated. Subsequently, Mr. Rebagliati was barred from the U.S. over past marijuana use after admitting on "The Tonight Show with Jay Leno" to using marijuana.  Mr. Rebagliati was unable to travel to the United States until he applied for and received a non-immigrant waiver.

10

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

October 9, 2023                                                   _____
                                                                          Leonard D.M. Saunders