IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HERITAGE FOUNDATION & MIKE HOWELL<br><br>*Plaintiffs*,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY<br><br>*Defendant*. | )<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 23-cv-1198 (CJN)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF ANDREW ARTHUR

1. My name is Andrew Arthur. I am recognized as an expert in the area of immigration, generally, and immigration policy, specifically. To that end, I have testified before Congress on 11 different occasions on immigration issues, and I have been quoted on immigration issues by national media such as *The New York Time*s, *Wall Street Journal*, *Washington Post*, *Los Angeles Times*, and *National Review*.

2. I make this Declaration at the request of Plaintiffs' Counsel. I have received no renumeration for my work in this matter. This Declaration is based on my personal knowledge, my review of cited materials, and my decades of experience in immigration.

3. In arriving at the opinions contained herein, I have reviewed relevant background material such as pleadings in this case and prior public statements made by HRH Prince Henry Charles Albert David George, the Duke of Sussex, Earl of Dumbarton, and Baron Kilkeel K.C.V.O. ("HRH" or "Duke of Sussex")

1

**BACKGROUND**

4.     I serve as a Resident Fellow in Law and Policy at the Center for Immigration Studies ("CIS"), an independent, non-partisan, non-profit research organization dedicated to providing immigration policymakers, the academic community, news media, and concerned citizens with reliable information about immigration into the United States.

5.     Prior to joining CIS in 2017, I served as Staff Director for the U.S. House Committee on Oversight and Government Reform, National Security Subcommittee, from 2015–2016.

6.     I served as an Immigration Judge from 2006–2015. During that time, I held hearings and issued decisions in cases involving more than 15,000 aliens charged with removability from the United States; I issued orders in cases where aliens sought release on bond; and I adjudicated applications for immigration benefits.

7.     I served as counsel for the U.S. House of Representatives Judiciary Committee from 2001–2006 and as an Associate General Counsel for the U.S. Department of Justice from 1999–2001.  In both of these roles, my responsibilities focused on immigration.

8.     I earned a Juris Doctor from the George Washington University Law School in 1992 and a Bachelor of Arts in History from the University of Virginia in 1988.

**APPLICATION OF IMMIGRATION LAW TO THE DUKE OF SUSSEX.**

9.     I have reviewed Defendant's Memorandum of Points And Authorities in Support of Defendant's Motion for Summary Judgment (ECF No. 23-1) ("Mot."); Declaration of Jarrod Painter (ECF No. 23-3) ("Painter Decl."); Declaration of Shari Suzuki (ECF No. 23-5) ("Suzuki Decl."); Declaration of Catrina M. Pavlik-Keenan (ECF No. 23-8) ("Pavlik-Keenan Decl.") in this matter and believe Defendant's Declarants omit a number of relevant facts in their analysis

of what is actually publicly known about the Duke of Sussex's immigration status. For the purposes of my analysis, I assume that the Duke of Sussex is legally in this country; that is to say, he has been admitted and granted some lawful immigration status by the relevant authorities.

10. The Duke of Sussex is one of the highest profile individuals in the world from politics to pop culture. I believe the Duke of Sussex to be unique in terms of disclosing virtually every aspect of his private life for commercial gain.

11. As an initial matter, I do not understand that any of the Defendant Department of Homeland Security's ("DHS") Declarants have disputed that the Duke of Sussex would have been required to answer in writing the question of whether he used drugs prior to lawfully entering the United States. *Cf.* Painter Decl. ¶ 24 (admitting a standard form, DS-160 asks drug related questions). That is the law. One must answer that question when applying for admission into the United States. If the Duke of Sussex were not asked about drug use prior to admission to this country, it would be an extreme abuse and abdication of Defendant's legal duties.

12. That is a basic fact under the Immigration and Nationality Act ("INA") and the regulations and policies implementing the INA. From that basic fact, there is a binary that drives all analysis in this Declaration. In short, the Duke of Sussex either told the truth or did not.

*Scenario 1: The Duke of Sussex told the Truth.*

13. Assuming the Duke of Sussex told the truth, he would be inadmissible under section 212(a)(2)(A)(i)(II) of the INA, 8 U.S.C. § 1182(a)(2)(A)(i)(II), which provides:

> Except as provided in clause (ii), any alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of— . . .
> > **(II)** a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of Title 21), is inadmissible.

