### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

HERITAGE FOUNDATION,et al                    Civil Action
                                             No. 1:23-1198
                    Plaintiff,

        vs.

U.S. DEPARTMENT OF HOMELAND                  February 23, 2024
SECURITY,                                    2:32 p.m.

                    Defendant.               Washington, DC
_____

                TRANSCRIPT OF MOTION HEARING
        **BEFORE THE HONORABLE CARL J. NICHOLS**
               UNITED STATES DISTRICT JUDGE

APPEARANCES:

**For Plaintiff:**         **Eric Neal Cornett**
                           LAW OFFICE OF ERIC NEAL CORNETT
                           70 I Street S.E., 525
                           Washington, DC 20003
                           606-275-0978

                           **Samuel Dewey**
                           **Daniel Mauler**
                           **Nile Gaudiner**
                           CHAMBERS OF SAMUEL EVERETT DEWEY
                           2200 12th Court North, Apt. 609
                           Arlington, VA 22201
                           703-261-4194

**For Defendant:**         **John Bardo**
                           **Peter Pfaffenroth**
                           DOJ-USAO
                           601 D Street NW
                           Washington, DC 20530
                           202-870-6770

**Reported By:**           **LORRAINE T. HERMAN, RPR, CRC**
                           Official Court Reporter
                           U.S. District & Bankruptcy Cts.
                           333 Constitution Avenue NW
                           Washington, D.C. 20001
                           lorraine_herman@dcd.uscourts.gov

*** Proceedings recorded by stenotype shorthand.
*** Transcript produced by computer-aided transcription.

1       <u>**P R O C E E D I N G S**</u>

2    **DEPUTY CLERK:** Good afternoon, Your Honor.

3    This is civil case year 2023-11998, *Heritage*

4 *Foundation, et al versus U.S. Department of Homeland*

5 *Security.*

6    Counsel, please come forward and introduce

7 yourselves for the record, beginning with the plaintiffs.

8    **MR. DEWEY:** Good afternoon, Your Honor.  Sam Dewey

9 for the plaintiffs.

10    **THE COURT:** Mr. Dewey.

11    **MR. DEWEY:** With me are Dan Mauler, also counsel,

12 Neal Cornett and Dr. Nile Gaudiner from the Heritage

13 Foundation, as the client rep.

14    **THE COURT:** Good afternoon, everyone.

15    **MR. BARDO:** Good afternoon, Your Honor.  John

16 Bardo on behalf of the Department of Homeland Security.  I'm

17 joined at counsel table by my deputy, civil division chief,

18 Peter Pfaffenroth.

19    **THE COURT:** Good afternoon as well.

20    We are here principally on the parties'

21 cross-motions for summary judgment.  I'm going to treat this

22 as a typical oral argument.  I'm going to start with the

23 government.

24    I just want to say a couple things.  Really, just

25 one thing at the beginning, which is I am not privy to any

1    of Prince Harry's immigration information.  I haven't asked

2    for it to be submitted in camera.  I haven't asked for any

3    explanation of it to be submitted in camera.  So everyone

4    should take every question I ask as a hypothetical, based on

5    the arguments that have been presented to me, many of which

6    assume a set of facts.

7            And I'm going to be exploring those to some

8    extent.  But I just don't know the answers to many of the

9    questions I'll be asking, because I have not ordered, as I

10   said, the disclosure of the information, even to me, or the

11   declarations to me.

12           And part of the reason I did that, in addition to

13   not knowing whether it's appropriate to do so, is I wanted

14   to be able to have a hearing where I could ask hypothetical

15   questions without risking disclosing the very information

16   that the government says it is unable to disclose.

17           So no one should read anything into my questions

18   to suggest that I know the answers to what happened with

19   Prince Harry's immigration information.

20           So with that, why don't we begin with the

21   government.  And we have cross-motions.  I don't think we

22   need to argue the motions separately.  They are obviously

23   targeting at the same set of issues.

24           What I would really like to hear from you,

25   Mr. Bardo, is the government's main arguments.  I'll have a

1      series of questions.  I'll then go to Plaintiff's counsel

2      for their argument.  Perhaps a short rebuttal from the

3      government and then short surrebuttal, as warranted, from

4      Plaintiff's counsel.  Okay?

5                  **MR. BARDO:**  That's fine, Your Honor.

6                  **THE COURT:**  Go ahead.

7                  **MR. BARDO:**  Yes.

8            Your Honor, the government, in response to the

9      plaintiff's broad request for immigration information

10     regarding Prince Harry that's stored within various

11     components of the Department of Homeland Security, has

12     issued a partial categorical withholding, as well as a

13     partial *Glomar* response.  These are all based on Exemption 6

14     and Exemption 7(C).  Those are the personal privacy

15     exemptions.  Exemption 7(C) being the law enforcement one.

16           The reason for the categorical withholding and the

17     partial *Glomar* is none of the information that we have can

18     be released without acknowledging what Prince Harry's

19     immigration status is or tipping our hand as to what it is.

20     That's the type of information that's consistently been held

21     by courts to be the type of information that can be withheld

22     under the personal privacy exemption.  And we have an

23     obligation to withhold that information.

24                 **THE COURT:**  Is Plaintiff right -- and it feels

25     very uncomfortable to me to refer to him as Prince Harry,

1    because that sounds very informal.  People wouldn't call me

2    Judge Carl.  But I'm not sure there's a really more formal

3    last name that he goes by.  I could call him the Duke.

4            **MR. BARDO:**  I can call him the Duke of Sussex.

5            **THE COURT:**  Why don't we call him the Duke of

6    Sussex.  That feels less inappropriately informal to me.

7            **MR. BARDO:**  All right.

8            **THE COURT:**  Is Heritage right that for the Duke of

9    Sussex to enter the United States, he would have had to

10   answer the question, at some point, whether he had used

11   illegal drugs?

12           **MR. BARDO:**  Not necessarily, Your Honor.

13           There are several ways in which he could have been

14   admitted into the United States lawfully.  That could be he

15   could have had a waiver.  He could be here on a Category A

16   visa or this could --

17           **THE COURT:**  Remind me.  I know you say that.  A

18   Category A visa is?

19           **MR. BARDO:**  That's a diplomatic visa, Your Honor.

20           This could also --

21           **THE COURT:**  That's not really plausible at this

22   point, is it?

23           **MR. BARDO:**  It's possible.

24           **THE COURT:**  I asked whether it was plausible.

25           **MR. BARDO:**  Yes, we would argue that it is

1    plausible, Your Honor.

2            **THE COURT:**  You think it's plausible that the Duke

3    is -- notwithstanding all of his issues documented in his

4    book -- is here as a diplomat for the UK?

5            **MR. BARDO:**  Your Honor, I haven't studied the

6    standards, exactly, what's required to be -- to be a

7    recipient of a diplomatic visa.  But we -- it is certainly

8    plausible.

9            **THE COURT:**  Okay.

10           You say he might have sought a waiver.  I

11   understand that.  If he sought a waiver, he would have had

12   to tell the government why he was seeking the waiver.  And

13   would that have disclosed to the government -- again, this

14   is all "if."

15           If he sought a waiver, he would have had to say

16   why he was seeking a waiver.  And would that have not either

17   disclosed the answer to the question I asked you, whether he

18   would have to answer, or can you ask for a waiver without

19   disclosing the reason for the waiver?

20           **MR. BARDO:**  My understanding, Your Honor, is he

21   would have had to answer that question in that circumstance.

22           **THE COURT:**  Okay.  So at some point, at least, the

23   Duke, to enter the U.S., either had to answer the question

24   whether he had engaged in drug use or would have had to have

25   a Category A diplomatic visa or would have had to seek a

1 waiver of the kind articulated in the parties' briefs, but

2 that itself would have disclosed past drug use.  Yes?

