

Neutral Citation Number: [2024] EWHC 418 (Admin)

Case No: AC/2021/LON/002527

**IN THE HIGH COURT OF JUSTICE**
**KING'S BENCH DIVISION**
**ADMINISTRATIVE COURT**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 28 February 2024

**Before**:
**MR JUSTICE LANE**

- - - - - - - - - - - - - - - - - - - - -

**Between:**

**THE KING**
**on the application of**
**THE DUKE OF SUSSEX**                    **Claimant**

**- and –**

**THE SECRETARY OF STATE FOR THE**
**HOME DEPARTMENT**                    **Defendant**

- - - - - - - - - - - - - - - - - - - - -

- - - - - - - - - - - - - - - - - - - - -

**Ms Shaheed Fatima KC, Mr Jason Pobjoy, Ms Gayatri Sarathy and Ms Marlena Valles**
(instructed by **Schillings International LLP**) for the claimant

**Sir James Eadie KC, Mr Robert Palmer KC, Mr Christopher Knight and Mr Aaron**
**Moss** (instructed by **the Government Legal Department**) for the defendant

Hearing dates: 5-7 December 2023

Confidential draft judgment circulated: 1 February 2024
- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

## (REDACTED FOR THE PURPOSES OF PUBLICATION)

This judgment was handed down remotely at 10:30am on 28 February 2024 by circulation to
the parties or their representatives by e-mail and by release to the National Archives.

**Mr Justice Lane:**

1.  The claimant challenges, by way of judicial review, the decision of the Executive Committee for the Protection of Royalty and Public Figures (RAVEC), communicated in a letter of 28 February 2020 that, as a result of his change in status in the Royal Family, he would no longer be provided with the same degree of publicly-funded personal protective security by the police, when in Great Britain. RAVEC's decision followed the decision of the claimant to cease to be a full-time working member of the Royal Family, carrying out official duties on behalf of the Sovereign. In his first witness statement, the claimant says that "my wife and I felt forced to step back from this role and leave the country in 2020". Although Ms Fatima KC drew attention to what the claimant had there said, it is common ground that the claimant's motivation for his decision is not in issue in these proceedings.

2.  I reiterate what I said at the conclusion of the public hearing on 7 December 2023. The parties have been extremely well-served by their respective leading counsel and legal teams, as has the court.

3.  The hearing of this judicial review was conducted partly in public and partly in private, pursuant to CPR 39.2. On 4 December 2023, I made an order pursuant to CPR 39.2 (3)(a)–(c), read with the confidentiality order of Swift J of 24 March 2022 and his confidentiality ring order of 19 June 2023. In broad summary, certain of the information relied upon in this case concerns security arrangements put in place either for the claimant or for other public figures in the United Kingdom. The public disclosure of such information would manifestly have a serious adverse impact on the individuals concerned, as well as being contrary to the public interest, including that of national security. To preclude the parties from making reference to this information would prevent the case from being determined justly. Accordingly, the publicly-available form of this judgment contains redactions.

## *THE DECISION OF 28 FEBRUARY 2020*

4.  The Secretary of State for the Home Department (the defendant) is responsible within Cabinet and accountable to Parliament for matters of national security. This includes the protective security of members of the Royal Family and other public figures. The defendant has delegated responsibility to RAVEC, which is an independently chaired Executive Committee established to act as an overarching executive authority for all matters relating to protective security arrangements for a cohort of individuals who are assessed to be at a particular risk from a range of threats in Great Britain, including terrorism, extremism and fixated behaviour. The Home Office, the Police (through the Metropolitan Police Service) the Royal Household, the Cabinet Office and the Foreign, Commonwealth and Development Office are represented on RAVEC. Others, such as [redacted text] or police forces, can be invited to attend at the discretion of RAVEC's chair.

5.  The decision of 28 February 2020 was taken by the then chair of RAVEC, Sir Richard Mottram GCB. The decision letter was addressed to the Rt Hon Sir Edward Young, Private Secretary to Her Late Majesty Queen Elizabeth II. The letter was headed "Security arrangements for the Duke and Duchess of Sussex". Sir Richard said that he was writing about those security arrangements in the light of the change in roles of the

claimant and his wife from full-time working members of the Royal Family to privately-funded members of the Family; and of their decision to spend the majority of their time in Canada for the next 12 months at least. The letter recorded that it was understood the claimant and his wife would travel back to the United Kingdom to pursue their private charity work and that Her Majesty the Queen may from time to time invite them to attend Royal occasions in the United Kingdom in their private capacity and to participate in family events. The letter said "As you know RAVEC essentially focuses on [redacted text] and who are considered to be at sufficient risk to justify publicly-funded measures to mitigate that risk." RAVEC was said to be "responsible for risks arising within Great Britain as they affect principals who are in almost every case resident within Great Britain. The future arrangements for the Duke and Duchess of Sussex do not fit readily within this framework".

6.    The letter explained that RAVEC had "commissioned up-to-date threat assessments" in respect of the claimant and his wife. RAVEC would continue to monitor the security of the claimant's family, including through periodic threat assessments. If anything should change "in terms of specific threat this would be communicated to the Home Office through established channels with the police and [redacted text] and actioned as necessary".

7.    Given "[redacted text] the Duke and Duchess, the existing provision of [redacted text] by the Metropolitan Police Service ... will no longer be appropriate and will be withdrawn by no later than 31 March 2020". Against the background set out earlier in the letter, there was no basis for publicly-funded security support for the claimant and his wife within Great Britain in relation to [redacted text].

8.    The letter continued that it was "difficult, however, to judge what might be appropriate without knowing the Duke of Sussex's forward programme or what private arrangements if any are being made for his security in Great Britain to link with and complement those which are being put in place in Canada". It was therefore thought to be sensible to put in place liaison arrangements between HM the Queen's Private Office, the Metropolitan Police and the Home Office in order "to look periodically at any forward engagements that may potentially warrant additional security attention". Sir Richard suggested that there should be a tripartite meeting to follow-up these detailed points and, in the light of that meeting, he would "intend to look at what guidance should be issued about the support to be provided and the mechanisms for liaison and the approval of support in individual cases".

9.    The letter ended by saying that, in the light of his personal involvement in future security arrangements for the claimant and his wife, the letter was being copied to Sir Mark Sedwill. It was also being copied to "[the Current Chair] and [redacted text] (MPS) but not more widely to other RAVEC members".

10.   Both the lead-up to the decision of 28 February 2020 and certain matters which post-dated it need to be set out in detail. In order to assist understanding, it may be convenient at this point to name and say something about those who feature most prominently in the account which follows. What I am about to say solely derives from the evidence before the court, either in the form of communications such as emails or the witness statements which have been filed and served in the present proceedings.

*DRAMATIS PERSONAE*

11.   **Sir Richard Mottram** was the Chair of RAVEC from 2009 to April 2021.  He had previously been Permanent Secretary in the Office of Public Service and Science within the Cabinet Office, the Ministry of Defence, the Department for the Environment, Transport and the Regions, the Department for Work and Pensions and, finally, Permanent Secretary Intelligence, Security and Resilience and Chair of the Joint Intelligence Committee in the Cabinet Office.  Sir Richard's first witness statement says that he has "extensive experience of Government across a wide range of policy areas, and am very familiar with decision-making in matters of, or touching on, national security".

12.   **[redacted text]** was the Secretary of RAVEC and the Chair of the Risk Management Board ("RMB").  In his emails to Sir Richard Mottram of 9 and 10 January 2020, [redacted text] describes himself as Head of Protective Security Section/Office for Security and Counter-Terrorism Home Office.  In his emails to the same recipient of 21 and 25 February 2020, [redacted text] describes himself as Deputy Head of Royalty, VIP and MP Security Unit Office for Security and Counter-Terrorism.

13.   **[The Current Chair]** became the Chair of RAVEC in 2021.  He was Chair at the time of the claimant's visits to Great Britain in April and June/July 2021 and March/May and June 2023.  [The Current Chair] was [redacted text] and [redacted text]. [The Current Chair]'s witness statement says he is "acutely familiar with the national security and counter-terrorism apparatus and in planning for and addressing risks in connection with the actions of hostile actors".

14.   **[A]** was the Royal Household's [redacted text].  He was a member of RAVEC at the time of the February 2020 decision.  [A] was also a member of the RMB.

15.   **Sir Mark Sedwill** was the Cabinet Secretary in 2020.

16.   **Shaun Hipgrave** is the Director of Protect and Prepare in the Homeland Security Group, formerly known as the Office for Security and Counter-Terrorism.  He assumed that role in 2019.  In his first witness statement, Mr Hipgrave describes his role as being the senior responsible owner of the Government's Counter Terrorism Strategy's objectives of keeping the public safe by strengthening protection against terrorist attacks and minimising the impact of such attacks. Mr Hipgrave states that the "Royalty, VIP and MP Security Unit ("RVIP") sits within my Directorate". The RVIP provides a Secretariat to RAVEC. Although not personally a member of RAVEC, Mr Hipgrave states that he is one of those responsible for informing the Secretary of State about RAVEC's work.  Mr Hipgrave attended RAVEC meetings on behalf of the Home Office and was responsible for the Home Office officials who worked in connection with RAVEC and acted as its Secretariat.  Mr Hipgrave was not involved in the 2020 decision but was involved in a decision in June 2021, concerning the claimant's visit to Great Britain. Mr Hipgrave was in the military for ten years and was a police officer for thirteen years.  He also has a background in the private-sector working with law enforcement agencies.

17.   **[redacted text]** was, in 2020, a senior civil servant in the Cabinet Office, working with the Cabinet Secretary. [Redacted text] appears to have been concerned with the claimant's security whilst the latter was outside the United Kingdom.  In 2020, that issue

was the responsibility of the Royal and Ministerial Visits Committee ("RMV"). References in the emails to "[redacted text]" are references to [redacted text].

18. **Sir Edward Young** was Private Secretary to Her Late Majesty Queen Elizabeth II.  As such, he was a member of RAVEC: paragraph 6 of the 2017 RAVEC terms of reference. In paragraph 16 of his second witness statement, the claimant says he was "expressly told that all correspondence [concerning his security] was to go through the Royal Household, specifically Sir Edward Young and Clive Alderton."

19. **Tom Laing-Baker** was the Late Sovereign's Assistant Private Secretary.  Mr Laing-Baker was not a member of RAVEC in 2020. (He appears to have become a member by 2021, according to the 2021 RAVEC terms of reference.)

20. **Simon Case** was the Private Secretary to the Duke of Cambridge.  He was not a member of RAVEC or the RMB.

21. **Fiona Mcilwham** was Private Secretary to the Duke and Duchess of Sussex.  She was not a member of RAVEC or the RMB.

### THE BACKGROUND TO THE DECISION OF 28 FEBRUARY 2020

22. On 8 January 2020, an announcement was made in relation to the claimant stepping back from official Royal duties and a public role.  On 11 January 2020, Sir Edward Young emailed the claimant with a draft paper, which was largely the work of Simon Case, concerning the detailed arrangements to give effect to the announcement.  Following a meeting at Sandringham on 13 January 2020, what the claimant describes as "an agreement of sorts was reached", which has been described in the media as the "Sandringham Agreement".  Under the heading "on Security", it was stated that given the claimant's public profile, as a result of being born into the Royal Family, his military service, his wife's own independent profile and the history of targeting of the Sussex family by right-wing extremists, the family would "continue to require effective security to protect them".  The Royal Family would support "the Sussexes in making the case for effective support from Her Majesty's Government and Canadian and other host Governments, whilst noting that these are independent processes and decisions for those Governments".

23. It is necessary at this point to refer to the witness statements of Sir Richard Mottram, since the account of the emails which follow concerns the exhibits to his two statements. Following the announcement of 8 January 2020, Sir Richard says that he and his team began to receive enquiries from other parts of Government and the Metropolitan Police in relation to the claimant's security provision.  Sir Richard and his team were aware that RAVEC would need to take a view on the matters that were within its purview, which did not extend to any protective security provision overseas; and that they would need to do so within a relatively short space of time, given the unusual and very high-profile context.

24. On 9 January 2020, [redacted text] wrote to Sir Richard Mottram "regarding last night's news".  Among the issues referred to in the email was what [redacted text] protection should be afforded to reflect the evolving role of the claimant and his wife, both in Great

Britain and overseas; and what [redacted text] protection the Royal Household might seek to secure.

25. Later on 9 January, Sir Richard Mottram replied to [redacted text] by email, stating that he was happy for [redacted text] to set up a meeting; although since he thought that [redacted text] was away, it might be difficult to fit that in with him at least. Sir Richard's initial thoughts were that it was difficult to reach a clear view on future security arrangements unless there was more clarity about the future roles of "the Principals" (that being the expression used in regard to those within the RAVEC cohort) and how they intended to divide their time.

26. On 10 January, [redacted text] replied to Sir Richard Mottram. The focus of this email was on security arrangements in Canada. The same day, Sir Richard Mottram responded. He noted the website of the claimant and his wife, which suggested that there would be no change in their security arrangements. Sir Richard said that, as Chair of RAVEC, he would expect to review in due course arrangements within Great Britain, without any prior assumptions about what would and would not be appropriate in the new circumstances. He suggested that [redacted text] speak privately to [A] to point out that provision for security both in Great Britain and overseas would need to be looked at in relation to [redacted text] the claimant and his wife.

27. Also on 10 January 2020, [redacted text] emailed to say he had spoken to [A] and mentioned that the Royal Household was preparing advice for the claimant and his wife on a range of issues, including security. [redacted text] said that apparently the security advice was going to flag to them that HMG might not be prepared to pay for security in the long term under the new arrangements, "So the Household are alive to this possibility".

28. On 13 January, Sir Richard Mottram emailed [redacted text] to say that he had had a discussion by telephone with the Cabinet Secretary, who was planning to put in writing with the Royal Household the line he was taking on the security arrangements:-
"In essence this was that [redacted text]. I commented that the Royal Household tended to see matters in [redacted text] – whereas we considered [redacted text]. There might be circumstances where some state support was justified in the context say of [redacted text] but this was different to [redacted text].
He said the Royal Household had also asked whether it was open to them to ask to pay for security delivered by the MPS but he had ruled this out. I agreed."

29. On 16 January 2020, Fiona Mcilwham emailed Sir Mark Sedwill. She thanked him for the helpful conversation the two of them had had on 15 January, stating that she had "faithfully relayed the details you had provided on security and finance/ tax exemptions to the Duke". Ms Mcilwham said that the claimant remained most concerned about security arrangements for his family. She noted that Sir Mark had highlighted that [redacted text]. She noted Sir Mark's suggestion that with a clearer sense of the claimant's schedule and, in particular, more detail on the [redacted text], Sir Mark and colleagues might be able to offer a more informed view. To that end, Ms Mcilwham attached for "illustrative rather than exhaustive" purposes, a list of "[redacted text]", involving the claimant.

30.  Following receipt of that email, Sir Mark Sedwill spoke by telephone to Sir Richard Mottram, who then emailed [redacted text].  In the email, Sir Richard referred to the telephone conversation with Sir Mark, who said he had had detailed conversations with "the Duke and Duchess of Sussex, and others in the Royal Household including Edward Young, about their future status and the implications for their future security arrangements".  That future status was still being finalised.  What followed in the email was said to be on the assumption that the couple "would essentially become private citizens and would spend much of the year in Canada".  [redacted text].  Sir Mark Sedwill had told them that they should have no expectation that the present security arrangements in Great Britain would continue.  RAVEC would wish to review what was appropriate.  RAVEC would address any need to mitigate risks of [redacted text] "but not provision because they were celebrities and faced intrusive interest from the public or the press".  If they had concerns regarding the latter risks, they could look to private sector provision.  [redacted text], Sir Mark Sedwill said he had told the Duke and Duchess [redacted text].  Although the Royal Household had raised the possibility of making a contribution to the costs of provision by the MPS when acting in support of the Duke and Duchess while they were engaged in [redacted text], this had been ruled out.

31.  Sir Richard Mottram asked how this had been received "and unsurprisingly there had been push-back from the Principal".  Sir Richard added that it was "very helpful for those concerned including Sir Edward Young to hear these messages from [the Cabinet Secretary] because when they heard them from me their reaction was to go above me to try to block action of any kind".  Sir Richard said that Sir Mark told him that there was no immediate further action needed such as, for example, to set out in writing what approach and processes RAVEC would follow in this case.  It was said that the two of them could discuss timing of a substantive review of the current Great Britain provision "in the light of the work you have in hand on an accelerated action plan". "You" is a reference to [redacted text].

32.  I should mention here that Sir Richard Mottram says in his first witness statement that, before the commencement of the present proceedings, he had not seen the draft paper mentioned in paragraph 22 above.  The same was true of the email from Fiona Mcilwham of 16 January 2020.

33.  On 27 January 2020, a meeting took place at Buckingham Palace.  It was chaired by Sir Edward Young and attended by Sir Mark Sedwill, Sir Richard Mottram, Tom Laing-Baker, Fiona Mcilwham, Simon Case and [A].

34.  [A] composed an email on 28 January, recording what had been discussed.  Under the heading "UK Government Position", Sir Mark Sedwill was recorded as saying that [redacted text] would very likely result in [redacted text].  He said it was very clear that from the Government's point of view [redacted text].  That would be the Government's position, even if the arrangement was in the nature of a fixed-term sabbatical.  If, however, [redacted text], then this re-categorisation could be reassessed.  The Government's advice would be for the claimant and his wife to contract a private security team, which had the confidence of the Canadians, as well as having a [redacted text].

35.  Under the heading "Risk review and Royal Risk Management Boards (RMB)", Sir Richard Mottram was recorded as setting out the standard Home Office processes that

would be followed, including risk assessment reviews.  Sir Richard agreed to commission the [redacted text] work required, with Royal Household engagement at the RMB.

