**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

HERITAGE FOUNDATION, *et al*,

    *Plaintiffs*,

    v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY,

    *Defendant*.

Civil Action No. 1:23-cv-01198 (CJN)

## UNSEALED MEMORANDUM OPINION

In this Freedom of Information Act case, Plaintiffs seek the disclosure by the Department of Homeland Security of certain immigration records relating to the Duke of Sussex, a member of the British Royal Family known popularly as "Prince Harry." The government argues that the Duke has a privacy interest that outweighs any public interest in those records and has therefore withheld them (and, with respect to one category, has declined to confirm whether they exist at all). Following *in camera* review of certain records and associated declarations, the Court agrees that the Duke's privacy interest outweighs any public interest, and therefore grants Defendant's Motion for Summary Judgment, ECF No. 23, and denies Plaintiffs' Cross-Motion for Summary Judgment, ECF No. 26.

### Background

The Duke of Sussex's full name and title is his Royal Highness Prince Henry Charles Albert David George of Wales, the Duke of Sussex, the Earl of Dumbarton, and Baron Kilkeel K.C.V.O. *See* ECF No. 7 at 1. In January 2023, the Duke released a memoir entitled *Spare*, which

sold over 1.4 million copies on its first day and was a *New York Times* bestseller. *Id.* at 37. The book shares intimate details of his life including numerous instances of drug use, ranging from marijuana and cocaine to psychedelics and psilocybin. *Id.* at 18.

It also describes how the Duke came to reside in the United States. In early 2020, he and his wife were living in Canada when they received word that their royal security was being withheld. *See Spare*, App. D. 386–87. In March 2020, the World Health Organization declared a global pandemic and Canada began to discuss the possibility of closing its borders. *Id.* at 388. According to the memoir, the Duke and his wife feared being trapped in Canada without royal security, so they left Canada by private plane and entered the United States on March 14, 2020. *Id.* They ultimately decided to stay, buying a home in Santa Barbara, California in July 2020. *Id.* at 391. They appear to still reside there.

In March 2023, two months after *Spare* was first published, Mike Howell and his employer the Heritage Foundation (together "Heritage") submitted a FOIA request to the Department of Homeland Security for the Duke's immigration records. *See generally* ECF No. 7-2.[1]  The request explained that Heritage was interested in learning "whether Prince Harry was properly vetted prior to or during admission into the United States" in light of his admitted "continuous and substantial" drug use. *Id.* at 9. Heritage contended that the Duke's "conduct likely violated numerous laws" that should have made him ineligible for admission. *Id.* Heritage further contended that if the Department admitted the Duke into the United States "without a waiver or any interview with

---

[1] The request seeks records related to: (1) the Duke's Alien Registration file, including any applications for immigration benefits; (2) immigration- and entry-related records maintained in twelve different databases; and (3) visa waiver requests under Section 212(d)(3) of the INA, 8 U.S.C. § 1182(d)(3)(A). *See* FOIA Request, ECF No. 1-5 at 3.

CBP," then it gave him "preferential treatment that [] would undermine public confidence in DHS, CPB, and USCIS's application of equal justice under the law." *Id.*

The Department denied the request and Heritage filed this suit. *See* Am. Compl., ECF No. 7 at 41–45. Following certain preliminary matters not relevant here, the government moved for summary judgment and Heritage cross-moved for partial summary judgment. *See* Def. Mot. for Summ. J., ECF No. 23; Pl. Cross-Mot. for Summ. J., ECF No. 26. As noted above, the government contends that the Duke has a privacy interest in his immigration records that outweighs any public interest in them. As a result, the government argues, it has appropriately withheld under FOIA Exemptions 6, 7(C), and/or 7(E) records that it has acknowledged exist, such as those in USCIS's Person Centric Identity Services and Person Centric Query System (which houses biographical and biometric information), and in CBP's TECS system (which houses entry and exit information). *See* Def. Mot. for Summ. J., ECF No. 23-1 at 7. And, the government contends, it has appropriately refused to confirm or deny whether it has certain records—such as records regarding an application for a waiver under Section 212(d)(3) of the Immigration and Nationality Act—because disclosing the existence (or not) of such records would disclose something not presently public about the Duke's immigration information. *Id.* at 9.

