UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

HERITAGE FOUNDATION, *et al*,

    *Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY,

    *Defendant*.

Civil Action No. 1:23-cv-01198 (CJN)

## ORDER

In September 2024, for the reasons described in a sealed Memorandum Opinion that was filed publicly in redacted form at ECF 48, the Court granted Defendant's Motion for Summary Judgment, ECF 23, and denied Plaintiffs' Cross-Motion for Summary Judgment, ECF 26. Plaintiffs have since filed a Motion for Relief under Federal Rule of Civil Procedure 59(e). ECF 50. For the reasons discussed below, that Motion is GRANTED IN PART and otherwise HELD IN ABEYANCE pending the steps described below.

### Background

As described in more detail in the Memorandum Opinion, ECF 48, in March 2023 Plaintiffs Mike Howell and his employer the Heritage Foundation (together "Heritage") submitted a FOIA request to the Department of Homeland Security for the Duke of Sussex's immigration records. *See generally* ECF 7-2. The request explained that Heritage was interested in learning whether the Duke "was properly vetted prior to or during admission into the United States" in light of his admitted "continuous and substantial" drug use. *Id*. at 9. Heritage contended that the Duke's "conduct likely violated numerous laws" that should have made him ineligible for admission. *Id*.

1

Heritage further contended that if the Department admitted the Duke into the United States "without a waiver or any interview with CBP," then it gave him "preferential treatment that [] would undermine public confidence in DHS, CPB, and USCIS's application of equal justice under the law." *Id*.

The Department denied the request and Heritage filed this suit. *See* Am. Compl., ECF 7 at 41–43. Following certain preliminary matters not relevant here, the government moved for summary judgment and Heritage cross-moved for partial summary judgment. *See* Def. Mot. for Summ. J., ECF 23; Pl. Cross-Mot. for Summ. J., ECF 26. As described in the Memorandum Opinion, *see* ECF 48 at 3, Heritage argued that a foreign national seeking to enter the United States must typically fill out forms that ask about past drug use. As a result, Heritage contended, there are only certain ways the Duke could have entered the United States in March 2020. He might have been in possession of a diplomatic visa, but Heritage contended that was unlikely given his status with the Royal Family. *See* Arthur Decl., ECF 28 at 4 n.1. Or he might have disclosed his past drug use and sought a waiver of admission under Section 212(d)(3) of the INA, which permits the Attorney General and the Secretary of State (or a consular officer) to provide a nonimmigrant visa to an otherwise inadmissible alien. But, Heritage argued, this normally would take several years to attain, as a consular office would have had to investigate the recency and seriousness of the Duke's drug use, his reasons for traveling to the United States, and the effect of his admission into the United States before making a recommendation to the Department of Homeland Security. *See id*. at 8–9. Alternatively, the Duke may have disclosed his past drug use but have been admitted into the United States without a waiver—which in Heritage's view would be unlawful under the INA and relevant regulations. *Id*. at 7–9. Or the Duke may have lied altogether about his drug use. *Id*. at 9–10.

In Heritage's view, the public has an interest in knowing which path was taken. In particular, Heritage argued that if the Duke disclosed his past drug use, then the public has an interest in knowing if the government granted him a waiver (which might reflect preferential treatment because of his celebrity status) or if he was admitted without a waiver at all (which could reflect government misconduct). *See* Pl. Memo. in Opp. of Summ. J., ECF 25 at 36; *see also* Arthur Decl., ECF 28 at 11–12. If, on the other hand, the Duke lied about his past drug use, then he lied to the government but has been allowed to remain—and Heritage argues that the public has an interest in knowing that as well. *See* Arthur Decl., ECF 28 at 12–13.

Heritage argued that the Court should grant it summary judgment (and deny summary judgment to the government) based on the public filings, but it also argued that if the "Court has any doubt regarding the [issues presented], the appropriate procedure is to order an *in camera* review." ECF 26-1 at 38. Heritage argued that resolution of the exemptions asserted by the government was "a matter well suited for *in camera* review" because, among other things, the "content of the document is critical given the discretionary nature of the court's inquiry as well as the case specific nature of balancing," and "judicial economy is often well served in that the number of records is relatively small and review of those records is almost always dispositive." *Id.* And Heritage did not limit its argument to the *in camera* review of responsive records; instead, it argued, "[s]ome courts have even gone further," including "government briefing [that] was reviewed *in camera*," and "an *in camera ex parte* hearing." *Id.* at 40.

The Court did not take Heritage up on these suggestions prior to oral argument on the motions. Instead, as the Court stated at that hearing, it was not then "privy to any of Prince Harry's immigration information. I haven't asked for it to be submitted *in camera*. I haven't asked for any explanation of it to be submitted *in camera*. . . . And part of the reason I did that, in addition

3

to not knowing whether it's appropriate to do so, is I wanted to be able to have a hearing where I could ask hypothetical questions without risking disclosing the very information that the government says it is unable to disclose." ECF 37 at 3. Among other topics that were discussed at the hearing was the propriety of the Court reviewing materials *in camera*. For its part, Heritage stated that it had "*no objection to any in camera procedure that Your Honor would like to pursue.*" *Id.* at 34 (emphasis added). At the end of the hearing, the Court took all issues under advisement, including whether it should engage in any *in camera* review. And as to that question, the Court specifically stated it "underst[ood] the government's argument that even if it do that, I should, in the first instance, permit or accept declarations, rather than the underlying materials"—and that "[f]rankly, that's my view generally because it's often the case that the underlying documents aren't all that easily decipherable without explanation, and sometimes the declarations help that." ECF 37 at 51