3

14.     The only way the Duke of Sussex could overcome that bar and lawfully be in the country in such a scenario is if he received a wavier under section 212(d)(3)(A) of the INA, 8 U.S.C. § 1182(d)(3)(A), which provides:

> Except as provided in this subsection, an alien (i) who is applying for a nonimmigrant visa and is known or believed by the consular officer to be ineligible for such visa under subsection (a) (other than paragraphs (3)(A)(i)(I), (3)(A)(ii), (3)(A)(iii), (3)(C), and clauses (i) and (ii) of paragraph (3)(E) of such subsection), may, after approval by the Attorney General of a recommendation by the Secretary of State or by the consular officer that the alien be admitted temporarily despite his inadmissibility, be granted such a visa and may be admitted into the United States temporarily as a nonimmigrant in the discretion of the Attorney General, or (ii) who is inadmissible under subsection (a) (other than paragraphs (3)(A)(i)(I), (3)(A)(ii), (3)(A)(iii), (3)(C), and clauses (i) and (ii) of paragraph (3)(E) of such subsection), but who is in possession of appropriate documents or is granted a waiver thereof and is seeking admission, may be admitted into the United States temporarily as a nonimmigrant in the discretion of the Attorney General.  The Attorney General shall prescribe conditions, including exaction of such bonds as may be necessary, to control and regulate the admission and return of inadmissible aliens applying for temporary admission under this paragraph.

Put differently, we know the Duke of Sussex sought and was granted a waiver under section 212(d)(3)(A) of the INA, 8 U.S.C. § 1182(d)(3)(A) if he told the truth.[1]

15.     In light of the foregoing, I do not understand the basis for the repeated statements by Defendant's Declarants that, "simply identifying whether records regarding any requests for a waiver pursuant to section 212(d)(3) of the INA exist would confirm that the Duke of Sussex may have required a waiver before any travel to the United States" (Pavlik Decl. at ¶ 25), or that

---

[1] The only exception to that rule is entry under a nonimmigrant category A visa, which applies solely to diplomatic entry.  I do not understand the Defendant to assert that HRH is an accredited diplomat and to grant a Category A visa in the absence of such accreditation and official purpose is contrary to law and in my experience would be a manifest abuse of power.  *See* section 101(a)(15)(A)(i) of the INA, 8 U.S.C. § 1101(a)(15)(A)(i) ("The term 'immigrant' means every alien except an alien who is within one of the following classes of nonimmigrant aliens- . . . an ambassador, public minister, or career diplomatic or consular officer who has been accredited by a foreign government, recognized de jure by the United States and who is accepted by the President or by the Secretary of State, and the members of the alien's immediate family"); Ex. 1 (State Department Website on Category A visas).

4

"to reveal whether such a waiver has been sought would reveal privacy protected information" (Panter Decl. at ¶ 33; *see also* Suzuki Decl. ¶ 37). Again, the option is binary. Either the Duke of Sussex applied for and received such a waiver to inadmissibility, or he lied, and in so doing both committed a felony under 18 U.S.C. § 1546 ("Fraud and misuse of visas, permits, and other documents") and rendered himself immediately deportable under section 237(a)(1)(A) of the INA, 8 U.S.C. § 1227(a)(1)(A), as explained below.

### *Scenario 2: The Duke of Sussex Lied*

16. If the Duke of Sussex lied about his drug use, he would have been inadmissible at the time of entry under section 212(a)(6)(C)(i) of the INA, 8 U.S.C. § 1182(a)(6)(C)(i), in addition to section 212(d)(3)(A) of the INA, 8 U.S.C. § 1182(d)(3)(A), as explained above. The former provision states: "In general. Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit provided under this chapter is inadmissible."