3    **MR. BARDO:**  Yes, I believe that's correct,

4 Your Honor.

5    **THE COURT:**  Okay.  Are there any other ways he

6 could have entered the United States?

7    **MR. BARDO:**  I cannot think of any off the top of

8 my head, but there could be others.

9    **THE COURT:**  Well, you're here representing the

10 United States.  I need to understand your understanding of

11 the INA and whether there are other ways that the Duke could

12 have entered the United States, at a minimum without

13 answering that question, but --

14    **MR. BARDO:**  Those are the only ways that I'm aware

15 of, Your Honor.

16    **THE COURT:**  Okay.

17    So assuming that we're in just the regular entry

18 world, where he's an entrant and he's asked the question

19 about past drug use.  If he answered "yes," what, in the

20 government's view, happens next?

21    **MR. BARDO:**  A consular officer, as we explained in

22 our brief, would have to seek an admission from him, and

23 that's a formal process that's layed out in the Foreign

24 Affairs Manual that requires a series of steps.

25    I mean, that gets into State Department

1    information, which is not at issue in this case.  But, yeah,

2    that's the process he would have to go through.  It's

3    not -- he couldn't appear at an interview with a consular

4    officer and the counselor officer says to him, I understand

5    you disclosed in your book you used drugs.  You can't come

6    here unless you get a waiver.  There is a formal process of

7    seeking an admission, according to the Foreign Affairs

8    Manual.

9         **THE COURT:**  Right.  And that applies if he

10   answered "yes" to that question.

11        **MR. BARDO:**  That's correct, Your Honor.

12        **THE COURT:**  Okay.

13        What if he had answered "no"?  Then whoever is

14   looking at his entrance materials wouldn't necessarily have

15   known anything about past drug use and might have admitted

16   him.  Yes?

17        **MR. BARDO:**  That's possible, Your Honor, yes.

18        **THE COURT:**  And in those circumstances -- again,

19   assuming this is hypothetically what's going on or what

20   happened, is Plaintiff right to suggest that the government

21   has or should have here some duty to investigate whether

22   that answer was correct, in light of the Duke's book?

23        **MR. BARDO:**  I'm not --

24        **THE COURT:**  I'm assuming, hypothetically, the

25   Duke, to enter the United States, answers "no" to the

1      question -- I'm not saying to enter.

2                In connection with his entry to the United States,

3      the Duke answers the question "no" to past drug use.  He

4      enters.  He's in the United States.  He's living here,

5      according to his book.  The book is then published and it

6      discloses, from his perspective at least, past drug use.  In

7      those circumstances, what, if anything, from the

8      government's perspective should happen next?

9           **MR. BARDO:**  Well, the book isn't sworn testimony

10     or proof that he used drugs.  It's his recollection of

11     events in his life that are presented in a way to sell

12     books.  Just by saying something in a book doesn't make it

13     true, and they can't necessarily go off a book.

14          **THE COURT:**  Right.  So maybe the government

15     couldn't conclude that -- again, in this hypothetical -- the

16     answer was untrue.  But would the government normally, when

17     presented with some evidence that an answer on an entry form

18     was incorrect, seek to determine whether there had been an

19     untrue statement made at entry?

20          **MR. BARDO:**  Your Honor, I'm not necessarily deeply

21     familiar with that -- those kinds of procedures that the

22     State Department uses.  But I would imagine so, if they had

23     some information that someone had made a false statement on

24     an official form; that there would be an investigation.

25          **THE COURT:**  I know you said there are possible

1    ways he could have entered.  Is it absolutely clear that the

2    Duke is not a U.S. citizen?

3              **MR. BARDO:**  He has said he's not a U.S. citizen,

4    Your Honor.

5              **THE COURT:**  Okay.  But that's as clear as his

6    other statements in the book.  I mean, it's not a sworn

7    admission --

8              **MR. BARDO:**  That's correct.  Yes.  And we do have

9    his -- we've admitted -- although we're not disclosing it,

10   we've admitted that we have his information in various

11   immigration files.  If he were a U.S. citizen, his

12   information wouldn't be in those files.

13             **THE COURT:**  Well, it depends when he became

14   naturalized.

15             **MR. BARDO:**  That's true.

16             **THE COURT:**  Okay.  So to just catalog the options,

17   you have at entry -- and I don't really think there's any

18   dispute that the Duke entered the United States at least in

19   March of 2020.  And then bought a house sometime thereafter

20   and is now making California his residence.

21             When the Duke entered in March 2020, if he

22   answered "yes" on that form that he had to fill out to past

23   drug use, that would have required something of the consular

24   officer or someone else reviewing that form, and he would

25   not have been permitted to enter, at least, automatically

1    right then.  Fair?

2         **MR. BARDO:**  That's true, Your Honor, unless he has

3    a diplomatic visa.

4         **THE COURT:**  Right.  Okay.  Let's put that to the

5    side for a second.

6         That's true unless -- or, in addition, he could

7    seek a waiver.  Right?

8         **MR. BARDO:**  That's right.

9         **THE COURT:**  As a practical matter, how do those

10   two things relate chronologically?  Can one seek a waiver

11   preemptively?

12        **MR. BARDO:**  My reading of the statute,

13   Your Honor -- and this is based on the text of the

14   statute -- is that a waiver is an option for someone who is

15   otherwise deemed inadmissible.  So my understanding, just

16   based on the text of the statute, is you have to first go

17   through the process of getting in through the normal

18   channel, and if you are denied at that point, then you can

19   petition, the statute says, the Secretary of State or the

20   Attorney General for a waiver.

21        **THE COURT:**  I suppose that could have happened

22   before, though.  Right?  I mean, we're assuming that the

23   relevant entry is March 2020.  I guess, hypothetically, at

24   least, he could have tried to enter in 2019 or 2020, been

25   denied and then sought a waiver.

1          **MR. BARDO:**  Yes.  Hypothetically, that's possible.

2          **THE COURT:**  Right.  But assuming that didn't

3   happen, if he was -- if he checked the box or whatever on

4   the form in 2020 to past drug use, then either the process

5   you described kicks off, a consular officer seeks a formal

6   admission that is of the kind that you articulate in your

7   brief and/or he seeks a waiver.

8          **MR.CORNETT:**  That's correct, Your Honor.

9          **THE COURT:**  Okay.  And then, of course, there's

10  the diplomatic visa.

11          So why doesn't the public have an interest in

12  knowing which of those two routes the government took here?

13          **MR. BARDO:**  The public doesn't have an interest in

14  knowing it -- well, there's a minimal public interest in

15  knowing it because this is information on immigration status

16  that courts have consistently found to be exempt

17  information.

18          I mean, it's similar in category to someone's

19  health information or their education information.  This is

20  private, personal information.

21          The other reason is Prince Harry is -- or the Duke

22  of Sussex is one foreign national out of any number of

23  foreign nationals who enter the United States legally every

24  year.  The insight into how -- any insight that this would

25  give to how the government handled Prince Harry's admission

1   wouldn't be able to draw a broader -- give the public a

2   broader understanding of how the government conducts itself

3   in processing admissions from foreign nationals who admit to

4   drug use or high-profile individuals.

5            **THE COURT:**  I mean, it is definitely not the case,

6   you would concede, that FOIA requests related to specific

7   investigations or specific individuals can never be

8   insufficiently subject to public interest to warrant

9   disclosure.  I mean, there's tons of cases where courts have

10  held that, notwithstanding the fact that they are individual

11  cases, the public's interest outweighs the private interest.