36.   Under the heading "Threat Levels", Sir Richard Mottram set out that the threat level for the claimant [redacted text].  These threat levels would be reviewed as part of the risk assessment processes by the Home Office.  The results would be shared "with the Executive Committee [of RAVEC] in due course.  It was agreed that such assessments will need to be reviewed more frequently than annually, to ensure that security arrangements are commensurate to any threats and risks.  Threat assessments may change dependant on the role and profiles of the Principals during the next 12 months".

37.   Under the heading "Timeline for Change", it was noted that the Canadians were "planning to review security arrangements in days, rather than weeks.  The MPS would need to do the same".  Sir Mark Sedwill said that it was therefore necessary to start making new security arrangements as soon as possible.  He also said it might be possible to tolerate a "glide-path", while Sir Richard Mottram said that there could be a temporary transition period, with [redacted text], on the understanding that it would be for a short period only.  There was recognition that the security transition would be "challenging".

38.   Under the heading "Agreed Next Steps and Actions", the email recorded that the Home Office was "to complete a RMB/risk assessment [redacted text]".  [A] was "[redacted text]".

39.   Sir Richard Mottram's first statement says that, in the course of the discussion at this meeting, Fiona Mcilwham made some representations on the claimant's behalf.  She explained that the claimant's concerns over no longer being part of the RAVEC cohort were two-fold: (i) the claimant's [redacted text]; and (ii) he wanted to ensure that the British Government recognised [redacted text].  Sir Richard said he indicated that it would be possible for RAVEC to continue to carry out and monitor threat assessments in relation to the claimant, even after any withdrawal of protective security, [redacted text].  He said he fully understood the claimant's view in relation to threat although it was explained that it was unavoidable that [redacted text].  Sir Richard notes that the witness statement of the claimant says that the latter was not aware of the meeting at the time, although he knew discussions between officials were taking place.  As to this, Sir Richard states that it was his understanding and expectation that the claimant's private secretary and probably other Household officials would be discussing with him what had taken place at the meeting.  In this regard, Sir Richard notes the fifth action point in the email of 28 January, which recorded as the third of the agreed next steps and actions that Fiona Mcilwham would "consult with Principals and put in place plans for starting commercial provision".

40.   On 5 February 2020, Sir Richard Mottram emailed [redacted text] to say he had been told by the Cabinet Office that Sir Edward Young was about to write, setting out final details of the claimant's future role.  This would allow RAVEC properly to review the claimant's security on an informed basis.  In his first witness statement, Sir Richard says that, throughout that period, Sir Richard and Home Office officials, particularly [redacted text], were liaising with other members of RAVEC and interested bodies.  Both Sir Richard and [redacted text] kept in regular contact with the MPS, being aware that the MPS were keen for the situation to be resolved as swiftly as possible, especially since they had officers in Canada with the claimant and his family.  The MPS did not, however,

have any particular view on the appropriate security arrangements for the claimant in Great Britain in the future.  Sir Richard says that everyone "shared the understanding that such a fundamental and deliberate change [redacted text] would inevitably involve some measure of change to the protective security authorised by RAVEC".

41.  On 6 February 2020, Sir Edward Young wrote to Sir Mark Sedwill to describe what had been agreed between Her Majesty the Queen and the Duke and Duchess of Sussex in January "about what will and will not change in the ways in which the Duke and Duchess of Sussex lead their lives".  Sir Edward said that not every detail was yet known but he had endeavoured to set out as much information as he could about what had been agreed "some two weeks ago".  Under the heading "Security", reference was made to the claimant's public profile by virtue of being born into the Royal Family, as well as his military service.  Reference was made to the Duchess's own independent profile and well documented history of targeting. The Royal Family was also "mindful of tragic incidents of the past".    The document said that "discussions to date, including with Sir Richard Mottram, have been useful in making sure that the parameters of the RAVEC process are well understood".  Her Majesty and the Family recognised that these were "independent processes and decisions about the provision of publicly funded security", which were "for the UK Government, the Government of Canada, and any other host Government".

42.  This communication from Sir Edward Young was forwarded by the Cabinet Office to Sir Richard Mottram on 10 February.  Also on 10 February, Sir Richard Mottram received by email a copied and pasted extract from a letter which the claimant had sent to the Cabinet Secretary.  Sir Richard was not given the entire letter at the time.  He says in his first witness statement that the part concerned with security arrangements in Great Britain was passed on to him because the Cabinet Office wanted to explore whether he thought it was better for him to respond.  Sir Richard replied on 12 February 2020, saying that he did not think it was sensible for him to reply to parts of the letter, not least because much of its focus was on security arrangements overseas, which was not a matter for RAVEC.  Sir Richard considered that any response was for the Cabinet Office, although he offered to make suggestions on any draft.  In the event, he was not sent any draft reply upon which to comment.

43.  The claimant's letter to Sir Mark Sedwill (sent by Fiona Mcilwham on 10 February) expressed the claimant's disbelief that such important conversations were being had without any attempt by anyone to consult the claimant.  The claimant could not see how he could have his security removed, unless the current risk to him and his family had decreased, [redacted text].  The claimant asked who would be willing to put him and his family in a position of extreme vulnerability and risk – "a position that no one was willing to put my mother in 23 years ago – and yet today, with greater risk, as mentioned above, with the additional layers of racism and extremism, someone is comfortable taking accountability for what could happen.  I would like that person's name who is willing to take accountability for this choice please …".  As well as the claimant's biggest concern being "[redacted text]", he believed that it was "essential to our safety to keep MET security, [redacted text]".  The claimant said he had been told "[redacted text]".  The claimant said the biggest threat was "[redacted text]".  The claimant considered that the decision was being imposed upon him "without a sensible amount of consultation as some form of punishment for protecting my family and putting them first".  He suggested a 6-12 month review in order to establish sensible protection measures so that this new model was given a better chance of success.  He would like "to see a full report of the

current risk matrix please, and the justification that countries outside of the UK somehow change the international threat to us".

44.  On 18 February 2020, Sir Mark Sedwill wrote to Sir Edward Young in response to the email of 6 February 2020.  Sir Richard Mottram received this correspondence on 25 February 2020.  It refers to Sir Mark having met the claimant on 3 February 2020 and having received his letter on 10 February 2020.  The letter said Sir Mark was reassured to understand that Sir Edward had begun to develop options for private provision for the relocation of the claimant and his wife to Canada.  Thereafter "through RAVEC and in co-ordination with the Canadian authorities, the Government will continue to monitor the security of the Sussex family and ensure that their private security provider [redacted text]".

45.  Meanwhile, Sir Richard Mottram's first witness statement says he liaised with Home Office officials regarding the commissioning of formal threat assessments in relation to the claimant.  A threat assessment was provided and considered by Sir Richard at a meeting with Home Office officials on 11 February 2020.  A further assessment was made available to him at the same time, regarding [redacted text]. Sir Richard says that the assessment he read on 11 February 2020 was produced on the basis of the law enforcement [redacted text] expertise available to the British Government. It was not the role of RAVEC or any of its members, including Sir Richard, to second-guess the content or conclusions of a threat assessment.  That was a matter for the bodies and officials who have the expertise and access to the relevant information.  When considering the protective security measures any Principal should receive, RAVEC accepts the conclusions and reasoning of the threat assessments available and then makes its decision as to the proportionate and appropriate measures which were informed by that assessment.

46.  The threat assessments that Sir Richard Mottram saw in February 2020 were and remain "highly classified documents" and they have not been produced in connection with these proceedings.  However, the threat statement came with a summary, which is said to have been formulated specifically to remove material of the greatest sensitivity.  The witness statement records certain aspects of the summary.  This includes that [redacted text]. Appended to the assessment was [redacted text].

47.  Sir Richard Mottram says that he also had regard to other specific forms of threat assessments produced in relation to the claimant on 14 February 2020 in relation to [redacted text]; and on 19 February 2020, in relation to [redacted text].  These assessed the threat to the claimant as [redacted text] respectively.  Again, these documents are said to be extremely sensitive.  Sir Richard says that this description of the threat assessments was being provided "on an exceptional basis" for the purposes of considering the claim. Threat assessments would not ordinarily be disclosed, even to the Principal, and even on confidential terms.

48.  Sir Richard Mottram's first witness statement says that on 21 February 2020, [redacted text] informed Sir Richard Mottram that he had spoken to [redacted text] for the Royal Household (namely, [A]) who had passed on a request from Fiona Mcilwham, supported by Sir Edward Young, that Sir Richard should send a letter setting out RAVEC's position on the rationale and timeframe for the removal of MPS protection.  It was intimated that this would help to further official communication to the claimant as well as managing

the transition of arrangements and associated planning. [redacted text] had made it clear to [A] that no final decision had yet been taken.

49.   [redacted text]'s email of 21 February to Sir Richard Mottram records "[redacted text]" [[redacted text]] as wondering whether Sir Richard might wish to write to the Household to confirm that the claimant no longer fell within the RAVEC system and stating that [redacted text] and committing to run an RMB after, not before, that letter is issued. The email said that in broad terms "[redacted text]". The purpose of the RMB "would be simply to inform the nature of the scale of any [redacted text] which the Household might wish to put in place". [redacted text] felt that might help to ensure there was a [redacted text], which he understood the Cabinet Secretary wished to see. [redacted text] also asked whether RAVEC would be happy to commission threat assessments for the claimant and his wife on an annual basis, [redacted text].

50.   Meanwhile, on 19 February 2020, [A] had written to Fiona Mcilwham to record that he had confirmed certain matters "with the Home Office team that support Sir Richard in his role as independent Chair of [RAVEC]".  The Office for Security and Counter-Terrorism (OSCT) requested updated intelligence assessments [redacted text].  This included "[redacted text]".  As part of the established process, the reports would be compiled and shared with the Home Office Deputy Head of Royalty and VIP, in his capacity as Chair of the Risk Management Board.  Thereafter, the reports would be released to [A], and the Royal Household representative at all annual RMBs [redacted text].  A date for the RMB/Intelligence review on the claimant and his wife was to be confirmed. The Royal Household was pushing for the process to be completed as soon as possible, "certainly before mid-March … Going forward, mindful of geographic location, the request to Sir Richard and the Home Office (to the MET) will be that this active threat monitoring continues" for the claimant and his wife.  Senior Metropolitan Police colleagues were said to be supportive.  In terms of [redacted text], [A] said that [redacted text].

51.   On 19 February 2020, Fiona Mcilwham forwarded both Sir Mark Sedwill's response to Sir Edward Young's letter of 6 February and the email just mentioned from [A].  Ms Mcilwham said this was to provide "reassurance that there will be active threat monitoring by UK plc regardless of the type of security arrangement in place".

52.   On 20 February, [A] wrote to the claimant to say that "working with Fiona, I am aware of the high-level policy discussions that have occurred, but do not work at a level where I can directly influence outcomes".  What [A] had been doing on the claimant's behalf was "scoping what 'best in class' commercial security provision is available in Canada and the US".  The same day, the claimant replied to [A] to say that no one from government had actually told the claimant what the final decision was and that he had not received any reply to the questions that he believed he deserved to know "before making this next step".

53.   On 21 February 2020, [A] replied that, "working with the support of Fiona and Edward", he had requested, via the Home Office, a formal letter to be written to the claimant from the Chair of RAVEC.  In requesting that letter, [A] had verbally signposted the concerns the claimant had detailed and suggested to Ms Mcilwham that they should await the content of that letter before deciding how best to seek any additional detail if questions remained unanswered.  Also on 21 February, the claimant replied to say that hopefully

"Richard can answer the concerns and prove to me that someone has actually thought about the consequences without being punitive, which is how most of the decisions have been made in the last couple of months".

54. On 24 February 2020, Sir Richard Mottram emailed [redacted text] to thank him for the "very helpful round-up".  So far as concerned [redacted text]'s approach to the Principals, Sir Richard was not sure that the approach was defensible.  As had previously been discussed, Sir Richard had already set out the tests of public provision of security in his letter to Sir Edward Young about [redacted text].  This set out [redacted text].  The issue was [redacted text].  Given [redacted text], Sir Richard considered [redacted text].  What were unclear to Sir Richard were the [redacted text].  This suggested to Sir Richard that [redacted text].  If the Principals and the Royal Household [redacted text], then "they would [redacted text]".

55. Sir Richard said that "if we follow this line of argument there would be no RMB but we would organise an exploratory meeting on these lines on a tripartite basis.  I suggest we discuss tomorrow whether this approach stacks up and whether I would write to the Household before or after the tripartite meeting?".  On the commissioning of intelligence assessments, if the Principals were to spend most of their time overseas, then "it might be expected RMV would take the lead but [redacted text] and am happy for it to be a RAVEC responsibility".

56. On 26 February, Sir Richard Mottram wrote to [redacted text], further to his email on 24 February and the discussion that had taken place on 25 February.  In the light of these, Sir Richard had drafted a letter to Sir Edward Young, upon which he welcomed [redacted text]'s drafting points, as well as the points that others might have on it. Having agreed the text amongst themselves, they then "might show it to [redacted text]".

57. The same day, [redacted text] wrote to Sir Richard Mottram to thank him for the letter. He agreed that this "has tied together most of the strands we were grappling with yesterday".  [redacted text] asked whether he was correct in understanding that "this means there will not be a further/final RMB for [the claimant] on the grounds this is no longer required given alternative government arrangements will be established for [redacted text]"  [redacted text] said he suspected "we will be pushed for this clarity (not least by [redacted text])".

58. On 27 February, Sir Richard Mottram replied to [redacted text]. As to the first of his queries, relating to the RMB, Sir Richard said "your understanding is correct".

59. Sir Richard Mottram's first witness statement states it was at this point clear in his mind that the claimant [redacted text] such as to justify inclusion in the RAVEC cohort. Accordingly, Sir Richard had to consider whether the claimant [redacted text].  However, it was possible that the claimant [redacted text].  [redacted text], Sir Richard envisaged putting in place a mechanism for liaison between the Royal Household acting on the claimant's behalf, the police and the Home Office, to [redacted text].  It was on that basis he began drafting a letter along those lines on 25 February 2020.

60. As regards RMB assessments, the witness statement explains that one consequence in the change of the claimant's role and his decision to live mainly abroad was that the assessment of risk that the RMB had conducted in respect of the claimant in April 2019

had been overtaken by events.  Moreover, the methodology underpinning the assessments of the RMB [redacted text].  Sir Richard Mottram ultimately saw no merit, therefore, in conducting a formal RMB process for the claimant.  The decision to consider the case for [redacted text] was, in Sir Richard's view, a flexible and tailored approach, which better matched the claimant's revised circumstances.

61.    Sir Richard states that the position he reached in the decision of 28 February was his own.  He did not reach it because the Cabinet Secretary had reached a similar view.  Had the Cabinet Secretary expressed a position with which Sir Richard disagreed, as Chair of RAVEC Sir Richard would have taken the position that he felt was right.  As it was, however, both reached the view that a change in the security position was appropriate. Sir Richard considers this was because Sir Richard and the Cabinet Secretary were both deeply familiar with the applicable framework and the handling of different cases over many years.  Sir Richard also believes that RAVEC's decision was in fact more favourable to the claimant than that of the RMV (as regards the position whilst the claimant was outside Great Britain). This was because RAVEC's decision [redacted text].

62.    In the course of preparing his first witness statement, Sir Richard Mottram says that he had seen an email to [redacted text] from [A], dated 28 February 2020, copied to Ms Mcilwham, confirming receipt of the decision letter and that it would be passed to the claimant via his Private Office.

### EVENTS FOLLOWING THE DECISION OF 28 FEBRUARY 2020

63.    An email of 2 March 2020 from Sir Richard Mottram to (amongst others) [redacted text] describes a meeting Sir Richard had that day with Sir Edward Young.  One topic was the decision of 28 February.  The discussion included the issue of arrangements that needed to be put in place regarding Canada.  There was then a brief discussion about [redacted text].  Sir Richard asked why this issue was being raised.  Sir Edward said that he believed the comparison was being drawn by friends of the claimant, who had suggested to him that he was being treated more harshly than [redacted text].  Sir Richard replied that this was to misunderstand [redacted text].  Sir Richard said that RAVEC was planning to look at [redacted text].  There was said to be "no suggestion that the Palace would pursue this [redacted text] argument further".

64.    On 6 March 2020, Fiona Mcilwham wrote to Sir Mark Sedwill on the claimant's behalf. Sir Richard Mottram was sent a copy of that letter, along with a covering email on 9 March from Ms Mcilwham drawing attention to its contents.  The letter referred to the statement made by the Canadian Government about security arrangements for the claimant and his family.  It said that the claimant would be grateful to know in more detail how the current threat assessment was reached.  Although the letter of 28 February set out some of the criteria that guided RAVEC's recommendations, Ms Mcilwham said it did not state whether RAVEC considered fully [redacted text].  The claimant asked what RAVEC thought was the risk from [redacted text].  The claimant also noted that his security [redacted text], which he believed was the wrong way around.  He asked whether RAVEC could, with the upmost (sic) discretion, undertake a revised threat assessment, taking account of this possibility.  In his first witness statement, Sir Richard Mottram says that there was nothing in this letter which caused him any concern that he should revisit the decision of 28 February.

65. Sir Mark Sedwill wrote to Sir Edward Young on 12 March 2020, setting out the position of the RMV in relation to security provision abroad.  The letter also noted that RAVEC's decision of 28 February confirmed that RAVEC would continue to monitor the security of the Sussex family within Great Britain including through periodic threat assessments. Should anything change in terms of specific threat, including [redacted text], this would be communicated to the Home Office through established channels with the police and [redacted text] and be actioned as necessary.