Heritage has a different view. *See generally* Pl.'s Memo in Opp. to Summ. J., ECF No. 25. As Heritage sees it, a foreign national seeking to enter the United States must typically fill out forms that ask about past drug use. As a result, Heritage contends, there are only certain ways the Duke could have entered the United States in March 2020. He might have been in possession of a diplomatic visa, but Heritage contends that was unlikely given his status with the Royal Family. *See* Arthur Decl., ECF No. 28 at 4 n.1. Or he might have disclosed his past drug use and sought a waiver of admission under Section 212(d)(3) of the INA, which permits the Attorney General and

3

Case 1:23-cv-01198-CJN   Document 48   Filed 09/23/24   Page 4 of 13


the Secretary of State (or a consular officer) to provide a nonimmigrant visa to an otherwise inadmissible alien. But, Heritage argues, this normally would take several years to attain, as a consular office would have had to investigate the recency and seriousness of the Duke's drug use, his reasons for traveling to the United States, and the effect of his admission into the United States before making a recommendation to the Department of Homeland Security. *See id.* at 9. Alternatively, the Duke may have disclosed his past drug use but have been admitted into the United States without a waiver—which in Heritage's view would be unlawful under the INA and relevant regulations. *Id.* at 7–9. Or the Duke may have lied altogether about his drug use. *Id.* at 9–10.

In Heritage's view, the public has an interest in knowing which path was taken. In particular, Heritage argues that if the Duke disclosed his past drug use, then the public has an interest in knowing if the government granted him a waiver (which might reflect preferential treatment because of his celebrity status) or if he was admitted without a waiver at all (which could reflect government misconduct). *See* Pl. Memo. in Supp. of Summ. J., ECF No. 25 at 36; *see also* Arthur Decl., ECF No. 28 at 11–12. If, on the other hand, the Duke lied about his past drug use, then he lied to the government but has been allowed to remain, and the public has an interest in knowing that as well. *See* Arthur Decl., ECF No. 28 at 12–13.

Following oral argument on the motions, the Court ordered the government to provide it (*ex parte* and *in camera*) declarations detailing, with particularity, the records it was withholding and the particular harm that would arise from public disclosure of them. *See in Camera* Order, ECF No. 38 at 2. The Order was based, in part, on the Court's conclusion that *in camera* review was necessary to determine whether the privacy interests asserted by the government indeed outweighed the public interest advocated by Heritage. *Id.* In response, the government submitted

three declarations from FOIA officers at the Department, CBP, and USCIS. *See* Notice of Compliance with Court Order by Gov't, ECF No. 41. Those declarations describe the records that each entity had located in response to Heritage's request and provide further information regarding the bases for the government's arguments for withholding (or for not confirming or denying their existence).[1] ██████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

     Of particular relevance here, those declarations and documents reflect that ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███  ██  ████  █████  ██████  ███  ██████  █

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███

    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[1] On September 9, 2024, the Court issued this Memorandum Opinion (and an accompanying order) in unredacted form *ex parte* and under seal to the government, at docket entries 46 and 47. The Court has determined that this redacted Memorandum Opinion includes all of the information that can be made publicly available without disclosing information subject to properly asserted FOIA exemptions. The Court is also unsealing the Order lodged on September 9, 2024, which remains ECF 46.