Shortly thereafter, the Court ordered the government to provide it (*ex parte* and *in camera*) declarations detailing, with particularity, the records it was withholding and the particular harm that would arise from public disclosure of them. *See* Order, ECF 38 at 2. The Order was based, in part, on the Court's conclusion that *in camera* review was necessary to determine whether the privacy interests asserted by the government indeed outweighed the public interest advocated by Heritage. *Id*. And although the Order did not state so expressly, it was also based on the Court's view that, as stated at the hearing, "it's often the case that the underlying documents aren't all that easily decipherable without explanation, and sometimes the declarations help that." ECF 37 at 51. Heritage did not lodge any objection to this Order, either by contending that the Court was required to review the underlying records *in camera* before reviewing declarations, or by raising some other concern.

4

In response, the government submitted three declarations from FOIA officers at the Department, CBP, and USCIS. *See* Notice of Compliance with Court Order by Gov't, ECF 41. Those declarations described any records that each entity had located in response to Heritage's request and provided further information regarding the bases underlying the government's arguments for withholding (or for not confirming or denying their existence).

The next month the Court conducted an *in camera* hearing with the government to ask questions about those declarations. Following the hearing, the Court asked the government whether it would be willing to produce certain additional information, which according to the government is held at the Department of State (a non-party). *See* Memorandum Opinion at 6 n.2. Relying on 8 U.S.C. § 1202(f)—which prohibits State from releasing records "pertaining to the issuance or refusal of visas or permits to enter the United States"—the government declined to do so. *See id.* In addition, and as more specifically explained in the *ex parte* and *in camera* portions of an Order entered on August 15, 2024, *see* Order, ECF 45, the Court ordered DHS to produce certain underlying records for the Court's review—which the government provided.[1]

On September 9, 2024, the Court entered and provided to the government, *ex parte* and under seal, an unredacted Memorandum Opinion (and accompanying Order) granting the government's motion for summary judgment and denying Heritage's. *See* ECF 48 at 5 n.1. On September 23, 2024, after considering the government's positions regarding what portions of the Opinion could be issued publicly, the Court issued a redacted version. *See* ECF 48. That redacted

---

[1] Subject to the discussion below, the Court believed (and continues to believe) that the colloquy during the *in camera* hearing, much of the August Order, and of course the underlying records themselves cannot be disclosed to Heritage. Until recently, however, the Court was not aware that the *fact* of the hearing and the *fact* of the August 2024 Order were not disclosed to Heritage because those events are not reflected on the public docket (and were not otherwise communicated to Heritage). Accordingly, contemporaneously with this Order the Court will provide Heritage with a copy of the non-public docket.

version, the Court concluded, "include[d] all of the information that can be made publicly available without disclosing information subject to properly asserted FOIA exemptions." *Id.* at 5, n.1.

**Analysis**

1.  Heritage's first argument is that the Court erred by not reviewing the responsive records *in camera* before reviewing declarations *in camera*. *See* ECF 50 at 4. This argument stems from a doctrine, most recently addressed by the Court of Appeals in *Perioperative Servs. & Logistics, LLC v. United States Dep't of Veterans Affs.*, that it is generally improper for a court to review *in camera* declarations from the government unless the court concludes that the public submissions, together with an *in camera* review of the underlying *records*, are insufficient to decide the case. 57 F.4th 1061, 1065 (D.C. Cir. 2023). This doctrine reflects a general sequence: A Court must premise the need for *in camera* declarations on the *initial* insufficiency of its review of public materials and the relevant records *in camera*.

Given Heritage's contentions here, this argument is curious. After all, as noted above, Heritage argued in its summary judgment brief that the Court should review materials *in camera*, and specifically mentioned the possibility of the Court receiving briefs or conducting a hearing *in camera*, *see* supra ECF 26-1 at 38; stated at the March 2024 hearing that it had "no objection to any *in camera* procedure that Your Honor would like to pursue," ECF 37 at 34; and never raised an objection when the Court ordered the government to provide it with declarations *in camera*, ECF 38. In any event, to the extent the concern is about the Court justifying why it ordered the review of those declarations, the Court expressly finds here what it previewed at the March hearing (and stated above): The declarations were necessary prerequisites to the court understanding the sealed records in the first instance, and the Court properly anticipated this from the dense nature of immigration records generally—without having to physically see the specific records in

question. The Court thus ordered the review of *in camera* declarations based on what it anticipated would be the insufficiency of its review of the underlying records themselves; no case, to the Court's knowledge, holds that a court cannot presume the difficulty of reviewing records without first seeing them.

2.      Heritage's second argument stands on firmer ground. Heritage contends that the Court should have decided "whether portions of those declarations could be made public in redacted form." ECF 56 at 1. The Court agrees. Accordingly, the Court orders the government to provide it, no later than February 20, 2025, its position on whether and to what extent (1) the declarations it provided *in camera*, (2) the transcript of the *in camera* hearing, (4) the Court's August 15 2024 Order, and/or (4) additional parts of the Memorandum Opinion can be redacted and made available to Heritage. Following that submission, the Court will determine what portions of those materials can be produced to Heritage form—and will thereafter determine whether additional briefs are necessary or additional relief is warranted.

DATE: February 13, 2025

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　*/s/ Carl J. Nichols*
　　　　　　　　　　　　　　　　　　　　　　　　　　　　CARL J. NICHOLS
　　　　　　　　　　　　　　　　　　　　　　　　　　　　United States District Judge