17. That lie would have been material for purposes of section 212(a)(6)(C)(i) of the INA, 8 U.S.C. § 1182(a)(6)(C)(i) because the Duke of Sussex would have been inadmissible based on the true facts and/or the misrepresentation cut off a line of inquiry that is relevant to his eligibility for admission and that might have resulted in proper determination that he be denied admission. *See Matter of S- and B-C-*, 9 I&N Dec. 436, 448-49 (BIA 1960; AG 1961); *see also* 9 FAM 302.9-4(B)(5) ("Interpretation of the Term Material Fact")

18. Had the Duke of Sussex been admitted to the United States by lying about his drug use, he would be deportable under section 237(a)(1)(A) of the INA, 8 U.S.C. § 1227(a)(1)(A), which states: "Inadmissible aliens. Any alien who at the time of entry or

adjustment of status was within one or more of the classes of aliens inadmissible by the law existing at such time is deportable." Again, not only would the Duke of Sussex have been inadmissible under section 212(d)(3)(A) of the INA, 8 U.S.C. § 1182(d)(3)(A) because of his drug use, but he would also would have been inadmissible under section 212(a)(6)(C)(i) of the INA, 8 U.S.C. § 1182(a)(6)(C)(i) for his misrepresentations about his drug use. Therefore, he would be deportable under section 237(a)(1)(A) of the INA, 8 U.S.C. § 1227(a)(1)(A) because he was inadmissible at the time of his entry.

## DHS's MISCONDUCT

19.     In my opinion, Defendant's treatment of the Duke of Sussex's immigration status raises substantial questions as to whether, at best, Defendant engaged in improper or negligent conduct by giving preferential treatment to him.[2] If the Duke of Sussex truthfully disclosed his now publicly admitted drug use at the time of his entry, it is my opinion that Defendant may well have acted improperly in granting a waiver under section 212(d)(3)(A) of the INA, 8 U.S.C. § 1182(d)(3)(A). If the Duke of Sussex lied at time of entry, it is my opinion that Defendant almost certainly acted improperly in failing to take immediate action against him in the aftermath of *Spare* and its attendant media rollout.

20.     Under either alternative, it is my opinion that the current record "warrant[s] a belief by a reasonable person that the alleged Government impropriety might have occurred." *Nat. Archives & Records Admin. v. Favish*, 541 U.S. 157, 159 (2004).

---

[2] The basis for the preferential treatment does not affect my opinion.

***Scenario 1:  The Duke of Sussex Disclosed His Drug Use and DHS Likely Granted an Improper Section 1182(d)(3)(A) Waiver***

21.     There are no set written standards governing waivers under section 212(d)(3)(A) of the INA, 8 U.S.C. § 1182(d)(3)(A).  But based on my considerable experience, I believe that under the normally applied DHS standards, the Duke of Sussex would have faced considerable challenges in obtaining a waiver under section 212(d)(3)(A) of the INA, 8 U.S.C. § 1182(d)(3)(A), if he received one at all, which would be a close question.  Any waiver would likely require a lengthy processing time and a number of affirmative steps to examine his drug use.

22.     Start with the nature of the Duke of Sussex's drug use.  I have closely reviewed the Duke of Sussex's drug use discussed in paragraphs 23–43 of the Amended Complaint and in my experience, the following facts would make the adjudication of the Duke of Sussex's waiver under section 212(d)(3)(A) of the INA, 8 U.S.C. § 1182(d)(3)(A) an extremely difficult and lengthy process (if a waiver was issued at all).

23.     *First*.  The conduct in question is not incidental, fleeting, or occasional.  It is longstanding and frequent.  For long periods of time, it was part of the Duke of Sussex's almost daily routine.

24.     *Second*.  None of the use was pursuant to lawful medical guidance and the use attributed to "therapeutic" purposes was unlawful.  Moreover, much of the use was not temporary and incidental to an emotional trauma or in response to a medical event.  It was deliberate and for recreational purposes.

25.     *Third*.  Although the Duke of Sussex's drug use began as a minor, his drug use continued and was at its most chronic well into the Duke of Sussex's adult life.  The drug use was not youthful indiscretion; it was a deliberate and on-going adult choice.

26.     *Fourth*.  The conduct is not confined to marijuana use in small doses but included the use of a number of other scheduled drugs, and he has admitted to heavy drug use impeding basic functioning.

27.     *Fifth*.  The conduct was illegal in the country in which it occurred; this was not the case of legal consumption in a foreign country.

28.     *Sixth*.  The conduct reflects contempt for law and order.  Much of the adult chronic drug usage occurred in England while the Duke of Sussex was a senior working Royal and held Government Office (which he still holds).  *See* Regency Act, 1937, 1 Edw. 8 & 1 Geo. 6, c. 6(2).  The chronic commission of such offense while in office, on, for example, Windsor Castle grounds, and while protected by a government security detail, would be seen as showing (and breeding) contempt for the law.