12           **MR. BARDO:**  Yeah.  I admit, Your Honor, I wouldn't

13  say that never -- that that's never possible.  But I

14  would -- this case is similar to a case called *Property of*

15  *the People versus Department of Justice*, where your

16  colleague, Judge Cooper, upheld a *Glomar* response from the

17  FBI when the plaintiff had sought records regarding

18  President Trump's interactions with the FBI prior to 2015.

19           They found that President Trump's, from when he

20  was a private citizen, his privacy interests outweighed any

21  public interest that there may be in previous interactions

22  he may have had with the FBI.

23           And I would argue, if President Trump has a

24  privacy interest in that kind of interaction with the

25  government, Prince Harry's privacy interest is even greater.

1    Because he was never a governmental official in this

2    country, has never appeared on a ballot in this country.

3    There's a much bigger public interest in an interaction with

4    a would-be elected officer than there is with a member of

5    the royal family of a foreign country.

6         **THE COURT:** This is really not briefed by the

7    parties and it's just a reminder to me. Sometimes, if I

8    recall correctly, parties with an interest in documents

9    requested by a FOIA requester have an opportunity to make

10   their view known about disclosure or not.

11        **MR. BARDO:** You mean reverse FOIA, Your Honor?

12        **THE COURT:** Reverse FOIA, yeah.

13        Is reverse FOIA available to such parties in the

14   context of Exemptions 6 and 7(C) when we're talking about

15   privacy versus public interest? Or is it just in the

16   competitive harm context where it often is used?

17        **MR. BARDO:** That's where we see it most commonly,

18   Your Honor, in competitive harm. But it would certainly be

19   available to people in Exemption 6 or 7(C). But the

20   government has the same obligation to protect Prince Harry's

21   privacy as it would to protect anybody's privacy whose

22   immigration records were being sought.

23        **THE COURT:** What that means -- I'm not suggesting

24   it's outcome-determinative, of course. But what that means

25   is that, at least, in theory, the Duke of Sussex would have

had the opportunity and has had the opportunity to intervene

here or to bring a suit, a reverse FOIA action, to preclude

the production of the information on the grounds that he

didn't want it produced.

**MR. BARDO:**  In theory, he would, Your Honor.

**THE COURT:**  Yeah.  I'm not suggesting at all that

that's a prerequisite to the government prevailing here.

So I recognize the government's litigating

position across cases.  And I understand it.  I've said

this.  That there's, of course, potential harm from

disclosure of information in camera, whether declarations or

otherwise.

But why isn't this one of those cases where it

might make the most sense for the government to at least

tell me what the true set of facts is?  Because while it's

been nice to have that discussion with you without

disclosing facts, because I don't know them, at least

sometimes knowing the non-public facts helps me understand

the strength of the privacy interests and to weigh against

the public interests in what I then would at least know what

was disclosed or would be disclosed.

**MR. BARDO:**  Well, Your Honor, as you alluded

to -- I mean, the ability to do an in-camera review is

within your discretion.  But you alluded to what I think was

one of your earlier opinions, *Judicial Watch versus*

1   *Department of Justice*, where you acknowledged the risks that

2   come with information potentially getting out.

3          **THE COURT:**  Yes.  That was classified information

4   and that was concerned about national security.  Here the

5   concern would be different.  The concern would be that, as

6   always, when information is shared, it runs the risk of a

7   disclosure of the very thing that is sought to be protected.

8          And I'm not discounting the Duke's privacy

9   interest.  I'm just suggesting -- you know, harm to national

10  security seems, to me, a greater interest from inadvertent

11  disclosure than the privacy interest that the government is

12  asserting on the Duke's behalf.

13         **MR. BARDO:**  Well, many of these records,

14  Your Honor, are law enforcement records.  So there is a

15  stigma associated with being mentioned in a law enforcement

16  record.  And Plaintiff's didn't contest this, but one of the

17  exemptions we argued was Exemption 7(E), the law enforcement

18  techniques exemption.  So there is confidential law

19  enforcement tools and techniques in these files that would

20  be in anything we would produce in an in-camera review.

21         **THE COURT:**  Obviously, I've been asking a lot of

22  questions.  Probably diverted you from the argument you

23  wanted to make.  Do you want to circle back to your core set

24  of arguments?  I apologize.

25         **MR. BARDO:**  That's fine, Your Honor.

1        The public interest in this information, as I

2   alluded to before, this is one individual, who had

3   interactions with the government.  It's not going to allow

4   people to draw broad conclusions.  We understand that the

5   Duke of Sussex is a public figure.  But even a public figure

6   has been found to have had their privacy interests; that

7   includes --

8        **THE COURT:**  I think, to be fair, Heritage doesn't

9   argue that Prince Harry has no privacy interest -- excuse

10  me, the Duke of Sussex has no privacy interest in his

11  immigration records.  Their argument is that they're not

12  very strong privacy interests in light of the book and how

13  public a figure he both is and has made himself to be.

14        So his privacy interests are lower in this

15  information than they would be if they were yours, for

16  example.  Because you are not a very public person.  Not in

17  the same way.

18        So it's not that he doesn't have privacy

19  interests.  Of course, he does, I think Plaintiff says.

20  It's really that they are either at an ebb or at least much

21  weaker than other people's.

22        **MR. BARDO:**  Well, these specifically are

23  immigration records.  And the government has cited multiple

24  cases in its brief about the private nature of immigration

25  records and about the fact that people who are public

1    figures still maintain their privacy interests.

2         The only case that Plaintiff has really cited to

3    the contrary is this *Muchnick versus DHS* case.

4         **THE COURT:**  Yes.

5         **MR. BARDO:**  In that case, the subject of the

6    records was a sexually violent predator who had been

7    credibly accused.  He got off in the Irish courts on a

8    technicality.  So there was much higher public interest in

9    that particular case than there is here with someone who

10   admitted to using drugs.

11        The plaintiffs haven't cited any cases that are

12   similar to this one where they found -- where a court has

13   found that a public figure does not have a privacy interest

14   in his immigration records, absent this one outrageous

15   outlier of a case.  And I don't mean outrageous in the

16   opinion; I mean outrageous in the facts that they relied on

17   to demonstrate public interest.

18        **THE COURT:**  But why isn't that case pretty similar

19   to this one?  I mean, no conviction there.  As you said,

20   tossed on statute of limitations grounds or whatever it was.

21   The person goes through the waiver process, I guess, because

22   of that claim.  The court says the public's interest in

23   knowing how it was that he was admitted outweighs his

24   interest in not having his heretofore private immigration

25   materials not disclosed.  That seems pretty close to this

1    case.

2             **MR. BARDO:**  Well, the subject in that case had

3    been accused of sex crimes and had molested multiple young

4    girls.  This is someone who, in this case, is someone who in

5    a book admitted to using some drugs.

6             I mean, common sense dictates that the public

7    would be much more interested in how someone who is a

8    credibly-accused sexual predator is in the country versus

9    someone who just admitted to using drugs.

10            **THE COURT:**  Really, I think, maybe frame it a

11   little bit differently.  The public has more interest, in

12   your view, in why the government admitted that guy than it

13   does in knowing why the government admitted the Duke of

14   Sussex.

15            **MR. BARDO:**  That's right, Your Honor.

16            **THE COURT:**  Given they're different.

17            **MR. BARDO:**  That's right.

18            **THE COURT:**  Because this is, of course, about

19   shining a light, if appropriate, on government

20   decision-making.  It's not about the public's interest,

21   prurient or otherwise, in individual entrants.

22            **MR. BARDO:**  That's right, Your Honor.

23            **THE COURT:**  Anything else you'd like to add before

24   I turn it over to Plaintiff's counsel and come back to you

25   for rebuttal?

1    **MR. BARDO:**  Nothing else, Your Honor.  We will

2 stay on the briefs for now.   Thank you.