66. The claimant and his family relocated from Vancouver, Canada to California, USA on 14 March 2020.

67. An email of 18 March 2020 from [A] to Fiona Mcilwham described a meeting he had had with the Home Office.  UK police support would involve a process whereby the claimant's Private Office, with support from the Royal Household, would provide events/function detail for review.  This would be an electronic submissions process, working to a 28 days' notice schedule, to allow sufficient time for the necessary assessments to be made.  [redacted text].  [A] said that he was "confident that it will work, but less certain or clear on what outcomes can be expected …  Doing some test cases …  would be a good way to stand up the necessary data flows and agree templates etc".

68. A short formal letter detailing these arrangements was sent by [redacted text] to [A] on 20 March 2020.  This letter was not seen by the claimant.  This was because the Royal Household requested stronger language to be included so that, according to Sir Richard Mottram, there was greater clarity on the future approach.  This resulted in a letter of 23 March 2020 from [redacted text] to [A].  The foot of the letter records that [redacted text] was writing as "Secretary of RAVEC".  Although the letter was not signed, it appears that the letter was forwarded by email on 23 March by [A] to Ms Mcilwham.  The letter says that, as discussed, in cases where augmented publicly funded security arrangements were being sought for specific engagements in Great Britain, the RAVEC Secretariat would require notification from the Royal Household no fewer than 28 days in advance. The Secretariat would then consider that request, consulting with other parts of government where appropriate and in consultation with the Chair of RAVEC where applicable.  Requests would be considered on the basis of the parameters set out in Sir Richard Mottram's letter of 28 February.  For clarity, the letter included an explanation that there was no basis for publicly-funded security support [redacted text].  The letter of 23 March suggested that for planning purposes it would be prudent to assume there would be [redacted text] but that would be reviewed by exception [redacted text] and requested through the Queen's Private Office.

69. In an email to the claimant of 27 March 2020, [A] recommended that, with the policy parameters fixed in the RAVEC and Cabinet Secretary letters, "test case" trips and events should be provided for the Home Office and Cabinet Office to review.  This was put forward with the aim of seeking "a refined and improved judgment on future [redacted text]".

70. On or around 28 March 2020, the claimant responded to [A], stating that he was not aware that the policy parameters were fixed and he thought the security arrangements were to be determined in "test trips".   The claimant said that he would "like them to

provide an example of where someone else has [redacted text].  The obvious difference aside from that is the fact that I was born into this and the threat will never decrease because of my status regarding the Family".

## *RAVEC'S TERMS OF REFERENCE*

71.  At this point, it is necessary to refer in some detail to the terms of reference of RAVEC.  The terms which were current at the time of the decision of 28 February 2020 were those of 2017.  Under the heading "Role", it is explained that RAVEC is responsible for which individuals should receive vulnerability mitigation and/or protection measures at public expense and to what level.  The Home Secretary is responsible and accountable to Parliament for national security, including protection measures.  The Home Secretary delegates decision making responsibility for which individuals should receive the mitigation and/or protection measures at public expense to an independent Chair of RAVEC.  The Chair is appointed by the Home Office Permanent Secretary following consultation with the Cabinet Secretary and the Private Secretary to HM the Queen.

72.  The Chair is responsible for decisions on vulnerability and protection measures for individuals present in England, Wales and Scotland.  Different arrangements apply in Northern Ireland.  The Chair of RAVEC is the owner of any residual risk arising from decisions on who should or should not receive the relevant mitigation/protection measures [redacted text].  Any decisions "will reflect the risk tolerance that the Chair is willing to accept, having consulted with the Home Secretary on the Government's risk appetite and having taken into account [RAVEC] members' views of what would represent a proportionate response to the assessed risk faced by individuals".

73.  [redacted text] will always be provided to the [redacted text].  The Home Secretary and RAVEC has also agreed that [redacted text] those in the immediate line of succession to the throne.  [redacted text].

74.  Under the heading "Membership", the terms of reference state that membership of RAVEC comprises the Private Secretary to HM the Queen, the Master of HRH the Prince of Wales' Household, the Assistant Commissioner Specialist Operations, Metropolitan Police Service, the Deputy Assistant Commissioner Specialist Operations, Metropolitan Police Service, the Director General of the Office for Security and Counter Terrorism, Home Office, the Deputy Director, National Security Secretariat, Cabinet Office (in their role as Chair of the RMV) and the Head of Protective Security Section, Protect and Prepare Unit OSCT (in their role as Secretary to RAVEC).  The Executive Committee of RAVEC will meet at least twice a year in full session but other meetings will be held as and when required, at the discretion of the Chair.

75.  Under the heading "Responsibilities" the Royal Household will provide Royal representation and input, advising the Chair on any specific matters relating to members of the Royal Family.  This is said to help to inform the Chair's decision on whether any vulnerability mitigation and/or protection measures are appropriate at public expense.

76.  Under the heading "The role of the Police Service", the terms of reference state that the Metropolitan Police Service is the national police lead for vulnerability mitigation and protection.

77. Under the heading "The role of the Home Office", it is said that the Home Office is the national lead for the formulation of policy on the protection of Royalty and public figures in England, Wales and Scotland. The policy seeks to ensure the continued and effective assessment of threat and evaluation of risk in order to determine who requires any form of vulnerability mitigation or protection and then ensuring its proportionate delivery for those who are deemed to require it. In the event of serious harm to a protected Principal, the Home Secretary with the support of the Prime Minister, will accept Ministerial accountability for any failure. The Protective Security Section within the Protect and Prepare Unit leads for the Home Office on all issues relating to the vulnerability mitigation and protection of Royal and public figures. The Home Office is responsible for representing the interests of public figures.

78. Under the heading "The role of Cabinet Office", the terms of reference state that the Cabinet Office National Security Secretariat is responsible for the policy governing overseas visits and that they chair the RMV. The Cabinet Office will attend RAVEC meetings to ensure [redacted text] and to be kept informed of domestic decision making.

79. Under the heading "Key tasks", paragraphs 20 to 23 of the terms of reference are as follows:-

> "20. The Executive Committee will:
> - Exercise the national policy on the provision and delivery of vulnerability mitigation and protection measures for members of the Royal Family and public figures.
> - Determine on an annual basis (or more frequently as necessary), a set of reasonable worst-case scenarios against which potential threats to an individual will be assessed, drawing on the advice of [redacted text].
> - Evaluate the risk analysis conducted by the Risk Management Board in order to determine which individuals, [redacted text], should receive vulnerability mitigation and/or protection measures. [redacted text].
> - At a minimum, review annually arrangements that have been agreed and put in place to ensure they remain commensurate to threat and risk.
> - Promote effective relationships between all parties involved in the delivery of vulnerability mitigation and protection measures.
>
> 21. The Executive Committee's risk evaluation is based on the Risk Management Board's risk analysis, but takes into account judgements about the risk appetite of Government. This is based on [redacted text].
> 22. The Chair of the Executive Committee or the Chair of the Risk Management Board will write to, or brief and then follow up in writing, any individual who has been through the risk assessment process in order to [redacted text]. This will include providing [redacted text]. The Chair will articulate what measures will be provided [redacted text].
> 23. If an individual who falls within the remit [of] the Executive Committee, and is in receipt of vulnerability mitigation and/or protection measures, wishes to discuss any aspects of their

arrangements it will be for the individual to raise this with the Chair of the Executive Committee."

80. Although Sir Richard Mottram's first witness statement says he was involved in their creation, the 2021 terms of reference came into force in June 2021, after Sir Richard had been succeeded as the Chair of RAVEC by [the Current Chair].  The 2021 terms of reference make different provision for the role of the Chair.  Instead of the Chair being responsible for decisions on vulnerability mitigation and protection measures and being the owner of any residual risk arising from decisions on who should or should not receive vulnerability mitigation and/or protection measures [redacted text], the 2021 terms refer to the Chair's primary role as being to assist the Committee and to promote productive working relationships within the Committee, seeing actively and constructively to achieve consensus in the work of the Committee. At Annex A (Process of RAVEC decision-making outside regular meeting cycle), it is said that if the Committee cannot reach an agreed view, the Chair will consider any comments and objections and will make a final decision.

81. Paragraph 4 of the 2021 terms of reference reads as follows:-
   "4. Throughout this document, reference will be made to risk, which for the purposes of RAVEC's decision-making brings together a number of factors in the following way:
   (i)      capability + intent = threat
   (ii)     Threat + vulnerability = likelihood
   (iii)    Likelihood + impact = risk".

82. Under the heading "Key tasks", the first bullet point now refers to the Executive Committee evaluating the risk analysis conducted by the Risk Management Board in order to determine which individuals should receive protective security measures proportionate to the assessed risk.

### THREAT ASSESSMENTS AND RISK ASSESSMENTS

83. As well as exhibiting RAVEC's terms of reference, Sir Richard Mottram's first witness statement exhibits an extract from the Government's 2019 National Risk Assessment. Sir Richard states that RAVEC operates within the framework of the National Risk Assessment, which identifies major hazards and threats and assesses the risks involved based upon their likelihood and impact.    The extract concerns "High profile assassination".  It describes the likely public reaction to a successful attack on a high-profile public figure, [redacted text].  The subject of risk assessment is addressed in the first witness statement of Shaun Hipgrave.  As mentioned above, he is Director of Protect and Prepare, formerly known as the Office for Security and Counter Terrorism.  The Royalty, VIP and MP security unit sits within Mr Hipgrave's Directorate.  That unit provides the secretariat to RAVEC.

84. Mr Hipgrave explains that [redacted text].  Mr Hipgrave says it is not the role of the RMB to question or second guess the assessment level, which may differ as between different types of threat.

85. Mr Hipgrave says that one important consideration for all decisions on the protective security to be provided to Principals in RAVEC is the risk analysis which is completed for RAVEC by the RMB.  The RMB provides RAVEC with expert advice in respect of

the threat picture, the risks faced and any proposed mitigation of those risks. Whilst the RMB analysis forms part of RAVEC's wider evaluation of risk, ultimately, Mr Hipgrave says, the matter is for RAVEC. The RMB is chaired by a Home Office official within the Royalty, VIP and MP Security Unit. As we have seen, at the relevant time that was [redacted text].

86. Mr Hipgrave explains that the RMB does not consider [redacted text] or by attempts to intrude on the privacy of a Principal, [redacted text]. Mr Hipgrave considers that last exclusion to be an important one, given the significance of a free press and freedom of expression, which "will inevitably give rise to tensions with individual privacy which is not for RAVEC, or the Government to seek to resolve".

87. The membership of the RMB includes relevant officials of the Home Office, the Royal Household, the Metropolitan Police Service and representatives of any specialist law enforcement body with relevant threat and risk information to provide. The precise details are, Mr Hipgrave says, extremely sensitive and it would not be appropriate, even with the confidentiality restrictions that exist in the present proceedings, to set out in any further detail the membership or the precise nature of the threat assessments carried out by the RMB. It is, he says, sufficient to note that the assessments look to address the full range of potential threats, [redacted text]. The RMB may be invited by RAVEC to consider risk assessing any individual for their potential inclusion within the RAVEC cohort. Such invitations are invariably driven by [redacted text]. The basic pre-requisites for consideration for inclusion within the RAVEC cohort are whether [redacted text]. Mr Hipgrave says that these are not "tick box" tests and meeting them does not guarantee entry into the RAVEC cohort. He considers, however, that they are helpfully indicative of the type of cases which would lead RAVEC to scrutinise carefully whether the individual ought to be included within the cohort.

88. The RMB had previously used a hierarchy where members of the existing cohort sat within their applicable institution, [redacted text]. This scoring process is, however, no longer used.

89. The assessments of threat provided to the RMB include consideration against a list of the most likely reasonable worst-case scenarios which are approved by RAVEC annually. This allows the RMB to reach an overall view of the threat potential. The purpose of the exercise is not to eliminate all risk to all individuals, as that would be impossible and will involve the extension of protective security to every individual in the country. The exercise is always judgmental and evaluative rather than mechanistic.

90. Mr Hipgrave says that the RMB will also consider the degree of impact of any successful attack by reference to a range of indicators. The precise details of these indicators are, again, extremely sensitive. A candid overview, however, would demonstrate that the indicators relate to the following broad concepts of impact:-[redacted text].

91. The RMB also takes into account [redacted text]. All of these matters are put together by the RMB to create a consolidated risk profile for the individual comprising threat, impact of a successful attack and risk. They will also include a recommendation for protective security mitigation.

92.     In general, Mr Hipgrave says it is expected that the RMB will consider each Principal within the RAVEC cohort annually to inform RAVEC decision-making.

93.     Mr Hipgrave says that, as discussed in Sir Richard Mottram's statement, there are a small number of individuals who have left the RAVEC cohort but in respect of which RAVEC has agreed to continue [redacted text].  This means, according to Mr Hipgrave, that [redacted text] and a RMB assessment can be undertaken to carry out more detailed work, if required.

94.     The [redacted text] RMB assessment on the claimant was completed on 23 April 2019.  It set out a "[redacted text]" with [redacted text].  The RMB recommendation was for [redacted text] for the claimant.

### *RAVEC'S EVALUATION CRITERIA*

95.     A paper called "RAVEC Evaluation Criteria" of 27 May 2021, prepared by the RVIP and MP Security Unit, Homeland Security, describes RAVEC's function as being to make decisions on which individuals should be in receipt of publicly-funded security measures and the nature of such measures. It is said to do so by evaluating the risk assessment provided by the associated RMB and any security recommendations the RMB might make. This process is said to be in line with a review of 2016 by John Tesh entitled "Risk Assessment and Decision Making Review of Royalty and VIP Protection".

96.     The paper says that there is, however, no formally documented position that underpins what criteria should be taken into account as part of the evaluation process. Clarifying the framework for evaluation is said to provide a firmer basis for ensuring that decision making processes are applied in a consistent and transparent manner. The document notes that RAVEC's terms of reference have been significantly updated. They include as one of RAVEC's key tasks "a requirement that evaluation criteria be developed and kept under ongoing review". The document says that this "paper sets out a proposed approach to fulfilling that requirement".

97.     The paper recommends that RAVEC formally adopts the evaluation criteria set out in the Tesh Review (I record here that this Review has not been adduced by the defendant in the present proceedings, although it was requested by the claimant). There follows a description of "risk analysis", said to be an inventory of what the risks are, including impact and likelihood; and "risk evaluation", which is said to be a policy-making process in which social values and risk tolerance levels are factored in by Ministers and officials, in order to decide about the objectives of policy, what measures can or must be taken to achieve those objectives and whether the residual risk is tolerable. The paper then expands on these propositions.

### *THE "OTHER VIP CATEGORY"*

98.     Mr Hipgrave's first witness statement deals with an element of the RAVEC cohort that he describes as the Other VIP Category.  It is necessary to explain more about this so-called category.  The Other VIP Category sits alongside what Mr Hipgrave describes as the Role-Based Category and the Occasional Category.  That last category concerns Principals who [redacted text].  The majority of the RAVEC cohort fall into the Role-Based Category because they [redacted text].  For example, [redacted text].  For Royal

Principals, [redacted text].  Mr Hipgrave says that ultimately whether you are a member of the Royal Family [redacted text].  That position will be conveyed to RAVEC by the Royal Household.

99. The Other VIP Category comprises a smaller number of individuals, [redacted text]. They are included within the RAVEC cohort because of the facts peculiar to each individual, [redacted text].  The Other VIP Category is, Mr Hipgrave says, ultimately determined by reference to the Government's risk appetite; that is to say, the level of exposure to risk that is considered tolerable and justifiable by Ministers.

100. In his confidential schedule to his first witness statement, Mr Hipgrave states that there are [redacted text] within the Other VIP Category.  [redacted text].

101. [redacted text]

102. In addition to [redacted text], Mr Hipgrave says that [redacted text].

103. At paragraph 31 of his first witness statement Mr Hipgrave emphasises that the three categories he describes (Role-based, Other VIP and Occasional) are not labels that RAVEC uses on a day to day basis and that RAVEC does not formally categorise Principals in this or any other way.  He had formulated the labels or categories in order to help to explain the makeup of the cohort for the assistance of the court.

### THE CLAIMANT'S VISITS TO THE UNITED KINGDOM, FOLLOWING HIS RELOCATION TO NORTH AMERICA

104. The claimant visited the United Kingdom in April and June 2021, April, June and September 2022 and March, May and June 2023.  It is common ground between the parties that, if the decision of 28 February 2020 is unlawful, then decisions made in relation to security arrangements for these visits by the claimant would also be unlawful because they were made under the process set out in the 2020 decision.  The claimant, however, also seeks to make specific challenges in relation to the visits of June 2021 and March, May and June 2023.

105. In February 2021, the late Duke of Edinburgh's health was declining.  On 20 February 2021, [A] emailed the Home Office regarding the UK security provision for the claimant in respect of [redacted text] security for the claimant. [A] formally requested "an emergency RMB on Monday to inform decision-making and provide clarity to" the claimant. On 21 February 2021, [redacted text] of the Home Office replied, saying that he and [A] had agreed separately that it would be useful to speak the following day.  Also on 21 February, Lucy D'Orsi of the Metropolitan Police wrote regarding the claimant's position.  She said that the claimant should be dealt with under the inward visitor process and that Sir Richard Mottram did not have involvement in that, as far as she was aware. She was also not aware that [redacted text] and she was "not convinced we need an RMB process as we do not do that for incoming visitors do we?".

106. On 10 April 2021, an individual who for the purposes of these proceedings is called X emailed [A].  X is one of the individuals who provides the claimant and his family with security in the US.  X requested a threat and risk assessment with the most up-to-date information.  X's preference was to have this done prior to their departure that evening

but if that were too short a timeframe, X would need it by the time the claimant [redacted text]. The same day, [A] replied that he was confident that in line with established procedures, [redacted text] the following day. On 11 April 2021, [A] wrote to the Metropolitan Police to thank them for their assistance and to show a draft of what he intended to give to the claimant to explain how this specific trip had been risk assessed.