████████████████████████████████████████████

████████████████████████████████████

**Legal Standards**

"[T]he vast majority of FOIA cases can be resolved on summary judgment." *Brayton v.*

*Office of U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).  The most relevant

question here is whether the government has adequately demonstrated that the information it is

withholding is subject to one or more FOIA exemptions.  Under Exemption 6, the government can

decline to disclose "personnel and medical files and similar files the disclosure of which would

constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  To apply

this exemption, courts must first conclude that the records in question are indeed "personnel,

medical, or similar files." *See Multi Ag Media LLC v. U.S. Dep't of Agric.*, 515 F.3d 1224, 1228

(D.C. Cir. 2008).  If the records qualify as such files, then courts must balance the privacy interest

in those records against the public interest in the requested information. *See U.S. Dep't of Def. v.*

*Fed. L. Rel. Auth.,* 510 U.S. 487, 497, (1994); *see also Lepelletier v. FDIC*, 164 F.3d 37, 47 (D.C.

Cir. 1999) (holding that courts must weigh the "privacy interest in non-disclosure against the

public interest in the release of the records in order to determine whether, on balance, the disclosure

would work a clearly unwarranted invasion of personal privacy.").  "Congress' primary purpose in

enacting Exemption 6 was to protect individuals from the injury and embarrassment that can

---

[2] Following the government's original *in camera* submission, the Court asked the government
whether it would be willing to produce additional records relating to ████████████████████
which according to the government are maintained at the Department of State (a non-party).
Relying on 8 U.S.C. § 1202(f)—which prohibits State from releasing records "pertaining to the
issuance or refusal of visas or permits to enter the United States"—the government declined to
do so.

result from the unnecessary disclosure of personal information." *See U.S. Dep't of State v. Washington Post*, 456 U.S. 595, 599 (1982).

Under Exemption 7, the government can also decline to release certain records "compiled for law enforcement purposes." *See* 5 U.S.C. § 552(b)(7). These are generally records for which there is "(1) a rational 'nexus' between the record and the agency's law enforcement duties, and (2) a connection between the subject of the record and a possible security risk or violation of federal law." *Levinthal v. FEC*, 219 F. Supp. 3d 1, 6 (D.D.C. 2016) (citing *Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 32 (D.C. Cir. 1998)).

One subcategory of Exemption 7, Exemption 7(C), exempts "records or information compiled for law enforcement purposes" when disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). This exemption, "which requires the government to prove only that disclosure 'could reasonably be expected to constitute an unwarranted invasion of personal privacy,' is 'somewhat broader' than Exemption 6, which requires proof of a 'clearly unwarranted invasion of personal privacy.'" *Roth v. U.S. Dep't of Just.*, 642 F.3d 1161, 1173 (D.C. Cir. 2011) (quoting *U.S. Dep't of Just. v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 756 (1989)). Government withholdings under Exemption 7(C) are subject to a two-part test. First, the records must be compiled for a law enforcement purpose, which can be determined based on a focus "on how and under what circumstances the requested files were compiled, and whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding." *Jefferson v. U.S. Dep't of Justice*, 284 F.3d 172, 176–77 (D.C. Cir. 2002) (citations and internal quotation marks omitted). Second, the government must show that (1) the disclosure of the records would "reasonably be expected to constitute an unwarranted invasion of personal privacy," and (2) that "personal privacy interest"

is not "outweighed by the public interest in disclosure" of the records. *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 160, 165–66 (2004).

Exemption 7(E) in turn permits the government to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . would disclose techniques and procedures for law enforcement investigations or prosecutions or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).

But even when an exemption applies, the Court's inquiry does not stop there. FOIA requires the release of "any reasonably segregable portion of a record" that is not exempt after appropriate redactions have been applied. *See* 5 U.S.C. § 552(b). However, the government can withhold an entire document if the non-exempt portions are "inextricably intertwined with exempt portions." *See Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977). In those cases, the government must provide a "detailed justification" and not just "conclusory statements" to demonstrate that it has released all reasonably segregable information. *See id.* at 261. The burden is on the government to show, with reasonable specificity, why a document cannot be further segregated. *See Armstrong v. Executive Office of the President,* 97 F.3d 575, 578–79 (D.C.Cir.1996).