29.     Turn to the apparent ease of the Duke of Sussex's entry.  The Duke of Sussex's actual entry to the United States to take up residence is documented via "selfie" video of his family flying in via private jet on March 14, 2020, at around 6:00 a.m.  *See Harry & Meghan*, Netflix, Episode 6.  The Duke of Sussex writes in *Spare*—obviously prior to March 14, 2023: "In March 2020 the World Health Organization declared a global pandemic, and Canada began to discuss the possibility of closing its borders.  But Meg had zero doubts.  *They're definitely going to close those borders, so we need to figure out somewhere else to go . . . and get there.*" *Spare* at 388.  In other words, the Duke of Sussex was able to enter the country in a matter of weeks.

30.     Again, in my experience, the process of obtaining a waiver under section 212(d)(3)(A) of the INA, 8 U.S.C. § 1182(d)(3)(A) is lengthy and complex, especially when taking into account the extended period of the Duke of Sussex's drug use and the fact that the

8

only reason he desired to come to the United States when he did was a concern that the border would be closed in response to the pandemic, particularly given that there appears to have been no impediment to the Duke of Sussex remaining in Canada or returning to the United Kingdom. *Cf. Matter of Hranka*, 16 I&N Dec. 491, 492 (BIA 1978) (prior construction of section 212(d)(3) of the INA, 8 U.S.C. § 1182(d)(3); "In deciding whether or not to grant an application under section 212(d)(3)(B), there are essentially three factors which we weigh together.  The first is the risk of harm to society if the applicant is admitted.  The second is the seriousness of the applicant's prior immigration law, or criminal law, violations, if any.  The third factor is the nature of the applicant's reasons for wishing to enter the United States.").

31. I also note that, even if the Duke of Sussex told the truth on his initial application, there is a question of failure to act.  The Duke of Sussex admitted in *Spare* to habitual recreational drug use starting March 2020 while residing in the United States.  Plainly, when a waiver under section 212(d)(3)(A) of the INA, 8 U.S.C. § 1182(d)(3)(A) is granted, it is with the implicit understanding that the conduct waived not continue which goes to the first factor in *Matter of Hranka*, "the risk of harm to society if the applicant is admitted."  In criminalizing the possession and use of drugs, Congress has determined that the possession and use of those drugs poses some level of harm to society.

### Scenario 2:  The Duke of Sussex Lied and DHS Failed to Take Appropriate Action.

32. After the publication of *Spare*—and attendant publicity—it would be impossible for DHS to ignore the fact that HRH answered "no" to use of drugs but admitted in writing to the drug-related conduct in *Spare*.

33. In my experience, when it comes to the attention of DHS that an applicant for admission blatantly lied in order to obtain that admission, some immigration enforcement action

9

ensues, if not the placing of the applicant into removal proceedings on the grounds set forth above (the proper course of action absent truly extenuating circumstances highly improbable to be present here), then at least an investigation of that individual's removability.[3]  There is nothing to suggest that occurred here, and given the attention paid to the Duke of Sussex in the media, any such enforcement action would almost definitely have been publicly revealed.

### PUBLIC INTEREST IN HOW THE DUKE OF SUSSEX'S DRUG RELATED ISSUES WERE PROCESSED

34.     I have also been asked to evaluate whether disclosure of the Duke of Sussex's immigration information related to his drug use would inform "how [Defendant] . . . carried out their respective statutory duties"; that is to say how Defendant "carries out substantive law enforcement policy" and whether the Defendant "pulled its punches" in cases involving the powerful and famous.  *CREW v. DOJ*, 746 F.3d 1082, 1093 (D.C. Cir. 2014).

35.     In a similar vein, I have been asked as an expert to evaluate the Defendant's submissions that learning how DHS handled an extraordinarily high-profile drug related immigration case would not provide substantial information to the public.  Mot. at 19 ("Further, Prince Harry is but one foreign national who obtained admission into the United States, and Courts have recognized that there is a minimal amount of information of interest to the public in a single incident or investigation"); Suzuki Decl. ¶ 21 ("one person's CBP entry and exit records, even a famous person's, is insufficient evidence to undermine public confidence in CBP and its application of equal justice under the law." (internal citation omitted); Panter Decl. ¶ 19 ("In most cases, there is no discernable public interest in disclosure of such information because

---

[3]  This is not a case where removal would cause hardship.  The Duke of Sussex and his family are welcome in the United Kingdom and the Commonwealth.  There is no variable threat to the Duke of Sussex or his family in those countries.  The Duke of Sussex is also extraordinarily wealthy.

disclosure of private information in USCIS files regarding specific third-parties does not shed light on the activities of USCIS, and as a result disclosure would constitute a clearly unwarranted and unwarranted invasion of their personal privacy.").