3    **THE COURT:**  Thank you.

4    Counsel, Mr. Dewey?

5    **MR. DEWEY:**  May I proceed, Your Honor?

6    **THE COURT:**  You may.

7    **MR. DEWEY:**  Your Honor, in Plaintiff's view, this

8 is a case about whether the government provides special

9 treatment for high-profile celebrities.

10    The Duke repeatedly admitted at length to the

11 elements of drug crimes, both here and abroad, in his

12 autobiography.  He admitted to daily drug use after he was

13 admitted in March of 2020.

14    The Duke sought entry to this country in March of

15 2020, as Your Honor has noted.  As of January 2020, he was

16 looking for a residence in Canada.  His royal security was

17 withdrawn in February of 2020.  He thought about moving

18 elsewhere.

19    In March of 2020, the Duke and the Duchess formed

20 an intent to leave Canada because of the closing border.

21 Less than two weeks later, the Duke enters the country on

22 March 14th to take up residence without any difficulty

23 whatsoever.

24    The Duke's admissions make him inadmissible

25 without -- as Your Honor has noted -- a waiver.  As

1      Plaintiff's declarants explain, that is a complicated,

2      lengthy and technical process.  And yet again, the Duke

3      entered into less than two weeks.

4           In Plaintiff's submission, that set of facts

5      raises profound questions about DHS's conduct.  There is a

6      profound public interest in understanding, one, whether or

7      not DHS acted improperly, and that is the public interest

8      under the *Favish* line.

9           And the second -- and Your Honor alluded to this,

10     I think, earlier in discussions with my friend -- is *CREW*

11     *III* and *IV* in our papers, which is understanding:  How does

12     DHS understand high-profile cases?  And that line of cases,

13     Your Honor, goes very directly to the point Your Honor made,

14     that if the profile is high enough, treatment of an

15     individual suffices.

16          **THE COURT:**  Can we just go back to the first set

17     of questions I asked the government?  'Cause I think there's

18     actually agreement on these propositions, notwithstanding

19     perhaps -- and this is not to cast dispersions at all.  But

20     I think everyone agrees that when the Duke entered on

21     March 14th, he was -- one of a few things had to be true.

22     Either -- if he checked -- if he did not check the box for

23     past drug use, then maybe nothing would have happened with

24     respect to that question, and he would have entered, at

25     least possibly.

1          If he checked the box for past drug use, then he
2   should not have been entered immediately and a process
3   should have commenced, either to learn more, perhaps to seek
4   the kind of formal admission that we've been talking about,
5   and/or for him to seek a waiver to permit his entry.
6          And then I think, at least, hypothetically,
7   there's the possibility that none of those questions gets
8   asked because he's on a diplomatic visa.  And I know your
9   view of that.
10          It seems to me that everyone agrees that those are
11   the -- that's sort of the suite of possible steps that could
12   occur.  I know I'm being very general.  But do you see it
13   any differently than I just articulated?
14          **MR. DEWEY:**  We don't, Your Honor, with one
15   technical exception.
16          **THE COURT:**  Yeah.
17          **MR. DEWEY:**  And I think, based on what the
18   government said, I agree with you that that's now not in
19   dispute.  Your Honor asked if he can seek a waiver
20   preadmission.
21          **THE COURT:**  Yeah.
22          **MR. DEWEY:**  You can.  That's the form I-192.  And
23   it is a pretty lengthy form.  To Your Honor's point, you
24   have to explain the basis for seeking a waiver.
25          **THE COURT:**  Yeah.

1    **MR. DEWEY:**  In this case, that would likely take a

2    long time.  As Mr. Saunders, one of our experts, points

3    out --

4          **THE COURT:**  I read the reports.

5          On March 14th, 2020, if the Duke checked the box,

6    Yes, I've engaged in past drug use, either he would then

7    have -- from your perspective -- to seek a waiver at that

8    point, or he could have previously, but if he had previously

9    sought a waiver, he would have had to disclose the past drug

10   use and the reason for the waiver.

11         **MR. DEWEY:**  Yes, Your Honor, broadly, with a

12   couple technical caveats, if I may.

13         **THE COURT:**  Please.

14         **MR. DEWEY:**  The first technical caveat is if he

15   checks the form, the agents would be under a duty to examine

16   him further.  That is pretty basic.  If they didn't do that,

17   that would, quite frankly, be misconduct more egregious than

18   we've alleged in our papers may well have occurred.  That is

19   in the reports, as Your Honor has noted.

20         The second technical point is Your Honor asked if

21   he could have a waiver previously.  That possibility, I

22   guess, theoretically, in the theoretical could exist, but

23   there are a number of factors in the record that indicate he

24   probably wouldn't.

25         First, prior entries as a working royal on

government business, he could be in on a Class A.  2015, he comes to see the president and he's traveling with a large Metropolitan Police security detail.  We can see that for those trips, he might not have been asked the question because he's legitimately being sent by Her Majesty's government to do official work.

As to the waiver in this instance, Your Honor, the waiver is only valid for the time length of the visa.  To get a non-immigrant visa that let's you into the country for more than, "I'm going to see my friends," you would need to have some sort of basis, whether it's an O visa for special talent or a job-based visa.  So you would have to have that set up in advance.

Even if there was a prior waiver, the standard -- it's going to be consider differently for, "I'm coming to go to a friend's wedding," versus, "I'm living here."  And that process would have to be done again.

**THE COURT:**  So I guess that triggers a question that I had meant to ask before.  And that is:  Does a citizen of the UK -- or in what circumstance does a citizen of the UK need a visa to enter the United States, or did as of March 2020?

**MR. DEWEY:**  Your Honor, as of March 2020, a citizen could have entered using the visa-waiver process, which let's you in for 90 days.  You just can't conduct

1    business.  However, there's a question on that about the

2    drug use.

3              **THE COURT:**  Okay.  So that does --

4              **MR. DEWEY:**  And there's examples in our papers,

5    Your Honor, where people checked "yes," and in one case, a

6    high-profile individual was pulled off the plane.

7              **THE COURT:**  So really, unless you're on a

8    diplomatic visa, if you are a citizen of the UK seeking to

9    enter the United States, in March 2020, you have to either

10   answer the question, Have you used drugs in the past, or

11   have a waiver that applies to the visit that we're talking

12   about.

13             **MR. DEWEY:**  Correct.

14             **THE COURT:**  Okay.  Got it.

15             **MR. DEWEY:**  Your Honor, a couple questions you

16   asked my friend that I want to attempt to provide some

17   insight on.

18             **THE COURT:**  Please.

19             **MR. DEWEY:**  The admissions process that my friend

20   referred to applies only to a custodial process.  We cited

21   cases in our papers, admittedly from the 9th Circuit,

22   holding it does not apply.  For example, the context of a

23   psychiatric examination.

24             *Spare* is a valid admission.  It's an admission by

25   a party opponent.  If the Duke were here and I were

1    examining him, as Your Honor knows, it comes in.  Indeed,

2    the Duke confirmed the accuracy of passages in *Spare* under

3    cross-examination in the high court, in an unrelated manner,

4    and I would be happy to provide Your Honor with that

5    transcript if it would be helpful on that point.

6              Your Honor asked about reverse --

7         **THE COURT:**  It seems to me that the dispute

8    between the parties about what is a quote/unquote

9    "admission" isn't all that relevant to me.  I understand the

10   point.

11        **MR. DEWEY:**  Agree, Your Honor.  I'm just trying to

12   provide Your Honor with technical clarity.

13        **THE COURT:**  Yep.

14        **MR. DEWEY:**  I don't think it really matters for

15   our purposes.

16        **THE COURT:**  Yeah.