107. According to Mr Hipgrave's first witness statement, he regarded [A]'s reference to "an emergency RMB" as an incorrect use of terminology. In actuality what was being requested was an emergency meeting between the three relevant organisations to discuss options so that senior members of the tripartite could make decisions about how to proceed. Mr Hipgrave agrees with the observation that an RMB would not be appropriate because the claimant's visit to attend the funeral of the Duke of Edinburgh was to be covered using the Inward Visitor Protection Policy (IVPP) which is created to deal with the protective security arrangements for international visitors to the United Kingdom. Under it, specific consideration could be given to national interest cases where protection for specific and clearly defined visits could be justified. Mr Hipgrave said that he supported the use of IVPP in principle on this occasion because it was a pragmatic and compassionate solution to the problem that RAVEC was not a suitable vehicle to make decisions with fewer than 28 days' notice, in a context such as the Duke's passing, where such notice was not possible. A threat assessment was not carried out in respect of the claimant with regard to the use of the IVPP because [redacted text]. In the event, the claimant was covered by the IVPP, which meant [redacted text].

108. In early June 2021, X, on behalf of the claimant, began to discuss a visit that the claimant was planning for June and July. One purpose of the visit was the unveiling of a statue in the gardens of Kensington Palace in honour of Diana, Princess of Wales.

109. In the witness statement of X, he refers to "Teams" calls with [A] for the Royal Household. Mr Hipgrave says that RAVEC was not aware of these calls or their content. The first email correspondence of which Mr Hipgrave is aware was between the Home Office and [A] on 7 June 2021. A Home Office official made a proposal to [A] which it was emphasised had not yet been put to the Chair of RAVEC. In this email, the proposal was [redacted text]. Mr Hipgrave says [redacted text].

110. On 10 June 2021, a meeting took place between officials to discuss the proposed mandate to be issued by RAVEC [redacted text]. Mr Hipgrave says that at this point no wider itinerary for the claimant was known. There were then emails between [A] and X, who on 11 June 2021 said that the claimant would also be attending an event called WellChild on 30 June 2021 at Kew Gardens. Mr Hipgrave says that this email of 11 June 2021 was the first time that anyone on behalf of the claimant had identified for RAVEC's purposes the details of the event to be held on 30 June 2021. This was 19 days before the event, rather the minimum 28 days required by RAVEC.

111. On 16 July 2021, [the Current Chair], now Chair of RAVEC, invited Mr Hipgrave to a video call that was due to take place on 18 June 2021 in order "to agree an approach for [the claimant's] [redacted text] and also discuss the way forward for when [the claimant] and family come to the UK in the future". In advance of the call, Mr Hipgrave was provided with a briefing note. This included a proposed mandate written by Home Office officials and approved as a draft for discussion by RAVEC's Chair. Each of the individuals attending the meeting had, Mr Hipgrave says, been made aware of the

proposed mandate before the meeting.  At the beginning of the meeting, the proposed mandate was also set out.

112.  The proposed mandate was said to be based on the claimant's itinerary as provided in draft by the Royal Household.  [redacted text].  The mandate provided for [redacted text].  So far as the Kew Gardens event was concerned, the document stated that [redacted text].  It was stated that as per Sir Richard Mottram's letter of February 2020, RAVEC [redacted text].  That position was believed to be supported by the Royal Household "although there is unease around this course of action".  In line with Sir Richard Mottram's letter and discussion with the Royal Household, [redacted text].

113.  The document also contained bullet points under the heading "Future visits from [the claimant] and family".  It was said that once the Royal Household's position on future visits was clear, the Home Office intended to codify the arrangements outside of the usual process, with a label to cover the Principal and his family, such as "exceptional membership".  Under the heading "Background", it was said that the claimant's historic threat assessments and current profile had been considered, as well as views of security professionals in the police and Royal Household.

114.  On 24 June 2021, RAVEC's Chair wrote to the Executive Committee members concerning the protective security arrangements for the claimant for his visit.  The letter said that the arrangements were considered to be a proportionate package that was in line with RAVEC's position as set out in Sir Richard Mottram's letter of 28 February 2020 and Mr Hipgrave's letter to [A] on 20 May 2021.  The approach taken for protective security on this trip provided, the letter said, a potential model to be applied for future visits of the Principal and his family.  For the purposes of such visits, the Principal was in effect considered an "exceptional member" of the RAVEC cohort.

115.  On the evening of 24 June, the claimant's legal representatives, Schillings, wrote to [A] raising concerns about the approach taken by RAVEC.  The letter from Schillings stated that they were aware of what future arrangements were set out by the then Chairman of RAVEC and the then Cabinet Secretary in February and March 2020 and that "we reserve our position on these statements of policy for now".  The urgent issue, raised in the letter, was the need to resolve security cover for the claimant's "imminent visit to the UK".  The letter contended that although the claimant's role may have changed, the risks he carried had definitely not.  [redacted text].  The letter queried why RAVEC was taking the view it did on this event when "[redacted text]".

116.  Mr Hipgrave says that the June decision letter was not issued on 24 June but held back for reconsideration at an urgent meeting the following morning.  This telephone meeting with RAVEC's Chair took place on 25 June.  The Chair was provided with a copy of Sir Richard Mottram's letter of 28 February 2020.  He was also given a copy of the threat assessment in respect of the claimant which had been carried out in order to inform the February 2020 decision.  He was also given a 2021 "[redacted text]", which was a document commissioned from [redacted text] in order to assist the decision making earlier in 2021.  It was agreed at the telephone meeting that the letter would be sent to the claimant and his solicitor.  RAVEC considered the representations made on behalf of the claimant.  It reached the assessment that [redacted text] compared with that discussed on 18 June.  Accordingly, a change in position was not appropriate.

117. After further communications from Schillings in which, amongst other matters, they highlighted media awareness of the charity event, Mr Hipgrave sent Mr Robinson of Schillings a letter dated 29 June 2021. In this letter, Mr Hipgrave stated that the concerns mentioned had been considered and that "we take the decisions around protected security for the Duke extremely seriously". The significance the Home Office attaches to protective security was "reflected in the long-established [RAVEC], which is responsible for carefully considering the important and complex issues regarding decisions on protective security for certain individuals". The letter went on:-

"You noted in your letter that you have seen the arrangements set out in previous correspondence from early 2020 and April 2021, which deals with the measures in place leading up to and following the point at which the Duke ceased to be a working member of the Royal Family residing in Great Britain. The decisions regarding the Duke's security for this visit to Great Britain are consistent with the positions taken in those letters.

Correspondence of February 2020 stated that [redacted text].

118. Following the description of the protective security measures to be provided for the visit, the letter said that "the package offered to the Duke, as described above, constitutes a bespoke security package that takes account of the particular, unique facts and circumstances at play. The tailored nature of the package demonstrates the care and consideration that has been involved in ensuring that appropriate measures are taken for this visit". The letter said that such decisions and assessments of threat and risk were made following "further discussion and consultation with partners, which look at a range of factors when considering the appropriate [redacted text] protection afforded to a given individual". The letter ended as follows:-

"It would be inappropriate for me to discuss the protective security measures in place for any other individual, but to be clear, while one factor to be taken into account is the way in which other members of the cohort requiring [redacted text] protective security are treated, we consider each case on its own facts. Those provided with publicly funded protective security and the nature of the measures in place, are kept under regular review to ensure the allocation of police resource is fair, consistent and appropriate".

119. Schillings responded on 1 July. They asked whether a formal threat assessment had been made for the claimant, in light of his change of circumstances. Mr Hipgrave's reply of the same day was that it was not possible to share details of threat assessments with private persons in receipt of protective security or their representatives, due to the classification of that material. Reference was made to the letter of 28 February 2020, in which it was said that threat assessments were commissioned for the claimant [redacted text] at that time. As such, it was right at that juncture to review his security arrangements. It was repeated that [redacted text].

120. In his witness statement, X describes transportation to the WellChild awards event at Kew on 30 June 2021. X says that it was unsatisfactory and dangerous. [redacted text]. X says that they encountered difficulties leaving the WellChild Awards event. Paparazzi ambushed the vehicle at several points during their return, which posed a risk to the claimant both physical and mentally. Being cornered by the paparazzi made them feel like "sitting ducks". X says that "we all know that the Duke's mother died at least partly as a result of the gross negligence of the paparazzi following her vehicle". On 3 July 2021, X wrote an email describing the journey in some detail. Amongst other things, X

described [redacted text].  Given that [redacted text].  This produced even more interest in the vehicle.

121.  In response to the claimant's criticisms of the arrangements made by RAVEC for the claimant's visit in June/July 2021, Mr Hipgrave says it is important to reiterate that this was the first occasion on which RAVEC had implemented the 2020 decision to a visit by the claimant, in a context which [redacted text]. It was therefore "always likely to take longer than … it … has in response to future requests". The relevant details of the trip were not provided until 11 June 2021, substantially less than the 28 day notice period. The claimant, through his team, made repeated representations as to his concerns and preferences, which RAVEC continually considered and reconsidered.  Given it was the first visit to Great Britain for the claimant with his private security support, Mr Hipgrave considers that may have caused the claimant and his team to [redacted text].

122.  The Home Office had been notified on 3 August 2022 that the claimant and his wife and children would be visiting the United Kingdom between 2 and 11 September 2022.  The itinerary did not [redacted text].  On 10 August 2022, RAVEC met to decide what protective security, if any, should be provided.  A letter outlining RAVEC's decision was sent to the Private Secretary to the Sovereign, since the request for protective security had come through the Royal Household.  The letter of 12 August was from the Chair of RAVEC to Sir Edward Young.  It explained that [redacted text].

123.  On 20 August 2022, Schillings wrote to say that the proposed security arrangements for the September visit were not lawful and that [redacted text] was plainly inadequate.  It was also stated that the August decision of RAVEC was taken prior to the public event announcements, made on 15 August 2022, concerning events that the claimant would attend whilst in the United Kingdom.  It was submitted on behalf of the claimant that this would require RAVEC to reconsider its decision. In his statement, Mr Hipgrave denies it was incorrect to suggest that RAVEC did not know on 10 August 2022 that the events would be made public and the time at which this would happen.

124.  The response from the Government Legal Department to Schillings on 2 September 2022 stated that RAVEC did not consider it necessary or appropriate to reconsider the August decision.  In the meantime, Schillings had written on 1 September 2022 to request that the Chair of RAVEC speak personally to the claimant.  That request was granted.  A video conference took place that day, with the claimant outlining his desire generally for [redacted text].  On 3 September 2022, Mr Hipgrave wrote to Schillings to say that the Chair of RAVEC had decided that the August 2022 decision remained appropriate.  Mr Hipgrave is not aware of any security incidents arising in relation to the claimant during the period of his visit up to 8 September 2022.

125.  In connection with the charitable event attended by the claimant in Manchester on 5 September 2022, [redacted text].  The claimant raised concerns with [redacted text] about his travel by train to Manchester because of his proximity to the public.  [redacted text].

126.  Following the public announcement by the doctors to Her Late Majesty the Queen on 8 September 2022 concerning her health, the Chair of RAVEC wrote to the Sovereign's Private Secretary to confirm that [redacted text].  This approach reflected the compassionate grounds which had been applied in April 2021 in respect of the funeral of

the Duke of Edinburgh.  Following the death of Her Late Majesty, RAVEC [redacted text].

127.   The claimant was in the United Kingdom between 26-31 March 2023 in order to attend a hearing in the Royal Courts of Justice in <u>Various Claimants v Associated Newspapers Limited</u> (claim number KB-2022-003317).   The claimant's Director of European Security emailed [A] "in accordance with the agreed procedure" to provide "formal notice of the Duke of Sussex's travel to the United Kingdom from 26 March to 31 March 2023".  In light of various matters, including that he was the son of King Charles III, a brother of the Prince of Wales, and that Al Qaeda had recently called for the claimant to be killed, the Director of European Security said that the claimant [redacted text].  On 10 March 2023, [redacted text], the Deputy Director of Royalty, VIP and MP Security Unit Homeland Security, wrote to say that RAVEC would meet to determine what protective security arrangements should be mandated for the visit.   Without pre-empting that decision, [redacted text] said "it is clear that the proposed visit [redacted text].  If the Duke wishes to [redacted text].

128.   On 21 March 2023, the Chair of RAVEC wrote to explain that, following the RAVEC meeting on 20 March, certain security arrangements had been made.  These were set out in the letter, which recorded the fact that [redacted text].  Schillings wrote on 23 March 2023 to the Chair of RAVEC.  Much of this letter was concerned with issues relating to the (by now extant) judicial review.  However, the letter also said that the claimant "has serious concerns not only regarding his own welfare, but also the security and safety of others who will, given the nature of a courtroom and its environs, be within close proximity".  On 25 March 2023, the Government Legal Department replied, stating that the claimant's attendance at the Royal Courts of Justice "[redacted text]".

129.   The claimant was in the United Kingdom between 5 and 6 May 2023, to attend the Coronation of His Majesty King Charles III.  On 27 April 2023, the Chair of RAVEC wrote to explain [redacted text].  This elicited a response from Schillings on 28 April 2023.  The claimant was said to be concerned that RAVEC had [redacted text].

130.   On 2 May 2023, the Government Legal Department wrote to say that RAVEC had specifically considered [redacted text].   RAVEC considered that the package set out in the letter of 27 April 2023 constituted the appropriate balance, [redacted text].  That balance was also consistent with the decisions RAVEC had previously taken in relation to the claimant, including in relation to his visit for the Platinum Jubilee of Her Majesty Queen Elizabeth II in May 2022.

131.   The claimant was in the United Kingdom between 4 and 8 June 2023 in order to provide evidence at the trial in the case of <u>HRH the Duke of Sussex v Mirror Group News Ltd</u> (claim number BL-2009-0001787) at the Royal Courts of Justice (Rolls Building).  Those concerned with providing security to the claimant wrote to [A] to say that "In accordance with the agreed procedure, we write to provide you with formal notice" of the claimant's visit to the United Kingdom from 4 to 8 June.  It was said that the claimant's presence at the Royal Courts of Justice in March 2023 had attracted significant international media attention, with large numbers of people attending the court proceedings and congregating outside the building.  RAVEC was requested to provide a security package "that is proportionate to the heightened threat the Duke, and those around him, face at this time,

and the particular security vulnerabilities of his attendance at court".  That should include but not be limited to "[redacted text]".

132.  On 23 May 2023, the Chair of RAVEC wrote to give details of the protective security arrangements that RAVEC had agreed on 22 May.  [redacted text].  The letter explained that RAVEC's remit [redacted text].  Reference was made to the [redacted text].  The Chair said that, [redacted text], he understood the [redacted text].

133.  Schillings responded by means of a letter dated 26 May 2023 to the Government Legal Department.  The letter expressed the concern of the claimant that "as with prior trips, the proposed protected security arrangements for the June trip are, again, inadequate, inappropriate and ineffective".  Reference was made to an incident in New York City on 16 May.  [redacted text].  The letter of 26 May took issue with the statement in the letter from the RAVEC Chair of 23 May that whilst [redacted text].  The letter from Schillings of 26 May said that it was categorically wrong and also deeply offensive to diminish the gravity of the incident by defining it as being about "privacy".  [redacted text].

134.  On 2 June 2023, the Government Legal Department replied.  It said that RAVEC did not agree with the general concern expressed on behalf of the claimant, that the proposed protective security arrangements were inadequate, inappropriate or ineffective.  The decision to provide [redacted text] was consistent with the approach adopted on previous occasions over the last two years, [redacted text].   RAVEC had taken into account [redacted text] and was briefed by [redacted text].  [redacted text], it was understood that [redacted text].

135.  On the last day of the hearing before me, Ms Fatima KC produced a copy of a letter dated December 6 2023 from the Chief of Intelligence in the New York City Police Department.  The letter is addressed to the Chief Superintendent OCU Commander Royalty and Speciality Protection.  The Chief of Intelligence says that he wishes to make the Chief Superintendent "aware of certain changes to the security posture that will be afforded to the Duke and Duchess of Sussex in light of the security incident that took place on May 16 2023 in New York City".  The letter says that a thorough review of the incident had taken place and although no formal charges were brought against the parties involved at the time "we did conclude that the behaviour in question was reckless.  As a result, [redacted text], beginning with an upcoming trip in the current weeks".  The investigation had found reckless disregard of vehicle and traffic laws and persistently dangerous and unacceptable behaviour on the part of paparazzi during the night in question.  They had operated vehicles, scooters and bicycles in a manner that forced the security team, which included the NYPD lead car, to take evasive actions on several occasions and a circuitous route to avoid being struck by pursuing vehicles or trapped on side blocks.  The conclusion was that there was sufficient evidence to arrest two individuals for reckless endangerment.  [redacted text].

***THE CLAIMANT'S GROUNDS OF CHALLENGE***

136.  The present judicial review claim was filed on 20 September 2021.  The grounds of claim were amended pursuant to an order dated 22 July 2022 and re-amended pursuant to an order of mine, shortly before the hearing.  The detailed grounds of resistance have, likewise, been amended.

137. In their present form, the grounds of challenge can be summarised as follows.  Ground 2 contends that there has been a failure to take account of material considerations, in making the decision of 28 February 2020.  The claimant argues that RAVEC should have considered the impact that a successful attack on him would have, bearing in mind his status, background and profile within the Royal Family and his ongoing charity work and service to the public.  RAVEC should have considered, in particular, the impact on the United Kingdom's reputation of a successful attack on the claimant.  The issue of "impact" plainly involved having regard to the tragic circumstances in which the claimant's mother lost her life and the impact of that loss felt across the world.  The nature of the [redacted text].  The claimant also has [redacted text].  These considerations were so obviously material that it was irrational not to take them into account.