In limited circumstances, the government may decline to acknowledge the existence of certain records if "the fact of the existence or nonexistence of agency records falls within a FOIA exemption." *See Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007).

## Analysis

I.    **The Duke Has a Reasonable Privacy Interest in His Immigration Records.**

Exemptions 6 and 7(C) protect information in which a person has a reasonable privacy interest.[3]   Heritage acknowledges that the Duke has a privacy interest in his "health information or financial information or family relationships." *See* Pl. Memo in Opp. to Summ. J., ECF No. 25 at 13 (internal quotations omitted).   But, Heritage argues, he has a limited (if any) privacy interest regarding his drug use and his immigration records, given what is already publicly known, including through the publication of *Spare*.   As Heritage puts it, the "Duke of Sussex's Netflix series and *Spare* expressly detail the timing and manner of his entry to take up residence and the details of his decision to maintain residence in the United States." *Id.* at 20.   And in his various media appearances, Heritage argues, the Duke gave "a startlingly candid and comprehensive account of his illegal drug use." *Id.*

Heritage is partially correct that as a public figure, the Duke's public statements tend to diminish his privacy interests compared to ordinary foreign nationals admitted to the United States. *See, e.g.*, Pl. Memo in Opp. to Summ. J., ECF No. 25 at 22 n.10.   But it goes too far in arguing that that privacy interest is so diminished by his public statements as to be *de minimis*.   Like any foreign national, the Duke has a legitimate privacy interest in his immigration status. *See, e.g., Bales v. United States Dep't of State*, No. CV 18-2779 (RC), 2020 WL 1078854, at *4 (D.D.C. Mar. 6, 2020).   And the Duke's public statements about his travel and drug use did not disclose, and therefore did not eliminate his interest in keeping private, specific information regarding his immigration status, applications, or other materials. *See In Painting and Drywall Work*

---

[3] Heritage concedes that responsive records would satisfy the requirement of Exemption 7(c) that they be compiled for a law enforcement purpose. *See* Pl. Cross-Mot. for Summ. J., ECF No. 26-1 at 14.

*Preservation Fund, Inc. v. HUD*, 936 F.2d 1300 (D.C. Cir. 1991) (noting that the privacy interest under FOIA "includes the prosaic (*e.g.,* place of birth and date of marriage) as well as the intimate and potentially embarrassing"),; *see also Behar v. Dep't of Homeland Security*, 39 F.4th 81, 93 (2d Cir. 2022) ("Exemption 7(C) requires only that the agency establish that the privacy interest protected by the exemption is an interest in avoiding disclosure of personal matters and keeping personal facts away from the public eye.") (internal citations and quotations omitted).

In particular, the summary judgment record reflects that the Duke has never disclosed publicly (among other things) the following facts: ███████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████ That is the "type of information that a person would ordinarily not wish to make known about himself," *id.,* and therefore the government has demonstrated that the Duke retains a privacy interest in these records.

## II.     Whatever Interest the Public Has in Disclosure of the Records is Outweighed by the Duke's Privacy Interest.

That does not end the matter, of course.  Under Exemptions 6 and 7(C), the Duke's privacy interest must be weighed against the public's interest in disclosure.  Heritage's principal argument is that the public has an interest in knowing "whether DHS committed misconduct or acted negligently in either admitting the Duke of Sussex or in allowing him to stay within the United States." Pl. Cross-Mot. for Summ. J., ECF No. 26-1 at 24.  Heritage also argues that the disclosure of the records would help the public "better understand how DHS conducts itself and exercise[s]

official discretion in high-profile cases involving the admission of high-profile and influential individuals who have engaged in illegal drug use." *Id.*

As described in more detail above, Heritage's first argument is based on its contention that in March 2020 the Duke entered the United States either by disclosing his past drug use (and was admitted inappropriately) or failing to disclose his past drug use. *See supra* at 3–4. ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ [4] As Heritage puts it, "[I]f the records fail to shed light on those questions, or show that in fact the expected impropriety did not occur then the case immediately is at an end; there is no need to evaluate the sufficiency of Plaintiffs' asserted public interest or conduct the complex balancing inquiry. Judgement may simply be entered for Defendant." *See* Pl. Cross-Mot. for Summ. J., ECF No. 26-1 at 46.