36. Again, analysis of this question requires a binary. Either the Duke of Sussex disclosed his drug use, or he lied about it. In my opinion given, the immense profile and public interest in the Duke of Sussex's immigration status *vis a vis* his drug use, there would be considerable public benefit in understanding how the Defendant conducted itself under either scenario.

### *Scenario 1: The Duke of Sussex Was Honest About His Drug Use*

37. Because the waiver process under section 212(d)(3)(A) of the INA, 8 U.S.C. § 1182(d)(3)(A) has no written standards and involves a significant amount of prosecutorial discretion, information about specific cases can reveal a great deal to the public. Based on my experience, it is my opinion that any information that enables the public to better understand how Defendant exercises and cabins its discretion is invaluable in informing the public *how* Defendant goes about enforcing immigration law. Simply put, Americans generally and our elected representatives in particular should know whether Defendant utilizes its discretion impartially regardless of the wealth or poverty, or fame, notoriety, or obscurity of the individual involved. "Equal justice under law" is a cornerstone of our society and the fundamental tenet of our legal system, which is why those words appear atop the entrance to our nation's highest court.

38. Purely theoretical studies can only tell so much about the exercise of that type of prosecutorial discretion; individual case studies are also needed and are often the most informative of studies. Case studies are a common academic approach; their value is recognized

in a number of disciplines. That is particularly the case when it comes to enabling the public to understand if high-profile aspects of a case—from the status of the immigrant in question to the amount of press or political attention—affect DHS decision-making. Indeed, understanding if DHS "pulls its punches" in the case of rich and powerful immigrants to the country realistically can only be judged by the public via a case study.

39. In my opinion, understanding how DHS adjudicated the Duke of Sussex's waiver (if it did so at all) under section 212(d)(3)(A) of the INA, 8 U.S.C. § 1182(D)(3)(A) would provide the public with not only the ability to know if the government "pull[ed] its punches" in a high-profile case, but would more importantly provide the public with valuable lessons about *how* DHS is exercising its discretion. Such information could certainly inform the on-going debates of the Duke of Sussex that are widely covered in the press. The information would also inform widely covered debates over immigration policy.

40. This case raises many critical questions. Was the Duke of Sussex expected to undergo a physical or psychological examination before a waiver was granted? Was he required to undergo drug testing—a common requirement that many blue-collar workers in the United States must submit to before they are allowed to commence employment here—before he was granted a waiver? At what level was the decision to grant a waiver made, and to what degree did that process differ from the case of any other ordinary foreign national seeking admission to the United States?

### *Scenario 2: The Duke of Sussex Lied About Using Drugs*

41. In a normal case, if DHS comes across information that someone blatantly lied to obtain admission to the country, they will take prompt enforcement action that in this instance would have quickly become public. DHS reports that there were 30.6 million nonimmigrant

admissions in the fourth quarter of FY 2022 alone[4], an average of more than 332,600 per day. Given that volume, and the brief period of time CBP officers at the ports of entry have to conduct each inspection, those officers must depend on the veracity of each individual applicant. For that reason, fraud and misrepresentation in the admission process often does more serious harm to our port inspections system than the subject of the fraud or misrepresentation itself, because if CBP officers were required to examine the bona fides of each individual entrant, that inspections system would creep to a halt, and with it the international commerce on which much of our economy relies. Understanding how DHS exercises its enforcement discretion in high-profile cases would inform the public debate and ensure the public that the laws are being applied fairly.

I declare under the penalty of perjury that the foregoing is true and correct.

October 9, 2023

Andrew Arthur

---

[4] Legal Immigration and Adjustment of Status Report Fiscal Year 2022, Quarter 4, *U.S. Dep't of Homeland Security* (updated Apr. 4, 2023). Source : https://www.dhs.gov/immigration-statistics/special-reports/legal-immigration#:~:text=in%20this%20report.-,Recent%20Trends,increase%20from%20FY%202021%20Q4.