17        **MR. DEWEY:**  Your Honor asked about reverse FOIA.

18   Under reverse FOIA, in the Supreme Court's opinion, you

19   would need a statutory bar to disclosure because most FOIA

20   exemptions are discretionary.  The only applicable statutory

21   bar to disclosure, under the law I've seen, would be the

22   Privacy Act, but that would apply to a citizen or lawful

23   permanent resident.  However, the Duke still could seek to

24   intervene as a right or leave from Your Honor to answer that

25   question.

1          As to the Exemption 7(E) point, I just wanted to

2    clarify for Your Honor that we reserved on those exemptions

3    asserted.  We didn't think we were going to challenge them.

4    We didn't think we were going to contest redaction of names.

5    But we don't know until we don't know what the *Glomar* stands

6    for.

7          **THE COURT:**  I recall lines in your brief, for

8    example, you know, If the *Glomar* is accurate, then we don't

9    have to take up some of these other issues.  But if you

10   can't *Glomar* the question, then we may have some issues.  I

11   recall that.

12         **MR. DEWEY:**  Absolutely, Your Honor.

13         **THE COURT:**  Let's just assume, hypothetically,

14   that there is really just a couple ways that Prince Harry

15   gets in and -- excuse me, the Duke of Sussex gets in.  And

16   that -- let's just assume, hypothetically, that there's

17   either a public interest in understanding how the government

18   went about reaching those conclusions or, perhaps even more,

19   there's a question about whether the government acted

20   improperly.

21         And I have to waive those public interests against

22   the privacy interest here.  What standard am I applying

23   other than just, like, making it up?  What guidance is

24   there, really, other than looking to concrete cases that

25   have particular outcomes?

1      **MR. DEWEY:**  Your Honor, I can give you concrete

2   cases that have outcomes.  I can give you *Muchnick*, which I

3   think is on all fours.  And I'll circle back to that in a

4   moment, Your Honor.

5      **THE COURT:**  An out-of-circuit district court

6   opinion.

7      **MR. DEWEY:**  Correct.  That's the only opinion we

8   could find in these circumstances and you take what you

9   have.

10          As to the broader question, we've cited factors

11  some of your colleagues have looked to in the brief:  Press

12  interest, government interest, whether or not the

13  information is necessary to provide the transparency.  In

14  some instances, there will be a public interest, but the

15  information might be cumulative, and your colleagues said,

16  Well, you don't need it there.  Which, obviously, is not the

17  case here, or in a vacuum, as Your Honor has pointed out.

18          Some courts have looked to:  Is it per se

19  involving criminal conduct?  Not the case here.  This is the

20  *Codrea* opinion, where, I think, Judge Contreras did a very

21  good job of attempting to glean factors, as Your Honor

22  pointed out.  I can't give you a D.C. Circuit opinion.  I

23  can't even give you an out-of-circuit opinion.  I can only

24  give you those district court opinions that cycle through

25  the facts.

1          **THE COURT:**  Yeah.

2          **MR. DEWEY:**  One other addition I would make, Your

3    Honor, is I don't think Your Honor -- Your Honor could reach

4    that question.  I don't think Your Honor will need to here

5    because I think the government has conceded that point.

6          **THE COURT:**  Which point?

7          **MR. DEWEY:**  The balancing of the interest, if you

8    assume the public interest we've cited.  They did not

9    respond at all to that argument when we cross-moved.

10         **THE COURT:**  Well, I mean, it seems to me that a

11   fair amount of the government's brief is to argue the Duke

12   has a very heightened privacy interest.  And the implication

13   of that is to say, I think -- I will hear from the

14   government, I suppose, in rebuttal -- even if you spot that

15   there is some interest in knowing how the government went

16   about its business here -- 'cause I don't think they

17   say -- they definitely do not concede or assume, for

18   purposes of argument, that there's been a showing of

19   government impropriety.  But I do think that they argue that

20   the balancing always has to tip in favor of non-disclosure

21   because of the very heightened privacy interest.

22         **MR. DEWEY:**  I think that's probably right,

23   Your Honor.  I was referring to the specific parsing of the

24   factors.  And obviously, that's within Your Honor's

25   discretion.

1          **THE COURT:**  All right.

2          So fill in the blank, then.  The public's interest

3   in what the government's up to or alleged government

4   impropriety outweighs Prince Harry's privacy interests

5   applying "X" standard.

6          **MR. DEWEY:**  Your Honor, here we have -- we would

7   submit a very significant public interest, which is the

8   public interest under *Favish*.  It's the most potent public

9   interest.  I can give you that from the court and from the

10  D.C. circuit.  I think you start out with that public

11  interest as not a loading of the dice, per se.

12         **THE COURT:**  This side of the scale is heavy if --

13         **MR. DEWEY:**  It's very heavy.

14         I think you would then ask the factors we went

15  through.  How does the media see this?  Some courts have

16  looked to that.  I think the answer -- you know, the media

17  is here.  They are interested.  We filed those papers.

18         **THE COURT:**  They may be interested because it's

19  the Duke, not because they are that interested in what the

20  government was up to.

21         **MR. DEWEY:**  I can't ascribe the motive.  I can

22  just say some courts have looked to as the case reported.

23  Your Honor can certainly draw that distinction, and I can't

24  contest that sitting here today.  I'm just going off the

25  factors that are there.

1          **THE COURT:**  Understood.

2          **MR. DEWEY:**  There has been some congressional

3    interest, Your Honor.  You can look to that.  I think it is

4    significant that here there is no other way to get the

5    information.  That has been a very significant factor in the

6    balancing that other district courts have looked to.

7          I think it's relevant that this is not criminal

8    conduct, and that that's relevant.

9          On the privacy side of the scale, Your Honor --

10         **THE COURT:**  Right.  Because there are cases

11   where -- I can't remember what the name of the case is,

12   which case it is.  I think it's the *Tattle* opinion where, in

13   the context of a death penalty case, the information sought

14   related to, I guess, additional indicia of additional

15   criminal behavior by the four potential other murderers.

16         And the D.C. Circuit said:  That still is a pretty

17   significant privacy interest, to not disclose whether the

18   government -- what the government did with respect to those

19   people in sort of a criminal investigation sense.  But, of

20   course, the D.C. Circuit, nevertheless, held that the public

21   interest in knowing how the government investigated an

22   alternative set of murders in a capital case would outweigh

23   those privacy interests.

24         **MR. DEWEY:**  Your Honor, the case is *Roth* that Your

25   Honor is thinking of.

1    **THE COURT:**  Yeah, *Roth*.

2    **MR. CORNETT:**  I think *Roth* cuts in our favor

3    because it shows the strength of the *Favish* interest,

4    because there they did find, no, you really do need this;

5    there's some suggestion of impropriety.

6         As to the privacy interest, one, it's a criminal

7    case.  This is not; it's lesser.  And, two, as I understand

8    it, there the other defendants were maintaining their

9    innocence.  Here you have such an extensive admission and

10   such an amount of public profile that we think on the other

11   side of the ledger, it does diminish the privacy interest.

12        I understand what the government is saying, well,

13   he hasn't spoken to every detail of his immigration process,

14   but he has spoken about it some, Your Honor.  The statement

15   my friend referred to that we lodged with the Court earlier

16   this week, where he said:  I am not a citizen, but I've

17   thought about it.

18        The other point on that is, in our view, the

19   necessary implications of the admissions in *Spare*, with the

20   points we've previously discussed that are conceded, carry a

21   lot of weight and diminish the privacy interest, too.

22        For example, in the *Glomar* records about the

23   waiver, I think we all agree, if he checks "yes," he has a

24   waiver, or at least applied for a waiver.  And in that

25   setting, we would say his own admissions have destroyed

1    pretty much any privacy interests there because it's a known

2    fact.