138. Ground 3 contends that the security arrangements described in the decision of 28 February 2020 were unreasonable.  A decision may be unreasonable in the *Wednesbury* sense (<u>Associated Provincial Picture Houses Ltd v Wednesbury Corporation</u> [1948] 1 KB 223), either because it is outside the range of reasonable responses open to the decision maker or because of a demonstrable flaw in the process by which the decision was reached.  Both of these limbs are relied on by the claimant.  RAVEC should not have treated the claimant's [redacted text] as being essentially determinative of whether the claimant should get protective security.  RAVEC gave excessive and unreasonable weight to that factor, contrary to and misapplying RAVEC's policy or practice.

139. Ground 4 concerns an alleged lack of adequate transparency.  The claimant says that RAVEC's policy, although of such a kind as to make it inappropriate to be published, should nevertheless have been available to the claimant at the start of RAVEC's decision-making process in respect of him.  The claimant was, he says, not informed about the composition of RAVEC, the details of RAVEC's policy or how it operated or applied.

140. Ground 5 alleges procedural unfairness in that the claimant was denied the opportunity to make informed representations before RAVEC reached its decision on 28 February 2020.  The claimant relies on <u>R v SSHD ex p Doody</u> [1994] 1 AC 531 at page 560.  The content of the duty will depend on the facts of the particular case: <u>JA (Afghanistan) v SSHD</u> [2014] 1 WLR 4291 at paragraph 17.  The duty arises when a person's legally protected interest may be affected by the decision of a public authority: <u>R (Talpada) v SSHD</u> [2018] EWCA Civ 841 at paragraph 57.  In the present case, the claimant submits that he stood to be deprived of an existing benefit; namely, the security he had been receiving hitherto.

141. Ground 6 essentially arises from the disclosure to the claimant, in the course of these proceedings, of the 2017 and 2021 terms of reference of RAVEC and the 2021 evaluation criteria.  Permission to bring judicial review has not been granted in respect of ground 6 and that ground is being dealt with on a "rolled up" basis.  Ground 6 is divided into 3 elements.  Ground 6A and 6B are closely intertwined.  They allege, respectively, misapplication of policy/failure to follow policy; and irrationality/unreasonableness in failing to treat the claimant as within the RAVEC cohort and by not applying the process in the relevant terms of reference.  The policy in question is said to be the terms of reference and evaluation criteria.  The alleged failings are in essence twofold.  First, the decision of 28 February 2020 is vitiated because a risk analysis in respect of the claimant should have been conducted by the RMB, prior to the decision being taken.  This, the claimant says, represented a departure from policy.  In accordance with the *Nadarajah*

principle (R (Nadarajah) v SSHD [2015] EWCA Civ 1363), a policy must be followed unless there is a good reason not to do so.  No such reason exists, according to the claimant, in the present case.

142.   The second aspect arises from Mr Hipgrave's three-fold categorisation in his first witness statement of those who comprise the RAVEC cohort.  Given what has been disclosed in these proceedings in respect of the Other VIP Category, the claimant submits that Sir Richard Mottram's decision of 28 February 2020 was not made with regard to certain individuals who are within that category, and whose position was in material respects analogous to that of the claimant.  [redacted text].  There was thus no rational basis for refusing to consider whether the claimant fell within the Other VIP Category, failing to treat him as falling within that category and, at least, failing to commission an RMB analysis before making the decision.  Similar points are made in respect of the claimant [redacted text].

143.   The claimant also says that by failing to treat him as falling within the RAVEC cohort and therefore not following the process in the relevant terms of reference, RAVEC acted irrationally or unreasonably in the public law sense.  In particular, it was irrational, on the one hand, to say that the claimant was no longer within the RAVEC cohort and, on the other, to state (as Sir Richard Mottram does in his first witness statement) that the claimant nevertheless remained within the "purview" of RAVEC, in the sense that there would be occasions when it would be appropriate to provide the claimant with protective security.  The point is said to be reinforced by the letter of 24 June 2021 from the new Chair of RAVEC, which describes the claimant as in effect an "exceptional member" of the RAVEC cohort. The decision in May 2023 in respect of the claimant was irrational on the further basis that it [redacted text].

144.   A contrast is also drawn by the claimant with [redacted text]. [redacted text], in contrast to that taken in respect of the claimant.

145.   The final pleaded challenge is Ground 6C. This alleges procedural unfairness, in that the claimant was not fully and properly informed about the RAVEC "categories" or the terms of reference and so could not make meaningful submissions about them. The same is true, says the claimant, of the Other VIP Category and the [redacted text].

*TIMELINESS*

146.   The claim in this case was issued on 20 September 2021.  The substance of the challenge is to the decision of 28 February 2020.   This established the principle for the arrangements in respect of the claimant's security when he was to visit the United Kingdom.  CPR 54.5(1) requires a judicial review claim to be made promptly and in any event within three months.  The issue of delay was specifically preserved by Swift J, when he granted permission in respect of certain of the (then pleaded) grounds.  For the reasons I set out later in this judgment, I find that time began to run for the purposes of the CPR on 28 February 2020 and not, as the claimant contends, when the claimant was first informed about security arrangements for his visit to the United Kingdom, and which he considered to be unsatisfactory. This is said to be either 22 June or 29 June 2021.

147.   The defendant, however, does not take a timeliness issue in respect of Ground 6A or (at least most of) 6C.  Grounds 4 and 5 are, however, closely bound up with Ground 6C;

indeed, the defendant's skeleton argument addresses all three of those grounds under a single heading.  In these circumstances, I conclude there is little point in refusing to extend time in respect of Grounds 4 and 5, even though in practice they are largely overtaken by Ground 6C.  I therefore extend time for the purposes of grounds 4 and 5.

148. Although I understand the defendant to take a timeliness point in respect of elements of Ground 6B, it is noteworthy that he acknowledges this ground's relationship with Ground 6A.  At paragraph 33 of the defendant's skeleton argument, he contends that Ground 6B does no more than "repackage" the complaints set out in Ground 6A under what the defendant describes as the more accurate heading of "unreasonableness".  I also note that, in responding to Ground 6B, the defendant engages with the complaint made about RAVEC's decision of May 2023, albeit without accepting the claimant's contention that that decision may be discretely challengeable by reference to the so-called concept of "rolling" judicial review.  In light of all this, I consider that it is in the interests of the overriding objective to extend time so as to enable Ground 6B to be substantively advanced by the claimant.

149. Somewhat different timeliness considerations apply in the case of Grounds 2 and 3, which are addressed later in the judgment.

## DECIDING THE CLAIM

### Ground 6A (Failure to follow policy without good reason)

150. The claimant submits that RAVEC failed to follow its own policy, which required it to ask the RMB to carry out a risk analysis, before deciding whether to remove the claimant from the RAVEC cohort.  The claimant says that, at the time of the decision, he was still within that cohort by reason of [redacted text].  No good reason was given by Sir Richard Mottram for refusing to follow that policy.  Thus, the *Nadarajah* principle was violated.  The principle was articulated by Laws LJ, who held at paragraph 68 that "Where a public authority has issued a promise or adopted a practice which represents how it proposes to act in a given area, the law will require the promise or practice to be honoured unless there is good reason not to do so".  Laws LJ considered that this was a "requirement of good administration, by which public bodies ought to deal straightforwardly and consistently with the public".  That statement found approval in the Supreme Court in Mandalia v SSHD [2015] 1 WLR 4546 at paragraph 29.

151. The high point of the defendant's case on this issue is founded on the judgment of the Court of Appeal in R (Good Law Project Ltd) v The Prime Minister and others [2022] EWCA Civ 1580.  The subject matter was the use of private emails and messaging services by Ministers and officials, when undertaking Government business.  At paragraph 55, the Court of Appeal noted that by the end of the hearing, it was common ground that "not every failure by the executive without good cause to comply with every policy made by the executive would be unlawful.  This is because some policies, especially internally administrative policies, will be relevant only to the executive".  At paragraph 56, the Court observed that the Supreme Court held in paragraph 3 of A v SSHD [2021] 1 WLR 3931 that "Policies are different from law.  They do not create legal rights as such".  In Good Law Project, the Court held that the policies regarding the use of private emails etc. did not involve the exercise of public power and were not about individual cases or the rights of an individual (paragraph 59).  At paragraph 65, the Court considered the fact that certain of the policies were expressed to be "guidance" and others

might reasonably have been described as "arrangements" strongly suggested that the policies in question were "not the sort of policies which are or should be subject to a duty to comply enforceable by way of a claim for judicial review".

152. The claimant submitted that particular regard should be had, in the present case, to the judgment of Henshaw J in HZ and others v SSHD [2023] EWHC 660 (Admin). That case concerned asylum seekers who challenged a decision by the Secretary of State to provide them with "bridging" accommodation in Manchester, and sought orders requiring the Secretary of State to provide the claimants with such accommodation in the London Borough of Southwark. The ground of the claim was failure to follow a relevant policy. Henshaw J rejected the claim. At paragraphs 104-107 of his judgment, he addressed the principle that a public body must, in the absence of good reason, follow its policy as to how it will act in relation to the public. At paragraph 106, he considered the judgment of the Supreme Court in R (Friends of the Earth) v Secretary of State for Transport [2021] PTSR 190. That case involved determining the meaning of the expression "Government policy" in section 5 (8) of the Planning Act 2008. At paragraph 106 of its judgment, the Supreme Court held that "the epitome of 'Government policy' is a formal written statement of established policy. Insofar as the phrase might in some exceptional circumstances extend beyond such written statements, it is appropriate that there be clear limits on what statements qualify as 'Government policy' … In our view the criteria for a 'policy' to which the doctrine of legitimate expectation could be applied would be the absolute minimum required for a statement to constitute a 'policy' for the purposes of section 5(8)".

153. At paragraph 107 of HZ, Henshaw J held that the Supreme Court's conclusions in Friends of the Earth did not and were not intended to affect the question of the type of policy to which the "ordinary" principles, as articulated in (inter alia) Mandalia, applied. He concluded that there may, accordingly, be a general public law duty to adhere, absent good reason, to a promise or practice, even if it was not a formal written statement that was clear, unambiguous and devoid of relevant qualification. However, Henshaw J held that the certainty with which a policy was expressed may be relevant to the questions of whether the defendant had in fact departed from it and, if so, whether or not there was good reason to do so. For the reasons I shall give, that qualification is, with respect, both correct and important in the context of the present case.

154. Even if RAVEC's alleged policy or practice in the present case was susceptible to judicial review, the defendant contends that this must be only of the basis of *Wednesbury*-style irrationality. In so saying, the defendant relies upon the judgments of the Supreme Court in Begum v Special Immigration Appeals Commission [2021] AC 765. The Supreme Court held, inter alia, that the Court of Appeal had erred in allowing the appeal against the judgment of SIAC by making its own assessment of the requirements of national security and proffering its assessment for that on the Secretary of State. Such an approach did not give the Secretary of State's assessment the respect it should have received. Lord Reed drew, in particular, on the judgment of Lord Hoffmann in SSHD v Rehman [2003] 1 AC 153 who, at paragraph 49, held that there were, in the area of national security assessments, inherent limitations in the powers of the judicial branch of government; and that although what was meant by "national security" in a statute was a question of law, the question of whether something was in the interests of national security was not a question of law but, rather, a matter of judgment and policy: paragraphs 55 and 56 of Begum. At paragraph 69, Lord Reed concluded the principles to be applied by SIAC in

reviewing the Secretary of State's exercise of his discretion were largely the same as those applicable in administrative law, in a case that did not involve a question of whether the Secretary of State had acted incompatibly with an individual's ECHR rights. At paragraph 70, Lord Reed explained that, in considering whether the Secretary of State had acted in a way in which no reasonable Secretary of State could have acted, SIAC must have regard to the nature of the discretionary power in question and the Secretary of State's statutory responsibility for deciding whether deprivation of citizenship was conducive to the public good.  Matters of evaluative judgment, such as the level and nature of risk posed by the appellant and the effectiveness of the means available to address it, and the acceptability or otherwise of the consequent danger, were incapable of objectively verifiable assessment.  In such areas, SIAC had to bear in mind that the Secretary of State's assessment should be accorded appropriate respect.

155.  The claimant relies on R (Munjaz) v Mersey Care NHS Trust [2006] 2 AC 148. The House of Lords there considered a code of practice made under section 118 of the Mental Health Act 1983.  At paragraph 68, the House held that although there was no statutory obligation to comply with the code it "cannot be divorced from its statutory background" and was "more than something to which those to whom it is addressed must 'have regard to'". At paragraph 69, Lord Hope said that those to whom the code was addressed "must give cogent reasons if in any respect they decide not to follow it.  So these reasons must be spelled out clearly, logically and convincingly.  I would emphatically reject any suggestion that they have discretion to depart from the code as they see fit".  As will be apparent from what I say at paragraphs 159 et seq, the background and subject matter of Munjaz and the present case can hardly be more different.  Accordingly, what Lord Hope said at paragraph 69 cannot simply be carried over to the circumstances of the present case. In similar vein, the claimant draws attention to paragraph 35 of the judgment of Males J in R (X) v London Borough of Tower Hamlets [2013] 3 All ER 157, in which he held that "the greater the departure, the more compelling must [the reasons for departure] be".  X, however, was also a case about statutory guidance, where the defendant Council was found to have erred by departing from that guidance because the Council disagreed with it. These cases shed no relevant light on the matters with which I am concerned, save to emphasise the different environment in which RAVEC operates.

156.  I can therefore understand why the defendant prays in aid  Friends of the Earth and Good Law Project.  The policy or practice with which I am concerned is very far from being of the public nature of the published immigration policy in Mandalia.  I agree with Sir James Eadie KC that the contrast between RAVEC's terms of reference and such a published immigration policy is stark.  I have, nevertheless, concluded, in agreement with Ms Fatima KC, that this aspect of the claimant's challenge is justiciable by means of judicial review.  Unlike Good Law Project, RAVEC's terms of reference have "outward facing" elements, in that they are obviously capable of affecting the position of individuals who are not within a Government department. At this level of the judicial hierarchy, I must be cautious in extending any principle that can be said to flow from Good Law Project.  So far as concerns Friends of the Earth, that case concerned the interpretation of policy in a specific statutory context.  As such, it has nothing material to say in the present case.

157.  I also do not consider the fact that we are here in the area of national security and international relations (in so far as a successful attack may have an effect on the Government's reputation abroad) means that the *Nadarajah* principle must simply give way to that of *Wednesbury*.  As Ms Fatima KC says, the defendant is unable to point to

any authority to that effect. I also bear in mind, both here and throughout my analysis, that the case is concerned with an extremely important issue; the protection of an individual from being killed or injured by hostile actors. Although the ramifications of the judgment in Begum are still being explored in the SIAC context, I do not consider it is necessary for this court to venture down that path.

158. None of this, however, assists the claimant because the *Nadarajah* principle is not a rigid one, to be applied in the same manner regardless of subject matter and context. Even where it applies, the important matters articulated by Lord Hoffmann in Rehman must still be brought to bear in two ways. First, the subject matter at issue and the expertise and constitutional responsibilities of the relevant decision makers will be relevant to the court's task of construing the terms of the policy and the nature and scope of the practice. Secondly, those things will also have an important bearing upon whether, applying the *Nadarajah* principle, the court concludes that a "good reason" has been shown from departing from any policy or practice, as so construed. Importantly, the requirement of a good reason must not, in the area of national security and its associated considerations, lead the court to substitute its own value judgment, so as to violate the principle of the separation of powers, as explained by Lord Hoffmann. In short, the expression "good reason" is protean in nature. That, in effect, is the point being made at the end of paragraph 107 of HZ.

159. Two further considerations serve to underscore what I have just said. First, the decision making with which we are concerned has no statutory context. It is, rather, an aspect of the Royal Prerogative. Although that in no sense precludes public law scrutiny of the decision, it shows we are far removed from, say, decision making under the Immigration Acts or the Planning Acts. Secondly, the assertion that Sir Richard Mottram should have thought to initiate the RMB process before making the decision is very close to being a complaint about the adequacy of investigation or enquiry. Ordinarily, such a *Tameside* challenge (Secretary of State for Education and Science v Metropolitan Borough of Tameside [1977] AC 1014) needs to be founded on irrationality: R (Plantagenet Alliance Ltd) v Secretary of State for Justice [2015] 3 All ER 261. This is not to resile from what I have said earlier: the *Nadarajah* principle still applies; but care must be taken to ensure it is properly applied in context.

160. With all of the above in mind, it is necessary to examine the evidence. Before doing so, however, I must first identify the correct approach. In Gestmin SGPS S.A. v Credit Suisse (UK) Ltd and another [2013] EWHC 3560 (Comm), Leggatt J, at paragraphs 16 to 19 of his judgment, observed that memory is fallible and is especially unreliable when someone comes to recalling past beliefs. This is because memories of past beliefs "are revised to make them more consistent with our present beliefs". Furthermore, the process of civil litigation in itself subjects the memories of witnesses to powerful biases.