Heritage's second argument—that the records will help the public better understand how the Department conducts itself and how its officials exercise discretion—also fails. Public

---

[4] Heritage objects to the Department's *Glomar* responses, arguing that the Department's public declarations and filings do not "explain why merely acknowledging application for a Section 1182(d)(3)(A) waiver would actually and concretely cause the harm protected by Exemption 6 and 7(C)." *See* Pl. Mot. for Summ. J., ECF No. 26-1 at 35. But disclosing whether or not there are such records would tell the public something that is not publicly known about the Duke—whether he did, or did not, apply for such a waiver. For the reasons discussed above, disclosing that information would infringe on the Duke's reasonable expectation of privacy in his immigration records without a sufficiently strong public interest in them. The Court therefore grants summary judgment in favor of the Department as to its *Glomar* response.

disclosure of records about a single admission of a foreign national in the circumstances described above would provide the public, at best, limited information about the Department's general policy in admitting aliens. And the marginal public benefit of knowing that limited information is outweighed by the privacy interest the Duke retains in his immigration status and records.[5] The public's interest in disclosure "is not fostered by disclosure of information about private citizens that is accumulated in various governmental files but that reveals little or nothing about an agency's own conduct." *Fed. L. Rel. Auth.*, 510 U.S. at 496.

Heritage insists that this case is analogous to *Muchnick v. Dep't of Homeland Sec.*, where plaintiff sought immigration files for the former coach of the Irish Olympic swim team who was accused of sexually abusing young female swimmers before immigrating to the United States. *See* 225 F.Supp.3d 1069 (N.D. Cal. 2016). The *Muchnick* Court granted summary judgment in favor of the plaintiff, holding that the public interest in disclosure outweighed the coach's diminished privacy interests. But that holding was based on its conclusion that the swim coach had virtually no privacy interest in his records. *See, e.g., Muchnick*, 225 F.Supp.3d at 1076 ("Anyone who bothers Googling his name can get their hands on the sordid details of his alleged crimes."). Here, in contrast, the Court has concluded that the Duke retains a privacy interest in his immigration records. The Court there also held that "the public has a strong interest in understanding how and

---

[5] Heritage also objects to the Department's categorical withholdings. Heritage concedes that many of the documents it seeks contains exempted information, but argues that those records can be produced with "appropriate redactions." Pl. Memo in Opp. to Summ. J., ECF No. 25 at 19. But the Court concludes, based on the public and *in camera* record, that the non-exempt portions of the documents that Heritage requests are not reasonably segregable from the exempt portions, and that there would be no marginal public value in what would remain unredacted. *See Mead Data Cen. Inc.*, 566 F.2d at 261, n.55 (D.C. Cir. 1977) (holding that a court may decline to order an agency to "commit significant time and resources to the separation of disjointed words, phrases, or even sentences which taken separately or together have minimal or no information content"). The Court therefore grants summary judgment in favor of the Department as to the categorical withholdings.

why their government allowed a man with a far-worse-than-checkered past (and perhaps present) to stay here for more than two decades." *Id*. For the reasons discussed above, in this case, the public does not have a strong interest in disclosure of the Duke's immigration records.

**Conclusion**

For the forgoing reasons, the Court grants the Defendant's motion for summary judgment and denies Plaintiffs' cross motion. An Order will issue contemporaneously with this Opinion.


DATE:  September 23, 2024

_____
CARL J. NICHOLS
United States District Judge

13