3          **THE COURT:**  So let me just flip it around.  Maybe

4    make it a more positive statement.

5          Because of his admissions, if it were now

6    disclosed that he had applied for a waiver, that really

7    wouldn't add much to the public's knowledge about him and

8    his conduct because he's already made public the underlying

9    facts that would make a waiver application necessary.

10         **MR. DEWEY:**  Correct, Your Honor.  That is

11   precisely it.  And I think there's plenty of law to follow

12   on that.  The weight of that -- the Steele dossier case, I

13   think, is a good example of that.  There's so much out there

14   that, how much does this really add to the calculus?  Not

15   much.

16         A related point --

17         **THE COURT:**  So let me ask you this question, then:

18   Doesn't that -- and, I mean, I know you're probably in favor

19   of this to some extent, but doesn't that counsel in favor of

20   my getting from the government an in-camera submission,

21   ex parte in-camera submission, so that I would know whether,

22   for example, what would be disclosed was a waiver

23   application because disclosure of a waiver application would

24   be to disclose a set of facts about the Duke, maybe many of

25   which are kind of already public in the sense we've been

1    talking about.

2            But if, instead, the materials reflected some

3    other thing, maybe it wouldn't.  Maybe the disclosure of

4    that information would not disclose materials that are

5    already known.

6            **MR. DEWEY:**  Completely agree, Your Honor.  We have

7    no objection to any in-camera procedure that Your Honor

8    would like to pursue.  The government actually volunteered

9    in-camera review in *Muchnick*.

10           And I think, Your Honor, we cited in our cases --

11   brief other cases where some of your colleagues said, Well,

12   let me see the documents because that will kind of settle

13   the question.  We all cited the *Phillips* case from SDNY

14   where the judge there thought there was a *Favish* issue but

15   looked at the documents and said, well, there's nothing in

16   here that informs this.  So that really moots out the

17   parties' dispute.

18           We have no problem with that.  We think it is

19   absolutely appropriate in this case, Your Honor, should

20   Your Honor want to look at that material.

21           Obviously, Plaintiff's position is, we should

22   prevail without even getting to that step.

23           **THE COURT:**  I understand.

24           **MR. DEWEY:**  But if Your Honor wants to do it, we

25   have no objection and think it would be extremely prudent.

1          If I can, on the privacy interest, Your Honor.  I

2   know we're talking at a high level of generality, the basic

3   core issues.  We would note that we think the declarations

4   on that issue have problems under D.C. Circuit law and Your

5   Honor's recent opinion in Padreas.  They don't really get

6   into some of the details Your Honor and I were just

7   discussing.

8          For example, taking the *Glomar* of the 212(d)(3)(A)

9   waiver, they don't really assess, well, what is the

10  additional harm to the privacy interest and disclosure of

11  that information in light of the tableau of what we know.

12  They don't address, well, what is the actual mechanism of

13  concrete harm in knowing the visa class, for example.  None

14  of that is addressed.

15         I understand Your Honor's question, and going

16  directly to the core issue, I just want to flag that that is

17  a live issue as well.

18         **THE COURT:**  Right.

19         **MR. DEWEY:**  I did want to circle back to *Muchnick*,

20  Your Honor, because it is a district court case from out of

21  district, but I do think that it is the only case,

22  Your Honor is correct, to address similar circumstances.

23         **THE COURT:**  It feels like the closest case that

24  I've seen.

25         **MR. DEWEY:**  We exhaustively reviewed the cases,

1    Your Honor, and that is the closest we've been able to find.

2           I just wanted to respond briefly to the

3    government's submissions.  The fact that one is accused,

4    regardless of how credibly, of sexual abuse is actually not

5    a ground to deny admission, depending on how one's coming

6    in.  It is -- it could, in theory, be used discretionarily,

7    but it's not an actual ground for admission.  And,

8    therefore, we would submit that this case is actually more

9    egregious than *Muchnick* because we have a --

10          **THE COURT:**  Let me just pause you there to be a

11   very layperson about it, maybe.  Does that mean that if

12   someone is a UK citizen -- or I can't remember if he was

13   Ireland or UK, but whatever, assuming a UK citizen -- is

14   credibly accused of a sexual assault crime and not

15   prosecuted, and then appears for admission to the U.S.  Is

16   there a box on the form that that person has to check "yes"

17   or "no" to?

18          **MR. DEWEY:**  Yes.  Probably as to previous law

19   enforcement encounters.  Think of -- I know Your Honor has

20   done a clearance review.  Think of that.

21          **THE COURT:**  Have you ever been arrested?  Okay.

22          **MR. DEWEY:**  That same type of question,

23   Your Honor.  Encounters with law enforcement?  Yes.

24          There was an issue in *Muchnick* as to whether he

25   was truthful on a subsequent application for citizenship,

1   but he was truthful on the initial application.  We know

2   that from the opinion.  And that is not a per se ground of

3   inadmissibility.  You could investigate it, decide someone

4   is not a sufficient character.  That is purely

5   discretionary.  It is not a per se ground of

6   inadmissibility, like we are talking about here.

7          As to the realm of the public interest, we would

8   submit there is a public interest to understand, is DHS

9   engaging in favoritism?  This is not a new issue in this

10  space.  This has been brought up before with other cases.

11  Has DHS engaged in preferential treatment for high-profile

12  individuals with these types of issues?

13         So we really do think that the government's

14  distinction, well, he was credibly accused, doesn't really

15  cut any water.  And, if anything, we are more reliant on

16  that.  And we do think that, you know, if Your Honor follows

17  Judge Breyer's opinion, that we do prevail.

18         If I can just circle back to another technical

19  point.  We do think there is an issue that the Department

20  has not at all controverted the expert reports, and we think

21  at the summary judgment stage, once those are in, there

22  needs to be some contravention of those reports of some

23  sort.

24         **THE COURT:**  Well, to the extent they are

25  statements of law --

1       **MR. DEWEY:**  Understand, Your Honor.

2       **THE COURT:**   -- that's my bailiwick.  To the

3   extent that they purport to weigh public and private

4   interests, that's my bailiwick.

5       To the extent that they are statements about

6   practice and the like, a hundred percent.  They are in the

7   record.  They are uncontroverted, from my perspective.

8       **MR. DEWEY:**  Correct.  We think it's a problem for

9   the government, Your Honor.  That that significantly weighs

10  in favor --

11      **THE COURT:**  Which part?

12      **MR. DEWEY:**  Not -- the last part, Your Honor,

13  indicated to the extent those statements are uncontroverted

14  and in the record.

15      **THE COURT:**  No, no, no, no.  For example --

16      **MR. DEWEY:**  The difficulty of obtaining the

17  waiver, the waiver process, the types of examinations they

18  go through.  I know Mr. Saunders talks about some of his

19  other high-profile clients.

20      **THE COURT:**  I haven't really heard the government

21  to argue that it is easy to get a waiver.

22      **MR. DEWEY:**  Understood, Your Honor.  I just want

23  to clarify that, from our perspective, that's undisputed and

24  that cuts in our favor.  I don't know if they've taken a

25  position on that.

1          **THE COURT:**  Fair enough.

2          **MR. DEWEY:**  I think that just undergirds the

3   public interest.  That there really is, in our case, under

4   *Favish*, where we need to know more, *Favish* is not

5   insurmountable.  We've given the Court the relative quote.

6   It's less than overcoming good faith.

7          **THE COURT:**  Right.

8          **MR. DEWEY:**  We think that we've overcome that

9   clearly.  Here, when you, as Your Honor has done, carefully

10  look at the facts that are in the record and then draw the

11  appropriate conclusions from them.