161. In R (The Good Law Project) v Minister for the Cabinet Office [2022] PTSR 933 (not to be confused with the case mentioned at paragraph 151 above), Lord Burnett CJ held at paragraph 86 that the "general rule is that the evidence of a witness is accepted unless given the opportunity to rebut the allegation made against them, or there is undisputed objective evidence inconsistent with that of the witness that cannot sensibly be explained away so that the witnesses' testimony is manifestly wrong. A court hearing a judicial review will generally accept the evidence of the public authority: and will not normally decide contested issues of fact…" In similar vein, the Divisional Court (Singh LJ and

Foxton J) in R v British Gas Trading Limited v Secretary of State for Energy, Security and Net Zero  [2023] EWHC 737 (Admin) pointed out at paragraph 18, that in judicial review cases orders can be made for the cross-examination of witnesses and "Where … no order is made for the cross-examination of witnesses, the general approach is to assume the correctness of the defendant's evidence unless other material before the court shows that the evidence cannot be correct…" (paragraph 19).   At paragraph 20, the Divisional Court said that it also "kept in mind the numerous judicial observations as to the greater reliability of the contemporaneous documents or inherent probability in determining what has happened, than the recollection of a witness…"

162.  I have sought to follow the above, in considering the evidence. The first piece of evidence is the terms of reference document of 2017.  The claimant emphasises the word "will" in paragraph 20 of this document, whereby the Executive Committee "will … evaluate the risk analysis conducted by the Risk Management Board in order to determine which individual…should receive vulnerability mitigation and/or protection measures".  The defendant's starting point is that this document and the other later terms of reference cannot be treated as hard-edged policy documents.  I agree.  The fact that the words in paragraph 20 that I have just quoted cannot be taken at face value is immediately apparent.  If RAVEC had to obtain a risk analysis from the RMB in order to determine who should come forward in the RAVEC cohort then, as Sir James Eadie KC points out, this would apply to everyone present in England, Wales and Scotland.  Paragraph 20, like the rest of the document, must therefore be read on the basis that it is being used by RAVEC members (in particular at this time, the Chair) by reference to a number of value judgements.  The point is underscored by Mr Hipgrave's evidence that the RMB may (not must) be invited by RAVEC to consider risk assessing an individual for potential inclusion within the RAVEC cohort.

163.  The claimant seeks to rely upon the evaluation criteria paper of May 2021.  This document was not, of course, in force at the time of the decision under challenge.  As can be seen, it is framed as recommendations, to be taken forward along with the 2021 terms of reference. One therefore needs to be cautious in using it to determine if the decision of 28 February 2020 is unlawful because it was reached without an RMB assessment of the claimant.

164.  In deciding what weight to place upon the witness evidence regarding the impugned decision, it is relevant to note what is said at paragraph 9 of the evaluation criteria.  In describing the RMB stage in the process, paragraph 9 makes reference to an RMB review. It says that this review:-

> "… has recommended that the RMB assesses the risk to any individual principal       more holistically, and in more detail, than under current processes.  This will in-turn provide a more in-depth and tailored set of proposals for the security package that an individual principal should receive.  With that increasingly detailed focus on an outcome, the aim is to provide a set of proposals which better support the evaluation process, and in some respects start that process, recognising that a decision on security measures rests with the Committee".

165.  Far from assisting the claimant's case, paragraph 9 of the evaluation criteria paper supports that of the defendant. An RMB assessment had at the time certain significant limitations. It supports the defendant's position that, even if the terms of reference would

otherwise have required one, Sir Richard Mottram had a good reason not to call for an RMB assessment of the claimant, before reaching his decision.

166. It is the case that the contemporaneous records of January and February 2020 indicate that, initially, it was considered that an RMB assessment would be undertaken in respect of the claimant, in the light of the change in his circumstances announced in January 2020. However, the email from Sir Richard Mottram to [redacted text] of 24 February shows that Sir Richard had developed a "line of argument", whereby "there would be no RMB but we would organise an exploratory meeting on these lines on a tripartite basis". The lines would be to [redacted text].

167. On 26 February 2020, [redacted text] (who, besides being the Secretary of RAVEC, was the Chair of the RMB) wrote to Sir Richard Mottram to ask if he (ie [redacted text]) was "correct in understanding this means there will not be a further/final RMB for" the claimant "on the grounds that this is no longer required given alternative governance arrangements will be established for [redacted text]?" On 27 February 2020, Sir Richard Mottram replied to [redacted text] to say, on that issue, "your understanding is correct".

168. The relevant witness evidence is contained in the first and second witness statements of Sir Richard Mottram. Beginning at paragraph 4 of his first witness statement, Sir Richard describes how he came to finalise the decision at the end of February 2020. At paragraph 75, he says that he was clear that the claimant would [redacted text] to justify inclusion in the RAVEC cohort but that he had also to consider whether the claimant was subject to a specific threat or threats such as to justify [redacted text]. Nevertheless, [redacted text]. [redacted text], Sir Richard envisaged putting in place a mechanism for liaison between the Royal Household, the police and the Home Office to identify [redacted text]. It was on that basis that Sir Richard began drafting a letter to Sir Edward Young along those lines on 25 February 2020.

169. The claimant attacks what is said at paragraph 75 on the basis that it is not reflected in the contemporaneous records. However, the email from Sir Richard Mottram to [redacted text] on 24 February 2020 plainly envisaged a change, whereby there would not be a need for an RMB. The email suggests that this was because there would be a tripartite mechanism for identifying [redacted text]. That, of course, would have resulted in a [redacted text] than the one issued on 28 February 2020. The fact that Sir Richard was, by this time, thinking more broadly, in terms of what was eventually decided is suggested by [redacted text]'s email of 26 February, which refers to "alternative governance arrangements… for [redacted text]".

170. I therefore consider that the contemporaneous evidence is entirely compatible with what Sir Richard Mottram has to say in his first witness statement. It is also consistent with paragraphs 36 and 37 of Sir Richard's second witness statement, in which he clarifies that the "core of my point on the RMB was that it would no longer be required because alternative governance arrangements would will be in place, through RAVEC, for considering individual requests on a case by cases basis in context. To the extent that that was a departure from the existing processes, that was because we were formulating a decision addressing the claimant's [redacted text] which was to place him outside existing processes and a new structure was instead being designed for him". At paragraph 37, Sir Richard explains that "it made much more sense to assess the threat and risk issues" arising from the claimant's [redacted text]. That "[redacted text]" is, of

course, what an RMB assessment would have provided. The claimant does not explain why this conclusion was incorrect.

171. I am entirely satisfied that legally sufficient reasons existed for RAVEC to depart from its policy on practice, to the extent that this would otherwise have resulted in an RMB assessment being conducted in respect of the claimant in 2020, prior to a decision being taken on whether he should receive vulnerability mitigation and/or protection measures at public expense.  Far from assisting the claimant, for the reasons I have given, the evaluation criteria support the fact that, at the time, an RMB assessment of the claimant would have been likely to be of less practical utility than the [redacted text] arrangements described in the letter of 28 February 2020.

172. The point is reinforced in the second witness statement of Shaun Hipgrave.  This explains that the 2021 terms of reference do not apply to the claimant and instead RAVEC applies the bespoke decision-making model devised in the decision of 28 February 2020.  Mr Hipgrave has seen in draft the second witness statement of Sir Richard Mottram as to why the latter considered in February 2020 that the RMB assessment process was not the most appropriate model to be used for the claimant.  Mr Hipgrave says that the same rationale has continued to apply.  He explains that "if there were no alternative process available which enabled RAVEC to consider the full range of circumstances applicable to the claimant, then the RMB assessment could be used, even if it would not work as effectively for the reasons Sir Richard explains.  I agree with [the claimant's revised amended statement of facts and grounds] that 'RMB analysis is qualitatively different from a threat assessment'.  However, in the claimant's case – and uniquely – RAVEC has in place for him a bespoke process whereby his intended presence in Great Britain is considered in advance, by reference to the specifics of what is planned and why".  This means that a "much more focussed consideration can be given, informed in particular by the views of the Metropolitan Police as the experts in the delivery of protective security and the risks likely to be posed by the various contexts".  It will also be "informed by relevant threat assessments [redacted text]".  In contrast, Mr Hipgrave says that the "RMB process will consider risk posed by the principal's [redacted text]".  Mr Hipgrave considers that this "is a proportionate approach for a principal [redacted text]".  In contrast, however, "a bespoke consideration carried out by RAVEC of [redacted text]".

173. A similar point is made in the first witness statement of [the Current Chair], the current Chair of RAVEC.  He has seen and agrees with (what were then) the draft second witness statements of Sir Richard Mottram and Shaun Hipgrave and confirms that what is there said "represents the continuing view of RAVEC".  [The Current Chair] says that "to be clear, RAVEC continues to treat the Claimant as not being within its cohort, but that when a request for protective security results in an authorisation by RAVEC, the Claimant re-enters the cohort for those purposes and to that extent. The Claimant is not treated as a principal to which the 2021 [terms of reference] apply, both because he is not within the cohort and because he has in place specific bespoke processes applicable to him".  [The Current Chair] says that RAVEC "does not, and would not usually expect to, commission an RMB assessment of the claimant for the reasons both of the other two statements set out".  [The Current Chair] considers that the individualised consideration by RAVEC of a [redacted text], with the benefit of expert operational policing input at the decision-making meetings, "allows RAVEC to reach [redacted text]".  [redacted text], RAVEC has not actively considered or taken a decision as to whether or not to commission an RMB for the claimant.  [The Current Chair] does not believe that any

member of RAVEC has suggested such a course but he does "not consider that surprising, or as evidence that RAVEC has ignored the value of an RMB; RAVEC is intimately familiar with what the RMB can add to its decision-making, but is also increasingly familiar with how to approach notification of visits to Great Britain by the claimant".

174. The claimant submits that these passages from Mr Hipgrave's second witness statement are not rooted in contemporaneous evidential material and so should be viewed with scepticism, as they are *ex post facto* justifications for the decision of 28 February. Whilst employing due caution and bearing in mind the observations of Leggatt J in Gestmin, I nevertheless consider that significant weight can be placed on this evidence. For the reasons I have given, the contemporaneous evidence does, on proper analysis, disclose a rationale for the change in approach adopted by Sir Richard Mottram in late February 2020, to which [redacted text] (as Chair of the RMB) did not demur. I further note that the description of the arrangements for the claimant as "bespoke" is not one that has been adopted only in the course of defending the present proceedings. The expression is used by Mr Hipgrave in his letter of 29 June 2021 to Tim Robinson of Schillings, in connection with the arrangements put in place by RAVEC for the claimant's visit in June/July 2021.

175. Standing back, what emerges clearly from the evidence before the court is that Sir Richard Mottram, [the Current Chair] and Shaun Hipgrave all speak from positions of significant knowledge and expertise in the highly specialist area with which we are concerned. They can be taken to have a thorough understanding of the RAVEC terms of reference. In this regard, the defendant draws attention to the judgment of Lord Carnwath in Hopkins Homes Ltd v Secretary of State for Communities, Local Government and another [2017] 1 WLR 1865. That case involved the proper approach to the application of town and country planning policies by specialist planning inspectors. At paragraph 25 of the judgments, Lord Carnwath said that even where there are disputes over the interpretation of a statement of policy, this may well not be determinative of the outcome. "Furthermore, the courts should respect the expertise of the specialist planning inspectors, and start at least from the presumption that they will have understood the policy framework correctly". Lord Carnwath considered that the position of planning inspectors "is in some way analogous to that of expert tribunals, in respect of which the courts have cautioned against undue intervention by the courts in policy judgments within their areas of specialist competence: see *AH (Sudan) v Secretary of State for the Home Department (United Nations High Commissioner for Refugees Intervening)* [2008] AC 678, para 30, per Baroness Hale of Richmond".

176. The claimant's response is that one cannot extrapolate from Lord Carnwath's judgment any general proposition that bears on the facts of the present case. I disagree. The fact that Lord Carnwath was making a broader point about the proper approach to expert adjudicative bodies is borne out by his citation of AH (Sudan), which involved the concept of internal relocation in relation to the 1951 Refugee Convention, a subject as far removed from town and country planning as can be imagined. The broader point is that courts should be wary of concluding that expert adjudicators have fundamentally misunderstood how to go about their allotted tasks. That point applies with particular force where, as here, we are in an area in which the courts should be particularly wary of venturing across the constitutional divide identified by Lord Hoffmann in Rehman.

177. I have already referred to the changes in the 2021 RAVEC terms of reference, compared with those in force at the date of the decision of 28 February 2020. In light of those

changes and bearing in mind the responsibilities of RAVEC's current Chair, it is particularly significant that [the Current Chair] says what he does in his witness statement about the ongoing approach to the claimant's visits to Great Britain. If [the Current Chair] had any doubt about the validity of the decision, by reference to which RAVEC continues to operate, he could be expected to say so. Both on that particular matter and more generally, it is also a relevant consideration in my analysis that none of these witnesses has been sought to be cross-examined by the claimant.

178. An instance of the claimant's mechanistic, overly literal approach to the 2017 terms of reference concerns the criticism of the passage in Mr Hipgrave's second witness statement, in which he distinguishes a Principal [redacted text], for whom an RMB assessment would be appropriate, and a person such as the claimant, for whom bespoke consideration would be more suitable. The claimant contends that this ignores the fact that the 2017 terms of reference refer to an RMB being undertaken for the person "present" in the United Kingdom. The claimant's approach wrongly treats the text of the terms of reference as if the latter were an Act of Parliament and ignores the positions and expertise of all those concerned. The same applies to the claimant's submission that, even on the evidence of the witnesses, the claimant is described as an "exceptional" member of the RAVEC cohort, albeit coming in and out of it in accordance with the decision of 28 February 2020. The claimant says that this means, even on the defendant's case, that the claimant should have received an RMB analysis. This is an impermissibly formalistic stance. So too is the submission that the claimant was a member of the RAVEC cohort in January 2020 and should have received an RMB analysis before being removed from it or before [redacted text] otherwise changed.

179. Before leaving the issue of the RMB, it is necessary to address the claimant's complaint that RAVEC treated him differently from [redacted text]. From the confidential schedule to Sir Richard Mottram's first witness statement, we see that [redacted text].

180. It is common ground that an RMB assessment was carried out in respect of [redacted text]. The claimant says this highlights what he considers to be the unlawful failure of RAVEC to obtain an RMB assessment before he was removed from the RAVEC cohort. I do not consider that there is merit in this criticism. The witness evidence highlights the distinction between someone, [redacted text], and a person, such as the claimant, who [redacted text]. I refer in particular to the second witness statement of Shaun Hipgrave. I also note that, in the confidential schedule to the witness statement of [the Current Chair], it is stated that RAVEC takes a more cautious approach where, amongst other factors, a Principal [redacted text]. I shall return to [redacted text] in due course.

181. I turn to the claimant's submission that the decision of 28 February 2020 was rendered unlawful by reason of the fact that Sir Richard Mottram treated [redacted text] as leading to him being removed from the RAVEC cohort, without regard to (or without a good reason for distinguishing) the fact that there exists the Other VIP Category; and that the claimant's new position was analogous with individuals who fall within the RAVEC cohort by reason of their inclusion in that category.

182. The first thing to note is that, as explained in the second witness statements of Sir Richard Mottram and Shaun Hipgrave, the "category" labels that Mr Hipgrave uses in his first witness statement are no more than constructs to aid the understanding of the claimant and the court, rather than being formal categories used by RAVEC in its decision-

making.  Amongst other things, this means that the Other VIP Category needs to be understood as the "wholly exceptional" thing it is (paragraph 13 of Shaun Hipgrave's second statement).

183.  It is on that basis that one must consider the cotemporaneous evidence on this issue. Sir Richard Mottram's email of 24 February 2020 to [redacted text] says that as "we discussed last week I have already set out [redacted text] in my letter to Edward Young about [redacted text].

184.  The email explains that [redacted text].  Sir Richard therefore identified the issue for RAVEC as being "[redacted text]".

185.  I have already discussed the relevant remaining part of this email and what followed it, when addressing the RMB issue.  It is manifest that Sir Richard Mottram's thought process, which led to the "bespoke" arrangement set out in his letter of 28 February 2020, was made by reference to the "[redacted text]" described in his email of 24 February 2020.  I do not consider that there is any public law error in the way in which Sir Richard Mottram approached [redacted text].  [redacted text], so as to keep the claimant within the RAVEC cohort, [redacted text].

186.  A similar problem affects the claimant's approach to the witness evidence.  In paragraph 11 of his second witness statement, Sir Richard Mottram says that when he was considering in February 2020 how the claimant should be treated by RAVEC, following his change in status, Sir Richard specifically had regard to the likelihood of a threat to the claimant's security arising and the impact of a successful attack on him, in asking himself whether this justified the claimant remaining within the cohort [redacted text]. The fact that this is not expressly stated in the contemporaneous materials does not prevent the court from placing material weight upon this aspect of the second witness statement.  I refer to what I have said earlier in this regard.  Furthermore, the credibility of this statement needs to be assessed in a common-sense manner, by reference to the broader RAVEC process.  The impact both at home and abroad of a successful attack on a particular individual lies at the heart of the rationale for RAVEC's existence.  It would be bizarre if the highly-experienced Chair of RAVEC, making a decision about the claimant, would not have had in mind the consequences of a successful attack, both as regards [redacted text]. In so finding, I am (as Ms Fatima KC rightly cautioned) not stepping outside the evidence. This conclusion directly stems from the evidence about the nature and functions of RAVEC and the responsibilities and expertise of its members. It is a conclusion that follows <u>AH (Sudan)</u> and <u>Hopkins Homes</u>.

187.  The claimant also criticises paragraph 11 of Sir Richard Mottram's second witness statement and other aspects of the witness evidence, for taking the allegedly contradictory position of, on the one hand, reaching decisions on a case-by-case basis and, on the other, doing so with regard to the positions of those falling within the so-called Other VIP Category. In paragraph 11, Sir Richard says he was aware of the exceptional members of the RAVEC cohort [redacted text]. Whilst the backgrounds and situations of these individuals were different from those of the claimant, Sir Richard says they "provided a measure of inspiration for the [redacted text]".  Again, I find the claimant's criticism fails to engage with the nature of RAVEC decision-making.  RAVEC was not only entitled but obliged to approach matters on a case by case basis as regards certain cases, given their exceptional characteristics.  RAVEC was plainly under no obligation to adopt an

explicitly comparative exercise of the kind for which the claimant contends and to draw from it only the conclusion that the claimant wished to see. Once these matters are understood, there is nothing exceptionable in paragraph 11.

188. In the confidential schedule to Sir Richard Mottram's second witness statement, he addresses in detail the positions of [redacted text]. Sir Richard assumes (as this occurred before he became Chair of RAVEC) that this was because of [redacted text].