12          With that, Your Honor, unless the Court has any

13  other questions, I'm happy to rest for now.

14          **THE COURT:**  Yes.  Thank you.  I'll give you an

15  opportunity for surrebuttal, if necessary.

16          **MR. KNIGHT:**  Thank you, Your Honor.

17          **THE COURT:**  Of course.

18          Counsel.

19          Mr. Bardo, I'm happy to hear from you on anything

20  you'd like to address.

21          **MR. BARDO:**  Yes, Your Honor.

22          Mr. Dewey talked extensively about the *National*

23  *Archives versus Favish* case.  They haven't met the burden

24  under *Favish* to demonstrate a potential government

25  impropriety.  There is a line in the opinion that says

1    government impropriety is easy to allege but difficult to

2    prove.

3            As we've discussed, in my first go-round here,

4    there are multiple lawful ways -- or several lawful ways in

5    which the Duke could have been admitted into the United

6    States.  Getting through any of those ways does not

7    demonstrate any kind of government impropriety.

8            The plaintiff's have --

9            **THE COURT:**  Wait.  Just to go back.  The multiple

10   lawful ways are what?

11           **MR. BARDO:**  Yes.  Waiver and diplomatic visa.

12           **THE COURT:**  But the plaintiff says, It's absurd to

13   think that he has a diplomatic visa and a waiver takes a

14   long time, and you haven't disputed that.

15           **MR. BARDO:**  No.  They also have no evidence that

16   he didn't go through the waiver process and go through the

17   long waiver process years in advance.

18           **THE COURT:**  That's true.  But it seems, in light

19   of the book, somewhat unlikely that that happened.  Don't

20   you think?

21           **MR. BARDO:**  That's the way he characterizes it in

22   a book that's meant for a commercial audience.  It's not

23   necessarily the full story.

24           **THE COURT:**  But you agree, then, that other than

25   having a diplomatic visa and going through the waiver

1    process, other than those two options, the only way the Duke

2    could have entered would have been to lie on the form?

3              **MR. BARDO:**  Well, it's possible that a consular

4    officer just may not have sought an admission, but that's

5    unlikely.

6              **THE COURT:**  Right.  The likely ways he could have

7    been admitted are diplomatic visa, waiver, lied on the form.

8              **MR. BARDO:**  Yes.  That's right, Your Honor.

9              **THE COURT:**  That's really the universe.

10             **MR. BARDO:**  Yes.

11             **THE COURT:**  But Plaintiff says each of those

12   things raises a red flag.  Diplomatic visa -- I'm just

13   putting words in Plaintiff's mouth -- is kind of

14   preposterous to consider, given the current relationship

15   between the Duke and the family.  So that's diplomatic visa.

16             Waiver, the problem with waiver is they have

17   experts that are unrebutted that say it takes a really long

18   time.  So you have to imagine that that process, if it was

19   to work to allow him to enter in March of 2020, had to start

20   before that, but that seems highly inconsistent with how he

21   articulates what they did in the book from Canada, COVID,

22   January/February 2020 through March 2020.

23             **MR. BARDO:**  Yeah.

24             **THE COURT:**  And so if he sought a waiver and was

25   granted it very quickly, Plaintiff says that would be

1   anomalous and could imply preferential treatment.

2           Then the third option, the third primary option

3   is, he didn't check the box.  He didn't admit to drug use.

4   And if that's the world we're in, Plaintiff says, Well,

5   okay, he entered, but then the government should have done

6   something thereafter because it has highly public admissions

7   to suggest that the form was inaccurate.

8           And the government typically, when it gets wind of

9   people who lied on their immigration forms, does something

10  about it.  And if the government hasn't done anything here,

11  that's also at least a red flag.

12          So what is your responses to that suite of -- I'll

13  put it this way, the suite of red flags that Plaintiff

14  raises in response to the options you've articulated?

15          MR. BARDO:  Sure.  Well, with respect to lying on

16  the form, I mean, that goes through various levels of

17  speculation.  They have no factual basis or any basis to

18  believe that he got in that way and that the government is

19  somehow pulling its punches for somebody who lied on a form.

20          THE COURT:  Doesn't that mean that it is then --

21  the very likely scenario here is that he sought a waiver?

22          MR. BARDO:  I wouldn't say it's very likely.  I

23  mean, it's --

24          THE COURT:  Most likely?

25          MR. BARDO:  I wouldn't say that either.  I mean,

1    it's possible for him to have a diplomatic visa.  He is

2    still a member of the British royal family and still has the

3    title Duke of Sussex.

4           I know he's formally stepped down from his roles,

5    but he is still a government official in the United Kingdom

6    by his birth and by his title.

7           **THE COURT:**  Does he have a privacy interest in the

8    fact that he holds a diplomatic visa?

9           **MR. BARDO:**  Yes, he does.  As a matter of fact,

10    that would be -- we would be prohibited from disclosing that

11    because that's visa information.  I cited the statute in my

12    brief.

13           **THE COURT:**  Yeah.

14           **MR. BARDO:**  Courts have found that Exemption 3

15    would apply in that circumstance.

16           **THE COURT:**  Okay.

17           **MR. BARDO:**  That would be in the State

18    Department's custody.

19           **THE COURT:**  Right.  The visa -- the materials

20    around a diplomatic visa, of course, are principally resided

21    at State.  I get that.

22           If someone submitted to DHS or to State -- I'm not

23    trying to make this about the relevant agency -- question,

24    does the Duke of Sussex presently have a diplomatic visa,

25    would the government *Glomar* that or have to respond to that?

1    What's the --

2         MR. BARDO:  Well, FOIA doesn't require the

3    government to answer interrogatories.  So if they were --

4         THE COURT:  Sorry.  You're right.

5         Disclose to us records relating to any diplomatic

6    visa held by the Duke of Sussex.

7         MR. BARDO:  Right.  They would have to *Glomar* that

8    and they would be able to cite Exemption 6 as well as

9    Exemption 3.

10        THE COURT:  Okay.  I read -- perhaps incorrectly

11   read Plaintiff's brief to suggest that there is no privacy

12   interest in a diplomatic visa because it's diplomatic.

13        MR. BARDO:  That is not correct, Your Honor.

14        THE COURT:  Okay.  Okay.

15        MR. BARDO:  It's still -- statutes prohibit us

16   from disclosing that information.

17        THE COURT:  All right.  I, again, took you off of

18   the argument you're presenting.  You're talking about

19   *Favish*.

20        MR. BARDO:  Yes.  In the last part that I was

21   going to address with *Favish*, nothing that the plaintiffs

22   have submitted in these declarations really add additional

23   insight into what's already in the briefs or what's already

24   publicly known.

25        They have no basis to contend that Prince Harry

didn't go through the process ahead of time and that he
didn't go through a rigorous examination by a consular
officer, followed by the process that's required for a
waiver.

And even the declarants that Plaintiff submitted,
even they say that there are no set written standards
necessarily to obtain a waiver.  So it's difficult to
understand how they could allege government impropriety in
handling a case that -- in making a decision where there
isn't necessarily clear written standards, where there's a
lot of discretion.

**THE COURT:**  But you agree that for Prince Harry to
enter on March 14th, 2020, pursuant to a waiver, at least
standard protocol would have required that the waiver be
teed up earlier than that day because, otherwise, it would
normally take long.

**MR. BARDO:**  That's probably correct, Your Honor.

**THE COURT:**  Okay.  Got it.

Anything else you would like to add, Counsel?

**MR. BARDO:**  Oh, yeah.  That's it, Your Honor.
Thank you.

**THE COURT:**  Thank you.

Mr. Dewey.