189. Sir Richard says that he did not consider the claimant's [redacted text], was exceptional in the same way as that of [redacted text]. Although the claimant's [redacted text], brought with them potential security risks that needed careful assessment, Sir Richard considered the problem was "to judge how the likelihood of these risks and their impact would develop in [redacted text]". This led to the decision to make provision for "bespoke processes", as the appropriate way to deal with a particular combination of circumstances to the claimant.

190. The claimant contends that, having rejected "some sort of artificial comparison exercise", that is what Sir Richard in fact did. We are, here, in the realm of mere disagreement between the parties, rather than in a place indicative of public law error. Both in the contemporaneous material and in the witness evidence, it is plain why the decision was taken to address any need for publicly provided security of the kind with which RAVEC is concerned on an *ad hoc* basis by reference to [redacted text]. [redacted text], Sir Richard Mottram was plainly entitled to conclude, at the end of February 2020, that it was not possible for RAVEC at that point to see how matters regarding the claimant would develop. The position would not have been materially affected if an RMB assessment had been commissioned at that time. The positions of the claimant and [redacted text] were very different in terms of their [redacted text]. There was an [redacted text]; whereas [redacted text]. In this regard, the claimant contends that what Sir Richard Mottram should have done was to have compared the position of [redacted text], with that of the claimant in 2020 who, [redacted text]. There is a distinct air of unreality about this submission. We simply do not know what the position was when [redacted text]. Any suggestion that RAVEC needed to investigate this issue fails the *Tameside* test.

191. So far as [redacted text] is concerned, [redacted text].

192. In the confidential schedule to his second witness statement, Sir Richard Mottram addresses the [redacted text]. There are particular issues of risk that apply to the [redacted text], which warrant RAVEC's interest. They are essentially role-based inclusions in the cohort and [redacted text]. Sir Richard says that it did not occur to him that there was any relevant analogy with the position of the claimant in 2020 and he does not see one now. The claimant contends that [redacted text] in reality fall to be treated as *sui generis* and so he should, like them, fall within the RAVEC cohort, given that he is regarded by RAVEC as *sui generis*. Again, however, this consequence simply does not follow. It is a further instance of the claimant's misconceived mechanistic approach.

193. I turn to the issue of [redacted text] the RAVEC cohort. The claimant submits that, notwithstanding [redacted text].

194. [redacted text]

195. So far as concerns [redacted text], Mr Hipgrave says that [redacted text].  In the confidential schedule to the witness statement of [the Current Chair], he says that "[redacted text]".  [redacted text].  [The Current Chair] says that [redacted text].

196. [redacted text]

197. In Sir Richard Mottram's email of 28 January 2020 to [redacted text], he mentioned that RAVEC "[redacted text]".  Any suggestion that this observation meant that RAVEC failed to take account of the particular risks facing the claimant at the time is refuted by both the contemporaneous evidence and the witness evidence.  In addition, at paragraph 34 of his first witness statement, Sir Richard Mottram states that the material point of distinction between [redacted text] and the claimant "[redacted text]".

198. I grant permission to advance Ground 6A. For all of the above reasons, I find that Ground 6A fails.

### Ground 6B (irrationality)
199. Ground 6B alleges irrationality or unreasonableness in failing to treat the claimant as falling within the RAVEC cohort and therefore by not applying the relevant terms of reference.  The defendant's response to ground 6B is, first, that it does no more than re-package the complaint made by the claimant in Ground 6A under what the defendant describes as the legally more accurate heading of "unreasonableness", alleging irrationality in RAVEC not treating the claimant as part of the RAVEC cohort and thereby not applying the various aspects of the terms of reference to him.  In addressing ground 6A I have explained that, in so far as the 2017 terms of reference constituted a policy or practice, the defendant has shown there was a sound reason in public law terms for not obtaining an RMB assessment before taking the decision of 28 February 2020 and that the defendant was not obliged to treat the claimant as still falling within the RAVEC cohort. I have explained why Sir Richard Mottram was entitled to conclude that the [redacted text] meant that he fell outside the RAVEC cohort; and that there was no public law error in not treating the claimant as still being within that cohort by reference to the Other VIP Category.  The claimant's own view of the risks he faces, including the consequences of a successful attack on him, whilst genuinely held, were not so compelling that they had, as a matter of law, to be accepted by the expert and experienced decision-maker, which the evidence plainly shows Sir Richard Mottram to be.

200. There is, accordingly, a great deal of overlap between Ground 6A and 6B.  Ground 6B, however, alights on the passage in paragraph 35 of Sir Richard Mottram's first witness statement that, although the claimant was removed from the RAVEC cohort, he "remained within the purview of RAVEC in the sense that the decision recognised [redacted text], and the Claimant remained a person whose threat assessments RAVEC would continue to monitor".  In the same vein, the claimant draws attention to the letter of 24 June 2021 from the current Chair of RAVEC to the RAVEC members, which sets out the proposed arrangements for the June 2021 visit of the claimant to the United Kingdom, wherein the claimant was described as "in effect to be considered an 'exceptional member' of the RAVEC cohort".  Thus, says the claimant, he in fact remained within the RAVEC cohort, even on the defendant's own case, and yet the process set out in the terms of reference was not followed. This includes the more detailed

2021 terms of reference, which should have been applied to the June 2021 visit and the Coronation visit of May 2023.

201. I have dealt with this complaint above, insofar as it involves the assertion that the claimant should have undergone an RMB assessment. In its broader formulation, the complaint in Ground 6B suffers the same crucial weakness as I have identified a number of times in addressing Ground 6A. It proceeds from an inappropriate, formalist interpretation of the RAVEC process, subjecting that process to an interpretative analysis which may be appropriate for some kinds of statutory provisions and statutory guidance but which is entirely inapt for the sort of decision-making with which we are here concerned. The fact that the claimant remains with the "purview" of RAVEC in the way Sir Richard Mottram describes does not mean the claimant falls to be treated, for security purposes, as [redacted text] or the sort of exceptional individual whose circumstances are such as to make their ongoing presence in the RAVEC cohort appropriate. The "bespoke" process devised for the claimant in the decision of 28 February 2020 was, and is, legally sound. I have already referred to the witness statement of [the Current Chair], the current Chair of RAVEC, who makes it plain that the claimant's visits to the United Kingdom continue to be dealt with in terms of the decision of 28 February 2020, whereby "the claimant re-enters the cohort for those purposes to that extent"; but that he "is not treated as a principal to which the 2021 ToR apply both because he is not within the cohort and because he has in place specific bespoke processes available to him". Furthermore, [the Current Chair] explains that RAVEC [redacted text] as to whether or not to commission an RMB for the claimant and [the Current Chair] does not believe any member of RAVEC has suggested such a course. None of this is remotely irrational.

202. Ground 6B separately alleges that RAVEC's decision of May 2023, made within the framework of the decision of 28 February 2020, was irrational in its own terms because it authorised [redacted text]. I shall address this visit first because the complaint made about the visit of May/June 2021 is connected with what is said to have occurred in [redacted text].

203. The evidence of the current Chair of RAVEC explains that the claimant's attendance at the Coronation was [redacted text].

204. [redacted text] is explained in the first witness statement of Mr Hipgrave. It is [redacted text]. As already noted, Mr Hipgrave says that [redacted text].

205. Commenting on the claimant's contention that the May 2023 arrangements were irrational, the current Chair of RAVEC does not agree. The [redacted text] issue was specifically discussed within RAVEC on 21 April 2023. RAVEC had regard to the [redacted text] threat assessment regarding the claimant and had [redacted text]. [The Current Chair] explains that [redacted text]. It will be a [redacted text]. For this reason, [the Current Chair] says that it is "simply not right in RAVEC's view to characterise [redacted text]".

206. It is manifest that we are, here, once again concerned with what is a disagreement on the part of the claimant with an expert assessment that RAVEC was entitled to reach. The claimant's evidence indicates that he does not consider [redacted text]. He is, of course, entitled to that view; but RAVEC, in the light of its experience, has rationally concluded otherwise. Indeed, RAVEC [redacted text].

207. The complaint about the arrangements for the visit in June 2021 is essentially about the issue of paparazzi.  We have seen in the witness statement of X how paparazzi caused him and the claimant alarm on 30 June 2021, following the charity event at Kew Gardens. It is, of course, entirely understandable why the claimant should be particularly concerned about the activities of paparazzi, in the light of what happened to his mother, Diana, Princess of Wales.

208. I have noted earlier how the claimant took grave exception to the categorisation by the defendant of this issue in 2023 as relating to privacy.  Plainly, the uncontrolled activities on highways of photographers can pose both a direct and indirect danger to the safety of road users and pedestrians. That danger is not to be underestimated.  The essential point that was being made on behalf of the defendant, however, is that potential problems arising from the activities of paparazzi are not a matter for RAVEC.  [redacted text].  As [the Current Chair] explains, "[redacted text]". The same point emerges from the evidence of Mr Hipgrave. RAVEC is concerned with security against persons bearing a hostile intent towards an individual, not those who, however recklessly, may cause danger in their efforts to get a photograph of a celebrity that they can then try to sell to a media outlet.  As [the Current Chair] says, "[redacted text]".

209. It is in the light of this important point that the letter of 6 December 2023 from the Chief of Intelligence of New York City Police Department needs to be considered.  As noted, contrary to what appears to have entered the public domain, the letter states that reckless endangerment did take place on 16 May 2023, when the claimant and the Duchess were being driven in Manhattan.  The fact that, [redacted text].  In any event, it does not [redacted text].

210. The claimant suggests that if a photographer is able to get so close to the vehicle in which the claimant is travelling in order to take a photograph of him, then so too could someone with intent to harm the claimant.  Whilst this may be true, it sheds no light on the risk of there being persons with such hostile intent.

211. The complaints about arrangements for the claimant's visits in March and June 2023 concern in part the issue of [redacted text]. In view of what I have just said, these complaints are wrongly directed at RAVEC. They cast no retrospective doubt on the legality of the decision of 28 February 2020 or disclose any discrete error in the arrangements made by RAVEC for the claimant's attendances at the RCJ. The complaints also take issue with [redacted text]. RAVEC has, however, explained why [redacted text]. The claimant's consistent stance is that he merits [redacted text]. Neither that stance nor anything else advanced by the claimant shows that RAVEC was wrong as a matter of public law to regard [redacted text].

212. I grant permission to advance Ground 6B. For the reasons I have given, Ground 6B fails.

### Grounds 4 (transparency etc), 5 and 6C (procedural unfairness)

213. Grounds 4, 5 and 6C concern alleged lack of transparency and procedural unfairness. The claimant refers to R (Citizens UK) v SSHD [2018] 4 WLR 123 for the key procedural fairness obligations that are relevant in the present case.  A public body must not exercise its powers on the basis of an undisclosed or secret policy: R (Lumba) v SSHD [2012] 1 AC 245.  A public body must give an individual an opportunity to make representation

before the decision is taken: R (Talpada) v SSHD [2018] EWCA Civ 841.  An individual must be given sufficient information to enable them to make representations: R v P Borough Council ex parte S [1999] Fam 188.

214. Ground 4 contends that RAVEC's approach to the claimant was not transparent.  What is meant by "transparency" was addressed in detail by the Divisional Court in R (Manchester Airports Holdings Ltd) v Secretary of State for Transport and another (Jacobs intervening) [2021] 1 WLR 6190.  At paragraph 44, the Divisional Court said there was a "strong indication" that neither a notion of "good administration" nor "transparency" as an aspect thereof identified any immutable legal standard either peculiarly within the expertise of a court or capable of predictable application by a court.  Although a court might identify and regulate conduct at the outer margins of what might amount to good administration or transparent action, the court was not well-placed within those margins to prescribe hard and fast legal standards.  Notions of good administration and transparency were not counterparts to the principle of fairness.  Even when applying the principle of fairness, courts have been careful to recognise that they must make allowance for the fact that one size cannot fit all: "Any freestanding notion of 'good administration' or 'transparency' is several degrees further removed: neither is likely to describe a manageable legal standard".

215. I consider that this exposition answers the claimant's transparency challenge. As is apparent from the preceding analysis of the evidence, RAVEC does not have a mandatory set of criteria that it applies in order to consider whether an individual should come within the RAVEC cohort. As Swift J observed in his permission decision, what there is can be described as "simply descriptive of arrangements RAVEC has in fact put in place for particular individuals, over a number of years". Both the identity of the RAVEC cohort and the protective security arrangements are extremely sensitive and would not ordinarily be disclosed to another individual.

216. The claimant's invocation of Lumba is misplaced. The evidence shows that the claimant has throughout been aware of the central point of contention between him and the defendant. The claimant considers he should receive protective security from the State, whenever he is in Great Britain, because of his position within the Royal Family and factors concerning his past and present situations. RAVEC did not share this view. The paper provided by the Royal Household in January 2020 warned the claimant that he would likely need private security. At the meeting in mid-January 2020, the Cabinet Secretary explained to the claimant's Private Secretary that the claimant should have no expectation of his existing security arrangements remaining the same. This was reiterated at the meeting of 27 January 2020. I deal with these in detail below. Suffice to say for the purpose of Ground 4 that the claimant's appeal to Lumba and the principle of transparency does not succeed.

217. The essential thrust of this group of grounds is, in fact, procedural unfairness.  As held in the Manchester Airport case and as authoritatively held in R v SSHD ex parte Doody [1994] 1 AC 531, what is required by way of procedural fairness is highly context-specific. With that in mind, it is necessary to turn to the specific complaints raised by the claimant under the broad heading of procedural unfairness.  The claimant submits that the identified workings of RAVEC ought to have been disclosed to him so that he could make representations to it about the application of the terms of reference and why he should be treated as being in the Other VIP Category.  So far as concerns the first matter,

the claimant's second witness statement says that he recalls, prior to January 2020, his [redacted text] telling him that a body called RAVEC had "some role in determining security provision, but my knowledge and understanding of RAVEC was only at a very high level. I did not know who RAVEC was comprised of, what its role was, or how it made decisions in relation to the security provision for [redacted text]". The claimant says he only learned that RAVEC is a tripartite body that consists of the Royal Household, the Home Office and the police through pre-action correspondence before commencing the present proceedings. The claimant cannot recall any incidents when anyone ever identified themselves when speaking to him as being part of RAVEC or as being representative of it. Although the claimant recalls a meeting on 6 February 2019 at which the RMB/RAVEC process was supposed to have been explained to him, the claimant does not recall any explanation being given of how RAVEC decided whether a person fell within the RAVEC cohort or how that decision was made.

218. It is, I find, highly relevant that on 11 January 2020, Sir Edward Young provided the claimant (and Ms Mcilwham) with a "draft options paper". This stated that the "level of protection is a decision for the Home Secretary, delegated to the Chair of the Executive Committee for the Protection and Vulnerability Mitigation of Royalty and Public Figures (RAVEC). This process is underpinned by a Home Office-led intelligence-based assessment of threat and risk, completed annually. The assessment process involves several additional factors, including [redacted text] and [redacted text]. A table accompanying this paper addressed a number of scenarios by reference to the heading "Security". This included under "[redacted text]" the following: "Private security (Sussex-funded) with [redacted text]".

219. The claimant's Private Secretary, Ms Mcilwham, met with the Cabinet Secretary, Sir Mark Sedwill, in mid-January 2020. The claimant says this was on 15 January 2020. The meeting was referenced in an email of 16 January 2020 from Ms Mcilwham to Sir Mark Sedwill. Ms Mcilwham thanked Sir Mark for the helpful conversation and said that "I have faithfully relayed the details you provided on security… to the Duke". She said that the claimant "remains most concerned about security arrangements for his family"; and that "he would like to understand better why [redacted text]". Ms Mcilwham explained the claimant's reasons for considering that the risks to him [redacted text]. If anything, they could potentially attract more attention and threat. Ms Mcilwham said that Sir Mark Sedwill had "highlighted that [redacted text]…you suggested that with a clearer sense of [the claimant's] schedule and in particular more detail on [redacted text]…you – colleagues might be able to offer a more informed view". To that end, Ms Mcilwham set out from [redacted text].

220. Paragraph 14 of the claimant's second witness statement says "the Cabinet Secretary had a meeting with my Private Secretary, Ms Mcilwham, on 15 January 2020, but neither I nor my wife were in attendance at that meeting". The claimant does not, however, suggest that the details provided to Ms Mcilwham by the Cabinet Secretary on security issues were not relayed to him, as Ms Mcilwham said. Clearly, Ms Mcilwham's email demonstrates that, even by this stage, she had an understanding of the matters that needed to be addressed, so far as concerned security arrangements for the claimant.

221. As I have earlier recorded, on 27 January 2020 a meeting took place at Buckingham Palace, chaired by Sir Edward Young. It was attended by Simon Case, the Duke of Cambridge's Private Secretary, Fiona Mcilwham, the claimant's Private Secretary (on-

line), the [A] with the Royal Household and the Sovereign's Assistant Private Secretary (remotely by telephone).  Also in attendance was Sir Richard Mottram.  In Sir Richard's first witness statement, he says that the purpose of the meeting was to discuss the claimant's security and for the representatives of the Government and its protective security decision-making – ie. the Cabinet Secretary in relation to the RMV and Sir Richard in relation to RAVEC – to outline present thinking.  An email sent on the following day by [A] set out the nature of the matters discussed, in considerable detail.  I have referred to this above.  Amongst other things, Sir Richard Mottram explained the processes that would be followed, including risk assessment reviews.

222.  In his second witness statement, the claimant notes that Sir Richard Mottram refers to Ms Mcilwham attending the meeting on 27 January.  The claimant then says "if Sir Richard is suggesting that Ms Mcilwham's attendance is sufficient because she was able to make representations on my behalf, I do not agree.  I did not know about the significance of this meeting in advance and, so far as I am aware, neither did Ms Mcilwham – because if she had known, she would have told me.  I did not therefore know that this was a critical meeting in which decisions would be taken in relation to my security.  As a result I did not brief Ms Mcilwham of what representation should be made on my behalf ahead of that meeting".