**MR. DEWEY:**  One moment, Your Honor.

**THE COURT:**  Take your time.

1          **MR. DEWEY:**  Your Honor, very quickly on the

2     diplomatic visa question.

3          **THE COURT:**  Yeah.

4          **MR. DEWEY:**  The Class A visa, unless it were the

5     king himself, wouldn't permit work.  And we know the Duke is

6     working here.  If that was the case, there would be a pretty

7     substantial red flag there.  And that's in the *Arthur*

8     declaration, Paragraph 14, Note 1 in App A.

9          Second, Your Honor, and this is on Page 3 of the

10    appendix to the *Arthur* declaration.  It lists the

11    requirement documentation.  Plaintiff's submission is the

12    visa material may be covered by that statute.  It hasn't

13    been asserted here.

14          But there's a diplomatic note that is required to

15    get the visa, and that is a note that says he is coming over

16    'cause he's a diplomat; he's coming over because he's

17    traveling on behalf of Her Majesty the Queen, to meet the

18    president and do good work.

19          We would submit that note is not actually going to

20    be covered because it's not solely part of the visa issuance

21    or refusal process.  In our reply at Page 11, we cite one of

22    your colleague's opinion in the *Darnbrough* case, which says

23    that exemption is narrowly applied.

24          So our submission was, Whatever the interest in

25    the, "Do I have a diplomatic visa or not?"  There is no

1    privacy interest in, "Am I here as a diplomat?"  "Am I here

2    on behalf of His Majesty the King?"  I would think that

3    would be an appropriate question to be put to the government

4    in the abstract.

5            **THE COURT:**  What about the possibility -- this is

6    to sort of go back a little bit, I mean, to where you

7    started:  It's at least hypothetically possible that the

8    Duke could have entered on a diplomatic visa and then

9    applied for a different visa, and in connection with the

10   application for a non-diplomatic visa, where he now has some

11   time, he's here, he says, You know what?  I've decided I

12   want to say.  And he says, But I'm probably not going to be

13   a diplomat anymore, and I want to be a regular, old visa

14   entrant.

15           **MR. DEWEY:**  As a technical matter, if he was in

16   status, he could apply for another visa.

17           Again, Your Honor, we'd go back to we think the

18   diplomatic note; there would be something in the DHS file

19   reflecting that status.  I can't point you to a case, but we

20   would submit there's no privacy interest.

21           **THE COURT:**  The thing about that, it means that

22   there is -- there's at least this possibility -- if he

23   doesn't have a diplomatic visa on March 14th, 2020,

24   obviously, he's applying not as a diplomat and he has to

25   check the box and get a waiver.  And that takes some time.

1          But if he has a diplomatic visa at that time,

2     enters, and then, hypothetically, applies for a waiver, then

3     the lengthy process your experts talk about isn't something

4     that has to happen on March 14th.  It just has to happen

5     before his visa converts to a different visa.

6          **MR. DEWEY:**  That would be correct on Your Honor's

7     hypothetical.  If I might step back for a moment, though.

8          **THE COURT:**  Please.

9          **MR. DEWEY:**  As to that entry, if he somehow had a

10    valid diplomatic visa, normally it would only be issued for

11    the trip.

12         **THE COURT:**  It might not allow him to remain?

13         **MR. DEWEY:**  It would be an abuse to use that to

14    enter, Your Honor, because he was not entering for a

15    diplomatic purpose.  At that time, January 18th is the

16    so-called Sandringham statement.  The Queen takes him back.

17    He does not have any official duties at that point.

18         In February, his security is pulled, Your Honor.

19    We would submit it would be extraordinary anomalous for Her

20    Majesty's government to withdraw official security, yet

21    permit someone to enter as a diplomat or as a government

22    official on a government mission.

23         **THE COURT:**  Yeah.

24         **MR.CORNETT:**  Again, absent the King himself, the

25    Class A visa, you can't come here and work.  And that would

1    be a bigger red flag if -- I want to be careful, if I'm

2    articulating this correctly.  That may have happened, but

3    when the agent was admitting him and saw he's coming in on a

4    Class A visa, when the whole world knows he's no longer a

5    working royal; that would in and of itself raise a profound

6    red flag of:  What in the world is happening that someone

7    can come in on that visa?  Which would not be appropriate

8    for that class of entry.

9         Again, Your Honor, and I apologize for the

10   confusion to brief because it's a fine point.  The visa

11   statute is narrowly drawn on your colleague's opinion.  Our

12   submission is that the communications from the British

13   government saying the Duke of Sussex has an official role,

14   and that's why he's coming in, or the Duke of Sussex is an

15   accredited credible diplomat, that communication should be

16   responsive.  It would be in the DHS file somewhere.  It's

17   relevant.

18        We would submit that's not covered by the statute

19   and you don't have a privacy issue absent an extraordinary

20   national security consideration and saying, "I'm on official

21   business or I'm here as an accredited diplomat."

22        **THE COURT:**  The brief was clear.  I was sort of

23   elevating it to higher level of generality.

24        I think what I was really trying to explore was

25   the -- I mean, obviously, it seems unlikely that the Duke is

1   still on a diplomatic visa, for all the reasons you've

2   articulated.  What I was really just exploring was whether

3   there was a possibility that he was on one when he entered

4   and then converted later in a way that would make working

5   acceptable on the new visa; whereas it wouldn't be on the

6   diplomatic visa and the like.

7              **MR. DEWEY:**  He could have done that, Your Honor.

8   He was working pretty quickly when he was here and he was

9   residing here.  And then, again, we think letting him in on

10  that visa without taking a step back and saying, Wait a

11  minute.  This is quite odd.

12             **THE COURT:**  Right.

13             **MR. DEWEY:**  What is going on here?  That that

14  would in and of itself be a red flag.  And I think the

15  declarants are pretty clear on that, Your Honor.  And that

16  that's why they both discounted that possibility in their

17  analysis.

18             **THE COURT:**  Got it.

19             **MR. DEWEY:**  Unless the Court has any other

20  questions, I wanted to clarify that point, but I'm happy to

21  take any other questions.

22             **THE COURT:**  No, no.  I think I have it.  Thank you

23  very much.

24             **MR. DEWEY:**  Thank you, Your Honor.

25             **THE COURT:**  Mr. Bardo, any last word?  Don't need

1    to.

2         **MR. BARDO:**  Nothing else, Your Honor.

3         **THE COURT:**  Okay.  Thank you.

4         So, first of all, thank you for the strong briefs

5    and argument today.  I'm going to take the matter under

6    advisement, as I often do in highly-disputed, somewhat

7    complicated summary judgment contexts.

8         My taking it under advisement is to both the

9    ultimate questions and, to some extent, the predicate

10   question of whether I think I should look at some

11   information ex parte in camera.  I haven't even decided that

12   that's necessary.

13        I think if I were to do so, I would decide that

14   pretty quickly and I would ask the government to make a

15   submission.  I understand the government's argument that

16   even if I do that, I should, in the first instance, permit

17   or accept declarations, rather than the underlying

18   materials.

19        Frankly, that's my view generally because it's

20   often the case that the underlying documents aren't all that

21   easily decipherable without explanation, and sometimes the

22   declarations help that.

23        So I will take the matter under advisement and you

24   will hear from me.  You will probably hear from me -- if I

25   do want something in camera, you'll probably hear from me

1   pretty soon.  Okay?

2            Thank you, all.

3         (Proceedings concluded at 3:41 p.m.)

1 **C E R T I F I C A T E**

2

3          I, **Lorraine T. Herman, Official Court Reporter,**

4 certify that the foregoing is a true and correct transcript

5 of the record of proceedings in the above-entitled matter.

6

7

8      February 25, 2024          /s/ Lorraine T. Herman
                **DATE**                     **Lorraine T. Herman**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25