223.  As I have also mentioned, Sir Richard Mottram sent an email on 28 January 2020 to [redacted text], setting out his account of the meeting.  This recorded Sir Mark Sedwill as emphasising that the State's interest was in handling any threat of [redacted text], not in providing general security to facilitate the new role of the claimant and his family.  Sir Richard said that he would be setting in hand a RAVEC review.  Ms Mcilwham suggested that "we should not move too quickly to make changes.  The Sussexes were developing their plans and the new arrangement was subject to review in 12 months' time".  The general view around the table was, however, in support of early action to recognise the new reality.  There was then "a more detailed discussion of their future plans and the potential security consequences" and "Fiona Mcilwham agreed to provide a forecast of their engagements".

224.  The claimant says that his discussions with Ms Mcilwham at this point principally concerned the claimant's work programme in order to provide assurance that it was "business as usual" with limited changes.  The claimant says it was relevant to note that Ms Mcilwham had only been in her job as Private Secretary for a matter of months at the time of 27 January 2020 meeting.  Given the importance of this matter, he says "I would have expected RAVEC to alert me personally to the fact that this would be a critical meeting in which a decision would be taken on my security so that I could request that I could attend or make representations on my behalf, or give full instructions to Ms Mcilwham about what representation to make".  The claimant further says that he did not know that he could or should have made representations concerning his security to Sir Richard Mottram.

225.  The email of 6 February 2020 from Sir Edward Young to Sir Mark Sedwill said under the heading "Security" that "the discussions to date, including with Sir Richard Mottram, have been useful in making sure that the parameters of the RAVEC process are well understood.  Of course, Her Majesty and her family recognise that these are independent processes and decisions about the provision of publicly funded security are for the UK Government…".  The email went on to say that following "Mark's very constructive

meeting with His Royal Highness earlier this week, we are actively developing options for private provision, in case required".

226. It is apparent from the above that there is no substance in the contention that the defendant failed to act in a procedurally fair manner. In particular, there was no reason to assume that the claimant's Private Secretary was unaware of the security issues arising as a result of the claimant's [redacted text]. On the contrary, the evidence shows that she was entirely conversant with them following the meeting on 27 January 2020, if not before. She would have been well aware of RAVEC and its Chair, who was at that meeting. If there had been the need for any questions to be asked about RAVEC, Ms Mcilwham can be expected to have asked them. I do not accept that the fact she may have been Private Secretary for some six months has any bearing. Her communications are indicative of someone with a good grasp of her job. There was no reason for Sir Richard Mottram and the Government officials to think that Ms Mcilwham would not report to the claimant on what was being discussed. It is, furthermore, relevant that representatives of the Royal Household, in particular Sir Edward Young and [A], were closely involved and were making representations accordingly. It is, therefore, not possible to take Sir Edward's statement, on behalf of Her Majesty and her family, that "the parameters of the RAVEC process are well understood" at anything other than at face value. In the circumstances, therefore, whether the claimant considers additional steps should have been taken is beside the point.

227. This leads on to the submission in relation to Grounds 5 and 6C that the claimant suffered procedural unfairness in being denied an opportunity to make representations, prior to the decision on 28 February 2020. The claimant's skeleton argument contends that in 2020 the claimant was deprived of an existing benefit (stemming from his membership of the RAVEC cohort) and was unable to make representations on, amongst other things, the fact that he should be in the same or an analogous position to individuals in the Other VIP Category; that he should have been treated as a *sui generis* category within the RAVEC cohort, such as [redacted text]; and that [redacted text].

228. These complaints essentially traverse the same ground as has already been analysed in respect of Ground 6A and 6B. Furthermore and importantly, there is no basis for assuming that the claimant or those acting for him would have been informed by RAVEC about the position of [redacted text]. On the contrary, such information is obviously highly sensitive in nature. It has been disclosed now only in compliance with the duty of candour owed in respect of these judicial review proceedings. As can be seen from the evidence analysed above, the position of these individuals has, in any case, no bearing upon the position of the claimant, other than in the way described by Sir Richard Mottram; namely, that it provided "inspiration" for the bespoke approach that was adopted in respect of the claimant in the decision of 28 February 2020.

229. Finally, it is contended that procedural unfairness arose by not applying the RMB process to the claimant. This is tied to the complaint that the claimant ought to have been informed about the 2017 terms of reference. Again, however, ample channels of communication were available to the claimant, such as I have described. The claimant had no right to require RAVEC to initiate a fresh RMB process in the light of his changed situation. In determining what fairness demands in this context, it is important to understand that undergoing an RMB assessment is not a right or even a benefit. It is, as Sir James Eadie KC submits, an analytical tool. Accordingly, and given RAVEC

concluded that a better tool was available in the form of the process described in the letter of 28 February, there was no procedural unfairness in RAVEC not specifically drawing the position of the RMB to the attention of the claimant.  Insofar as the assertion of benefit extends more widely, so as to encompass being (at the time) within the RAVEC cohort, it adds nothing.

230.  The defendant submits that if, contrary to his stance on this matter, it were to be found that procedural unfairness occurred, then it was at least highly likely that the outcome for the claimant would not have been substantially different if the conduct complained of had not occurred. Section 31(2A) of the Senior Courts Act 1981 would be engaged and relief must be refused.  Contrary to what is said on behalf of the claimant, the defendant says that this is not a case where the decision would have been taken on the basis of materially different information and advice; and none has been identified.

231.  For the reasons I have given, I do not consider that there was any procedural unfairness, such as might vitiate the decision.  If I am wrong by that, I find myself in agreement with the defendant.  Whilst fully bearing in mind the high hurdle that has to be surmounted in order to engage section 31(2A) and having full regard to the fact that Sir Richard Mottram's first witness statement was signed on 10 December 2022, I am in no doubt that paragraph 147 of that statement should be accepted by the court:-

> "147. I have carefully considered all of the points advanced on behalf of the claimant in his legal claim. I can say with assurance that even if I had received a document making all of these points in February 2020, they do not contain any point which seems to me to undermine or affect the fundamental rationale for the Decision, or [affect] the bespoke provision it makes in the claimant's favour].  Subject to the court identifying any error of law in the decision, even if I had had before me the matters now set out in this claim as the claimant's representations, I would have reached the same decision for materially the same reasons".

232.  For the above reasons, Grounds 4, 5 and 6C fail (permission being granted to advance Ground 6C).

**Grounds 2 (failure to take account of material considerations) and 3 (irrationality)**

233.  I turn to Grounds 2 and 3.  As I have said, the defendant submits that these grounds are out of time.  The claimant submits that time only began to run when he was first affected by the decision of February 2020.  This happened in June 2021.  His earlier visit, in connection with the funeral of the Duke of Edinburgh, had not resulted in the claimant being [redacted text].  The claimant relies on R (Badmus v SSHD [2020] 1 WLR 4609. In that case, the claimant sought to challenge the setting of rates of remuneration for activities undertaken by those in immigration detention.  The relevant decision of the defendant was in May 2018 but the claim was not brought until October 2018.  The Court of Appeal held that the claimants had not been affected by that decision until they had been detained for immigration purposes in a removal centre in which the rule regarding the remuneration rate applied.  At paragraph 78 of the judgment, the Court held that "it was only when the claimant first became affected by the measure or policy that he or she had sufficient status or standing to bring the judicial review claim.  So far as the claimant was concerned, the grounds to make the claim cannot have arisen before then".

234. The claimant also relies on R (Raja) v Redbridge London Borough Council [2020] PTSR 2129.  At paragraph 18, Fordham J noted that the claimants had been an "ongoing failure" to recognise that the "sole justifiable response" to their concerns was for the defendant to make interim care provision.  There had been "a series of rejected requests and the continued persistence of the claim".  Accordingly, Fordham J characterised the proceedings as "rolling judicial review".

235. I am in no doubt that these cases do not assist the claimant and that, so far as Grounds 2 and 3 are concerned, the application was made considerably out of time.  Badmus is plainly distinguishable.  Until the claimants in that case were subjected to immigration detention, they clearly had no standing to challenge the relevant decision.  Any interest they may have had in it would have been purely hypothetical.  The contrast with the claimant's case is stark.  The claimant obviously had standing to challenge the decision of 28 February 2020 as soon as it was made.  It concerned him specifically.  It changed [redacted text] security arrangements that hitherto had been applied to him.  From the time the decision came into effect, the claimant knew that whenever he might come to the United Kingdom, he would have to engage with RAVEC in order for it to decide on [redacted text] the security to be provided.

236. The present case is also very far from being a "rolling judicial review", of the kind described by Fordham J in Raja. The decisions of RAVEC in respect of [redacted text] protection the claimant should receive during a particular visit could be the subject of a discrete public law challenge (as with the decision of May 2023: see above).  The decision of 28 February 2020, however, created a framework for the later decision-making.  Accordingly, it was the decision that needed to be challenged if that framework was to be legally called into question.

237. I must therefore consider whether to extend time.  I have decided that it is in the interests of the overriding objective to extend time to enable Grounds 2 and 3 to be substantively addressed.  The reason is that, as will by now be apparent, there is a good degree of overlap between, on the one hand, Grounds 2 and 3 and, on the other, Grounds 4 and 5 and 6A and 6C where the issue with timeliness is not materially contested by the defendant.  I have concluded that there is a degree of artificiality in excluding Grounds 2 and 3 from the ambit of substantive consideration.  I therefore address them.

238. I agree with the defendant that Grounds 2 and 3 are rationality challenges.  Ground 3 is expressly put forward on that basis.  Although Ground 2 is framed in terms of failing to take account of the material considerations, the nature and context of those considerations, upon analysis, involve matters of expert judgement and assessment. Accordingly, I agree with the defendant that the intensity of review is, in reality, that of rationality. Where, as here, there is no statute that prescribes or guides the relevancy of any considerations, it is for the decision-maker to determine what is relevant, subject only to a rationality review. This emerges from paragraphs 135 to 141 of the judgment of the Divisional Court in R (D) v Parole Board [2018] EWHC 694 (Admin), drawing on the authorities of In Re Findlay [1985] AC 318 and R (Khatun) v Newham London Borough Council [2005] QB 37. To adopt the language of Laws LJ in Khatun, there is also in the present case no "implied lexicon" of matters to be treated as relevant; and so it is for the decision-maker and not the court to make the primary judgment as to what should be considered. The analogy drawn by the defendant with how planning authorities and planning inspectors are told to address material considerations planning jurisdiction

is, I consider, apt: <u>R (Samuel Smith Old Brewery) (Tadcaster) v North Yorkshire Council</u> [2020] 3 All ER 527 at paragraph 32. Furthermore, since Ground 2 involves criticism of the decision-maker's approach to enquiry and investigation, the standard of review is that of *Wednesbury* reasonableness: <u>R (Plantagenet Alliance Limited).</u>

239. It was plainly rational for RAVEC to have had regard to the fact that the claimant was [redacted text]. [redacted text] considered for protection at public expense, having regard amongst other things to the level of risk and the impact an attack on them would have. This is to recognise the [redacted text].

240. Importantly, the decision of 28 February 2020 accepted that the claimant nevertheless occupied a particular and unusual position, such that it was appropriate to afford him protective security in certain circumstances, [redacted text]. This led to the "bespoke" arrangements, which I have described earlier and which, for the reasons I have given, are free from public law error.

241. The claimant argues that [redacted text] did not impact upon the threat level he faced. I agree, however, with the defendant that RAVEC was well aware of the claimant's status, background and profile. That included [redacted text]. The decision adopted a flexible approach precisely in order to recognise that [redacted text] might warrant exceptions being made in future in relation to particular contexts.

242. The assessment of the impact [redacted text]. This emerges from the first witness statement of Sir Richard Mottram which, for the reasons I have given, is to be accorded weight. RAVEC decided to have greater regard than the claimant thinks it should have done to the impact on State functions being less, as a result of his [redacted text], and less regard than he considers appropriate to the likely public reaction, were a successful attack on the claimant to take place. The fact that the claimant does not agree with this analysis does not begin to show that Sir Richard Mottram was not entitled in law to make it. A similar point applies to the way in which the claimant's [redacted text] were considered. These likely future activities were taken into consideration and addressed in the decision. They were an important reason why flexibility was built into the decision to allow for future case-by-case decision-making. The available assessments of threats posed to the claimant were also specifically considered and formed part of the basis for the decision. In so far as the claimant considers that [redacted text] is inappropriate, this, again, is a view to which he is entitled but which does not demonstrate that RAVEC was legally incapable of concluding that, in certain circumstances, [redacted text].

243. The claimant complains that his offer personally to reimburse or proactively finance the cost of protective security was not taken into account by RAVEC. The claimant points out that enquiries in this regard were made by the Royal Household to the Cabinet Office. The answer however, that emerges from the evidence is that, even if Sir Richard Mottram had been personally informed at the time about the offer, it would have been refused on the basis that a person is either entitled to the relevant protection as a member of the RAVEC cohort or they are not. This was confirmed as a principled position for the defendant to take by a decision of 15 February 2022. The claimant's judicial review challenge in respect of that decision was refused permission.

244. The claimant contends that the contemporaneous documentation does not evidence any consideration by RAVEC of the sufficiency of private security, where State security was,

essentially, withdrawn; for example, where a provision is [redacted text]. RAVEC was not, however, legally required to undertake a form of "cost benefit analysis", so as to compare [redacted text]. RAVEC's decisions are not taken by reference to cost. I agree with the defendant that members of RAVEC are, plainly, familiar with the differences between the powers of law enforcement bodies of the State and those of security providers. Those differences do not, however, mean that private security cannot be effective. I observe, in particular, that Sir Richard Mottram's first witness statement explains that RAVEC had access to specific work undertaken by the College of Policing, which considered, amongst other things in connection with operational protective security matters, the abilities of private security providers.

245. So far as concerns the aspects of Ground 3 upon which permission has been granted, I am satisfied that nothing said by the claimant reaches the threshold of irrationality. In particular, I do not accept that, as the claimant argues, there is no logical connection between [redacted text] and the provision of State security. The fact that RAVEC does, on an exceptional basis, provide protective security to [redacted text] has been dealt with above. The alleged absence of a logical connection does not, furthermore, engage with the difference between the impact of an attack on [redacted text]. The fact that there is a different justification for a very small number of persons in respect of [redacted text] is nothing to the point.

246. The remainder of Ground 3 involves the criticism that there has not been an RMB analysis. I have dealt with that issue above. The claimant criticises the fact that, in connection with the June 2021 visit, RAVEC failed to commission an updated threat assessment. Given, however, that the required 28 days' notice was not given as regards the claimant's attendance at the WellChild event, I accept there would have been considerable time pressure on the production of such an assessment. In any event, RAVEC was able to consider, before reconfirming its decision in relation to that visit, threat assessment information from the MPS Protection Command. RAVEC correctly understood that it would be informed proactively of anything that had a material effect on the previous threat assessments that had been carried out. This emerges from the evidence of Mr Hipgrave.

247. The claimant contends that the decision to provide "case-by-case" security provision was unreasonable because it resulted in excessive uncertainty and/or hardship for the claimant/his private security team. So far as the June 2021 visit was concerned, it is apparent from the witness statement of X that a good deal of the problems encountered around the journey from the event at Kew [redacted text]. As I have explained, any problems regarding [redacted text]. Insofar as the case-by-case approach may otherwise have caused difficulties, they have not been shown to be such as to overcome the high hurdle so as to render the decision-making irrational.

248. The final aspect of this ground of challenge is the alleged irrationality of being required to give 28 days' notice. There is no merit in this contention. It arose from the need to be able to address a [redacted text] of the kind belatedly given by the claimant to RAVEC in relation to the June/July 2021 visit. Given RAVEC's expertise, the decision to require 28 days' notice would need to be shown, by reference to evidence, to have been plucked out of the air or imposed for some extraneous reason, before this head of challenge could be made out. The claimant has pointed to nothing of the kind.

249.  Grounds 2 and 3 accordingly fail.

250.  Following the circulation of the draft judgment, the claimant invited the Court – in accordance with what he describes as the guidance in <u>Re S (Children)</u> [2007] EWCA Civ 694 – to refer expressly to the following submissions that the claimant had made in the course of the hearing. First, the claimant submitted that the answer to Sir James Eadie KC's point recorded at paragraph 162 above, that an RMB analysis would need to be carried out in respect of everyone in England, Wales and Scotland, is that the claimant was within the RAVEC cohort at the time of the decision; that RAVEC had accepted "jurisdiction" over the claimant and that, even on the defendant's case, the claimant is "in and out" of the cohort. Second, the claimant submitted that it was not a matter of the RMB analysis being less useful than the "bespoke" approach, or of the matter being categorised as "either/or". The claimant should have received an RMB analysis as well as individualised consideration. Third, the claimant says that without an RMB analysis, RAVEC could not lawfully reach the conclusion that the claimant should not be treated as within the Other VIP Category, having regard to the role and purpose of the RMB analysis.

251.  None of these submissions necessitates any substantive elaboration of the findings made above. On the contrary, they are further examples of the overarching problem with the claimant's case; namely, his "inappropriate, formalist interpretation of the RAVEC process" (paragraph 201 above). The decision of 28 February 2020 was obviously forward-looking in nature, which was the point being made by the defendant in paragraph 162. The "in and out" submission is dealt with at paragraph 178 above. The suggestion that the claimant should have received both an RMB analysis and a "bespoke" approach ignores the witness evidence of the defendant which, for the reasons I have given, falls to be given weight. As already explained, that evidence shows no irrationality or other unlawfulness, as regards the Other VIP Category.

### *DECISION*

252.  For these reasons, the application for judicial review is refused.